No. 2024-1537

# United States Court of Appeals
# for the Federal Circuit

DURA SYSTEMS BARRIERS, INC.,
*Plaintiff-Appellee*

v.

VAN-PACKER CO., JEREMIAS, INC.
*Defendants-Appellants*

Appeal from the United States District Court for the Central District of Illinois in
No. 1:19-cv-01388-SLD-JEH, Judge Sara Darrow.

## DEFENDANTS-APPELLANTS VAN-PACKER CO. AND JEREMIAS, INC.'S OPENING BRIEF

### K&L GATES LLP

George C. Summerfield
Nathan J. Fuller
70 W. Madison Street
Suite 3300
Chicago, IL 60602
(312) 372-1121

Courtney A. Neufeld
925 Fourth Avenue
Suite 2900
Seattle, WA 98104
(206) 623-7580

*Attorneys for Defendants-Appellants*

May 6, 2024

Claim 1 of the '569 Patent:

A modular fire-rated exhaust duct assembly comprising:

two or more exhaust duct modules;

each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of each of said exhaust duct modules being configured for receiving said second exterior flange connector;

said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and

a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction.

Appx125–26.

Claim 10 of the '569 Patent:

> An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:
>
> an inner duct liner formed with a generally rectangular cross-section;
>
> an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;
>
> a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one of said exhaust duct module being configured for receiving said first exterior flange connector;
>
> a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and
>
> said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

Appx126.

Claim 16 of the '569 Patent:

An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving a compressible insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to another end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

Appx126.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**   24-1537

**Short Case Caption**   Dura Systems Barriers, Inc. v. Van-Packer Co.

**Filing Party/Entity**   Van-Packer Co., Jeremias, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/06/2024

Signature:   /s/ George Summerfield

Name:   George Summerfield

iv

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Van-Packer Co. | | |
| Jeremias, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

v

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| James Shimota<br>(K&L Gates LLP) | Katherine Allor<br>(formerly of K&L Gates LLP) | |
| Jacob Michalakes<br>(K&L Gates LLP) | Nelson Hua<br>(formerly of K&L Gates LLP) | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES.................................................................IX

STATEMENT OF JURISDICTION.....................................................................1

STATEMENT OF THE CASE...............................................................................3

    I.   OVERVIEW OF THE '569 PATENT ...............................................3

    II.  THE PROCEEDING BELOW ..........................................................5

SUMMARY OF ARGUMENT ...............................................................................8

ARGUMENT..............................................................................................................9

    I.   LEGAL STANDARD ......................................................................9

    II.  THE DISTRICT COURT'S CONSTRUCTION IMPROPERLY RENDERS
          "THERMAL" SUPERFLUOUS...................................................9

    III. THE DISTRICT COURT'S CONSTRUCTION IS CONTRARY TO THE INTRINSIC
          EVIDENCE ..................................................................................12

        A.   *The Specification* ...........................................................12

        B.   *The Prosecution History* .................................................13

    IV. THE DISTRICT COURT'S ERRONEOUS CONSTRUCTION WAS NOT
          HARMLESS......................................................................................14

    V.   REVERSAL IS THE APPROPRIATE APPELLATE REMEDY .............18

CONCLUSION.........................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baxalta Inc. v. Genentech, Inc.*,
   972 F.3d 1341 (Fed Cir. 2020) ...................................................13, 14

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 801 (Fed. Cir. 2021) ...............................................9, 10, 11

*In re Lemay*,
   660 F. App'x 919 (Fed. Cir. 2016) .............................................19

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................12

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) ................................................12

*SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. Ltd.*,
   59 F.4th 1328 (Fed. Cir. 2023) ................................................11

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) .............................................................9

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ................................................13

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .................................................13

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
   905 F.3d 1341 (Fed. Cir. 2018) .................................................9

*World Class Tech. Corp. v. Ormco Corp.*,
   769 F.3d 1120 (Fed. Cir. 2014) ................................................13

## **STATEMENT OF RELATED CASES**

Pursuant to FCR 28(a)(4) and 47.5(a), there was one other appeal from the same civil action previously before this Court, *Dura Systems Barriers, Inc. v. Van Packer Co.*, Appeal No. 23-1888, which was voluntarily dismissed on June 6, 2023. Pursuant to FCR 47.5(b), there is no other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## **STATEMENT OF JURISDICTION**

Pursuant to Fed. R. App. P. 28(a)(4) and FCR 28(a)(5), the district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction over the appeal from the district court's final judgment under 28 U.S.C. § 1295(a)(1).

## <u>STATEMENT OF THE ISSUE</u>

Whether the Court erred when it construed the claim limitation "thermal spacers thermally isolating" as a single limitation, thereby misconstruing "thermal spacers," and thereby erring in finding the accused products infringe the Patent-in-Suit.

## STATEMENT OF THE CASE

**I.    Overview of the '569 Patent**

U.S. Patent No. 10,024,569 (the "'569 Patent") issued on July 17, 2018, from an application filed on October 10, 2013. The patented subject matter is generally "[a] fire-rated exhaust duct system comprising a modular configuration or structure." Appx111. The '569 Patent has 20 claims, claims 1, 10, and 16 of which are independent.

One component of the claimed system appearing in each of the independent claims is a "thermal spacer," as illustrated in the relevant portion of representative claim 1:

A modular fire-rated exhaust duct assembly comprising:

two or more exhaust duct modules;

each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more ***thermal spacers*** configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more ***thermal spacers*** thermally isolating said inner duct liner from said outer casing;

Appx125, col. 8, lines 47–59 (emphasis added).

Outside of the claims themselves, the term "thermal spacer(s)" appears thirteen times in the '569 Patent. On only one occasion is the term "spacers" not expressly modified by "thermal."

3

> Once the thermal spacers 420 are correctly positioned, ***the spacers*** 420 are secured or connected to the outer casing panels 310 using staples or screws indicated generally by reference 424 in FIG. 5(*c*), or a suitable adhesive, to ensure that the thermal spacers 420 stay in the desired position for supporting the outer casing panels 310 and maintaining the gap or void so that the insulating material 410 is not unnecessarily compressed or crushed.

Appx124–125, col. 6, line 61–col. 7, line 2 (emphasis added).

The antecedent to "the spacers 420" in this passage is clearly "the ***thermal*** spacers 420," appearing just a few words earlier in the same sentence. Thus, the '569 Patent invariably references "***thermal*** spacers" throughout its specification. This emphasis on the thermal nature of the claimed spacers is also reflected in the prosecution history for the '569 Patent.  In arguing for patentability over the prior art, the applicant asserted that such art did not disclose or render obvious the claimed "thermal spacers." Appx422. The Examiner disagreed, stating that the originally claimed spacers "are only there to keep duct components in a spaced relationship without requiring any specific thermal properties." Appx422.

In response to the Examiner's rejection, the applicant amended the subject claims to specify "thermal spacers thermally isolating said inner duct liner from said outer casing." Appx432, Appx434, Appx436. As a result of the claim amendment, the term "thermal spacers" now appears twice in each of the independent claims, emphasizing the thermal nature of such spacers.

## II.     The Proceeding Below

DuraSystems sued Van-Packer for infringement of the '569 Patent.  In the proceedings below, Van-Packer asked the district court to construe separately the "thermally isolating" and "thermal spacers" limitations of the independent claims of the '569 Patent.  Appx555 n.5; Appx560.  Van-Packer proposed construing "thermal spacers" to mean spacers "having a specific thermal isolation property" where a "spacer" is something that maintains the inner duct liner and outer casing in a spaced relationship.  Appx555–56.  Van-Packer separately proposed construing "thermally isolating" to mean "preventing the thermal transfer of heat."  Appx560. In this fashion, the terms "thermal" and "thermally" were both ascribed meaning.

DuraSystems, in contrast, proposed construing the entire phrase "thermal spacers thermally isolating" as a single limitation, as opposed to proposing a discrete construction for "thermal spacers."  *See, e.g.,* Appx1797–98 n.6. DuraSystems proposed construing the entire phrase "thermal spacers thermally isolating" to mean "***components*** that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  Appx1799 (emphasis added).  In other words, DuraSystems' proposed construction did not require that the subject "components" themselves

5

have any thermal characteristics—they need only "maintain a space," *i.e.*, they need only act as spacers.

The district court, largely adopting DuraSystems' position, construed the entirety of the phrase "thermal spacers thermally isolating" to mean "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." *See* Appx33. In reaching its decision, the district court determined that, while the "thermal spacers must themselves thermally isolate," they "need not have a specific thermal property." Appx22; *see also* Appx23. The district court acknowledged that, under its construction, "'[t]hermal spacers,' devoid of any accompanying language (such as 'thermally isolating') therefore only refer to spacers *without* specific thermal properties," *i.e.,* the term "thermal" becomes superfluous. Appx27 (emphasis in original).

Based upon the district court's construction, DuraSystems moved for summary judgment of literal infringement. Appx2163. Van-Packer did not dispute that, under the district court's construction, the accused products satisfy the "thermal spacers thermally isolating" limitation. Appx2169. Nonetheless, when granting DuraSystems' motion, the district court changed its construction to specify that "spacers with perforations or holes maintain a spaced relationship and limit the

amount of heat conducted through the components so that they do not create fail points." Appx69.  The district court granted the parties' joint motion for entry of final judgment, given the parties' dispositions of all remaining claims and counterclaims. Appx95.

## <u>SUMMARY OF ARGUMENT</u>

The district court, despite Van-Packer's urging to the contrary, construed the limitation "thermal spacers thermally isolating" as a whole, rather than construing "thermal spacers" independent of "thermally isolating." In doing so, the district court rendered the first "thermal" term in that phrase superfluous, violating a canon of claim construction disfavoring superfluidity.

Further, the intrinsic evidence, including the claim language itself, the specification, and the prosecution history, all of which emphasize the "thermal" nature of the spacers, is contrary to the district court's construction, which renders that term superfluous.

# **ARGUMENT**

## I.    **Legal Standard**

The district court's claim construction rulings, including its rulings on indefiniteness, are reviewed de novo. *See, e.g., Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). To the extent that those rulings involve findings of subsidiary facts, such findings are reviewed for clear error. *See id.* at 841–42.

When reviewing a lower court's decision to grant summary judgment, this Court applies the law of the regional circuit and, under Seventh Circuit law, the district court's grant of summary judgment is reviewed *de novo*. *See, e.g.*, *Wis. Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1352 (Fed. Cir. 2018) (applying Seventh Circuit law).

## II.    **The District Court's Construction Improperly Renders "Thermal" Superfluous**

It is axiomatic that a construction rendering a claim limitation "void, meaningless, or superfluous" is disfavored. *See, e.g., Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) (*quoting Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2007)). Logically, if a claim construction would not vary either with or without a term from the construed claim limitation, then such construction would render that term superfluous.

All the independent claims of the '569 Patent require, in relevant part, "one or more ***thermal spacers*** thermally isolating said inner duct liner from said outer

9

casing." *See, e.g.,* Appx125, col. 8, lines 58–59 (emphasis added). Separately, such claims require "one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship." *See, e.g.,* Appx125, col. 8, lines 55–57.

Van-Packer proposed that the term "thermal spacers," which appears twice in the subject claims, be construed to mean "'a spacer having a ***specific thermal property***' where a 'spacer' is something that maintains two components in a spaced relationship." Appx555–56 (emphasis added). In contrast, the district court, following DuraSystems' lead, construed the entire phrase "thermal spacers thermally isolating" to mean "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." Appx17. The district court propounded no separate construction for "thermal spacers."

The end result is that the district court's construction applies equally to the actual limitation appearing in the claim – "thermal spacers" – as well as to the more general term "spacers," as such construction employs the generic term "components" without attributing any particular "thermal" property thereto.

In an analogous circumstance, this Court had the opportunity to address the proper construction of the limitation "hardware buffer" in *Intel Corporation v.*

*Qualcomm Inc.*, 21 F.4th 801 (Fed. Cir. 2021). *See also SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. Ltd.*, 59 F.4th 1328, 1335 (Fed. Cir. 2023) ("measured volume" must mean something more than "volume"). As the *Intel* decision noted, "because every buffer in our (physical) world is ultimately implemented on a physical device (*i.e.*, hardware), a 'hardware buffer' must mean something more than just a 'buffer implemented in hardware,' as Intel urges, or else the word 'hardware' would be erased from the claims." *Id.* at 809. The Court continued: "the striking fact that Qualcomm, in its claim language, did not just say 'buffer,' but instead said 'hardware buffer,' provides a strong reason to avoid the disfavored result of rendering the word 'hardware' superfluous." *Id.* at 810. By analogy, "spacers" in their general sense maintain a space between things, so defining the term "thermal spacers" simply as "components that maintain a space between the inner duct liner and outer casing" improperly erases the term "thermal" from the claims. *See id.*

Separate from the entire phrase construed by the district court, the independent claims of the '569 Patent also require "***thermal*** spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship," *i.e.,* without the "thermally isolating" modifier. *See, e.g.,* Appx125, col. 8, lines 55–57 (emphasis added). The district court did not construe the term "thermal spacers" as it appears in this portion of the claims. However, if it had, consistent with its construction of

"thermal spacers thermally isolating," the construction of this limitation would be "components that maintain a space between the inner duct liner and outer casing," with no reference to heat at all. As limitations are to be construed consistently with other claim limitations, this separate limitation highlights the manner in which the district court's construction renders the term "thermal" superfluous. *See, e.g., Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1409 (Fed. Cir. 2004).

DuraSystems will likely point to the portion of the district court's construction of "thermal spacers thermally isolating" that requires that the components "limit the amount of heat conducted through the components." While this portion of the construction relates to the "thermally isolating" term, there is nothing in that construction that accounts for the separate "thermal" term modifying "spacers," so such portion of the construction is unavailing, and the district court's construction is indeed erroneous.

## III. The District Court's Construction is Contrary to the Intrinsic Evidence

### A. The Specification

The specification is often "the single best guide to the meaning of a disputed term." *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). As noted above, with one exception, the specification of the '569 Patent specifies that the spacers described therein are "thermal." And, as to that one exception, the antecedent is "***thermal*** spacers." *See* Appx124–25, col. 6, line 61–col. 7, line 2

(emphasis added). This repeated and consistent use of the term "thermal spacers" limits the term to something more specific than components performing a generic spacing function. *See, e.g., Virnetx, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1318 (Fed. Cir. 2014). Thus, merely substituting "components" for "thermal spacers," as the district court has done in its claim construction, does not comport with the consistent use of that latter term throughout the specification.

### B.    The Prosecution History

A patent's prosecution history, if in evidence, forms part of the intrinsic evidence available for claim construction. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted). Further, through prosecution disclaimer, a patentee can, by acting with sufficient clarity, prescribe a special definition to a claim limitation. *See, e.g., World Class Tech. Corp. v. Ormco Corp*., 769 F.3d 1120, 1123 (Fed. Cir. 2014). Disclaimer or disavowal of claim scope "must be both clear and unmistakable." *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1348 (Fed Cir. 2020) (quoting *3M Innovative Props. Co. v. Tredegar Corp*., 725 F.3d 1315, 1325 (Fed. Cir. 2013)).

As noted above, during prosecution, the Examiner rejected the claims of the application that matured into the '569 Patent, determining that the prior art taught the originally claimed spacers, which "are only there to keep duct components in a

spaced relationship ***without requiring any specific thermal properties***." Appx422 (emphasis added).

In response to the Examiner's rejection, the applicant amended the subject claims to specify "thermal spacers thermally isolating said inner duct liner from said outer casing." Appx432, Appx434, Appx436 (emphasis added).  In support of this amendment, the applicant stated, "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties.'" Appx438.  As is clear from this exchange from the prosecution history, the applicant emphasized the thermal nature of the claimed spacers. In doing so, it clearly and unmistakably disavowed generic components with no thermal properties. *See Baxalta*, 972 F.3d at 1348.

The district court, in construing the limitation "thermal spacers thermally isolating" as including generic "components," improperly allowed DuraSystems to reclaim that scope. Again, the district court's construction was contrary to the intrinsic evidence, and therefore erroneous.

## IV.    The District Court's Erroneous Construction Was Not Harmless

Separately, and problematic for either of the competing claim constructions of "thermal spacers" at issue, the district court erroneously found that holes or voids defined by the accused spacers are part of such spacers themselves. *See* Appx69. As it is indisputably the holes that limit heat conductivity, as opposed to the spacers,

improperly including the holes as part of the accused spacers falsely imputes a thermal characteristic to such spacers. When the holes are properly excluded from the accused spacers: 1) under Van-Packer's construction thereof, the putative "*thermal* spacers" are left without a thermal characteristic, *i.e.,* they are simply spacers; and 2) under the construction of "thermal spacers thermally isolating" adopted by the district court, it is the holes, rather than the spacers, "that limit the amount of heat conducted through the components."

In finding that the accused spacers satisfied the "thermal spacer thermally isolating," the district court acknowledged that there were "perforations or holes" in such spacers, which Van-Packer properly referred to as "voids." *See* Appx69. Notably, DuraSystems' technical expert, Dr. Crimi, refers to "ceramic fiber insulation [that] occupies the *void*." Appx2241 (emphasis added). As can be seen the following annotated depiction of the accused spacers from the report of DuraSystems' technical expert, Dr. Crimi, "voids" (filled with ceramic fiber insulation) occupy a substantial portion of the area defined by the spacers' silhouette, *i.e.,* they are more than "perforations":



Appx2241.

Notably, Dr. Crimi, in colorizing the accused spacers in green, excluded the voids containing the fiber insulation. *See id.* Therefore, Dr. Crimi disagreed with the district court's conclusion that the voids (or the "perforations," to use the district court's parlance) are "in the spacer." *Id.* And the district court, for its part, cites to nothing in the record to support that the subject voids are part of a spacer. *See* Appx69.

Rather, the district court distinguished the voids defined by the accused spacers from the claimed "void . . . between at least at least a portion of space between said inner duct liner and said outer casing." *See id.* However, the district court's distinction misses the mark. The claimed "voids" are depicted as elements 402 in Figure 4 of the '569 Patent that is "filled with an insulating material":



Appx124, col. 5, lines 33–38.

That the void described with reference to elements 402 in Figure 4 of the '569 Patent is situated differently than the voids defined by the accused spacers is not the point. The inventors knew to use the term "void" to distinguish from "spacers." Further, the claimed void is situated between an "inner duct liner" and an "outer casing," and is "configured for receiving an insulation material." *See, e.g.,* Appx125, col. 8, lines 51–54. The spacers are "configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material ***occupies said void***." *Id.*, lines 55–58 (emphasis added). This claimed configuration is also depicted in Figure 4, with insulation material 410 (yellow) occupying voids 402 defined by the inner metallic liner 210 (red), the outer casing panels 310a and 310c (blue), and spacers 422 (green) therebetween:



Appx124, col. 6, lines 48–53.

In short, the holes or voids defined by the accused spacers are not properly considered part of the spacers themselves. As such, voids, as opposed to spacers, are solely responsible for any thermal isolation in Van-Packer's accused duct assembly, such assembly lacks the claimed "thermal spacers," irrespective of how that term is construed.

## V.    Reversal is the Appropriate Appellate Remedy

The parties filed cross-motions for summary judgment with DuraSystems seeking summary judgment of infringement and Van-Packer seeking summary judgement of non-infringement. Appx2160–76, Appx2777–804. DuraSystems presented no evidence of infringement under Van-Packer's construction of "thermal spacers," which requires, *inter alia,* that a spacer have "a specific thermal property." Appx555–56. The only evidence presented below was that by Van-Packer, proving

that the products accused of infringement did not contain spacers with thermal properties. Appx4091–93. As such, reversal, rather than remand, is the appropriate manner of disposing of this Appeal. *See, e.g., In re Lemay*, 660 F. App'x 919, 922 (Fed. Cir. 2016) (an absence of evidence to consider on remand warrants reversal).

## <u>CONCLUSION</u>

As the district court erred in its construction of the claim terms "thermal spacer" and "thermally isolating," Appellants respectfully request that this Court reverse the district court's grant of summary judgment and remand to the district court.

Dated: May 6, 2024

Respectfully submitted,

By:   /s/ George C. Summerfield
George C. Summerfield
Nathan J. Fuller
K&L Gates LLP
70 W. Madison Street
Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000

Courtney A. Neufeld
K&L Gates LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104
Tel.: (206) 623-7580

*Attorneys for Defendants-Appellants*

# ADDENDUM

## INDEX TO ADDENDUM

| Date | Description | Appendix Nos. |
|---|---|---|
| 9/3/2021 | Claim Construction Order (Dist. Ct. Dkt. No. 45) | Appx1-60 |
| 3/31/2023 | Order Granting Summary Judgment of Infringement (Dist. Ct. Dkt. No. 85) | Appx61-94 |
| 1/19/2024 | Final Judgment (Dist. Ct. Dkt. No. 95) | Appx95 |
| - | U.S. Patent No. 10,024,569 | Appx111-127 |

E-FILED
Friday, 03 September, 2021  02:44:04 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Consolidated Case No. 1:19-cv-01388-SLD-JEH |
| VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Plaintiff DuraSystems Barriers Inc. ("DuraSystems") accuses Defendants Van-Packer Co. ("Van-Packer") and Jeremias, Inc. ("Jeremias" and together with Van-Packer, "Defendants") of infringing U.S. Patent No. 10,024,569 (the "'569 Patent"). Now before the Court are the parties' respective claim construction briefs, ECF Nos. 31, 36, 41, as well as their respective motions for leave to file under seal various materials in support thereof, ECF Nos. 33, 37. For the reasons that follow, the Court DEFERS consideration of the claim terms Defendants assert are indefinite, ADOPTS the constructions identified below, and DENIES the motions for leave to file under seal.

## BACKGROUND

### I.    Procedural History

On December 3, 2019, DuraSystems filed its original complaint, which alleged two claims for patent infringement against Van-Packer, one with regard to the '569 Patent and another to a patent no longer at issue. *See generally* Compl., ECF No. 1. The day before, DuraSystems brought a materially identical lawsuit against Jeremias in the United States District

Court for the Northern District of Georgia. *See* Compl., 4:20-cv-04069-SLD-JEH, ECF No. 1.

On March 25, 2020, that action was transferred to this Court, *see* Order Transferring Case, 4:20-cv-04069-SLD-JEH, ECF No. 8, and on April 16, 2020, it was consolidated with this case, s*ee* Apr. 16, 2020 Text Order. The Clerk then filed DuraSystems's amended complaint, ECF No. 17, which names both Van-Packer and Jeremias. *See* Apr. 16, 2020 Text Order (directing the Clerk to file DuraSystems's proposed amended complaint, which was attached to the parties' motion to consolidate, ECF No. 16). Defendants' amended answer was filed on November 2, 2020, ECF No. 30. The Court issued a scheduling order on April 13, 2020. *See* Apr. 13, 2020 Text Order; Disc. Plan, ECF No. 14.[1] Fact discovery closed on December 11, 2020, and expert discovery (which shall include the exchange of expert reports and expert depositions) has not yet occurred. *See* Apr. 13, 2020 Text Order; Disc. Plan 2–3.

Defendants filed their opening claim construction brief, ECF No. 31, and motion to seal, ECF No. 33, on December 23, 2020, as well as the parties' joint appendix, ECF No. 32. DuraSystems filed its answering brief, ECF No. 36, and motion to seal, ECF No. 37, on February 5, 2021, and Defendants filed their reply brief, ECF No. 41, on March 3, 2021. DuraSystems filed the parties' status report and joint claim construction chart, ECF No. 42, on March 10, 2021. The Court conducted a *Markman* hearing on June 21, 2021. *See* June 21, 2021 Min. Entry.

---

[1] The parties' discovery plan, which the Court adopted in the April 13, 2020 scheduling order, *see* Apr. 13, 2020 Text Order, heavily cites the Local Patent Rules for the United States District Court for the Northern District of Illinois. This Court has not issued any local rules specific to patent cases and acknowledges its sister court's rules provide helpful guideposts in this action. But they are not controlling: All deadlines in this case, whether they were set in the discovery plan or have yet to be set, are subject to the Court's discretion.

Appx2

## II.     The '569 Patent

Flammable or hazardous gases, vapors, or particles are generated in commercial and industrial buildings and must be captured and transported to a place where they can be discharged.  U.S. Patent No. 10,024,569 col. 1 ll. 13–17 (filed Oct. 10, 2013), J.A. 0012, ECF No. 32-1.  Ventilation ducts are typically routed throughout these buildings; however, when such ducts must transport flammable or hazardous materials, they must be fire-rated—"capable of minimizing the transfer of heat through or across the duct walls."  *Id.* col. 1 ll. 20–36, J.A. 0012.

The utility of fire-rated ducts can be illustrated by the role they play in commercial kitchens.  In a commercial kitchen, exhaust ducts are configured to capture grease-laden air over deep fryers and grills.  *Id.* col. 1 ll. 40–41, J.A. 0012.  Such air "is extremely flammable, and must be transported through the building to an exterior area where it can be safely discharged." *See id.* col. 1 ll. 42–44, J.A. 0012.  In fact, it is so flammable, a minor kitchen fire "could enter the exhaust duct and quickly spread throughout the duct system."  *Id.* col. 1 ll. 44–47, J.A. 0012. Therefore, any potential duct fire "must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building."  *Id.* col. 1 ll. 47–50, J.A. 0012.

Fire-rated exhaust duct systems are usually fabricated in sections, which are shipped to an installation location and welded together to form conduit sections.  *Id.* col. 1 ll. 61–65, J.A. 0012. These systems "typically require the installation of an additional gypsum fire-rated enclosure . . . around the duct."  *Id.* col. 2 ll. 1–4, J.A. 0012.  This "add[ed] step" represented a "known shortcoming[] in the art," *see id.* col. 2 ll. 5–8, J.A. 0012, which was overcome by chimney manufacturers who "introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems, *see id.* col. 2 ll. 7–10, J.A. 0012.  But their "characteristic

3

**Appx3**

round profile significantly limits the volume of air that can be vertically carried in conventional building footprints" and "is often too large to fit into conventional ceiling . . . spaces or dimensions." *Id.* col. 2 ll. 12–16, J.A. 0012.

Enter the '569 Patent, a general illustration of an embodiment of which can be found below.



*Id.* fig. 1, J.A. 0003.[2]  It concerns a "fire-rated modular duct assembly, and improvements therein, suitable for exhausting flammable or hazardous gases, vapour, and the like," *id.* col. 1 ll. 7–9, J.A. 0012, and "suitable for pre-fabrication and configured for assembly in the field," *id.* col. 2 ll. 24–25, J.A. 0012.  According to an embodiment, this duct assembly comprises "individual duct sections which are factory fabricated and then mechanically assembled on site," *id.* col. 8 ll. 16–17, J.A. 0015, and the individual sections "are connected together to form longer sections and runs to create a fire-rated exhaust duct system in a building or other type of facility for exhausting or moving flammable or hazardous gases, vapours and materials from an

---

[2] Reference 100 points to a "fire-rated modular exhaust duct"; references 110(a) and (b) point to "exhaust duct sections or modules"; and reference 120 points to a "mechanical joint" that "connect[s] or couple[s] together" "individual exhaust sections."  '569 Patent col. 3 l. 67–col. 4 l. 7, J.A. 0013.

originating source, e.g. an exhaust hood . . . to a location where the flammable or hazardous gases, vapours or materials can be safely discharged," *see id.* col. 8 ll. 22–28, J.A. 0015.

Specifically, and according to an embodiment, the '569 Patent describes a modular, fire-rated duct assembly comprising "two or more exhaust duct modules," each of which having an inner duct liner, an outer casing, and a void between them. *Id.* col. 2 ll. 26–31, J.A. 0012. This void includes "one or more thermal spacers" configured to maintain the liner and the casing "in a spaced relationship so that . . . insulation material" occupies it. *Id.* col. 2 ll. 31–35, J.A. 0012. Flange connectors are attached to the modules and "configured to form a field assembly junction for coupling respective ends of . . . [the] modules to form a single exhaust duct run." *Id.* col. 2 ll. 36–44, J.A. 0012. Field assembly junctions are in turn encased by joint encasement sections, which are field connectable to each of the modules. *Id.* col. 2 ll. 44–46, J.A. 0012. According to another embodiment, the inner duct liner is "formed with a generally rectangular cross-section," and the outer casing is "formed with a generally rectangular cross-section . . . sized to substantially surround" the inner duct liner. *Id.* col. 2 ll. 50–54, J.A. 0012.

## DISCUSSION

### I.    Claim Construction

#### A.    Legal Standard

"The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation marks omitted). Indeed, this process "serves to define the scope of the patented invention and the patentee's right to exclude." *See HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017). But a court need only construe claim language that is disputed. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803

(Fed. Cir. 1999). "Claim construction is ultimately an issue of law . . . ." *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (citation omitted).

"[T]here is no magic formula or catechism" when it comes to claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc). But the Federal Circuit has nevertheless articulated general principles that guide courts, including the cardinal principle "the words of a claim are generally given their ordinary and customary meaning." *Id.* at 1312 (quotation marks and citations omitted). Perhaps more importantly, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [a "POSITA"] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313 (citations omitted). In addition, a POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.*

Sometimes, the ordinary meaning of a claim as understood by a POSITA may be immediately apparent to lay judges, and claim construction involves nothing more than applying the generally accepted meaning of commonly understood words. *Id.* at 1314. But courts are usually not so lucky. When the meaning of a claim term is not readily apparent, courts look to "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean." *Id.* (quotation marks omitted). These sources are "the words of the claims themselves, . . . the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quotation marks and citations omitted).

Obviously, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* Also instructive are the context in which a claim term is used in the

6

**Appx6**

asserted claim and other claims in the patent, both asserted and unasserted. *Id.* (citation omitted). Indeed, since claim terms are normally used consistently throughout a patent, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Differences among claims can be useful as well. *Id.*

As part of a "fully integrated written instrument," though, claims "must be read in view of the specification." *Id.* at 1315 (quotation marks omitted). The specification is not only relevant, it is often dispositive: "[T]he specification is the single best guide to the meaning of a disputed term." *Network-1 Techs., Inc v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022 (Fed. Cir. 2020) (quoting *Phillips*, 415 F.3d at 1315). For example, while courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification," *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (citation omitted), "limitations from the specification are not to be read into the claims," *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (citation omitted). Ultimately, "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips*, 415 F.3d at 1323 (citation omitted).

If it is in evidence, a court should consider a patent's prosecution history, which consists of the record of the proceedings before the United States Patent and Trademark Office (the "PTO") and includes the prior art cited during a patent's examination.[3] *Id.* at 1317 (citations omitted). The prosecution history and the specification are similar in that they both show how the PTO and the inventor understood the patent and were both created by the inventor in trying to explain and obtain it. *Id.* However, the prosecution history usually "lacks the clarity of the

---

[3] The parties jointly submitted the '569 Patent's prosecution history into the record. *See generally* J.A. 0018–0426, ECF Nos. 32-2–32-3.

specification" because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Id.* (citation omitted). Overall, while the prosecution history is useful because it can show how an inventor understood the invention, it is not as prominent as the claims and the specification in the claim construction analysis. *See id.* (citations omitted).

"In some cases . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) (citation omitted). Such evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."[4] *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1317). For example, expert testimony can "provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA], [and] . . . establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318 (citations omitted). But "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court," and a court "should discount any expert testimony that is clearly at odds with" the intrinsic evidence. *Id.* (quotation marks omitted). In sum, while extrinsic evidence "can help educate the court regarding the field of the invention and can help the court determine what a [POSITA] would understand claim terms to mean," *id.* at 1319, it is "less

---

[4] Both parties rely on extrinsic evidence. For example, both DuraSystems and Defendants rely on expert testimony. *See* Decl. of Tony Crimi ("Crimi Decl."), Pl.'s Br. Ex. AA, ECF No. 36-1 (testifying for DuraSystems); Decl. of Barry M. Cheek, Opening Br. Ex. B, ECF No. 31-3 (testifying for Defendants).

reliable" than intrinsic evidence, *id.* at 1318, and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," *id.* at 1319.

### B.    Analysis

At issue are the following nine claim terms: (1) "fire rated," (2) "specified fire rating," (3) "compressible insulation material," (4) "thermal spacers," (5) "thermally isolating," (6) "thermal spacers thermally isolating," (7) "exhaust duct module," (8) "joint encasement section," and (9) "joined directly."  Joint Claim Construction Chart.  Defendants argue the first three claim terms are indefinite and do not propose constructions thereof; DuraSystems disagrees and provides accompanying constructions.  *See id.* at 2.  Constructions of the other six claim terms have been presented.  *Id.* at 2–3.

### 1.    The Allegedly Indefinite Claim Terms

Defendants argue the terms "fire rated," "specified fire rating," and "compressible insulation material" are indefinite.  *Id.* at 2.  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The doctrine of indefiniteness derives from 35 U.S.C. § 112, under which a patent's claims, "evaluated from the perspective of someone skilled in the relevant art" "at the time the patent was filed" "in light of the patent's specification and prosecution history," must "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* at 908, 910 (emphasis omitted) (citations omitted); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("It has long been understood that a patent must describe the exact scope of an invention and its

manufacture . . . .").  This definiteness requirement "mandates clarity, while recognizing that absolute precision is unattainable."  *Nautilus*, 572 U.S. at 910.

But what is not clear is whether the Court should address Defendants' indefiniteness arguments now, at the claim construction stage, or later, at the summary judgment stage.  The Federal Circuit has not determined whether indefiniteness determinations should be made during claim construction.  But while it has "acknowledged that an indefiniteness analysis . . . is inextricably intertwined with claim construction" and "training questions of indefiniteness on individual claim terms is a helpful tool," the key question regarding indefiniteness is "whether the *claims*, not particular *claim terms*," meet the *Nautilus* indefiniteness standard.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1231–32 (Fed. Cir. 2016) (emphases added) (quotation marks and citations omitted).  Moreover, "the Federal Circuit's statements that indefiniteness is intertwined with claim construction mean only that the [c]ourt must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness, and not that the [c]ourt must determine indefiniteness during the claim construction proceedings."  *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190-EDL, 2002 WL 1892200, at *15 (N.D. Cal. Aug. 15, 2002), *amended,* 2003 WL 21033555 (N.D. Cal. Jan. 10, 2003), *aff'd*, 401 F.3d 1340 (Fed. Cir. 2005).  And it "ha[s] certainly not endorsed a regime in which validity analysis is a regular component of claim construction."  *Phillips*, 415 F.3d at 1327.

Many lower courts have not endorsed such a regime either; in fact, "district courts frequently decline to rule on indefiniteness at the *Markman* stage," *0912139 B.C. Ltd. v. Rampion USA Inc.*, CASE NO. C18-1464JLR, 2019 WL 3426058, at *16 (W.D. Wash. July 30, 2019) (collecting cases), and numerous courts have "opine[d] that rulings on indefiniteness are

10

**Appx10**

inappropriate at claim construction," *Kaneka Corp. v. JBS Hair, Inc.*, No. 3:10-cv-01430-P, 2012 WL 5364699, at \*5 (N.D. Tex. Oct. 31, 2012) (collecting cases).

But should this Court join them, it would face another issue: how to proceed here given Defendants have not proposed alternative constructions for the claim terms they assert are indefinite. The Federal Circuit has not prescribed a solution, although some district courts have tried. *See infra* Section I.B.1.b.

For the following reasons, the Court defers (a) considering Defendants' indefiniteness contentions and (b) construing the claim terms attacked as indefinite—"fire rated," "specified fire rating," and "compressible insulation material"—until the summary judgment stage.

a.     Indefiniteness Shall Be Addressed at the Summary Judgment Stage

The Court defers consideration of Defendants' indefiniteness assertions given the "[s]everal well-settled principles . . . [that] tend to discourage rulings on indefiniteness at the *Markman* stage." *See CSB-Sys. Int'l Inc. v. SAP Am., Inc.*, Civil Action No. 10-2156, 2011 WL 3240838, at \*17 (E.D. Pa. July 28, 2011). First, while indefiniteness is a question of law to which "[g]eneral principles of claim construction apply," *see HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019) (citation omitted), indefiniteness is an "invalidity defense[] [that must] be proven by clear and convincing evidence," *see Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1009 (E.D. Wis. 2017) (citing *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017)) (other citation omitted); *see also Am. GNC Corp. v. LG Elecs., Inc.*, Case No. 17-cv-01090-BAS-BLM, 2018 WL 400346, at \*10 (S.D. Cal. Jan. 12, 2018) (finding this "demanding evidentiary requirement counsels that consideration of indefiniteness challenges would be best addressed separately from the claim construction hearing" (citation omitted)); *cf. Uretek Holdings, Inc. v. YD W. Coast Homes, Inc.*, Case No:

11

**Appx11**

8:15-cv-472-T-36JSS, 2016 WL 3021880, at *3 (M.D. Fla. May 26, 2016) ("[T]he burden of proof is higher for establishing indefiniteness than it is for establishing a term's construction.").[5] Second, and more importantly, while claim construction proceedings give meaning to claim terms, "indefiniteness invalidates the claims entirely." *See 3-D Matrix, Inc. v. Menicon Co.*, Civil Action No. 14-cv-10205-IT, 2016 WL 111410, at *13 (D. Mass. Jan. 11, 2016) (citation omitted); *see also Nautilus*, 572 U.S. at 901 ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

Citing these principles, "district courts throughout the country have generally been reluctant to consider whether a patent is indefinite at the claim construction phase, rather than at the summary judgment phase." *See Junker v. Med. Components, Inc.*, CIVIL ACTION No. 13-4606, 2017 WL 4922291, at *2 (E.D. Pa. Oct. 31, 2017) (collecting cases); *Gilead Scis., Inc. v. Mylan Inc.*, Civil Action No. 1:14CV99, 2015 WL 1534067, at *2 (N.D. W. Va. Apr. 6, 2015) (noting "many judges have elected to wait and tackle indefiniteness at the summary judgment stage" due to "the high burden of proof on the party challenging a patent claim for indefiniteness," "the fact that a claim is not indefinite merely because the parties dispute its meaning," and "the dispositive effect of a ruling on indefiniteness" (collecting cases)); *see also 2-Way Computing, Inc. v. Nextel Fin. Co.*, No. 2:11-cv-00012-JCM-PAL, 2012 WL 4846145, at *20 (D. Nev. Oct. 9, 2012) (noting "it is more appropriate to defer these [indefiniteness] arguments until summary judgment because they are potentially dispositive and would invalidate

---

[5] Though, this evidentiary standard only applies to factual issues underlying indefiniteness disputes, not legal ones. *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (citation omitted); *cf. Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 114 (2011) (Breyer, J., concurring) (emphasizing that when evaluating patent invalidity claims, "the evidentiary standard of proof applies to questions of fact and not to questions of law," explaining "[m]any claims of invalidity rest, however, not upon factual disputes, but upon how the law applies to facts as given" and that "[w]here the ultimate question of patent validity turns on the correct answer to legal questions," the clear and convincing standard "has no application").

the patent, and because of the burden of proof required to show indefiniteness"), *amended on reconsideration on other grounds sub nom. 2-Way Computing, Inc. v. Sprint Nextel Corp.*, No. 2:11-CV-12 JCM (PAL), 2013 WL 2218010 (D. Nev. May 17, 2013).

      The Court is similarly reluctant and finds Defendants' indefiniteness arguments should be decided on a motion for summary judgment.  Indefiniteness decisions here could be dispositive.  For example, since the term "fire rated" is included in every independent claim in the '569 Patent, *see, e.g.*, '569 Patent col. 8 l. 47, J.A. 0015, indefiniteness rulings could invalidate the entire patent.  Indeed, as Defendants noted at the *Markman* hearing, "the entire case sort of rests on this term."  *See Markman* Hr'g Tr. 25:2–3, ECF No. 44.  Given these raised stakes (along with the raised burden on indefiniteness), the Court sees little harm in waiting until it has a fuller picture of this case to make them.  This means waiting until the parties have produced a complete discovery record at the summary judgment stage.

      At the *Markman* hearing, Defendants argued their indefiniteness contentions should be decided now because both parties have submitted declarations from experts in support of their claim construction briefs and those experts have been deposed.  *Id.* at 24:22–23, 27:3–11.  Nevertheless, as DuraSystems noted, full expert discovery has not yet taken place.  *See id.* at 26:18–24 ("[E]xpert discovery, I think, would be very relevant as to the date of that claim because experts will give additional insight into the understanding of a person of ordinary skill in the art, and how a person of ordinary skill in the art would be applying that term to the prior art, the accused products and so forth."); *see also* Apr. 13, 2020 Text Order; Disc. Plan 2–3.  Moreover, Defendants heavily rely on extrinsic evidence in making their indefiniteness assertions, *see generally* Opening Br. 8–10, 12–13 (relying on the testimony of its expert witness), and "where extrinsic evidence of the perspective of someone skilled in the art is

relevant to the indefiniteness inquiry, it is appropriate to defer the indefiniteness determination until after the close of discovery." *Lifescan Scot., Ltd. v. Shasta Techs., LLC*, Case No. 11-cv-04494-WHO, 2014 WL 11206411, at *3 (N.D. Cal. Nov. 10, 2014) (citations omitted). Ultimately, "it would be more appropriate and logical to defer the full consideration of any potential indefiniteness challenge to the summary judgment stage, after all fact and expert discovery has been completed." *Uretek Holdings*, 2016 WL 3021880, at *3.

### b.   These Claim Terms Shall Be Construed at the Summary Judgment Stage

Deferring indefiniteness until summary judgment creates another issue: how to move forward when Defendants have not proposed alternative constructions for "fire rated," "specified fire rating," and "compressible insulation material." District courts have encountered this situation before and dealt with it in various ways. For example, one court, citing a lack of alternative constructions, rejected an indefiniteness argument without prejudice to it being raised again at a later stage. *Kaneka*, 2012 WL 5364699, at *5. Another court simply chose to ignore indefiniteness at the claim construction stage. *See Steuben Foods, Inc. v. Oystar Grp.*, 1:10-CV-00780-EAW-JJM, 1:10-cv-00781-EAW-JJM, 1:12-cv-00904-EAW-JJM, 1:13-cv-00892-EAW-JJM, 1:13-cv-01118-EAW-JJM, 2017 WL 3842136, at *3 (W.D.N.Y. June 6, 2017) (electing to "defer consideration of [a party's] indefiniteness argument . . . until after claim construction").

Another court made preliminary indefiniteness rulings. In *Britax Child Safety, Inc. v. Nuna International B.V.*, No. 17-cv-2724, 2019 WL 7161687 (E.D. Pa. Dec. 23, 2019), the district court identified a "conundrum": the defendants "rais[ed] an indefiniteness argument as to multiple claim terms," their argument was "premature at such an early stage of the litigation," and they did not "either (a) offer[] an alternative proposed construction for such terms or (b) mov[e] for summary judgment on invalidity grounds," *id.* at *15 (quotation marks omitted). After observing it "must first attempt to determine what a claim means before it can determine

14

**Appx14**

whether the claim is invalid for indefiniteness, *id.* (quotation marks omitted), the district court identified a solution: "engag[ing] in claim construction analysis with respect to the terms [the defendants] allege[] are indefinite, while making only preliminary findings as to indefiniteness in light of the intrinsic record" "without prejudice to [the defendants'] ability to reassert [their] indefiniteness arguments at the close of discovery by way of a motion for summary judgment, *see id.* (citations and footnotes omitted). *See also, e.g.*, *Cap. Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-cv-1516-WSD, 2016 WL 3517595, at *4 (N.D. Ga. June 28, 2016) (embracing this approach); *Uretek Holdings*, 2016 WL 3021880, at *3 (adopting this approach).

The Court prefers to defer construction of the pertinent claim terms to summary judgment so indefiniteness and claim construction can be assessed together on a full discovery record. Indeed, these two analyses should be considered together, as despite the aforementioned material differences between them, "[i]ndefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). An indefiniteness analysis "involves consideration of primarily the intrinsic evidence," *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377–78 (Fed. Cir. 2015), and "[a]s in claim construction, in making an indefiniteness determination, the district court may make 'any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art . . . .'" *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 388 F. Supp. 3d 362, 364 (D. Del. 2019) (quoting *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017)), *aff'd*, 854 F. App'x 379 (Fed. Cir. 2021). With regard to "fire rated," "specified fire rating," and "compressible insulation material," claim construction and indefiniteness should be considered together, and since

15

**Appx15**

indefiniteness is deferred until the summary judgment stage, it follows claim construction should occur then as well.[6]

*   *   *

Should either party file a motion for summary judgment, the parties shall, in light of any new evidence produced via expert discovery, address the constructions of the terms "fire rated," "specified fire rating," and "compressible insulation material."  Defendants can then reassert their indefiniteness arguments.  On a motion for summary judgment, these claims shall be construed before any indefiniteness arguments are considered.  *See ASM Am.*, 2002 WL 1892200, at *15.

In the meantime, the remaining claim terms—"thermal spacers," "thermally isolating," "thermal spacers thermally isolating," "exhaust duct module," "joint encasement section," and "joined directly"—are addressed below.

### 2.      The Remaining Claim Terms

As an initial matter, it is necessary to identify those to whom the below claim terms are addressed: POSITAs.  *See Nautilus*, 572 U.S. at 909 (noting "patents are not addressed to lawyers, or even to the public generally, but rather to those skilled in the relevant art" (quotation

---

[6] Indeed, the preliminary indefiniteness approach employed by the *Britax Child Safety* court is not optimal.  For one thing, tentative decisions on issues as potentially dispositive as indefiniteness without the benefit of a complete discovery record could greatly elongate discovery proceedings and put certain parties in an unfounded position of strength in settlement negotiations.  Another problem with this approach is it assumes should indefiniteness be deferred until summary judgment, construction of ostensibly indefinite claim terms must occur beforehand.  But "claim construction can occur at virtually any point in the case: prior to discovery, pursuant to motions for summary judgment, or following the close of evidence at trial."  *CellCast Techs., LLC v. United States*, 152 Fed. Cl. 414, 432 n.5 (Fed. Cl. 2021) (quotation marks omitted); *cf. Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("District courts have wide latitude in how they conduct the proceedings before them, and there is nothing unique about claim construction that requires the court to proceed according to any particular protocol.  As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.").  While there are good reasons why claim construction should generally occur before the summary judgment phase, *see* Edward Brunet, Markman *Hearings, Summary Judgment, and Judicial Discretion*, 9 Lewis & Clark L. Rev. 93, 97 (2005) ("Cost-cutter sorts recommended a Markman hearing well in advance of trial and before expensive complex case discovery."), this does not mean some (or even all) disputed claim terms must be construed before then.

16

marks omitted)).  The parties agree a POSITA "would have a technical certification as a sheet metal worker or sheet metal mechanic, which is typically a five-year certification, or with equivalent work experience in the field of fire-rated duct systems."  *See* Opening Br. 5–6 (citations omitted).  Further, he or she "may also have a bachelor's degree in mechanical engineering or [a] related field, and . . . experience could replace formal training, such that a person with five or more years of experience working in the exhaust duct field would have appropriate training to be a POS[IT]A."  *Id.* at 6 (citations omitted).

a.   "thermal spacers" / "thermally isolating" / "thermal spaces thermally isolating"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "thermal spacers" | "thermal spacers thermally isolating" addressed below | "a spacer having a specific thermal isolation property" where a spacer is something that maintains two components in a spaced relationship | "thermal spacers thermally isolating" addressed below |
| "thermally isolating" | "thermal spacers thermally isolating" addressed below | "preventing the thermal transfer of heat" | "thermal spacers thermally isolating" addressed below |
| "thermal spacers thermally isolating" | "components that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or | "thermal spacers" and "thermally isolating" addressed separately above | "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" |

17

| | outer casing during fire rating testing" | | |
|---|---|---|---|
| | | | |

The terms "thermal spacers" and "thermally isolating" are present in claims 1, 10, and 16 (the "Independent Claims") of the '569 Patent and appear similarly in each claim.  Claim 1 provides a representative example; it claims:

> two or more exhaust duct modules; each of [which] having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing.

'569 Patent col. 8 ll. 49–59, J.A. 0015 (describing the first embodiment); *see also id.* col. 9 ll. 50–62, J.A. 0016 (describing the second embodiment); col. 10 ll. 30–43, J.A. 0016 (describing the third embodiment).  A figure depicting a thermal spacer configuration according to an embodiment is included below.  *See id.* col. 3 ll. 43–44, J.A. 0013.



SECTION A-A
FIG. 5b

18

*Id.* fig. 5(b), JA0007.[7]  As both parties heavily rely upon the prosecution history concerning

these claim terms, that should be examined as well.

The claim language regarding thermal spacers in the original draft of the '569 Patent was

notably different from the language ultimately approved by the PTO, as it did not include the

term "thermally isolating."  It reads:

> two or more exhaust duct modules; each of said exhaust duct modules having an
> inner duct liner and an outer casing, and a void being formed between at least a
> portion of space between said inner duct liner and said outer casing, said void
> being configured for receiving an insulation material, and *including one or more*
> *thermal spacers configured to maintain said inner duct liner and said outer*
> *casing in a spaced relationship* so that said insulation material occupies said void.

*E.g.*, Fire-Rated Modular Duct Assembly and Improvements Therein 14, J.A. 0037, ECF No. 32-

2 (emphasis added).

In a non-final communication rejecting the original draft on obviousness grounds,[8] the

examiner noted the relevant prior art, U.S. Patent No. 2,916,054 ("Callan"),

> teaches a modular fire-rated exhaust duct assembly comprising: two or more
> exhaust duct modules . . . each of [which] having an outer casing . . . and an inner
> flange . . . and a void . . . being formed between at least a portion of space
> between said inner flange and said outer casing, said void being configured for
> receiving an insulation material . . . *and including one or more thermal spacers . .*
> *. configured to maintain said inner flange and said outer casing in a spaced*
> *relationship* so that said insulation material occupies said void.

*E.g.*, Non-Final Rejection ¶ 4, J.A. 0257–58, ECF No. 32-3 (emphasis added).  While the term

"thermal spacers" was not the focal point of this first round of negotiations, the applicant (and

---

[7] Reference 212 points to an "external flange connector," '569 Patent col. 4 l. 24, J.A. 0013; reference 214 points to
a "flange," *id.* col. 4 l. 23, J.A. 0013; reference 320 points to an "inner connection angle member[]," *id.* col. 6 ll. 24-
25, J.A. 0014; reference 330 points to an "outer flashing member[]," *id.* col. 6 l. 20, J.A. 0014; reference 332 points
to "self-tapping screws or similar fasteners," *id.* col. 6 ll. 25–26, J.A. 0014; reference 420 points to a "thermal
spacer[]," *id.* col. 6 l. 51, J.A. 0014; and reference 600 points to "holes," *id.* col. 5, l. 13, J.A. 0014.

[8] *See* 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the
claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before
the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed
invention pertains.").

eventual patentee), William C. Duffy,[9] amending the original draft with respect to different claim language and responding to the examiner, argued Callan does not teach thermal spacers, explaining "the sidewalls . . . according to Callan do not comprise thermal spacers as being alleged and furthermore there is no description, teaching or suggestion by Callan that the sidewalls . . . are intended to maintain an inner duct in a spaced relationship from an outer casing, as recited in claim 1 [of the amended draft '569 Patent]."  Amendment 10, J.A. 0295, ECF No. 32-3 (quotation marks omitted).

The examiner rejected the amended draft.  *See* Final Rejection ¶ 4, J.A. 0302, ECF No. 32-3.  In responding to Duffy's thermal spacers assertion, the examiner explained the spacers in the amended draft "are only there to keep duct components in a spaced relationship without requiring any specific thermal properties" and that since Callan's spacers keep an inner flange and an outer casing in a spaced relationship, Callan does indeed teach "thermal spacers."  *Id.* at 12, J.A. 0312.  In other words, the amended draft and Callan both disclosed "thermal spacers," precluding Duffy from claiming them.

Duffy then amended the claim language concerning thermal spacers and responded to the examiner's explanation.  First, he amended the rejected language by adding the language in the '569 Patent, which, as indicated above, includes the term "thermally isolating."  Request for Continued Examination and Amendment 3, J.A. 0322, ECF No. 32-3.  Second, he provided context for his amendment, explaining "[t]he thermal isolation function of the thermal spacers . . . is entirely consistent with" the function fire-rated duct systems serve in commercial kitchens as recited in the background section of the '569 Patent.  *See id.* at 10, J.A. 0329; *see also* '569 Patent col. 1 ll. 47–50, J.A. 0012 ("[A]ny potential fire inside the duct system must be contained

---

[9] Duffy founded DuraSystems, which owns the '569 Patent by assignment.  Am. Compl. ¶¶ 9, 34.

and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building.").

He also stated "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating." Request for Continued Examination and Amendment 9, J.A. 0328. In addition, he noted "[a]ccording to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat . . . from the inner duct to the outer casing." *Id.* at 10, J.A. 0329. After rehashing his argument regarding Callan's sidewalls, he concluded "even if the sidewalls are construed as thermal spacers, which is not herein being conceded, Callan fails to describe and teach 'one or more thermal spacers thermally isolating said inner duct liner from said outer casing' as . . . amended and currently presented." *See id.* at 11, J.A. 0330 (quotation marks omitted).

The examiner then granted Duffy's application. Not. of Allowability 1, J.A. 0341, ECF No. 32-3. In his statement of reasons for the allowance, the examiner stated "the primary reason for allowance is the inclusion of limitations 'said one or more thermal spacers thermally isolating said inner duct liner from said outer casing' in claims 1, 10, and 16." *Id.* at 2, J.A. 0342. Further, he noted while Callan "teaches an insulated section, an inner duct liner, a first and second flange connector and a joint encasement section," it "does not teach an outer casing and thermal spacers which thermally isolate the inner duct liner from said outer casing." *Id.*

       i.       *"thermal spacers"*

Two issues concern the construction of "thermal spacers," one the parties vigorously address and the other they all but ignore: (1) whether thermal spacers require a spacer to have a specific thermal isolation property and (2) whether thermal spacers by themselves thermally

isolate.  For the reasons stated below, (1) thermal spacers must themselves thermally isolate, but (2) thermal spacers need not have a specific thermal isolation property.

Thermal Spacers Must Thermally Isolate

The intrinsic evidence shows thermal spacers themselves thermally isolate.  While DuraSystems argues a POSITA would understand "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat," Pl.'s Br. 17 (emphasis omitted) (quoting Request for Continued Examination and Amendment 10, J.A. 0329), the Independent Claims make clear the "thermal spacers thermally isolate[e]."  *See, e.g.*, '569 Patent col. 8 ll. 58–59, J.A. 0015.  While the word "configured" is used six times in each of the Independent Claims, *e.g.*, *id.* col. 10 ll. 27–56, J.A. 0016, it is never used to indicate the "thermal spacers" do not, on their own, thermally isolate the inner duct liner from the outer casing.

This idea is supported by the prosecution history.  First, despite Duffy arguing the arrangement of the inner duct liner, outer casing, insulation material, and thermal spacers is configured to prevent heat transfer, he nevertheless indicated "thermal spacers" have a "thermal isolation function."  *See* Request for Continued Examination and Amendment 10, J.A. 0329.  Second, and more importantly, by amending the draft independent claims to include the limitation "thermally isolating" in an attempt to overcome Callan, *see id.* at 11, J.A. 0330, he restricted the meaning of "thermal spacers" to spacers that thermally isolate the inner duct liner from the outer casing.  *Cf. Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [limit the meaning of a claim term] by clearly characterizing the invention in a way to try to overcome rejections based on prior art." (citations omitted)); *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) ("[A]n

22

**Appx22**

amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope.").

<u>Thermal Spacers Need Not Have a Specific Thermal Isolation Property</u>

Just because thermal spacers thermally isolate does not mean they must have a specific thermal isolation property.  Defendants first argue the Independent Claims "make[] clear that 'thermal spacers' are spacers that have a specific thermal isolation property."  Opening Br. 14 (emphasis and citation omitted).  But it is far from clear these claims—which make no mention of thermal isolation properties, let alone any particular one—mean what Defendants say.  They provide little support for this proposition; their primary citation is to the background section of a Federal Circuit case, *see Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1372 (Fed. Cir. 2004) (citation omitted), the relevance of which they fail to explain.  This argument is so lightly addressed, DuraSystems declined to respond to it.

Heavier, though, is the focus on the prosecution history.  Defendants contend Duffy "defined 'thermal spacer' to be a spacer with a specific property" by "disclaim[ing] . . . any spacer that does not have a specific thermal isolation property and that does not prevent the transfer of heat" in prosecuting the '569 Patent.  Opening Br. 16 (citations omitted).  They rely on Duffy stating "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating" and "the thermal spacers is [sic] configured to prevent the thermal transfer of heat."  *Id.* at 15–16 (citation and emphases omitted).  For its part, DuraSystems points out Duffy never limited thermal spacers to one thermal property, as it explicitly referred to "multiple thermal properties."  *See* Pl.'s Br. 15 (quotation marks, citation, and emphasis omitted) ("Defendants misconstrue this statement that clearly

includes multiple thermal 'properties' to be a definition and/or disavowal limiting 'thermal spacers' to one thermal property . . . .").

There are two exceptions to the rule claim terms are given their ordinary meaning: (1) "when a patentee sets out a definition and acts as his own lexicographer" and (2) "when [a] patentee disavows the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). The doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citations omitted). When a patentee has disavowed a particular meaning to obtain a patent, prosecution disclaimer applies and "narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324. This doctrine "plays an important role in the patent system," as "[i]t 'promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.'" *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (quoting *Omega*, 334 F.3d at 1324)). "Such disclaimer can occur through amendment or argument." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted).

But "for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) (quotation marks and alteration omitted). "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations," prosecution disclaimer does not apply. *Id.* (quotation marks omitted); *see also Omega*, 334 F.3d at 1325 ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim

24

**Appx24**

scope."). A party seeking to invoke this doctrine "bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art." *Shire Pharms.*, 839 F.3d at 1119 (quotation marks omitted). This is a heavy burden. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[T]he standard for disavowal is exacting . . . ."); *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

While "[a] disavowal must be clear, . . . it need not be explicit." *Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) (citation omitted). Indeed, patent applicants "rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following'" and "need not do so to meet the applicable standard." *Saffran v. Johnson & Johnson,* 712 F.3d 549, 559 (Fed. Cir. 2013). "Disavowal may be inferred from clear limiting descriptions of the invention in the . . . prosecution history." *Techtronic*, 944 F.3d at 907 (quotation marks and citation omitted). Further "[a]n inventor may also disavow claim scope by distinguishing the claimed invention over the prior art." *Id.* (quotation marks and citation omitted). And "an amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope." *Schindler*, 593 F.3d at 1285.

Defendants fail to show DuraSystems disclaimed any spacer that does not have a specific thermal isolation property. While Defendants rely on Duffy explaining "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating," Request for Continued Examination and Amendment 9, J.A. 0328, "a clear

disclaimer of any spacer that does not have a specific thermal isolation property" this is not, *see* Opening Br. 16 (citations omitted). On one side of the coin, it is doubtful Duffy was referring to one particular property when indicating "thermal" refers to "specific thermal proper*ties*." But on the other, when referring to "specific thermal properties," Duffy did not refer to multiple properties—just "thermally isolating." Though one could argue "thermally isolating" is the property Defendants are looking for, whether "thermally isolating" is a property is not entirely clear either. As Defendants assert, "a property is a material trait," Reply Br. 8; *cf. id.* ("'[H]eat transfer' is not a thermal property of a material." (citing Dep. of Tony Crimi ("Crimi Dep.") 181:7–187:13, 245:8–14, Reply Br. Ex. 1, ECF No. 41-1), and material traits "are ones such as thermal conductivity, thermal capacity, etc. that *result* in 'thermal isolation,'" *id.* (emphasis added). By this argument, thermal isolation[10] is not a property, but a result—or, as Duffy would put it, a "function." *See* Request for Continued Examination and Amendment 10, J.A. 0329 (discussing "[t]he thermal isolation function of the thermal spacers").

From this fuzziness comes a clear conclusion: Duffy's prosecution statement is "too vague or ambiguous to qualify as a disavowal of claim scope." *See Omega*, 334 F.3d at 1325. Accordingly, the term "thermal spacers" cannot be construed as spacers that possess a specific thermal isolation property and "thermal spacers" are therefore spacers that thermally isolate.

That "thermal spacers" cannot be construed this way is further supported by the examiner's rejection of the drafts of the '569 Patent. "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005). The examiner noted Callan, which "teaches a modular

---

[10] Whether "thermal isolation" and "thermally isolating" can or should be addressed in the same discussion is also unclear.

fire-rated exhaust duct assembly . . . including one or more thermal spacers . . . configured to maintain said inner flange and said outer casing in a spaced relationship, *e.g.*, Non-Final Rejection ¶ 4, J.A. 0257–58, "teach[es] thermal spacers," Final Rejection 12, J.A. 0312, even though it does not require thermal spacers to have any specific thermal properties.  In rejecting the amended draft, the examiner concluded it could not overcome Callan because its spacers were "only there to keep duct components in a spaced relationship without requiring any specific thermal properties."  *Id.*  "Thermal spacers," devoid of any accompanying language (such as "thermally isolating") therefore only refer to spacers *without* specific thermal properties.  Indeed, only after the amended draft was amended to pair "thermally isolating" with "thermal spacers" did the examiner determine it distinguished Callan.[11]

> ii.      *"thermally isolating"*

Chiefly at issue here is the extent to which "thermal spacers" must "thermally isolate." DuraSystems argues they must limit heat transfer and Defendants contend they must prevent it. *See* Joint Claim Construction Chart 2–3.  A construction favoring DuraSystems would trigger another issue: whether limiting heat transfer means "limit[ing] the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  *See id.*

The four corners of the '569 Patent provide little guidance; the claims do not explain what "isolating" means and the specification does not either.  While DuraSystems asserts language in the background section shows "isolating" means "minimizing," *see* Pl.'s Br. 18

---

[11] To be sure, the examiner ultimately granted Duffy's application, explaining "the primary reason for allowance is the inclusion of limitations 'said one or more thermal spacers thermally isolating said inner duct liner from said outer casing' in claims 1, 10, and 16."  Not. of Allowability 2, J.A. 0342.  But his explanation did not contain any reference to any specific thermal properties, and even if it did, unilateral statements by an examiner do not give rise to a "clear disavowal of claim scope by an applicant."  *See Salazar*, 414 F.3d at 1347.

(emphasis and quotation marks omitted), that language refers to the capabilities of the entire fire-rated exhaust duct system, not the thermal spacers—which as explained above, must *themselves* thermally isolate.  *See supra* section I.B.2.a.i.  Indeed, that "a fire-rated duct must be capable of minimizing the transfer of heat," '569 Patent col. 1 ll. 34–36, J.A. 0012, only speaks to a fire-rated duct.  Although DuraSystems contends other language shows "isolating" means "limit[ing]," *see* Pl.'s Br. 18 (emphasis and quotation marks omitted), that language doesn't even indicate what part of an exhaust duct module does the limiting.  *See* '569 Patent col. 1 ll. 47–50, J.A. 0012 ("[A]ny potential fire inside the duct system must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building.").

Perhaps for this reason, the parties primarily focus on the prosecution history.  Defendants argue Duffy's statement that "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat . . . from the inner duct to the outer casing," Request for Continued Examination and Amendment 10, J.A. 0329, "form[s] the basis for [their] construction," Opening Br. 19 (citation omitted).  DuraSystems contends Duffy was referring to the arrangement of multiple parts of the exhaust duct system, rather than just the thermal spacers, *see* Pl.'s Br. 17 (citation omitted), and argues a POSITA would understand "'prevent the thermal transfer of heat' to be a colloquial, rather than a literal, use of 'prevent,'" *id.* (citing Decl. of Tony Crimi ("Crimi Decl.") ¶ 50, Pl.'s Br. Ex. AA, ECF No. 36-1), reasoning preventing the thermal transfer of heat is a "physical impossibility" and a construction of "isolating" as "preventing" would therefore exclude every embodiment in the '569 Patent, *see id.* (citation omitted).

28

**Appx28**

This statement does not directly address "thermal spacers." Indeed, it means an exhaust duct system as a whole "prevent[s] the thermal transfer of heat," *see* Request for Continued Examination and Amendment 10, J.A. 0329—and not "thermal spacers," which themselves must thermally isolate, *supra, e.g.*, section I.B.2.a.i. But when read in the context of the '569 Patent, it demonstrates "isolating" is best understood as "limiting."

First, the word "prevent" should be read restrictively. While DuraSystems's expert testified it is not possible to truly prevent the transfer of heat, *see* Crimi Dep. 185:22–186:8, and declared a POSITA would understand Duffy used the word "prevent" colloquially, *see* Crimi Decl. ¶ 50, he nevertheless testified "preventing" means "stopping," as opposed to "limiting," *see* Crimi Dep. 189:9–12. And as he acknowledged it is possible to "effectively" prevent the thermal transfer of heat, *id.* at 186:11–14, DuraSystems's concern about excluding every embodiment in the '569 Patent, *see* Pl.'s Br. 17 (citation omitted), (even if Duffy's statement were about "thermal spacers") is unfounded. "Prevent" is therefore akin to "effectively stop."

Second, given this necessarily restrictive reading, construing "isolating" as "preventing" would be improper. If an exhaust duct system "prevents the thermal transfer of heat," finding thermal spacers must do so as well renders the term "thermally isolating" superfluous—a result the Federal Circuit would not countenance. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (citation omitted)). Indeed, there would be no need for thermal spacers to prevent the thermal transfer of heat if an exhaust duct system already does the same thing.

Third, because thermal spacers still have a "thermal isolation function," *see* Request for Continued Examination and Amendment 10, J.A. 0329, the definition of "isolating" must take a

middle ground between "preventing" (i.e., "effectively stopping") the thermal transfer of heat and doing nothing. Indeed, "thermal spacers" must still thermally isolate. The word "limiting," which Defendants acknowledge is broader than "preventing," *cf.* Opening Br. 19 (arguing against "broaden[ing] [the definition of] 'isolation' to mean 'limitation'" (citations omitted)), fits the bill.

Defendants, citing a dictionary, argue "the plain and ordinary meaning of isolate . . . is 'to set apart or cut off from a group or whole' or 'to place in quarantine,'" *id.* at 18 (quoting *The American Heritage Dictionary* 453 (4th ed. 2000), Opening Br. Ex. S, ECF No. 31-20), and accordingly, "the plain and ordinary meaning of 'thermally isolate' would then be to keep heat in one component from getting to the other," *id.* (footnote omitted). While the Court can rely upon dictionary definitions in construing claim terms, *see Cont'l Circuits*, 915 F.3d at 799, it can only do so if they "do[] not contradict the meaning otherwise apparent from the intrinsic record," *see Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1321 ("[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract."). Because the definition proffered by Defendants contradicts the meaning of "isolating" based on the intrinsic record, it is not considered. *See Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1222 (Fed. Cir. 2020) (finding "the intrinsic record trumps" after observing "the meaning of [a claim term] as discerned from the intrinsic evidence squarely conflicts with the meaning that [the plaintiff] would distill from its selected extrinsic evidence" (citation omitted)). Moreover, Defendants' definition does not even mention the word "prevent," the linchpin of their proposed construction. Even if the definition did not contradict the meaning suggested by the intrinsic evidence, it is accordingly overbroad. *See Luv N' Care, Ltd. v.*

**Appx30**

*Laurain*, CIVIL ACTION NO. 3:16-cv-00777, 2018 WL 3213149, at *6 (W.D. La. June 29, 2018) ("This Court does not rely on the dictionary definitions submitted by the LNC Parties as they are extrinsic evidence, are overly broad, and are contradicted by the intrinsic record.").

Finally, since "isolating" means "limiting," it is necessary to determine whether the rest of DuraSystems's proposed construction should be accepted.  In other words, the Court must determine whether limiting heat transfer means "limit[ing] amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  *See* Joint Claim Construction Chart 2–3.

Both parties ground their arguments in indefiniteness concerns.  Defendants argue DuraSystems's proposed construction "would be indefinite because there is no standard for how much heat the spacers need to 'limit' in order to avoid 'failure points,'" *see, e.g.*, Opening Br. 17 (citing Decl. of Barry M. Cheek ¶¶ 77–78, Opening Br. Ex. B, ECF No. 31-3) (other citation omitted), and thereby ties its position back to its indefiniteness contentions regarding the terms "fire rated" and "specified fire rating," *see* Reply Br. 9 ("[L]inking the meaning of the term 'thermally isolating' to a fire rating test makes the definition [of the term 'thermally isolating'] indefinite . . . ." (internal cross reference omitted)).  DuraSystems reasons a POSITA must know "to what degree the thermal spacer must 'limit' or 'minimize' the thermal transfer of heat to be a 'thermal spacer thermally isolating'" and references Defendants' indefiniteness argument concerning the term "compressible insulation material."  Pl.'s Br. 18.  Just as Defendants rely upon extrinsic evidence to support their indefiniteness position, DuraSystems relies upon extrinsic evidence to support its proposed construction.  *See id.* at 18–19.

As explained above, *supra* section I.B.1.a., indefiniteness arguments are best addressed on a motion for summary judgment.  Accordingly, the indefiniteness contentions regarding

"thermally isolating," like those regarding "fire rated," "specified fire rating," and "compressible insulation material," are deferred until the summary judgment stage. Whether DuraSystems's proposed construction is proper is tied to this indefiniteness dispute and will not be decided now.

In fact, it is even more justified to defer consideration of these indefiniteness contentions. Here, Defendants do not argue "thermally isolating" is facially indefinite and cannot be construed; rather, they say "thermally isolating" is indefinite if the Court adopts DuraSystems's proposed construction thereof. In other words, they raise an "as-applied" indefiniteness challenge—one which is especially well-suited to resolution at the summary judgment stage. *See, e.g.*, *3-D Matrix*, 2016 WL 111410, at *13 ("[C]ourts have recognized that there are reasons to defer ruling on indefiniteness until the summary judgment stage. This is especially so if the claim language itself is amenable to construction but is alleged to be indefinite as applied." (quotation marks and citations omitted)). Indeed, the parties' "battle of the experts" is precisely the kind of dispute that should not be decided at the claim construction stage. *See Steuben Foods*, 2017 WL 3842136, at *2 (citations omitted).

*   *   *

Most of the disputes regarding "thermal spacers" and "thermally isolating" having now been resolved, the Court turns to the first issue the parties present thereon: whether "thermal spacers" and "thermally isolating" should be construed separately or together. Defendants argue they should be construed separately because "the latter is the function the thermal spacers performs [sic], not what the thermal spacers are." *See* Opening Br. 13 n.5; *cf.* Reply Br. 7 ("Plaintiff is desperate to have the Court not say what a 'thermal spacer' is . . . ." (emphasis omitted)). DuraSystems contends they should be construed together because they "appear in the

32

**Appx32**

claims as 'thermal spacers thermally isolating,'[12] [and] it makes more sense to construe the phrase as a whole." Pl.'s Br. 12–13 n.6.

While the Court analyzed these terms separately, it construes them together, given they largely appear together in the Independent Claims, their separate constructions are primarily based on the same aspects of the '569 Patent's prosecution history, and each construction influences the other.

Accordingly, "thermal spacers thermally isolating" is construed as "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." The language subject to the aforementioned as-applied indefiniteness challenge is tentative; whether it shall remain so shall be decided, like the indefiniteness arguments, at the summary judgment stage.

b.    "exhaust duct module"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "exhaust duct module[s]" | "a section of pre-fabricated, factory-built exhaust duct" | "a section of an exhaust duct" | "a section of pre-fabricated, factory-built exhaust duct" |

The term "exhaust duct module" appears in claims 1, 3, 7, and 9–20. As Defendants acknowledge, the parties agree "a 'module' is a 'section' of an overall exhaust duct." *See* Opening Br. 20. They dispute whether an "exhaust duct module" is a "pre-fabricated, factory-built" duct. *See* Joint Claim Construction Chart 3.

---

[12] While the terms "thermal spacers" and "thermally isolating" do often appear together, *e.g.*, '569 Patent col. 8 ll. 58–59, J.A. 0015, the term "thermal spacers" sometimes appears on its own, *e.g.*, *id.* col. 8 l. 55, J.A. 0015.

The claims do not provide an answer, and the parties focus their attention on the specification.  Defendants, arguing an "exhaust duct module" is not necessarily "pre-fabricated, factory built," contend DuraSystems's construction impermissibly reads into the claims a preferred embodiment.  Opening Br. 20.  DuraSystems contends the '569 Patent describes the invention as an exhaust duct system "configured to be assembled in the field," *see* Pl.'s Br. 20 (quotation marks omitted), and a POSITA would understand a system configured this way "is a pre-fabricated or factory-built exhaust duct," *id.* (citing Crimi Decl. ¶ 65).  Both parties understand a "pre-fabricated duct" is a "factory-built" duct.  *See* Pl.'s Br. 20 (positing "those in the relevant industry distinguish between 'field-fabricated' versus 'pre-fabricated' / 'factory-built' fire-rated exhaust ducts"); Reply Br. 13 (referring to "an exhaust duct that is pre-fabricated and factory-built"); *cf.* '569 Patent col. 7 ll. 24–29, J.A. 0015 ("The insulation material . . . is affixed to the inner face or side of the outer metallic layer . . . using suitable adhesives and/or mechanical fasteners, in order to provide for pre-fabrication at the factory and thereby minimize the number of components transported to and assembled on site.").

"[P]atents disclose 'embodiments' and 'preferred embodiments' of the claimed invention, the purposes of which are 'to provide a disclosure to the public of [the inventor's] best mode of carrying out the invention when the applications were filed."  *Edelbrock, LLC v. Whipple Indus., Inc.*, Case No. 1:19-cv-01502-DAD-EPG, 2021 WL 321643, at *3 (E.D. Cal. Feb. 1, 2021) (alteration in original) (quoting *Constr. Tech., Inc. v. Cybermation, Inc.*, 965 F. Supp. 416, 431 (S.D.N.Y. 1997)).  "Such a disclosure is included for the benefit of the public, rather than to limit the scope of the invention."  *Id.* (citing *Constr. Tech., Inc.*, 965 F. Supp. at 431) (other citation omitted).  Accordingly, a patent's "*claims*, not specification embodiments, define the scope of patent protection," *see Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009)

(emphasis added), and "although the specification[] may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments," *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (quotation marks and alteration omitted). As the Federal Circuit has often explained, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quotation marks and alteration omitted). Stated differently, for the specification to disavow claim scope, it "must contain expressions of manifest exclusion or restriction." *See Cont'l Circuits*, 915 F.3d at 797 (quotation marks omitted).

But a specification disavowal, like a prosecution history disavowal, "need not be explicit." *Poly-Am.*, 839 F.3d at 1136 (citation omitted); *see Rembrandt Patent Innovations, LLC v. Apple, Inc.*, 716 F. App'x 965, 972 (Fed. Cir. 2017) ("[D]isclaimer does not require express statements by the patentee identifying the surrendered claim scope. Rather, it may be implicit, so long as it is sufficiently clear." (citing *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015)). Two types of implicit specification disavowal are relevant here. First, "an inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *See Poly-Am.*, 839 F.3d at 1136 (citation omitted). In other words, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon*, 503 F.3d at 1308; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only

35

**Appx35**

preferred embodiments, [can] . . . support a limiting definition of a claim term." (citation

omitted)).  Such statements "are more likely to be found in certain sections of the specification,

such as the Summary of the Invention," *C.R. Bard*, 388 F.3d at 864 (citation omitted), as well as

the abstract, *see, e.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed.

Cir. 2012), the background, *see, e.g.*, *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321

(Fed. Cir. 2011), and even the title, *see, e.g.*, *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d

816, 823 (Fed. Cir. 2016).  Second, "an inventor may disavow claims lacking a particular feature

when the specification distinguishes or disparages prior art based on the absence of that feature."

*Poly-Am.*, 839 F.3d at 1136 (citations omitted); *see also Astrazeneca AB v. Mut. Pharm. Co.*, 384

F.3d 1333, 1340 (Fed. Cir. 2004) ("Where the general summary or description of the invention

describes a feature of the invention . . . and criticizes other products . . . that lack that same

feature, this operates as a clear disavowal of these other products . . . ." (citation omitted)).

   "[I]n either case, an implied disavowal must be clear and may be undermined by other

intrinsic evidence from the patent's specification." *Kranos IP Corp. v. Riddell, Inc.*, 339 F.

Supp. 3d 850, 853 (N.D. Ill. 2018).  Indeed, "[t]he standard for disavowal of claim scope is . . .

exacting. . . . [and] [t]o find disavowal, [the Court] must find that the specification is both so

clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous

evidence of disclaimer." *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015)

(quotation marks omitted).  Ultimately, whether the specification disavows the scope of a claim

must be determined in light of the specification as a whole.  *See id.* at 514–16 (finding a patent's

specification disavowed the scope of a claim after reviewing the specification's "Background of

the Invention," "Summary of the Invention," and "Detailed Description" sections).

36

DuraSystems satisfies this heavy burden. First, it points to the first sentence of the '569 Patent's "Brief Summary of the Invention." *See* Pl.'s Br. 21 (quotation marks omitted). This sentence provides "[t]he present invention comprises embodiments of a modular fire-rated duct system and improvements therein and *suitable for pre-fabrication and configured for assembly in the field*," '569 Patent col. 2 ll. 22–25, J.A. 0012 (emphasis added), and thereby makes clear "pre-fabrication" is a "characteristic feature" of the invention as a whole, *see Poly-Am.*, 839 F.3d at 1136–37 (determining one sentence in the specification of the patent at issue "describe[d] a characteristic feature of the invention" and found, based in part on this sentence, that the patent "clearly and unequivocally disavow[ed] claims" lacking that feature). Indeed, by indicating the invention is "suitable for pre-fabrication," it describes "pre-fabrication" as a feature thereof. *See Astrazeneca*, 384 F.3d at 1340 (holding the specification disavowed "nonsurfactant solubilizers" in part because the specification "twice describe[d] micelle structures as a feature of the [invention]" by stating "[t]his form of controlled release mechanism is a suitable way to control the release of the micelles of drug and solubilizer" and it was "undisputed that surfactants are the only solubilizers believed to form micelle structures in [the relevant environment]" (quotation marks and citations omitted)). This sentence, which prefaces three paragraphs separately describing embodiments of the invention, is precisely the kind of "summation sentence" that can effectuate an implicit disavowal. *See GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) (finding a single sentence in the specification could limit claim language because it was "a summation sentence which describe[d] the invention as a whole" (emphasis and quotation marks omitted)).

Second, DuraSystems claims the "Background of the Invention" disparages fire-rated ducts that are not pre-fabricated and compares them to pre-fabricated ducts in a way that

"confirm[s] to a P[]OSITA that the '569 patent distinguishes between field-applied and pre-fabricated or factory-built fire-rated exhaust ducts."  Pl.'s Br. 20–21 (citations omitted).  In relevant part, the Background of the Invention provides:

> Known fire-rated exhaust duct systems are typically fabricated in sections, and the sections are shipped to the installation location.  At the installation location, the sections are welded together to form continuous conduits or conduit sections.  Due to field conditions, the welding could be of poor work quality, for instance, due to limited space and/or setup.  This means expensive rework and re-welding to seal leaks in the duct system during pressure testing.  Conventional fire-rated duct systems typically require the installation of an additional gypsum fire-rated enclosure (approximately 10" thick) around the duct.  In addition to requiring an additional step, the gypsum enclosure is typically constructed/installed by another trade.

'569 Patent col. 1 ll. 61–67, col. 2 ll. 1–6, J.A. 0012.  It then explains:

> In an attempt to overcome the known shortcomings in the art, chimney manufacturers introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems.  While these pre-fabricated fire-rated exhaust ducts addressed shortcomings of existing systems, the characteristic round profile significantly limits the volume of air that can be vertically carried in conventional building footprints, and in a horizontal configuration, the round profile or cross section is often too large to fit into conventional ceiling spaces or dimensions.

*Id.* col. 2 ll. 7–16, J.A. 0012.

These passages disavow ducts that are not pre-fabricated.  As DuraSystems notes, the first passage explains and discusses the disadvantages of fire-rated exhaust ducts that have to be augmented with "gypsum fire-rated enclosure[s]" at "the installation location"—which a POSITA would understand to be "field-applied."  *See id.* col. 1 ll. 61–67, col. 2 ll. 1–6, J.A. 0012; Pl.'s Br. 20–21 (citing Crimi Decl. ¶¶ 61–62).  The second passage then, after referencing "the known shortcomings in the art," introduces "pre-fabricated fire-rated exhaust ducts."  *Id.* col. 2 ll. 7–9, J.A. 0012.  While it describes another shortcoming with these ducts, the issue is not that they are "pre-fabricated" or otherwise cumbersome to put together but that they are round.

*Id.* col. 2 ll. 10–14, J.A. 0012.[13]  While the "Detailed Description of the Embodiments" contemplates "applications . . . [in which] the insulating material . . . and the outer metallic profile . . . be kept as separate components and then *field installed* over [the] joint between the exhaust duct sections," '569 Patent col. 7 ll. 30–34, J.A. 0015 (emphasis added), such applications are only contemplated "where size and weight limitations and/or characteristics" require them, *id.*, "thus even further disparaging" ducts that are not pre-fabricated, *see UltimatePointer*, 816 F.3d at 823 ("Although the [patent at issue] does include one embodiment where the handheld device 'may include a conventional, indirect pointing device,' indirect pointing is only used 'where direct pointing is not possible or not desired,' thus even further disparaging indirect pointing." (citation omitted)).  Ultimately, by distinguishing between "field applied" and "pre-fabricated" ducts, the Background of the Invention disavows the former and thereby limits the scope of the claims to the latter.  *See Poly-Am.*, 839 F.3d at 1136 (finding the inventor of a patent for certain trash bags "disavow[ed] claims lacking a particular feature" by stating in the specification that prior art trash bags "are difficult to secure over trash receptable lips").

To be sure, some Federal Circuit decisions arguably held statements characterizing an invention as a whole can only disavow subject matter if they are made "repeatedly and consistently."  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1346–48 (Fed. Cir. 2004) (holding a claim term was properly construed in accordance with a limitation that was "repeatedly and consistently" indicated in the specification by statements that "broadly

---

[13] Not surprisingly, the invention addresses this shortcoming.  *See, e.g.*, '569 Patent col. 9 ll. 14–16, J.A. 0016 (claiming "[t]he modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said exhaust duct modules have a generally rectangular cross-section"); *id.* col. 9 ll. 47–51, J.A. 0016 (claiming "[a]n exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising: an inner duct liner formed with a generally rectangular cross-section").

describe[d] the overall inventions of [the] patent[]"); *Sunovion Pharms., Inc. v. Teva Pharms., Inc.*, 731 F.3d 1271, 1277 (Fed Cir. 2013) ("The applicants' repeated and consistent attribution of the purity level of less than 0.25% levorotatory isomer to 'the invention' and 'the instant invention' thus gives meaning to the term 'essentially free.'" (citing *Microsoft*, 357 F.3d at 1348) (other citation omitted)); *see also Thermal Sols., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2009 WL 3126227, at *4 (D. Kan. Sept. 29, 2009) (referring to the "*Microsoft* standard . . . which allows the claim scope to be limited if the patent 'repeatedly and consistently' describes the scope of the invention (and not a mere embodiment) as limited").[14]  And the Federal Circuit has also said "[t]o find disavowal of claim scope through disparagement of a particular feature, we ask whether 'the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements . . . may be viewed as a disavowal.'"  *Openwave Sys., Inc.*, 808 F.3d at 513 (quoting *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)) (citing *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269–70 (Fed. Cir. 2007)).

As mentioned above, the specification only contains one statement describing the invention as a whole.  Whether it "repeatedly" disparages the prior art is not clear.  But it is also not clear whether the aforementioned caselaw signals it is necessary or sufficient for statements describing an entire invention or disparaging the prior art to be repeated.  More importantly,

---

[14] In addition, the Federal Circuit in *GPNE*, before finding a single summation sentence can limit claim language if it describes an invention as a whole, 830 F.3d at 1371, recognized "when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization," *id.* at 1370 (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374–75 (Fed. Cir. 2009)), and noted limiting words in the patent at issue were employed in the specification over 200 times, *id.*  While the court did not indicate those words addressed the invention as a whole, one of the cases it cited, *VirnetX*, speaks to words that do.  *See VirnetX*, 767 F.3d at 1318 ("The fact that anonymity is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim." (citation omitted)).

numerous other Federal Circuit decisions indicate both of these types of implicit disavowal are considered together when determining whether a specification disavows subject matter. *See UltimatePointer*, 816 F.3d at 823 ("Taken together, the repeated description of the invention as a direct-pointing system, the repeated extolling of the virtues of direct pointing, and the repeated criticism of indirect pointing clearly point to the conclusion that the "handheld device" in claims 1, 3, 5, 6, and 12 is limited to a direct-pointing device."); *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (affirming the district court's construction of a claim term after observing the specification, among other things, "describe[d] the features of the present invention as a whole" and "explained the benefits [thereof] over the prior art" (quotation marks and citation omitted)).[15]   Considering these two forms of implicit disavowal together makes sense, as whether a specification can disavow claim scope is determined with reference to the entire specification, not just to certain sections. *Cf., e.g.*, *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[T]his court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification *read as a whole* suggests that the very character of the invention requires the limitation be a part of every embodiment." (emphasis added)).   And it would make no sense to ignore demonstrable evidence of disavowal simply because two statements may be off in slightly different doctrinal silos.   Implicit disavowal by a statement describing an entire invention and by one disparaging

---

[15] On at least one occasion, the Federal Circuit even blended these types of implicit disavowal together.  In *Eon-Net LP*, the Federal Circuit affirmed the district court's decision to limit the claim terms "document," "file," "extract," and "template" to "information that originates from a hard copy document," 653 F.3d at 1321.  In doing so, it noted the specification of the relevant patent "repeatedly and consistently define[d] the invention as a system that processes information from hard copy documents."  *Id.*  However, in supporting this proposition, it cited (among other things) language that, instead of describing the entire invention, disparaged the prior art.  *See id.* ("The written description repeatedly and consistently defines the invention as a system that processes information derived from hard copy documents. The Background of the Invention section explains that 'conventional systems have limitations which decrease the efficiency of processing information from a hard copy document.'" (citation omitted)).

41

**Appx41**

the prior art are two sides of the same coin: two concepts that help courts answer the ultimate question of whether a specification disavows claim scope. Here, based on the summation sentence and the passages disparaging the prior art mentioned above, the '569 Patent's specification limits the reach of "exhaust duct modules" to those that are "pre-fabricated" in accordance with DuraSystems's proposed (and herein adopted) construction.

Defendants also argue "claim 1 explicitly requires 'field assembly' when other independent claims do not, creating a presumption that the 'exhaust duct module' in all the independent claims cannot be as limited." Reply Br. 13 (citation omitted). In other words, they, assuming *arguendo* "field assembled" means "pre-fabricated," *see id.*,[16] contend because claim 1 refers to "field assembly" and the rest of the Independent Claims do not, "field assembly"—and by extension, "pre-fabrication"—can only relate to that claim and therefore only describes one embodiment in the '569 Patent, and not the invention itself.

This argument implicates the doctrine of claim differentiation:

> The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope. Although the doctrine is at its strongest where the limitation sought to be "read into" an independent claim already appears in a dependent claim, there is still a presumption that two independent claims have different scope when different words or phrases are used in those claims.

*Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) (quotation marks and citations omitted). "However, claim differentiation is a rebuttable presumption that may be

---

[16] "Field assembled" (as opposed to "field applied," *see* Crimi Decl. ¶¶ 56–57, 65) does mean "pre-fabricated." This is demonstrated by the testimony of DuraSystems's expert, who explained "[a] P[]OSITA would understand . . . a fire-rated exhaust duct 'suitable for pre-fabrication' that is 'configured for assembly in the field' to refer to a pre-fabricated or factory-built fire-rated exhaust duct because that is precisely what a pre-fabricated or factory-built fire-rated exhaust duct is." *Id.* ¶ 64; *see generally id.* ¶¶ 61–65. Defendants do not seriously attack this testimony, and the Court can rely upon it. *See Phillips*, 415 F.3d at 1318 (explaining expert testimony can "provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA], . . . [and] establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field" (citations omitted)).

42

**Appx42**

overcome by a contrary construction dictated by the written description or prosecution history." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016) (citation omitted). Indeed, "claim differentiation is a rule of thumb that does not trump the clear import of the specification," *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009) (citation omitted), and "[w]hile claim differentiation may be helpful in some cases, it is just one of many tools used by courts in the analysis of claim terms," *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1400 n.1 (Fed. Cir. 2008).

Here, for the reasons stated above, this presumption has been rebutted by the specification. Accordingly, "exhaust duct module" is construed as "a section of pre-fabricated, factory-built exhaust duct."[17]

### c.    "joint encasement section"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "joint encasement section" | "one or more parts configured to encase the junction between two exhaust duct modules" | "one of multiple parts having a 3-dimensional profile that together encase the junction between two duct modules" | "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules" |

The term "joint encasement section" appears in claims 1 and 7–9. In relevant part, Claim 1 claims "[a] modular fire-rated exhaust duct assembly comprising: . . . a joint encasement

---

[17] In their reply brief, Defendants for the first time argue DuraSystems's proposed construction (which the Court herein adopts) "impermissibly reads out disclosed embodiments," Reply Br. 13 (citation omitted), because their expert "testified that Plaintiff's proposed construction excludes laboratory exhaust ducts," *id.* (citing Crimi Dep. 52:9–24). But Crimi said no such thing. The cited passage shows he only testified the '569 Patent's *claims* do not relate to laboratory exhaust ducts, not DuraSystems's proposed construction of "exhaust duct module." *See* Crimi Dep. 52:9–15. Moreover, when asked whether the term "exhaust duct module" excludes laboratory exhaust ducts, he answered in the negative, explaining "when I see the term 'fire-rated exhaust duct modules[,'] that, based on present knowledge of the art, such a thing doesn't exist in certainly consensus standards." *Id.* at 52:18–24.

section configured to be field connectable to each of said exhaust duct modules and encase said

junction." '569 Patent col. 8 ll. 47–48, col. 9 ll. 7–9, J.A. 0015–16. The parties do not dispute a

"joint encasement section" is meant to "encase the junction between two exhaust duct modules."

*See* Joint Claim Construction Chart 3. But, as explained below, they dispute the meanings of the

terms "encasement" and "section."

### i. *"Encasement"*

The parties agree the plain and ordinary meaning of "encase" is "to enclose in or as if in a

case." Opening Br. 22 (citing *The American Heritage Dictionary*, *supra* at 284); *cf.* Pl.'s Br. 23

(referring to this definition as that of "encasement"). They differ on whether this definition

means a joint encasement section must have a 3-dimensional profile. Defendants assert "[a] case

has thickness—a 3-D profile," Opening Br. 22, and cite (albeit with little explanation) three

figures from the '569 Patent, *id.* (citations omitted). They also cite the prosecution history,

arguing Duffy disclaimed a "joint encasement section" that does not have a 3-dimensional

structure by distinguishing Callan, which teaches a joint encasement section that has a channel

strip. *See* Opening Br. 23. DuraSystems asserts Defendants' figure-based argument is legally

improper because limitations from the specification cannot be imported into the claims and their

prosecution history-based argument is factually improper because Duffy did not mention 3-

dimensional profiles when attempting to distinguish Callan. Pl.'s Br. 23.

The claims do not say anything about a "joint encasement section" having a 3-

dimensional profile. Defendants' attempts to limit their scope by arguing a "joint encasement

section" must have a 3-dimensional profile fail. *See Fujifilm Corp. v. Motorola Mobility LLC*,

Case No. 12-cv-03587-WHO, 2015 WL 757575, at *12 (N.D. Cal. Feb. 20, 2015) ("[N]either a

patent's specification nor its prosecution history may be used to 'narrow a claim term or deviate

from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope.'" (quoting *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013)); *see also* discussion on prosecution history disavowal *supra* pp. 24–25; discussion on specification disavowal *supra* pp. 34–36.

First, Defendants' reliance on Figures 7–9 of the '569 Patent is misplaced.  Defendants chiefly rely on Figure 7 (which is referenced by Figures 8 and 9) in arguing their "proposed construction is . . . consistent with the specification which depicts multiple parts having [a] 3-dimensional profile, that when arranged together, encase the joint."  Opening Br. 22–23 (citation omitted).  But "courts may not limit patent claims to what is depicted in the drawing figures, because this would wrongly import limitations onto the claim from the specification, which is fraught with danger."  *Net Results, Inc. v. United States*, 112 Fed. Cl. 133, 149 (Fed. Cl. 2013) (quotation marks and citation omitted).  Indeed, "a patent need not illustrate the full scope of the invention," *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) (citation omitted), and "patent coverage is not necessarily limited to inventions that look like the ones in the figures," *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (citation omitted).  While figures can be limiting if they represent an entire invention or are described using strict language, *see TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1300–01 (Fed. Cir. 2008) (rejecting an attempt to discount the limiting effect of a figure because the figure was not described with reference to a preferred embodiment and used language such as "must" and "necessary"), the '569 Patent's "Brief Description of the Drawings" makes clear Figure 7 only depicts an embodiment of the claimed invention, '569 Patent col. 3 ll. 49–53, J.A. 0013.  The Federal Circuit "will not countenance the importation of claim limitations from a few specification statements or figures into the claims, particularly if those specification

45

**Appx45**

extracts describe only embodiments of a broader claimed invention," *Comput. Docking Station*, 519 F.3d at 1374 (citation omitted), and neither will this Court.[18]

Second, Defendants do not demonstrate Duffy disclaimed a joint encasement section that does not have a 3-dimensional structure while prosecuting the '569 Patent. In rejecting the first draft of the '569 Patent, the examiner noted Callan "teaches a modular fire-rated exhaust duct assembly comprising: . . . a joint encasement section . . . configured to be field connectable to each of said exhaust duct modules and encase said junction." Non-Final Rejection ¶ 4, J.A. 0257–58. Duffy countered that Callan does not teach a joint encasement section because "the locking clip . . . described and taught by Callan" "does not encase the junction," as it "merely comprises a channel strip that makes a physical connection between adjacent sections. Amendment 11, J.A. 0296.

This did not change the examiner's mind. In rejecting the second draft of the '569 Patent, the examiner explained that based on the language of claim 1 thereof,

> the joint encasement section only functions to connect the duct modules and encase the junction. As seen in figures 1 and 10 of Callan, the locking clip . . . joins two duct sections together and also covers the junction of the joint and thus satisfies the requirements of the claims. Therefore, Callan does indeed teach a joint encasement section as recited in the claims.

Final Rejection ¶ 8, J.A. 0312. Duffy neither amended nor addressed the language regarding the joint encasement section in his Request for Continued Examination and Amendment, and the examiner did not address it in the Notice of Allowability.

Defendants say Duffy disclaimed a joint encasement section that does not have a 3-dimensional structure in responding to the examiner's first rejection because he "confirm[ed] that

---

[18] Moreover, it appears Defendants abandoned their figures-based argument in their reply brief. *See* Reply Br. 13–14 (stating "Defendants' proposed construction [does not] import[] limitations from the specification" and "Defendants' proposed construction flows specifically from *arguments made during prosecution*, not a particular embodiment" (emphasis added) (citations omitted)).

[his] 'joint encasement section' must 'encase the junction,'" whereas Callan's joint encasement section is "a flat 'channel strip' or locking clip [that] merely sits on top of the junction." Opening Br. 23; *see also id.* ("Plaintiff distinguished its application claims from Callan, a 3-dimensional structure (as opposed to a mere flat strip) that encloses the junction on all sides (as opposed to just one side) would be necessary."). However, as DuraSystems notes, Duffy did not "distinguish Callan based on the lack of a 3-dimensional profile," but because Callan's "joint encasement section" "does not 'encase the junction.'" *See* Pl.'s Br. 23 (quotation marks and citation omitted). In fact, the term "3-dimensional" does not appear once in Duffy's rebuttal. Defendants' position rests on the idea "[a] case has thickness—a 3-D profile," and that because Duffy emphasized his joint encasement section must "encase the junction," he declared his joint encasement section must have a 3-dimensional profile. But Defendants cite nothing in the prosecution history or anywhere else that supports the idea a joint encasement section that encases a junction must be 3-dimensional—the threshold proposition "[a] case has thickness—a 3-D profile" is not accompanied by a single citation. Duffy's rebuttal can hardly be classified as a "clear and unmistakable" disclaimer of a joint encasement section without a 3-dimensional structure. *See Mass. Inst. of Tech.*, 839 F.3d at 1119 (noting "for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable" (quotation marks omitted)).

This conclusion is further supported by the examiner's response to Duffy's rebuttal. *See Salazar*, 414 F.3d at 1347 ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."). In their reply brief, Defendants note DuraSystems "offers no explanation why the locking clip [in Callan] did not 'encase' the joint." Reply Br. 14. But the examiner noted it did, explaining Callan teaches a joint encasement section because "the

joint encasement section only functions to connect the duct modules and encase the junction" and "the locking clip . . . joins two duct sections together and also covers the junction of the joint and thus satisfies the requirements of the claim." Final Rejection ¶ 8, J.A. 0312. While the examiner ultimately granted Duffy's application (and therefore may have taken a different view of Duffy's rebuttal), he said nothing in the Notice of Allowability to suggest Duffy's "joint encasement section" has a 3-dimensional profile, and his silence certainly cannot constitute a disclaimer. *Cf. Salazar*, 414 F.3d at 1345 ("[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a clear and unmistakable disavowal of claim scope." (citation omitted)).

    ii.  *"Section"*

   The parties next dispute whether a joint encasement section must have multiple parts. *See* Joint Claim Construction Chart 3. Defendants say yes and note a dictionary defines "section" as "one of several component parts that may be assembled or reassembled." *See* Opening Br. 23–24 (emphasis omitted) (citing *Webster's New Collegiate Dictionary* 1036 (1980), Opening Br. Ex. T, ECF No. 31-21). DuraSystems takes no issue with this definition, *see* Pl.'s Br. 23 (citation omitted), arguing it does nothing to support Defendants' construction because a joint encasement section "is only one of several component parts of the 'exhaust duct assembly' and 'exhaust duct module' of the claims, the other component parts including . . . the inner duct liner, outer casing, thermal spacers, insulation, and flange connector," *see id.* (citation omitted).

   Nothing in the intrinsic record indicates a joint encasement section must have multiple parts. Therefore, the issue here is whether this definition supports Defendants' proposed construction. *See Helmsderfer*, 527 F.3d at 1382 (noting a court can rely upon a dictionary

definition in construing a claim term so long as it "does not contradict the meaning otherwise apparent from the intrinsic record"). Defendants contend the language "one of several component parts" shows a joint encasement section must in turn have multiple parts; "parts" are therefore parts of a "joint encasement section." DuraSystems asserts "parts" are not parts of a joint encasement section but parts of an exhaust duct module as a whole.

The '569 Patent shows DuraSystems is correct. The '569 Patent teaches an exhaust duct system that is "configured for assembly in the field," '569 Patent col. 2 ll. 24–25, J.A. 0012, and contains a number of exhaust duct modules, each of which having a number of distinct parts, including an inner duct liner, *id.* col. 8 ll. 50–51, J.A. 0015, an outer casing, *id.* col. 8 ll. 51, J.A. 0015, and thermal spacers, *id.* col. 8 l. 55, J.A. 0015. A joint encasement section is one of those parts. *See id.* col. 9 l. 7, J.A. 0016. Accordingly, the dictionary definition of "section" merely supports the unremarkable proposition that a joint encasement section is a part of an exhaust duct module and "parts" are not parts of a joint encasement section but of an exhaust duct module. It does not support adopting Defendants' proposed construction.

Moreover, Defendants' proposed construction does not make sense if "parts" were parts of a joint encasement section. If that were so, Defendants' proposed construction would provide that a joint encasement section is "one of multiple parts of a joint encasement section." And their proposed construction still does not hold water with "parts" constituting parts of an exhaust duct module. Indeed, if a joint encasement section is one of multiple parts of an exhaust module, it would be erroneous to note they (the inner duct, the outer casing, and such) "together encase the junction between two duct modules" when not all of them have that function; only the joint encasement section does.

**Appx49**

But DuraSystems's construction is faulty as well, as it is unnecessary to note a joint encasement section has "one or more parts," given there is no guidance on how many parts it must have. Moreover, even including the word "parts" could cause confusion, as it may not be entirely clear whether "parts" refer to parts of a joint encasement section or parts of an exhaust duct module. *See, e.g.*, *j2 Glob. Commc'ns, Inc. v. Vitelity Commc'ns, LLC*, No. CV 11-07904 DDP (Ex), 2013 WL 5220173, at *6 (C.D. Cal. Sept. 13, 2013) (finding a word in a proposed claim construction was "unnecessary surplusage" and noting "[a]dding unnecessary verbiage is likely to confuse the jury, and, thus, frustrate one of claim construction's chief purposes" (citation omitted)). Indeed, the briefing has borne out this concern.

Defendants' other arguments as to why a joint encasement section should be construed to have multiple parts are without merit. First, they assert Figures 7–9 of the '569 Patent show a joint encasement section must have multiple parts. But just as it is improper to rely upon these figures to argue a joint encasement section must have a 3-dimensional profile, it is improper to rely upon them to argue it must have multiple parts. *See supra* at p. 45–46.

Second, they argue if a section is a part of an exhaust duct module, the word "section" would be surplusage. *See* Reply Br. 14–15 ("Plaintiff chose to attach the word 'section' to the term 'joint encasement'; other components in the claim (e.g., flange connectors) are not modified by the word 'section.' To read the word 'section' into every claimed component would improperly render the word 'section' in 'joint encasement section' surplusage." (citation omitted)). In a vacuum, this argument is appealing, as "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *See Wasica*, 853 F.3d at 1288 n.10 (citation omitted). But the rule against surplusage is not a hard and fast one.

50

First, the Federal Circuit has tolerated surplusage when the terms involved do not have different meanings. In *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365 (Fed. Cir. 2002), the Federal Circuit examined the terms "computer" and "computer system" and found the patent at issue used them as synonyms. *Id.* at 1373. While the court noted it usually would have been inclined to give meaning to the word "system," *see id.* (citation omitted), there was no reason to because the patent "provides no indication that the two terms mean different things," *id.* "Instead, the patent uses the term 'computer system' in the specification and the term 'computer' in the claims; nothing in the patent itself explicates their relationship or indicates any difference in meaning." *Id.*; *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("[S]urplusage may exist in some claims." (citing *Pickholtz*, 284 F.3d at 1373)).

*Pickholtz* is instructive, as the terms "joint encasement" and "joint encasement section" are used interchangeably in the '569 Patent. Indeed, while the '569 Patent often employs the term "joint encasement section," *e.g.*, '569 Patent col. 9 l. 32, J.A. 0016, it also uses the term "joint encasement" three times in the specification, *e.g.*, *id.* col. 7 ll. 15–16, J.A. 0015 ("The joint encasement . . . is configured to encase or surround the joint . . . ."), and does not indicate they mean anything different. While the terms "joint encasement" and "joint encasement section" both appear in the specification, *see, e.g.*, *id.* col. 7 ll. 15–16, 41 J.A. 0015, only one of them ("joint encasement section") appears in the claims, *see, e.g.*, *id.* col. 9 l. 32, J.A. 0016; *see also Bioverativ Inc. v. CSL Behring LLC*, Civil Action No. 1:17-cv-00914-RGA, 2019 WL 1276030, at *7 (D. Del. Mar. 20, 2019) (noting while its construction of a term rendered language superfluous, the construction was permissible because "[t]he individual words of the term have

meaning, but the term does not add a new limitation because it is inherent in the rest of the claim" and it was "the only reasonable result considering the intrinsic record").

Second, in any case, "no canon of claim construction is absolute in its application," *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998), and, like the canon of claim differentiation, this canon can be overcome by the weight of the rest of the intrinsic evidence. Indeed, in *Decisioning.com, Inc. v. Federated Department Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008), the Federal Circuit realized its construction of one claim term may have rendered the construction of another surplusage but stood by it in light of the intrinsic evidence. *See id.* at 1312 n.6 ("In light of the intrinsic evidence that we have discussed, we conclude that the claims of the '007 patent are limited to a publicly-accessible 'remote interface' despite the fact that such a construction may render the term 'public' in claim 16 surplusage."). In light of the foregoing discussion, the Court stands by its construction of "joint encasement section."[19]

Finally, Defendants argue a portion of Duffy's deposition testimony supports their proposed construction. They posit he "testified that, when developing his '569 Patent invention, he considered using a non-modular, single piece to 'wrap-around' the duct, but rejected the approach because the single piece did not work well," Opening Br. 24 (citation omitted), admitting "[w]e have sometimes situations in . . . real life, in construction, where you can't wrap around a duct on a site," *id.* (quoting Dep. of William Duffy ("Duffy Dep.") 135:20–22, Opening Br. Ex. O, ECF No. 31-16). A joint encasement section, therefore, cannot have only one part.

---

[19] Also, even if Defendants' surplusage argument were meritorious, it would not mean Defendants' proposed construction would be adopted. Indeed, accepting their argument would only entail rejecting their dictionary definition, which provides the primary authority for their proposed construction.

This argument fails.  As DuraSystems notes, "[a]n applicant is not required to disclose all possible embodiments covered by a claim."  Pl.'s Br. 24 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[O]ur case law makes clear that a patentee need not describe in the specification every conceivable and possible future embodiment of his invention." (quotation marks omitted))).  While Defendants reason applicants cannot disclose "inoperative embodiments" and Duffy's testimony shows he "disclos[ed] the only working embodiment using 'joint encasement sections,'" Reply Br. 15 (emphasis omitted) (citing *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362–65 (Fed. Cir. 2018)), they are off base for two reasons.  First, the case they rely upon is inapposite.  *Everlight* concerns not claim construction, but the patent code's enablement requirement, under which a specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  *See* 35 U.S.C. § 112(a); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) ("[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." (alteration in original) (quotation marks omitted)).  Indeed, the issue there was whether a specification taught a POSITA how to make the claimed device without undue experimentation as of the patent's effective filing date.  *Everlight*, 896 F.3d at 1363.  "Determining whether written-description and enablement requirements are met is distinct from determining claim scope."  *Optis Wireless Tech., LLC v. Apple Inc.*, Case No. 2:19-cv-00066-JRG, 2020 WL 1692968, at *10 (E.D. Tex. Apr. 7, 2020) (citing *Phillips*, 415 F.3d at 1327 (cautioning "we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction")).

53

**Appx53**

Second, in any event, Duffy did not even testify a one-section joint encasement section is "inoperative" or does not work. Duffy testified such a joint encasement section does not work in some situations, not that it does not work at all. *See* Duffy Dep. 135:16–24 (explaining he used four separate pieces as opposed to one because while one, wrap-around joint encasement section could work, "[w]e have *sometimes* situations . . . in construction, where you can't wrap around a duct on a site," as "[t]here is just no room." (emphasis added)). There may well be some sites in which there is sufficient room to "wrap around" a duct, and in those situations, a one-section "joint encasement section" would work.

\*    \*    \*

For the foregoing reasons, the term "joint encasement section" is construed as "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules."

d.    "joined directly"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "joined directly" | Plain and ordinary meaning; no construction needed | "joined without any intervening components" | No construction needed |

The term "joined directly" appears in each of the Independent Claims. For example, Claim 1 partly teaches "a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector." '569 Patent col. 8 ll. 60–64, J.A. 0015. Defendants purport to "propose[] a construction that is based on the plain and ordinary meaning but ensures necessary clarification that no intervening components are between the exterior flange connector and the inner duct liner." Opening Br. 24–25 (citation

54

omitted).  DuraSystems argues this term should not be construed because there is no dispute regarding its construction and construing it "would not change the outcome of any claim or defense in the case."  Pl.'s Br. 25.

Only terms that are in controversy must be construed, "and only to the extent necessary to resolve the controversy."  *Vivid Techs., Inc.*, 200 F.3d at 803 (citation omitted).  Indeed, just because claim construction is an issue of law does not mean a district judge "must repeat or restate every claim term."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."  *Id.*; *cf. Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims . . . .").  When a court is presented with a purported claim construction dispute, "[a] threshold question . . . is [therefore] whether and to what extent construction is even necessary."  *Warner Chilcott Co. v. Mylan Inc.*, Civil Action Nos. 11-6844 (JAP), 11-7228(JAP), 2013 WL 3336872, at *3 (D.N.J. July 2, 2013) (citation omitted).

As the term "joined directly" is not in controversy, it is not necessary to construe it.  Indeed, while Defendants claim "[t]he parties dispute the meaning of the word 'directly' tied to the word 'joined,'" Opening Br. 25, they do not identify any dispute.  In fact, they do not even identify DuraSystems's supposedly contrary position.  While they say their proposed construction "ensures necessary clarification," *id.* at 24–25, and cite a Federal Circuit case that explains a term may need to be construed when it has "more than one 'ordinary' meaning or

**Appx55**

when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute," *id.* at 25 (quoting *O2 Micro Int'l*, 521 F.3d at 1361), they neither explain why clarification is necessary nor identify more than one "ordinary meaning" of "joined directly."

Defendants implicitly argue this term should be construed because it is relevant to whether they can show the existence of an acceptable non-infringing alternative to the invention claimed in the '569 Patent. *See* Reply Br. 15. They are correct that the existence of a non-infringing alternative is relevant to two types of patent infringement damages: lost profits, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("[L]ost profits, . . . cannot be recovered if acceptable non-infringing alternatives were available during the period of infringement."), and royalties, *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996) (directing a district court to reconsider its reasonable royalty award in light of the defendant's ability to market a non-infringing alternative). But "[w]hether a non-infringing alternative is acceptable is a question of fact," *Meridian Mfg., Inc. v. C & B Mfg., Inc.*, 340 F. Supp. 3d 808, 846 (N.D. Iowa 2018) (citing *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991)), and "while claim construction involves determining the scope of the claim terms as a matter of law, it is not the task of the court to determine whether" a non-infringing alternative exists, *cf. Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2993856, at *6 (N.D. Cal. July 20, 2012) (citation omitted) (declining to construe a claim term because the dispute thereon was not about its construction but about the factual issue of whether it was disclosed by a prior art reference). This Court will not, under the guise of claim construction, give the term "joined directly" whatever clarification is required to facilitate a non-infringing alternative determination and thereby take that issue away from a jury. *Cf. PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (determining a court may

not "under the rubric of claim construction, . . . give a claim whatever additional precision or specificity is necessary to facilitate a comparison between the claim and [an anticipatory reference] . . . the task of determining whether the [reference discloses the claim limitation] is for the finder of fact").

Accordingly, the claim term "joined directly" shall not be construed.

## II. The Motions for Leave to File Under Seal

DuraSystems and Defendants both move for leave to file under seal documents supporting their respective claim construction briefs. Defendants move for leave to file under seal excerpts from Duffy's deposition because they contain "information represented by [DuraSystems] as being highly sensitive business information, the disclosure of which is likely to cause significant harm to [DuraSystems]." Defs.' Mot. Leave File Under Seal 1. DuraSystems moves for leave to file under seal excerpts of the deposition of Billie Joe Sims because the transcript thereof was "designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY and therefore falls under the protection of the parties' Stipulated Protective Order and the protection of the Court." *See* Pl.'s Mot. Leave File Under Seal 1. Both motions are unopposed.

Generally, "the record of a judicial proceeding is public." *Jessup v. Luther*, 277 F.3d 926, 927 (7th Cir.[20] 2002). Those "who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by

---

[20] A motion for leave to file under seal, which does not involve substantive issues of patent law, is governed by the law of the regional circuit in which a district court sits. *See Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1220 (Fed. Cir. 2013) (citation omitted) (applying regional circuit law to determine whether the district court abused its discretion in denying a motion for leave to file under seal); *see also ABS Glob., Inc. v. Inguran, LLC*, 14-cv-503-wmc, 2017 WL 3588290, at *1 n.2 (W.D. Wis. Apr. 5, 2017) ("As with other issues not exclusive to patent law, the Federal Circuit applies regional circuit law regarding confidentiality." (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 497 F. App'x 66, 67 (Fed. Cir. 2013))). Therefore, the Court shall follow Seventh Circuit law.

public (and publicly accountable) officials." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). As such, "when a court finds it necessary to consider certain information in making a decision, that information should ordinarily be made available to public scrutiny in order to preserve the integrity of the judicial process." *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, Case No. 4:13-cv-4021-SLD-JAG, 2013 WL 5973938, at *20 (C.D. Ill. Nov. 8, 2013) (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002); *Union Oil*, 220 F.3d at 567–68)). As the Seventh Circuit has explained, "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter*, 297 F.3d at 545.

These principles are supplemented by this Court's Local Rules. Under Local Rule 5.10:

> A party who has a legal basis for filing a document under seal without prior court order must electronically file a motion for leave to file under seal. The motion must include an explanation of how the document meets the legal standards for filing sealed documents. The document in question may not be attached to the motion as an attachment but rather must be electronically filed contemporaneously using the separate docket event "Sealed Document."

CDIL-LR 5.10(A)(2).

If a motion for leave to file under seal is denied, "the document tendered will remain under seal, and it will not be considered by the presiding judge for any purpose." *Id.* 5.10(A)(4).

As an initial matter, both motions are substandard. First, Defendants erroneously filed their motion both in regular order and under seal. Defs.' Mot. Leave File Under Seal (filed publicly); Defs.' Mot. Leave File Under Seal Certain Docs., ECF No. 34 (filed under seal with the sealed documents attached as exhibits thereto). Second, and more importantly, both motions contain little to no explanation as to how they "meet[] the legal standards for filing sealed documents." *See* CDIL-LR 5.10(A)(2). While Defendants say the sealed excerpts from Duffy's

deposition contain information that constitutes "highly sensitive business information, the disclosure of which is likely to cause significant harm to [DuraSystems]," Defs.' Mot. Leave File Under Seal 1, they do not explain how disclosure could harm DuraSystems or why such harm could justify secrecy. *See Baxter*, 297 F.3d at 547 ("Beyond asserting that the document must be kept confidential because we say so (the 'agreement is, by its terms, confidential'), this contends only that disclosure 'could . . . harm Abbott's competitive position.' How? Not explained. Why is this sort of harm (whatever it may be) a legal justification for secrecy in litigation? Not explained." (alteration omitted)). While DuraSystems states the transcript of the deposition of Billie Joe Sims was "designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY," *see* Pl.'s Mot. Leave File Under Seal 1, just because Defendants' counsel said they are confidential does not make them so under Seventh Circuit precedent, *see Orthofix Inc. v. Gordon*, Case No. 1:13-cv-01463-SLD-TSH, 2016 WL 1273160, at *5 (C.D. Ill. Mar. 31, 2016) ("[T]he parties have simply indicated in their motions that the documents in question have been designated 'Confidential' by agreement of the parties, and offer this as sufficient reason that the documents be filed under seal. This is inadequate; as the [Local Rules] state[], motions to file under seal must provide a legal basis for granting the request."); *cf. Union Oil*, 220 F.3d at 567–68 (explaining "[c]alling a settlement confidential does not make it a trade secret, any more than calling an executive's salary confidential would require a judge to close proceedings if a dispute erupted about payment (or termination)" and noting "requests to seal proceedings in order to implement the parties' preference for seclusion. . . . have been uniformly rejected" (collecting cases)).

However, the Court has not relied on any portion of the documents filed under seal in addressing the parties' claim construction disputes. Accordingly, both motions for leave to file

**Appx59**

under seal are denied, and the sealed documents shall remain sealed. *See Bd. of Trs. of Univ. of Ill. v. Micron Tech., Inc.*, 245 F. Supp. 3d 1036, 1043 (C.D. Ill. 2017) (denying a motion for leave to file under seal after noting the material portions of the documents relevant thereto were not relied upon). The Court will not consider them for any purpose. *See* CDIL-LR 5.10(A)(4).

## CONCLUSION

For the foregoing reasons, consideration of the claim terms asserted to be indefinite is DEFERRED and the motions for leave to file under seal, ECF Nos. 33, 37, are DENIED. The claim terms not asserted to be indefinite are, in accordance with and subject to the above discussion, construed as follows:

- "thermal spacers thermally isolating": "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing"

- "exhaust duct module": "a section of pre-fabricated, factory-built exhaust duct"

- "joint encasement section": "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules"

- "joined directly": No construction needed

Entered this 3rd day of September, 2021.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

E-FILED
Friday, 31 March, 2023  02:07:32 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DURASYSTEMS BARRIERS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Consolidated Case No. 1:19-cv-01388- |
| | ) | SLD-JEH |
| VAN-PACKER CO. & JEREMIAS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Before the Court are Plaintiff DuraSystems Barriers Inc.'s Motion for Summary

Judgment of Patent Infringement, ECF No. 63; Motion for Summary Judgment of No Invalidity,

ECF No. 64; and Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct

Affirmative Defense, ECF No. 65.  Also before the Court is Defendants Van-Packer Co. ("Van-

Packer") & Jeremias, Inc.'s Motion for Summary Judgment of Noninfringement and Invalidity,

ECF No. 67.[1]  Defendants moved to file certain exhibits under seal, ECF No. 68, as did Plaintiff,

ECF No. 75.  For the following reasons, Plaintiff's Motion for Summary Judgment of Patent

Infringement is GRANTED; Plaintiff's Motion for Summary Judgment of No Invalidity is

DENIED; Plaintiff's Motion for Summary Judgment Dismissing Defendants' Inequitable

Conduct Affirmative Defense is GRANTED; and Defendants' Motion for Summary Judgment of

Noninfringement and Invalidity is DENIED as to non-infringement, DENIED as to

indefiniteness, DENIED as to written description, DENIED as to enablement, DENIED as to lost

profits, and GRANTED as to convoyed sales.  Both motions to seal are DENIED.

---

[1] Defendants moved for leave to file excess pages in their summary judgment motion, ECF No. 62, but later moved to withdraw that motion, ECF No. 71.  Defendants seek to withdraw the motion as their summary judgment motion in fact complies with the type volume limitation set out by the Local Rules.  *See* Mot. Withdraw 1.  The motion to withdraw is accordingly granted.  The Clerk is directed to strike Defendants' motion for leave to file excess pages.

1

## BACKGROUND

This is a patent dispute.  Much of its procedural history and many of the underlying facts have already been recited.  *See* Sept. 3, 2021 Order 1–5, ECF No. 45.  The Court will introduce additional facts throughout its analysis; a high-level overview here will suffice.

It is undisputed that Plaintiff owns U.S. Patent No. 10,024,569 (the "'569 Patent").  *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 1–2, ECF No. 77.  Inventor William Duffy is Plaintiff's president.  *See* Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 3, ECF No. 79.  The '569 Patent describes "a modular fire-rated exhaust duct assembly" containing "two or more exhaust duct modules."  U.S. Patent 10,024,569 col. 2 ll. 26–28, ECF No. 32-1.  The exhaust duct modules have an inner duct liner, an outer casing, and a void between them.  *Id.* col. 2 ll. 28–31.  The void is configured to "receiv[e] . . . insulation material."  *Id.* col. 2 ll. 31–32.  Most important here is that the void includes "one or more thermal spacers," which are "configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void."  *Id.* col. 2 ll. 33–36.

Defendants sell certain exhaust duct products (the "Accused Products") that Plaintiff alleges infringe various claims of the '569 Patent (the "Asserted Claims").  *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 1–2.  This litigation arises from those allegations.  *See* First Am. Compl. ¶¶ 33–49, ECF No. 17.  Both parties now seek summary judgment as to myriad aspects of this case: liability, various defenses, and certain damages.

## DISCUSSION

### I.      Motions to Seal Exhibits

Defendants seek to file Exhibits A, G, H, and I to their motion for summary judgment under seal because those exhibits "contain information designated as confidential."  Defs.' Mot.

Leave File Under Seal 1.  Plaintiff, meanwhile, seeks to file Exhibits Q and S to its supplemental appendix under seal because those exhibits "are excerpts of deposition transcripts designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY and therefore fall under the protection of the parties' Stipulated Protective Order."  Pl.'s Mot. Leave File Under Seal 1.  Neither motion cures the deficiencies previously identified by the Court.  *See* Sept. 3, 2021 Order 57–60 (denying the parties' "substandard" motions for leave to file certain exhibits to their respective claim construction briefs under seal, explaining that "just because . . . counsel said they are confidential does not make them so under Seventh Circuit precedent"). Claims of confidentiality must be specifically justified.  *See Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 546 (7th Cir. 2002) (outlining the requisite analysis and describing a motion that "did not analyze the applicable legal criteria or contend that any document contains a protectable trade secret or otherwise legitimately may be kept from public inspection despite its importance to the resolution of the litigation" as "[s]o perfunctory . . . that it could have been summarily rejected"); *United States v. Foster*, 564 F.3d 852, 854 (7th Cir. 2009) (emphasizing that "[t]he law could not be clearer" in light of *Baxter International*); *see also Diamond Servs. Mgmt. Co. v. C&C Jewelry Mfg., Inc.*, Case No. 19 C 7675, 2021 WL 4258800, at *7 (N.D. Ill. May 11, 2021) ("[U]nder the common law of the Seventh Circuit, material . . . may not be sealed simply because one or more parties sought to give it confidential treatment under a protective order. Rather, a basis must exist for keeping from the public the material requested for sealing.").

The parties have been already admonished that motions to seal must be specific and "include an explanation of how the document[s] meet[] the legal standards for filing sealed documents," Civil LR 5.10(A)(2).  Civil Local Rule 5.10(A)(4) permits the Court to, "in its discretion, order a sealed document to be made public if (1) the document is filed in disregard of

legal standards, or (2) if the document is so intricately connected with a pending matter that the interests of justice are best served by doing so." The former is the case here as the parties' motions have been filed in contravention of the Local Rules and Seventh Circuit precedent. And the latter is the case here because documents such as expert reports on infringement and damages are without doubt of critical importance to this matter. *See Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-298, 2014 WL 2894898, at *6 (E.D. Wis. June 26, 2014) ("Damages are a key component of any civil action, and thus the underlying evidence must be largely open to public scrutiny."); *cf. City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 698 (7th Cir. 2014) ("Public access depends on whether a document influenc[ed] or underpin[ned] the judicial decision." (alterations in original) (quotation marks omitted)). For these reasons, the parties' motions to seal are DENIED. The Clerk is DIRECTED to unseal the exhibits on the docket at ECF No. 69-1, ECF No. 69-2, ECF No. 69-3, ECF No. 69-4, ECF No. 76-1, and ECF No. 76-2.

## II.    Motions for Summary Judgment

### a.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where one party has properly moved for summary judgment, the non-moving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The court's function is

**Appx64**

not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence "in the light most favorable to the non-moving party[] and draw[] all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

## b. Analysis

### i. Infringement

Both parties have moved for summary judgment as to infringement. "A determination of infringement generally requires a two-step analysis—the court first determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022). "Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device." *In re Gabapentin Pat. Litig.*, 503 F.3d 1254, 1259 (Fed. Cir. 2007). "[O]n summary judgment, the issue is whether there is no genuine issue of material fact regarding infringement." *Id.* "Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

The parties have narrowed the inquiry to a single question. As Plaintiff puts it, "[t]he issue . . . has been reduced to whether the Accused Products satisfy the 'thermal spacers thermally isolating' claim limitation because Defendants do not dispute that every other

limitation of the Asserted Claims is present in the Accused Products." *See* Pl.'s Mot. Summ. J. Infringement 7. In Defendants' words, Plaintiff's "case depends entirely on whether [their Accused Products] include[] a thermal spacer." *See* Defs.' Mot. Summ. J. 7.

The Court previously construed "thermal spacers thermally isolating" to mean "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." *See* Sept. 3, 2021 Order 33 (quotation marks omitted). Defendants primarily argue that their spacers do not limit heat and therefore cannot be thermal spacers. Defs.' Mot. Sum. J. at 14–17. Defendants' spacers are made of steel, *id.* at 15; Pl.'s Resp. Defs.' Mot. Summ. J. 17–18, and Van-Packer's infringement expert, Timothy Morse, conducted modeling demonstrating that the Accused Products' steel spacers increase the transfer of heat between the inner duct and outer casing such that portions of the outer casing become hotter when metal spacers are included. *See* Defs.' Mot. Summ. J. 15–17 (citing Morse Rebuttal Report 17–20, ECF No. 69-1). As a result, Defendants contend that their spacers cannot be thermal spacers as their spacers do not limit the amount of heat conducted through the components. *See id.* at 17 ("Because both expert witnesses agree that the . . . spacers increase the transfer of heat between the inner and outer walls, rather than limit it, the Accused Products do not include one or more thermal spacers and cannot infringe."); *see also* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 9–12, ECF No. 77 (advancing the same argument—that "the transfer of heat between the inner duct liner and the outer casing actually increases when [Defendants'] spacers are used" and therefore the spacers are not thermal spacers—in response to Plaintiff's Motion for Summary Judgment of Patent Infringement (emphasis omitted)).

**Appx66**

Plaintiff responds that Defendants improperly truncate and misapply the Court's full construction. *See* Pl.'s Resp. Defs.' Mot. Summ. J. 32–33; *see also* Pl.'s Mot. Summ. J. Infringement 9–11 (advancing this argument affirmatively in support of summary judgment). That is, thermal spacers may increase the transfer of heat to certain portions of the outer casing but still "limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." *See* Pl.'s Resp. Defs.' Mot. Summ. J. 32–33 (quotation marks omitted) ("Defendants' argument that their thermal spacers conduct more heat than no spacers at all is irrelevant to whether they limit the amount of heat conducted through the thermal spacers to the degree required by the claims . . . ."). The Court agrees with Plaintiff that its construction of "thermal spacers" does not require thermal spacers to decrease or fail to increase heat as compared to the absence of spacers, but rather to limit or cap the amount of heat conducted such that fire testing does not create fail points. *See* Sept. 3, 2021 Order 27–31; *cf. id.* at 27–28 (distinguishing "isolating" and "limiting" from "minimizing").

The question then becomes, do Defendants' spacers perform that function? Defendants argue their spacers do not because their spacers "are designed with holes . . . where the insulation creeps through the . . . metal spacers." *See* Defs.' Mot. Summ. J. 17–18. Because the "air occupying the holes is what limits heat transfer," Defendants' spacers cannot be thermal spacers because "the spacer *itself* must thermally isolate." *See id.* at 17 (emphasis altered). Defendants point to the deposition of Plaintiff's infringement and invalidity expert Tony Crimi to suggest that Crimi agrees that the "air [in the holes] . . . limits the flow of heat," not the spacers themselves. *See id.*

7

**Appx67**

Plaintiff responds that Defendants misrepresent Crimi's opinion. *See* Pl.'s Resp. Defs.' Mot. Summ. J. 33–34. Crimi's expert report as to infringement and May 11, 2022 deposition testimony provide clarity as to his perspective. For example, in the former, Crimi opines that Defendants' spacers are thermal spacers because

> they are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing. Specifically, the cutout portions of the spacers are designed to limit the transfer of heat through the spacer between the inner duct liner and the outer casing.

*See id.* at 34 (quoting Crimi Report 17, ECF No. 67-12); *see also* Crimi May 11, 2022 Dep. 45:3–12, ECF No. 67-3 (expressing a belief that Defendants' spacer "has the holes in it . . . to reduce heat transfer"); *id.* at 91:8–14 (explaining that the spacers' holes "provide[] an outlet for radiation of heat" to be absorbed by the insulation rather than transmitted through the cavity); *id.* at 96:11–22 (explaining that holes in the spacer "radiat[e heat] into the cavity where the insulation is"); *id.* at 219:7–11 (defining the metal spacer "[a]s the entirety of that part that includes both the metal strip and the voids").

Defendants characterize the parties' dispute as "center[ing] on what is actually performing the step of limit[ing] the amount of heat." *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 13 (second alteration in original). The Court finds that the parties generally agree as to how Defendants' spacers *work* but dispute whether a spacer can *be* a thermal spacer if its design includes holes, cutout portions, voids, or perforations (the parties have used all of these terms) that facilitate thermal isolation. *Cf.* Pl.'s Resp. Defs.' Mot. Summ. J. 34 ("Mr. Crimi's explanation that the cutouts or 'voids' in the thermal spacers allow the thermal spacers to limit the transfer of heat by dissipating heat into 'air' of the openings is entirely consistent with the position set forth in his expert report.").

Defendants argue that the Court's claim construction makes clear a spacer cannot have holes. *See* Defs.' Mot. Summ. J. 17 (citing Sept. 3, 2021 Order 22). First, Defendants argue that a thermal spacer cannot contain holes because a thermal spacer must maintain the space between the inner duct liner and the outer casing and holes do not maintain space. *See id.* To be sure, holes *without* a spacer could not maintain a spaced relationship, but that a spacer is not solid does not preclude its overall ability to maintain a space between the inner duct liner and outer casing.

Defendants also argue that the holes cannot be considered part of the spacer in light of the claim language. Per Defendants, the '569 Patent "distinctly claims *the void* separately." *See id.* at 18 (emphasis added). The '569 Patent does make clear that the duct modules contain *a* void between the inner duct liner and outer casing. *See id.* at 17–18. But Defendants' argument relies too heavily on the word "void" and offers too little in the way of analysis of the actual claim language. Perforations *in the spacer* are not themselves a "void . . . between at least at least a portion of space between said inner duct liner and said outer casing," *id.* at 17 (emphasis and quotation marks omitted).

To review, a "thermal spacer thermally isolating" is a component that "maintain[s] a space between the inner duct liner and outer casing that limit[s] the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing," Sept. 3, 2021 Order 33. The Court concludes that spacers with perforations or holes maintain a spaced relationship and limit the amount of heat conducted through the components so that they do not create fail points. This conclusion compels the Court to grant summary judgment as to infringement in Plaintiff's favor. Thus, Plaintiff's Motion for Summary Judgment of Patent Infringement is GRANTED and Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is DENIED as to non-infringement.

A final point: Defendants argue in their response to Plaintiff's Motion for Summary Judgment of Patent Infringement that Plaintiff "argues for an infringement read that renders its claims invalid." *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 16 (emphasis omitted). Defendants therefore ask the Court to "find that the Asserted Claims are indefinite." *See id.* at 17.  However, the indefiniteness arguments raised in Defendants' response do not match the indefiniteness arguments raised in Defendants' own summary judgment motion. *Compare id.* at 16–17 *with* Defs.' Mot. Summ. J. 23.  Most confusingly, Defendants' motion suggests Defendants intend to only incorporate certain arguments by reference, *see* Defs.' Mot. Summ. J. 23–24 (noting that Defendants "fully briefed" the indefiniteness of "compressible insulation material" at claim construction but not addressing Defendants' prior briefing with regard to the indefiniteness of "fire-rated" and failing entirely to address the indefiniteness of "specified fire rating"), but Defendants' response suggests otherwise, *see* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 16 ("During claim construction briefing, Defendants explained how the terms 'fire-rated' and 'specified fire rating' . . . are indefinite.").  This muddies the record, is arguably an end run around the summary judgment rules (because the claim construction briefs did not apply those rules or engage with the summary judgment standard), and ignores the Court's explicit instruction for Defendants to "*reassert* their indefiniteness arguments" at summary judgment, Sept. 3, 2021 Order 16 (emphasis added)—that is, to assert their arguments again in light of any new evidence to refine the issues before the Court and promote clarity in the record.  The Court will endeavor in the forthcoming invalidity analysis to address all relevant arguments that appear to have been raised by either party; however, any holes reflect the briefing.

**Appx70**

### ii. Invalidity

"[A]n alleged infringer may assert the invalidity of the patent—that is, he may attempt to prove that the patent never should have issued in the first place." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 96 (2011). Because "[p]atents are presumed to be valid," *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009), invalidity must be "prove[n] . . . with clear and convincing evidence," *Impax Lab'ys, Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). "[A] judgment of invalidity necessarily moots the issue of infringement." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir. 2004); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 648 (2015) (Scalia, J., dissenting) ("It follows, as night the day, that only valid patents can be infringed. To talk of infringing an invalid patent is to talk nonsense.").

Defendants raise four invalidity defenses: (1) obviousness, Def.'s Sec. Corrected Final Unenforceability & Invalidity Contentions 10–11, ECF No. 66-16; (2) lack of enablement, *id.* at 13; (3) lack of written description, *id.* at 14; and (4) indefiniteness, *id.* at 14. Defendants seek summary judgment as to lack of enablement, lack of written description, and indefiniteness. *See* Def.'s Mot. Summ. J. 18–24. Plaintiff, meanwhile, seeks summary judgment as to Defendants' obviousness defense. *See generally* Pl.'s Mot. Summ. J. No Invalidity.

### 1. Indefiniteness

A patent specification must "particularly point[] out and distinctly claim[]" its subject matter. 35 U.S.C. § 112(b). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The key question regarding indefiniteness is

11

**Appx71**

"whether the claims, not particular claim terms," meet the *Nautilus* indefiniteness standard.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1231–32 (Fed. Cir. 2016) (quotation marks and citations omitted).  Nevertheless, the Federal Circuit has recognized that "the common practice of training questions of indefiniteness on individual claim terms is a helpful tool. Indeed, if a person of ordinary skill in the art cannot discern the scope of a claim with reasonable certainty, it may be because one or several claim terms cannot be reliably construed." *Id.* at 1232.

At claim construction, Defendants argued the indefiniteness of the terms "fire-rated," "specified fire rating," and "compressible insulation material."  Def.'s Opening Claim Const. Brief 6, ECF No. 31.  The Court deferred construction of those terms so that indefiniteness and claim construction could "be assessed together on a full discovery record" and instructed Defendants to "reassert their indefiniteness arguments" at summary judgment.  *See* Sept. 3, 2021 Order 15–16.  Defendants now argue the terms "fire-rated," "compressible insulation material," and "thermal spacer" are indefinite.  Def.'s Mot. Summ. J.  *Id.* at 23–24.  The Court considers each claim term in turn to determine whether it is indefinite.

### a.  "Fire-Rated"

The Court must first determine whether the term "fire-rated" can be construed.  *See* Sept. 3, 2021 Order 16.  The ground rules of claim construction have already been established, *see id.* at 5–9, as has the identity and background of a person of ordinary skill in the art (sometimes called a "POSITA," among other permutations), *see id.* at 16–17.[2]

---

[2] At claim construction, the parties agreed that

> a POSITA would have a technical certification as a sheet metal worker or sheet metal mechanic, which is typically a five-year certification, or with equivalent work experience in the field of fire-rated duct systems.  Further, he or she may also have a bachelor's degree in mechanical engineering or [a] related field, and . . . experience could replace formal training, such that a person with five or

12

**Appx72**

The term "fire-rated" appears in a similar manner throughout the Asserted Claims. Claim 6, for example, claims in relevant part a "modular **fire-rated** exhaust duct assembly." '569 Patent col. 9 l. 27 (emphasis added). The term also appears elsewhere throughout the specification. For instance, the specification explains that "ventilation or exhaust ducts for flammable or hazardous materials cannot be configured with fire dampers, so the duct itself **must be fire-rated**." *Id.* col. 1 ll. 27–29 (emphasis added). The specification continues:

> To be classified as a **fire-rated** duct, an exhaust duct must be capable of preventing the release of flammable materials from inside the duct and/or combustible materials adjacent the exterior of the exhaust duct from catching fire if a fire exists on the other side of the duct. In other words, a **fire-rated** duct must be capable of minimizing the transfer of heat through or across the duct walls.

*Id.* col. 1 ll. 30–36 (emphasis added).

At claim construction, Defendants argued that this language was "confusing" because it "posits that, to be 'fire[-]rated,' a duct does not need to pass any test, but rather need only be 'capable of minimizing the transfer of heat through or across the duct walls.'" Defs.' Opening Claim Const. Brief 8. (quoting '569 Patent col. 1 ll. 30–37). Defendants went on to argue that many different fire rating tests exist and therefore a POSITA would not understand which test to apply. *See id.* at 9–11. Plaintiff proposed (and presumably still supports) the construction "rated for fire resistance with reference to its ability to withstand a standard fire resistance test," arguing that all that is required is that the duct pass *a* fire test. *See* Pl.'s Resp. Claim Const. Brief 5–10, ECF No. 36.

At summary judgment, Defendants primarily argue the term "fire-rated" is indefinite because "no fire rating standards exist for laboratory ducts." Defs.' Mot. Summ. J. 23. This

---

more years of experience working in the exhaust duct field would have appropriate training to be a POS[IT]A.

Sept. 3, 2021 Order 17 (alterations in original) (quotation marks and citations omitted).

argument appears to be in tension with Defendants' prior two indefiniteness arguments. Now the POSITA is not confused as to whether fire-rated refers to the capabilities of the duct.[3] Nor is the POSITA paralyzed in the face of the *entire universe* of fire tests. Instead, the POSITA lacks reasonable certainty as to the scope of the claims because he seeks to apply an installation-specific test that does not exist. *See id.*

However, the specification does not support that an installation-specific fire test must be applied. If anything, it dispels that conclusion: If "[f]ire-rated ducts are typically found in installations such as commercial kitchens and laboratories," *see* '569 Patent col. 1 ll. 38–39, and the POSITA knows there is no installation-specific test for laboratories, then "fire-rated" cannot mean "rated for fire resistance with reference to its ability to withstand an *installation-specific* fire resistance test."

The POSITA must know, then, that the "specified fire rating" that must be provided, *see id.* col. 9 ll. 27–30 (claiming "a modular fire-rated exhaust duct . . . wherein said inner duct liner and said outer casing . . . hav[e] a thickness to provide a specified fire rating"), is not determined by whether the duct is in a kitchen or a laboratory; rather, it reflects the standards promulgated by nationally and internationally recognized organizations existing to determine those standards, *see id.* col. 4 ll. 28–31 (referring to "requirements under the UL 2221 and ASTM E2336

---

[3] Although "words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history," a patentee may "set[] out a definition and act[] as his own lexicographer." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). At claim construction, Defendants suggested based on the specification language regarding classification that "the patentee chose to 'classify' (i.e., define) the term 'fire[-]rated,' not, as one might expect with reference to a very specific standard test, but instead with reference to a vague 'capability' of an exhaust duct." Defs.' Opening Claim Const. Brief 7–8. This argument was and remains underdeveloped. To act as a lexicographer, a patentee must "clearly set forth a definition of the disputed claim term, and clearly express an intent to define the term." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quotation marks omitted). Given that the standard for finding lexicography is "exacting," *id.*, the Court cannot agree that the specification language regarding classification constitutes lexicography. That the patent specification references "fire exposure tests" in several places also undermines that conclusion. *See* '569 Patent col. 4 ll. 46–47 (referencing techniques that "can provide mechanical strength to pass the fire exposure tests"); *id.* col. 6 ll. 9–16.

standards"). Thus, a fire-rated exhaust duct is simply an exhaust duct that has attained a fire rating, the determination of which is a straightforward inquiry based on whether or not the duct has been rated.

Thus, the Court concludes that fire-rated is not an indefinite claim term. The Court adopts the construction "rated for fire resistance with reference to its ability to withstand a recognized standard fire resistance test."

### b. "Compressible Insulation Material"

Defendants reassert their arguments at claim construction with respect to the indefiniteness of the term "compressible insulation material." Defs.' Mot. Summ. J. 23–24. At claim construction, Defendants argued that "compressible insulation material" was indefinite because "[t]he specification of the '569 Patent does not provide a standard for measuring the scope of 'compressible'" and "[t]he claims as a whole require a non-customary, ill-defined meaning" of the term. Defs.' Opening Claim Const. Brief 11–12. Plaintiff, meanwhile, proposed the construction "insulation material whose thickness changes under the weight of the inner duct." Pl.'s Resp. Claim Const. Brief 10.

The parties agree that "compressible" is a term of degree, *see id.* at 11 ("Plaintiff does not dispute that 'compressible' is a term of degree . . . ."), which frames the analysis. The Federal Circuit "ha[s] time and again had the occasion to consider the definiteness of claims containing descriptive words or terms of degree." *Niazi Licensing Corp.*, 30 F.4th at 1347. "Ultimately, patent claims with descriptive words or terms of degree must provide objective boundaries for those of skill in the art in the context of the invention to be definite." *Id.* at 1349 (quotation marks omitted). That is, terms of degree are permissible so long as they "provide[] enough

certainty to one of skill in the art when read in the context of the invention." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quotation marks omitted).

"[T]he written description is key to determining whether a term of degree is indefinite." *Id.* at 1378. Thus, the Court begins with the language of the '569 Patent itself. Its language makes clear that the "compressible insulation material" must occupy the void between the inner duct and outer casing. '569 Patent col. 3. ll. 10–14. Indeed, in summary and according to an embodiment, "[t]he void is configured with thermal spacers to prevent the insulation from being unduly **compressed** or crushed." *Id.* col. 8 ll. 14–19 (emphasis added). Thus, the '569 Patent suggests that compressible insulation must occupy the void between the inner duct and outer casing and also be compressible enough such that the thermal spacers effectuate the prevention of undue crushing compromising the material's insulative properties.

Thus, the Court disagrees with Defendants' assertion there are no objective boundaries for "compressible" contained in the '569 Patent, *see* Defs.' Opening Claim Const. Brief 12, as well as Defendants' related insinuation that the importance of preventing the crushing of the insulation appears nowhere in the '569 Patent, *see* Defs.' Reply Claim Const. Brief 5, ECF No. 41. Defendants seem to assume that objective boundaries must be numerical or tethered to a precise measurement (such as threshold density or elasticity) in order to be objective. *See* Defs.' Opening Claim Const. Brief 12–13. But this focus on "numerical values" is misplaced. *See* Defs.' Reply Claim Const. Brief 5. "[A]bsolute or mathematical precision is not required," as the question is whether a patent "provide[s] objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014). The specification provides this exact guidance.

16

**Appx76**

Extrinsic evidence, to the extent the Court must consider it, bolsters this conclusion. Presumably in response to Defendants' argument at claim construction that pegging compressibility to the efficacy of the insulation would yield "ridiculous results" and be technically unworkable, *see* Defs.' Reply Claim Const. Brief 6, Plaintiff enlisted expert Mark Colton to determine whether the insulation material in Van-Packer's duct was compressible, *see generally* Colton Report, ECF No. 74-5. Defendants respond that "reliance on an expert report relating to the compressibility of Defendants' Accused Products is insufficient to avoid indefiniteness" because "[i]t is undisputed" Defendants use compressible insulation. *See* Defs.' Reply Supp. Defs.' Mot. Summ. J. 11, ECF No. 81 (emphasis omitted). But Plaintiff explained that the purpose of the report was not to prove that Defendants use compressible insulation material, but disprove Defendants' argument that it would be necessary to perform a complicated and uncertain fire test to determine if compressible insulation material qualifies as such. *See* Pl.'s Resp. Mot. Summ. J. 48.

Defendants' only remaining argument is that dependent claim 18 invokes "insulation board." *See* Defs.' Reply Claim Const. Brief 6–7 (quoting '569 Patent col. 10 ll. 60–63). Defendants argue Plaintiff's construction is incompatible with claim 18 because insulation board cannot be compressed. *See id.* But insulation board can be compressed, even according to Defendants' expert Barry Cheek, who testified at deposition that a person of ordinary skill in the art would understand that compressible insulation is insulation that would be compressed in the absence of the spacers, that ducts may contain fiberglass insulation boards, and that "you don't want them to compress because you're negating some of that insulating capability because the air gaps [in the board] are what is your friend when it comes to insulating." *See* Cheek Dep. Excerpt 108:4–20, ECF No. 36-2; *see also id.* at 110:9–15 (responding "[y]eah, you would definitely

17

**Appx77**

want to have some type of spacer in there for sure" after Plaintiff's counsel asked if it was important to have spacers maintain the void when using fiberglass insulation board because "there's a risk that the fiber insulation board would become compressed").

Thus, the Court concludes that compressible insulation material is not an indefinite claim term. The Court adopts the construction "insulation material whose thickness changes under the weight of the inner duct."

### c. "Thermal Spacers"

Finally, Defendants argue that the claim term "thermal spacers," which the Court already construed in conjunction with the claim term "thermally isolating," *see* Sept. 3, 2021 Order 32–33, is indefinite because a POSITA would need to run a fire test to know if a thermal spacer thermally isolates, *see* Defs.' Mot. Summ. J. 23. Defendants go on to assert that "[a] claim that recites both a system (the duct) and a method (testing that must be done to know if a spacer is a thermal spacer)" fails to "apprise one of ordinary skill in the art of its scope and is invalid as being indefinite." *See id.*

The Court finds no support for Defendants' argument that "thermal spacers" must be indefinite because a POSITA must run a fire test to determine if a thermal spacer thermally isolates. To the contrary, "[d]efiniteness does not require that a potential infringer be able to determine *ex ante* if a particular act infringes the claims." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 40 (Fed. Cir. 2020).

Defendants' bare assertion that claims in the '569 Patent constitute impermissible hybrid claims is perfunctory and undeveloped and thus cannot be persuasive. That a POSITA may have to run a fire test to determine that a thermal spacer thermally isolates does not mean that any claim in the '569 Patent recites a method of use, a practice that is impermissible because it

18

**Appx78**

obscures "whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]." *See UltimatePointer, LLC v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (alterations in original) (quotation marks omitted). "[A] . . . claim covering both an apparatus and a method of use of that apparatus is invalid," *see IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005), but Defendants neither identify nor analyze any claims, *cf.* Defs.' Mot. Summ. J. 23; Defs.' Reply Supp. Defs.' Mot. Summ. J. 10–11. "Thermal spacers" necessarily cannot fail as a claim reciting a system and a method because "thermal spacers" is not a claim. *Cf.* Pl.'s Resp. Defs.' Mot. Summ. J. 46 ("The *claims* recite a 'thermal spacer thermally isolating.' That is a structure, not a method." (emphasis added)). As a matter of law, Defendants cannot succeed on a threadbare argument that is entirely untethered from the claims of the '569 Patent and offer the Court no reason to disturb its prior conclusion as to the indefiniteness of "thermal spacers." Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is therefore DENIED as to indefiniteness. The Court concludes no claims challenged by Defendants in the motion are indefinite.

### 2. Written Description

"The test for sufficiency of a written description is whether the disclosure clearly allow[s] persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (alterations in original) (quotation marks omitted); *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019) ("Th[e] requirement is satisfied only if the inventor convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and

demonstrate[s] that by disclosure in the specification of the patent." (second and third alteration in original) (quotation marks omitted)). "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Defendants advance two arguments as to invalidity under the written description umbrella. First, Defendants argue that the written description requirement is not met because the '569 Patent "does not describe a 'fire-rated' laboratory duct." Defs.' Mot. Summ. J. 18 (capitalization altered); *see also id.* at 20 ("[T]he '569 Patent simply does not provide any description of a fire-rated laboratory duct."). As the Court understands it, Defendants are arguing that the '569 Patent claims "fire-rated" laboratory ducts but "that is more than what was invented and described in the patent" because no standards for laboratory ducts exist. *Id.* at 19.

To support this argument, Defendants point to *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336 (Fed. Cir. 2010). *Id.* at 18. Defendants tell the Court that, in that case, the Federal Circuit "invalidated a claim directed to any vertebrate and mammalian cDNA as being unsupported by a specification that only discussed one species, namely rat cDNA." *Id.* (quotation marks omitted) Defendants are actually describing *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1566–69 (Fed. Cir. 1997), which the Federal Circuit referenced throughout its opinion, *Ariad Pharms.*, 598 F.3d at 1349–57. In any event, neither case appears particularly instructive absent analysis and application from Defendants. *See Eli Lilly*, 119 F.3d at 1568 ("[A] description of rat insulin cDNA is not a description of the broad classes of vertebrate or mammalian insulin cDNA. A written description of an invention involving a *chemical* genus, like a description of a chemical species, requires a precise definition

**Appx80**

. . . ." (emphasis added) (quotation marks omitted)); *Ariad Pharms.*, 598 F.3d at 1354–55.

Defendants' passing reference to *Gentry Gallery, Inc. v. Berkline Corporation*, 134 F.3d 1473

(Fed. Cir. 1998), Defs.' Mot. Summ. J. 20, similarly lacks explanation. *See Gentry Gallery*, 134

F.3d at 1478–80 (concluding that claims in a sofa patent "directed to sectional sofas in which the

location of the recliner controls [wa]s not limited to the console" were invalid because "the

original disclosure clearly identifie[d] the console as *the only possible location* for the controls"

and "the scope of the right to exclude may be limited by a narrow disclosure" (emphasis added)).

The experts agree that a fire-rated duct can be used in a laboratory regardless of whether that

duct has a rating specific for laboratory installations, *see* Crimi Feb. 24, 2021 Dep. 224:21–

225:5, ECF No. 67-6; Morse Dep. 99:7–15, ECF No. 74-3, and neither the construction of the

term "fire-rated" nor the language of the specification compels a conclusion that the rating must

be specific to the installation, *see* '569 Patent col. 1 ll. 38–39 ("Fire-rated ducts are typically

found in installations such as commercial kitchens and laboratories.").

Defendants' second argument is more promising.  Defendants argue that the '569 Patent

fails the written description requirement as to "thermal spacers" and "thermally isolating."  *See*

Defs.' Mot. Summ. J. 20–21.  Defendants also contend that the '569 Patent contains insufficient

information regarding the thermal gasket.  *See id.* at 21.  Defendants emphasize that even Crimi

agreed when asked by Defendants' counsel if he would agree that the '569 Patent describes the

thermal spacer in terms of the function it performs rather what the thermal spacer is.  *See id.* at

20.

Plaintiff protests that Crimi's answer "was solicited through distraction and trickery" and

"[s]uch litigation tactics should not be condoned."  Pl.'s Resp. Defs.' Mot. Summ. J. 43–44.

This is attorney argument and not obvious from the record.  Though the Court agrees with

Plaintiff that summary judgment in Defendants' favor is not appropriate as to written description, it does not find Plaintiff has shown Defendants could not prevail given the intensely factual nature of the written description inquiry and the nature of the written description here. *See Nat'l Graphics, Inc. v. Brax Ltd*, 151 F. Supp. 3d 903, 915 (E.D. Wis. 2015) (noting that "generic directives simply instruct[ing] the public to accomplish the patent's stated goal . . . suggest[] that the inventor . . . had not actually reduced [the invention] to practice" and denying summary judgment in light of conflicting expert reports); *see also Crown Packaging Tech.*, 635 F.3d at 1384 ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate."). Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is thus DENIED as to written description. Whether the written description requirement has been satisfied cannot be resolved at summary judgment.

### 3. Enablement

The enablement requirement "enforces the essential *quid pro quo* of the patent bargain by requiring a patentee to teach the public how to practice the full scope of the claimed invention." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1099–1100 (Fed. Cir. 2020) (quotation marks omitted); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997) ("Patent protection is granted in return for an enabling disclosure of an invention . . . ."). The Federal Circuit has stated that this requirement "is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Auto. Techs. Int'l., Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007)) (quotation marks omitted).

22

**Appx82**

"[W]hether a patent satisfies the enablement requirement is a question of law based on underlying factual findings." *McRO*, 959 F.3d at 1096; *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) ("Enablement is a question of law based on underlying facts."). To prevail, the challenger "must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without undue experimentation." *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (quotation marks omitted). To do so, the challenger must first "put forward evidence that some experimentation is needed to practice the patented claim." *Id.* After the challenger makes this "threshold showing," *id.* at 1189, the Court then turns to the factors articulated in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988), to "determin[e] whether the amount of that experimentation is . . . 'undue' or sufficiently routine such that an ordinarily skilled artisan would reasonably be expected to carry it out." *Alcon Rsch. Ltd.*, 745 F.3d at 1188. These factors include

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d at 737.

Defendants contend that the '569 Patent requires undue experimentation and therefore fails the enablement requirement. *See* Defs.' Mot. Summ. J. 21–22. This is because, essentially, the '569 Patent does not teach how to pass a fire test and fire tests are uncertain, complex, and time-consuming. *See id.* Defendants assert that this is "exactly the 'starting point, the direction for further research,' that is not enabling." *Id.* at 22 (quoting *Auto. Techs. Int'l*, 501 F.3d at 1284).

Plaintiff responds that "[e]nablement is not precluded by some experimentation," Pl.'s Resp. Defs.' Mot. Summ. J. 36 (alteration in original) (quoting *Wands*, 858 F.2d at 736),[4] arguing that the experimentation here is not undue because how to perform and pass a fire test is "well known in the art," *id.* at 37 (quotation marks omitted). The Court finds the parties' (and their experts') dispute over the extent of the experimentation required by the '569 Patent is intensely factual, with the disputed facts precluding summary judgment as to enablement in either party's favor. *See Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 980 (N.D. Ill. 2010) (denying summary judgment as to enablement where parties presented conflicting expert reports). Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is thus DENIED as to enablement. Whether the enablement requirement has been satisfied cannot be resolved at summary judgment.

### 4. Obviousness

A patent is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. Obviousness "is a question of law based on underlying facts." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007) ("The ultimate judgment of obviousness is a legal determination."). The underlying factual inquiries include "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness." *ZUP, LLC*

---

[4] This is not an exact quote: Rather, the Federal Circuit stated in *Wands* that "[e]nablement is not precluded *by the necessity for* some experimentation." *Wands*, 858 F.2d at 736 (emphasis added).

*v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).

Plaintiff argues all four of Defendants' obviousness defenses, each based on a different combination of prior art, fail as a matter of law. As to the Coleman Combination, Zogg Combination, and SMACNA Manual Combination, Plaintiff argues that they "do not teach 'thermal spacers thermally isolating' that 'limit the amount of heat conducted through the components.'" *See* Pl.'s Mot. Summ. J. No Invalidity 1. As to the Duffy Combination, Plaintiff argues it does not teach spacers. *See id.* at 1–2.

Defendants respond that Plaintiff focuses on only a single issue: the teachings of the prior art, which are questions of fact. *See* Defs.' Resp. Pl.'s Mot. Summ. J. No Invalidity 9, ECF No. 78. As a general matter, the Court agrees that a motion for summary judgment cannot get very far by ignoring the relevant inquiry. Here, Plaintiff tells the Court it must consider three *Graham* factors to evaluate obviousness, yet only analyzes one and does not explain why its analysis is dispositive in light of the multipronged inquiry. *See* Pl.'s Mot. Summ. J. Invalidity 5–18. This appears to be error, because "[a] determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors" because "each of the *Graham* factors helps to inform the ultimate obviousness determination." *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016); *see also Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) ("[T]he obviousness inquiry requires examination of all four *Graham* factors. Indeed, courts must consider all of the *Graham* factors prior to reaching a conclusion with respect to obviousness." (citation omitted)). "[T]he strength of *each* of the *Graham* factors must be weighed in every case and must be weighted en route to the final determination of obviousness or non-obviousness." *WBIP, LLC*, 829 F.3d at 1328. Plaintiff's

art-by-art approach is too narrow.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

In any event, "[t]he teachings of a prior art reference are underlying factual questions in the obviousness inquiry."  *In re Kubin,* 561 F.3d 1351, 1355 (Fed. Cir. 2009).  Because those teachings are disputed here, and because Plaintiff offers no roadmap for the Court's consideration of the other *Graham* factors nor explains why its arguments are dispositive in light of the governing law, Plaintiff's Motion for Summary Judgment of No Invalidity is DENIED. Whether the '569 Patent is nonobvious (or obvious) cannot be resolved at summary judgment.

### iii.  Unenforceability

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc).  The Federal Circuit has called inequitable conduct the "atomic bomb" of patent law because "inequitable conduct regarding any single claim renders the entire patent unenforceable."  *Id.* at 1288 (quotation marks omitted).

Inequitable conduct takes multiple forms; one occurs when the patentee withholds material information.  *See Baxter Int'l, Inc. v. McGaw, Inc*., 149 F.3d 1321, 1327 (Fed. Cir. 1998) ("Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.").  Defendants contend Plaintiff's failure to disclose the SMACNA Manual constitutes inequitable conduct that renders the '569 Patent unenforceable.  *See, e.g.*, Defs.' Sec. Corrected Final Unenforceability & Invalidity Contentions 14–16.

Plaintiff seeks summary judgment as to inequitable conduct, arguing that Defendants cannot establish either prong of the defense, Pl.'s Mot. Summ. J. Inequitable Conduct 9; that is, Defendants cannot "establish both the materiality of the withheld reference *and* the applicant's intent to deceive," *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1352 (Fed. Cir. 2021) (emphasis added) (quotation marks omitted).  Defendants' response makes clear that Defendants cannot establish the second element as a matter of law.

Intent requires that "the accused infringer . . . prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."  *Therasense*, 649 F.3d at 1290.  Crucially, "[i]ntent to deceive may be found only if specific intent to deceive is the single most reasonable inference able to be drawn from the evidence.  If more than one reasonable inference is possible, intent to deceive cannot be found."  *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016) (quotation marks and citations omitted).

Plaintiff argues in its motion that Defendants lack evidence demonstrating that Duffy knew of the SMACNA Manual's materiality and withheld it with deceptive intent.  Pl.'s Mot. Summ. J. Inequitable Conduct 14–18.  In particular, Plaintiff points to Duffy's deposition testimony that he has never read (or even "touched") a SMACNA Manual.  *Id.* at 15 (quotation marks omitted).  Plaintiff also argues that "there is no evidence that Mr. Duffy . . . knew about or had ever before seen" the relevant figures in the SMACNA Manual.  *Id.*

Defendants respond that "[t]here is at least a genuine dispute regarding an intent to deceive."  Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 28 (emphasis omitted).  Defendants suggest Duffy's testimony may not be credible, *see id.* at 29 ("[S]uch testimony is directly at odds with Mr. Duffy's demonstrable familiarity with the SMACNA Manual . . . ."),

27

**Appx87**

but begin and end with the argument that it is "equally problematic" if Duffy "refused" to read the SMACNA Manual to avoid learning of its materiality and withheld it on that basis, *see id.* at 28–30.  However, the case Defendants cite to for that proposition, *id.* at 2, 30, stands for the opposite conclusion, *see Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1378 (Fed. Cir. 2010), *overruled on other grounds by Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) ("[I]f [the inventors] did not read the brochure (and did not do so to avoid learning of damaging information), those actions regarding the failure to disclose the information on the inside of the brochure would at most, amount to gross negligence. Gross negligence is not inequitable conduct.").  As a matter of law, Defendants cannot succeed on their "heads I win, tails you lose" theory of inequitable conduct.  *See Therasense*, 649 F.3d at 1290 ("[T]he evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." (quotation marks omitted)).  The conduct they argue is most likely to have occurred is not inequitable conduct as a matter of law.  And in any event, Defendants' evidence, at best, establishes that Duffy has a cursory awareness of (not "demonstrable familiarity" with) the SMACNA Manual because some of its contents generally relate to his work.  *See, e.g.*, Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 29 (arguing that Duffy "knew of" the SMACNA Manual and was "familiar enough" with the SMACNA Manual to *infer* that it contains a particular teaching (quotation marks omitted)).  Accordingly, Plaintiff's Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct Affirmative Defense is GRANTED.[5]  *Cf.*

---

[5] Defendants ask pursuant to Federal Rule of Civil Procedure 56(d) for more time to obtain discovery from Plaintiff's patent prosecution counsel, a Canadian attorney.  Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 30–31.  Federal Rule of Civil Procedure 56(d) permits a court to deny or defer consideration of a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  The Court finds that Defendants have not made such a showing: Defendants' counsel's declaration, Shimota Decl., ECF No. 80-8, and the attached exhibits show only that Defendants have had difficulty securing discovery from the Canadian attorney and that there is a possibility he could have relevant information related to a separate, entirely speculative theory of inequitable conduct.  *Cf.* Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 30 (arguing that "testimony of prosecution counsel is ordinarily highly

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1367 (Fed. Cir. 2008) ("If a threshold level of intent to deceive or materiality is not established by clear and convincing evidence, the district court does not have any discretion to exercise and cannot hold the patent unenforceable regardless of the relative equities or how it might balance them.").

### iv.  Damages

Defendants finally argue that "the evidence is insufficient to support an award of lost profits or convoyed sales."  Defs.' Mot. Summ. J. 24 (capitalization altered) (emphasis omitted). The Court addresses each in turn.

### 1.  Lost Profits

A patentee may recover lost profits by establishing "(1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).  The Federal Circuit has commented that "[t]he second factor, absence of acceptable non-infringing alternatives, often proves the most difficult obstacle for patent holders."  *Id.* at 1286.  "Under this factor, if there is a non[-]infringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale."  *Id.*

Defendants argue that "no reasonable jury could find the absence of non-infringing alternatives" in light of the expert reports.  *See* Defs.' Mot. Summ. J. 24–25 ("Dr. Morse[] provided no less than five acceptable non[-]infringing alternatives . . . .  [Defendants' damages expert] Mr. Clemons[] similarly opined on the economic acceptability of . . . existing market

---

pertinent to a finding of inequitable conduct" because prosecution counsel *also* has a duty to disclose material information).

**Appx89**

solutions . . . ." (emphasis omitted) (citation omitted)).  Although Plaintiff's expert John Curtis

opined that "no acceptable non-infringing alternatives appear to have been available," Curtis

Report 16–20, ECF No. 69-3, Defendants argue that Curtis cannot render that conclusion, *see*

Defs.' Mot. Summ. J. 25.

To make this argument, Defendants point to *Webasto Thermo & Comfort North America,*

*Inc. v. BesTop, Inc.*, Case No. 16-cv-13456, 2019 WL 3334563, at *5–7 (E.D. Mich. July 25,

2019).  In *Webasto*, the district court granted a motion to exclude the defendant's damages

expert's testimony regarding a hypothetical non-infringing alternative because the expert's report

and deposition testimony "demonstrate[d] without question that his entire opinion . . . [wa]s

100% a regurgitation of what he was told in conversation" by an engineer.  *Id.* at *5.  Applying

Federal Rules of Evidence 602, 701, and 702, the court reasoned that the expert witness had

"absolutely no independent expertise or knowledge regarding the alleged alternative non-

infringing design-around about which he opines and relie[d] entirely on what he was told in

conversation by [the engineer], who [could not] offer any of the underlying opinions."  *Id.* at *6.

Analogizing to *Webasto*, Defendants argue that Curtis, an accountant, cannot rely on

conversations with Plaintiff's employee Paul Wells to form his various opinions as to market

alternatives.  *See* Defs.' Mot. Summ. J. 25.

Plaintiff distinguishes *Webasto*, arguing that the excluded opinions here concern *existing*

market alternatives rather than a hypothetical product.  *See* Pl.'s Resp. Defs.' Mot. Summ. J. 51.

Defendants reply that *Webasto* "does not recognize such a distinction," Defs.' Reply Supp. Def.

Mot. Summ. J. 12 n.3, but the *Webasto* court had no reason to consider that scenario.

Of course, "[a] party may object that the material cited to support or dispute a fact cannot

be presented in a form that would be admissible in evidence" at summary judgment.  Fed. R.

Civ. P. 56(c)(2). But admissibility is governed by the Federal Rules of Evidence. Whether the facts at hand are similar to any other case (particularly an unreported district court case) is not the inquiry. The parties' *Webasto* proxy war thus has limited utility.

Given that neither Defendants' motion nor Plaintiff's response (in which Plaintiff argues that certain *other* expert opinions are inadmissible, *see* Pl.'s Resp. Defs.' Mot. Summ. J. 49–50) engages with the Federal Rules of Evidence whatsoever, the Court is convinced that the best approach is to deny summary judgment as to lost profits. If this case proceeds to trial, the parties will have the opportunity to file motions *in limine* as to the inadmissibility of certain evidence, including expert evidence. The parties should engage directly with the relevant rules and explain at that time if those motions have dispositive consequences. Accordingly, Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is DENIED as to lost profits. This issue cannot be resolved at summary judgment.

### 2. Convoyed Sales

"A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (quotation marks omitted). For example, in *American Seating*, the patented invention was a wheelchair restraint system for vehicles, and the unpatented product was passenger seats. *Id.* at 1265. The Federal Circuit affirmed the district court's conclusion that the restraint system and seats lacked the requisite functional relationship because, among other reasons, the products operated independently and "[t]he evidence show[ed] that passenger seats command[ed] a market value and serve[d] a useful purpose independent of the patented" restraints. *Id.* at 1268–

69.  In *Juicy Whip v. Orange Bang*, the Federal Circuit reversed the district court's "clearly erroneous" conclusion that a patented syrup dispenser and unpatented syrup had no functional relationship because "[t]he dispenser needs syrup and the syrup is mixed in a dispenser.  Such is indeed a functional relationship."  *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1371–73 (Fed. Cir. 2004).

Defendants argue that Plaintiff "does not attempt the rigorous functional relationship test."  Defs.' Mot. Summ. J. 26.  In other words, Defendants contend that Plaintiff's unpatented products "have essentially no functional relationship to the patented invention," *Am. Seating Co.*, 514 F.3d at 1268.  But Defendants also have a more elemental grievance: That Plaintiff has not even identified the unpatented product(s) at issue.  *See* Defs.' Mot. Summ. J. 27.  Defendants cite to *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1333 (Fed. Cir. 2009) to suggest that convoyed sales damages cannot be awarded "where [the] damages expert [can]not identify specifically what products he included in his lost-profits analysis."  *Id.* at 27 (quotation marks omitted).  That does not seem to be the exact holding,[6] but Defendants' arguments are well-taken.  Plaintiff has neither identified any unpatented product(s) at issue nor articulated any basis for a functional relationship.

Plaintiff responds with Curtis's report, Pl.'s Resp. Defs.' Mot. Summ. J. 53, in which Curtis explains that Plaintiff's head of mechanical sales informed him that Plaintiff offers a variety of products relating to its patented technology and often generates additional sales because of it, Curtis Report 22.  Curtis also opines that sales of Plaintiff's patented products

---

[6] "[The plaintiff's] damages expert could not identify specifically what products he included in his lost-profits analysis, but speculated [at trial] that [the] pull-through products [that he included in his analysis] included such things as head braces, vests, and other products not used in spinal surgeries."  *DePuy Spine*, 567 F.3d at 1333.  "Because it [wa]s undisputed that [the plaintiff's] unpatented pull-through products neither compete[d] nor function[ed] with its patented . . . [surgical screws] and were sold (i.e., 'pulled-through') only by virtue of [its] business relationship with surgeons," the Federal Circuit held that "[the plaintiff] was not legally entitled to recover lost profits on those unpatented products."  *Id.* at 1333–34.

32

**Appx92**

promote sales of related duct and exhaust products because customers often request that the same manufacturer provide related products.[7]  *Id.* at 26.  This cannot be sufficient to avoid summary judgment.  Plaintiff argues that Defendants have "present[ed] no affirmative evidence to demonstrate the absence of convoyed sales," Pl.'s Resp. Defs.' Mot. Summ. J. 53, but Plaintiff misunderstands its burden, *see* Fed. R. Civ. P. 56(c)(1)(b).  Asked by Defendants to "put up or shut up," *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quotation marks omitted), Plaintiff now must put up facts from which a functional relationship between its patented technology and any accompanying unpatented product(s) could be found, *see Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." (quotation marks omitted)).  No reasonable jury could award convoyed sales damages based on Plaintiff's thin and vague facts.  Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is thus GRANTED as to convoyed sales.

## CONCLUSION

Accordingly, Plaintiff DuraSystems Barriers Inc.'s Motion for Summary Judgment of Patent Infringement, ECF No. 63, is GRANTED; Motion for Summary Judgment of No Invalidity, ECF No. 64, is DENIED; and Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct Affirmative Defense, ECF No. 65, is GRANTED.  Defendants Van-Packer Co. ("Van-Packer") & Jeremias, Inc.'s Motion for Summary Judgment of Noninfringement and Invalidity, ECF No. 67, is DENIED as to non-infringement, DENIED as to

---

[7] A similar link was rejected by the Federal Circuit in *American Seating*.  *See Am. Seating*, 514 F.3d at 1268 ("The fact that customers prefer that passenger seats and tie-down wheelchair restraint systems come from a single supplier for ease of purchase, repair, and uniform design and appearance, does not compel the conclusion that the seats and tie-down system are analogous to components of a single assembly . . . ." (quotation marks omitted)).

33

**Appx93**

indefiniteness, DENIED as to written description, DENIED as to enablement, DENIED as to lost profits, and GRANTED as to convoyed sales. Defendants' motion to seal, ECF No. 68, and Plaintiff's motion to seal, ECF No. 75, are DENIED. Defendants' motion to withdraw, ECF No. 71, is GRANTED. The Clerk is DIRECTED to strike ECF No. 62 and to unseal the exhibits on the docket at ECF No. 69-1, ECF No. 69-2, ECF No. 69-3, ECF No. 69-4, ECF No. 76-1, and ECF No. 76-2. The parties are encouraged to explore settlement and should file a status report advising the Court as to how this case will proceed within 60 days of service of this Order.

Entered this 31st day of March, 2023.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
–for the
Central District of Illinois

| | |
|---|---|
| DuraSystems Barriers Inc., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Consolidated Case No.** 1:19-cv-01388-SLD-JEH |
| | ) |
| | ) |
| Van-Packer Co. & Jeremias, Inc., | ) |
| | ) |
| **Defendants.** | ) |

## JUDGMENT IN A CIVIL CASE

**DECISION BY THE COURT**.   This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendant Van-Packer Co.'s GRZ Grease Duct System and Defendant Jeremias, Inc.'s DWGD-RZ Grease Duct System (collectively the "Accused Products") directly infringe claims 3, 6, 10–13, 16, 19, and 20 ("Asserted Claims") of U.S. Patent No. 10,024,569 ("'569 Patent").

Defendants, their officers, agents, servants, employees, and all persons acting in active concert or participation with them who receives actual notice of the injunction in this case by personal service or otherwise, is hereby permanently enjoined from directly or indirectly making, having made, using, selling, advertising, manufacturing, importing, or distributing the Accused Products, or any colorable imitation thereof, which infringes, literally or equivalently, the Asserted Claims of the '569 Patent until the '569 Patent expires or is no longer in force.

**Dated: 1/19/2024**

AJKV

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

US010024569B2

(12) **United States Patent**

Duffy

(10) **Patent No.:** **US 10,024,569 B2**

(45) **Date of Patent:** **Jul. 17, 2018**

(54) **FIRE-RATED MODULAR DUCT ASSEMBLY AND IMPROVEMENTS THEREIN**

(71) Applicant: **William Christopher Duffy**, Thornhill (CA)

(72) Inventor: **William Christopher Duffy**, Thornhill (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 368 days.

(21) Appl. No.: **14/051,016**

(22) Filed: **Oct. 10, 2013**

(65) **Prior Publication Data**

US 2015/0101697 A1    Apr. 16, 2015

(51) **Int. Cl.**
| | |
|---|---|
| *F16L 9/14* | (2006.01) |
| *F16L 9/18* | (2006.01) |
| *F24F 13/02* | (2006.01) |
| *F16L 23/14* | (2006.01) |
| *F16L 57/04* | (2006.01) |
| *F16L 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *F24F 13/0209* (2013.01); *F16L 9/003* (2013.01); *F16L 23/14* (2013.01); *F16L 57/04* (2013.01); *F24F 13/0263* (2013.01); *F24F 13/0281* (2013.01); *F24F 2221/30* (2013.01)

(58) **Field of Classification Search**
CPC ..... F24F 13/0209; F24F 13/0263; F16L 23/16
USPC ................ 138/149, 106–108, 111, 112, 148
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 624,715 A | 5/1899 | Wenz | |
| 1,986,965 A | 1/1935 | Harrison | |
| 1,992,574 A | 2/1935 | Jenkins | |
| 2,183,174 A | 12/1939 | Wiley | |
| 2,226,523 A | 12/1940 | Peck | |
| 2,916,054 A * | 12/1959 | Callan | F16L 9/003 |
| | | | 138/141 |
| 3,003,794 A | 10/1961 | Burley | |
| 3,123,880 A | 3/1964 | Barry et al. | |
| 3,198,561 A | 8/1965 | Witt | |
| 3,351,699 A | 11/1967 | Merckle | |
| 3,630,549 A | 12/1971 | Grimm | |
| 3,800,846 A | 4/1974 | Kurz | |
| 3,811,714 A | 5/1974 | Pintard | |
| 3,923,326 A | 12/1975 | Mez | |
| 4,133,566 A | 1/1979 | Miller | |
| 4,380,188 A | 4/1983 | Nichols | |
| 4,509,778 A | 4/1985 | Arnoldt | |
| 4,537,430 A | 8/1985 | Sullivan | |
| 4,557,297 A | 12/1985 | Montana | |
| 4,572,553 A | 2/1986 | Geldner | |
| 4,662,661 A | 5/1987 | Arnoldt | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2357078 | 12/2002 |
| CA | 2450977 | 5/2005 |

(Continued)

*Primary Examiner* — Vishal Pancholi

(74) *Attorney, Agent, or Firm* — Cognitive IP Law

(57) **ABSTRACT**

A fire-rated exhaust duct system comprising a modular configuration or structure. The fire-rated exhaust duct system comprises a plurality of exhaust duct sections. Each of the exhaust duct sections is configured to be joined or connected with other exhaust duct sections in the field or at an installation site, e.g. in building housing a kitchen facility or a laboratory facility to form longer sections or runs for exhaust duct system.

**20 Claims, 9 Drawing Sheets**



**US 10,024,569 B2**

Page 2

(56)              **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,725,083 | A | 2/1988 | Schauer |
| 4,765,375 | A | 8/1988 | Nakajima |
| 4,804,207 | A | 2/1989 | Berchem et al. |
| 4,836,585 | A | 6/1989 | Schauer |
| 4,859,320 | A | 8/1989 | Beall, Jr. |
| 4,913,127 | A | 4/1990 | Dugger |
| 4,940,264 | A | 7/1990 | Mez |
| 4,951,716 | A | 8/1990 | Tsunoda |
| 5,024,251 | A | 6/1991 | Chapman |
| 5,067,278 | A | 11/1991 | Lyons |
| 5,069,484 | A | 12/1991 | McElroy |
| 5,103,549 | A | 4/1992 | Meinig et al. |
| 5,129,690 | A | 7/1992 | Meinig et al. |
| 5,133,580 | A | 7/1992 | Meinig |
| 5,135,270 | A | 8/1992 | Arnoldt et al. |
| 5,165,189 | A | 11/1992 | Besal |
| 5,171,184 | A | 12/1992 | Saucier et al. |
| 5,219,403 | A | 6/1993 | Murphy |
| 5,356,048 | A | 10/1994 | Geiser |
| 5,378,028 | A | 1/1995 | Issagholian-Havai et al. |
| 5,450,879 | A | 9/1995 | Toben |
| 5,538,377 | A | 7/1996 | Stewart et al. |
| 5,564,758 | A | 10/1996 | Tiberio |
| 5,575,131 | A | 11/1996 | Menchetti |
| 5,653,482 | A | 8/1997 | Ficchi, Jr. |
| 5,673,947 | A | 10/1997 | DeWaal |
| 5,753,855 | A | 5/1998 | Nicoli |
| 5,775,414 | A | 7/1998 | Graham |
| 5,865,478 | A | 2/1999 | Lin |
| 5,898,132 | A | 4/1999 | Lee |
| 5,901,502 | A | 5/1999 | Rafalski et al. |
| 5,944,060 | A * | 8/1999 | MacKay ................. F16L 23/14 |
| | | | 138/137 |
| 6,109,665 | A | 8/2000 | Meinig |

| | | | |
|---|---|---|---|
| 6,143,984 | A | 11/2000 | Auteri |
| 6,148,867 | A | 11/2000 | Matthews et al. |
| 6,156,977 | A | 12/2000 | Benito-Navazo |
| 6,188,024 | B1 | 2/2001 | Benito-Navazo |
| 6,213,522 | B1 | 4/2001 | Jacobson et al. |
| 6,231,704 | B1 | 5/2001 | Carpinetti |
| 6,412,519 | B1 | 7/2002 | Goodhue |
| 6,460,573 | B1 | 10/2002 | Fischer et al. |
| 6,471,256 | B1 | 10/2002 | Fischer |
| 6,502,716 | B1 | 1/2003 | Kolesar |
| 6,505,864 | B1 | 1/2003 | Shuey |
| 6,547,287 | B1 | 4/2003 | Shah et al. |
| 6,550,823 | B1 | 4/2003 | Siegwart |
| 6,561,553 | B1 | 5/2003 | Issagholian-Havai |
| 6,758,502 | B2 | 7/2004 | Mattsson et al. |
| 6,848,720 | B2 | 2/2005 | Carns et al. |
| 7,195,290 | B2 | 3/2007 | Duffy |
| 7,501,576 | B2 | 3/2009 | Gagliardi |
| 7,699,070 | B1 * | 4/2010 | Husmann, Jr. .......... F16L 59/04 |
| | | | 138/114 |
| 8,178,781 | B2 | 5/2012 | Duffy |
| 8,276,319 | B2 | 10/2012 | Duffy |
| 2002/0121778 | A1 | 9/2002 | Tigerfeldt |
| 2003/0006611 | A1 | 1/2003 | Shuey |
| 2003/0160452 | A1 | 8/2003 | Mattsson et al. |
| 2005/0116470 | A1 | 6/2005 | Duffy |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2691316 | 7/2010 |
| CA | 2800362 | 7/2013 |
| FR | 2719347 | 4/1994 |
| GB | 2045321 | 3/1979 |
| GB | 2284989 | 6/1995 |
| JP | 8-178404 | 7/1996 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



SECTION A-A

FIG. 5b



SECTION AT FLANGE

FIG. 5a

SECTION B-B

FIG. 5c



FIG. 6



FIG. 7



FIG. 8



FIG. 9

US 10,024,569 B2

1

# FIRE-RATED MODULAR DUCT ASSEMBLY AND IMPROVEMENTS THEREIN

## BACKGROUND OF THE INVENTION

The present application relates to a duct assembly, and more particularly, to a fire-rated modular duct assembly, and improvements therein, suitable for exhausting flammable or hazardous gases, vapour and the like.

## BACKGROUND OF THE INVENTION

Many processes in commercial and industrial facilities generate flammable or hazardous gases, vapors or particles. The hazardous material must be captured at the source and transported or moved through the facility (e.g. building) to a location where the material can be discharged, e.g. directly into the atmosphere, or into a collection or a treatment system within the building or exterior to the building.

In a typical facility, ventilation ducts are routed throughout the building. The ventilation ducts penetrate and cross fire separations, and typically comprise interior dampers installed within the fire separation section to prevent fire that penetrates the duct from travelling through the duct across the fire separators in the building. It will be appreciated that while such an implementation may be sufficient for the fire protection of ventilation ducts, ventilation or exhaust ducts for flammable or hazardous materials cannot be configured with fire dampers, so the duct itself must be fire-rated.

To be classified as a fire-rated duct, an exhaust duct must be capable of preventing the release of flammable materials from inside the duct and/or combustible materials adjacent the exterior of the exhaust duct from catching fire if a fire exists on the other side of the duct. In other words, a fire-rated duct must be capable of minimizing the transfer of heat through or across the duct walls. It is also desirable to maintain the wall thickness to a workable minimum.

Fire-rated ducts are typically found in installations such as commercial kitchens and laboratories.

In a commercial kitchen, the exhaust hoods are configured to capture grease laden air over deep fryers and grills, which is extremely flammable, and must be transported through the building to an exterior area where it can be safely discharged. Due to the flammable nature of the exhausted vapour, a minor fire, for example, in the kitchen could enter the exhaust duct and quickly spread throughout the duct system. As a result, any potential fire inside the duct system must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building. In addition, the exhaust duct system must be capable of preventing the ignition of the grease laden air from a fire source in another part of the building and then spreading to the kitchen or other parts of the building where the exhaust duct system is routed.

In a laboratory installation, the exhaust system is configured to collect and exhaust chemical vapours, including vapours from chemicals with low flash points, and contain any fire inside the duct system, or prevent an external fire from igniting the vapour inside the duct system.

Known fire-rated exhaust duct systems are typically fabricated in sections, and the sections are shipped to the installation location. At the installation location, the sections are welded together to form continuous conduits or conduit sections. Due to field conditions, the welding could be of poor work quality, for instance, due to limited space and/or setup. This meant expensive rework and re-welding to seal

2

leaks in the duct system during pressure testing. Conventional fire-rated duct systems typically require the installation of an additional gypsum fire-rated enclosure (approximately 10″ thick) around the duct. In addition to requiring an additional step, the gypsum enclosure is typically constructed/installed by another trade.

In an attempt to overcome the known shortcomings in the art, chimney manufacturers introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems. While these pre-fabricated fire-rated exhaust ducts addressed shortcomings of existing systems, the characteristic round profile significantly limits the volume of air that can be vertically carried in conventional building footprints, and in a horizontal configuration, the round profile or cross section is often too large to fit into conventional ceiling space spaces or dimensions.

Accordingly, there remains a need for improvements in the art.

## BRIEF SUMMARY OF THE INVENTION

The present invention comprises embodiments of a modular fire-rated duct system and improvements therein and suitable for pre-fabrication and configured for assembly in the field.

According to an embodiment, the present invention comprises a modular fire-rated exhaust duct assembly comprising: two or more exhaust duct modules; each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void; a first exterior flange connector, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector; a second exterior flange connector, and another end of each of said exhaust duct modules being configured for receiving said second exterior flange connector; said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction.

According to another embodiment, the present invention comprises an exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising: an inner duct liner formed with a generally rectangular cross-section; an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said material occupies said void; a first exterior flange connector, and one end of said exhaust duct module being configured for receiving said first exterior flange connector; a second exterior flange connector, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

US 10,024,569 B2

3

According to a further embodiment, the present invention comprises an exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising: an inner duct liner formed with a generally rectangular cross-section; an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving a compressible insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void; a first exterior flange connector, and one end of said exhaust duct module being configured for receiving said first exterior flange connector; a second exterior flange connector, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

Other aspects and features according to the present application will become apparent to those ordinarily skilled in the art upon review of the following description of embodiments of the invention in conjunction with the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

Reference will now be made to the accompanying drawings which show, by way of example, embodiments according to the present application, and in which:

FIG. 1 is a perspective view of an exhaust duct system according to an embodiment of the present invention and comprising a rectangular configuration and two sections or modules;

FIG. 2 is a perspective view of an inner exhaust duct liner according to an embodiment of the present invention;

FIG. 3 is an exploded view of one the sections of FIG. 1;

FIG. 4 is a longitudinal sectional view of the first section in FIG. 1 taken along line A-A;

FIGS. 5(a) to 5(c) show a thermal spacer configuration according to an embodiment of the present invention;

FIG. 6 is a perspective view of an inner exhaust liner comprising first and second modular sections and the configuration for joining the two sections according to an embodiment of the present invention;

FIG. 7 is a perspective of the inner exhaust liner of FIG. 6 showing a configuration for thermally encasing the mechanical joint between the first and second modular sections according to an embodiment of the present invention;

FIG. 8 is a longitudinal sectional view of the inner exhaust liner of FIG. 7 taken through line B-B; and

FIG. 9 is a partial and enlarged view of the joint encasement, i.e. the encased mechanical joint, for the inner exhaust liner of FIG. 7.

Like reference numerals indicate like or corresponding elements in the drawings.

DETAILED DESCRIPTION OF THE EMBODIMENTS

Reference is first made to FIG. 1, which shows a fire-rated modular exhaust duct system or assembly according to an embodiment of the invention. The fire-rated modular

4

exhaust duct is indicated generally by reference 100 and according to an embodiment comprises a plurality of exhaust duct sections or modules 110, indicated individually by references 110a and 110b, as shown in FIG. 1. The individual exhaust sections 110 are connected or coupled together with a mechanical joint indicated generally by reference 120 and described in more detail below. Embodiments of the modular fire-rated exhaust duct system or apparatus according to the present invention are suitable for installations or applications requiring fire-rated duct systems, such as exhaust duct systems for commercial applications, for instances, kitchens and restaurants, laboratories and other chemical or hazardous material processing facilities, as will be apparent to those skilled in the art.

Reference is next made to FIG. 2, which shows an inner exhaust duct liner assembly according to an embodiment of the present invention and indicated generally by reference 200. The inner exhaust duct liner assembly 200 comprises an inner duct liner 210, and external flanged connectors 212, indicated individually by references 212a and 212b.

As shown in FIGS. 2 and 4, the inner metallic duct 210 is formed with an outer return or flange at each end, indicated generally by reference 214. The flange 214 is configured to overlap a portion of the external flange connector 212. According to an exemplary implementation, the inner metallic duct 210 is fabricated from stainless, carbon or coated steels, and is formed into a tube with a square or rectangular profile or cross-section. According to requirements under the UL 2221 and ASTM E2336 standards, the minimum wall thickness for the inner metallic duct 210 is typically 18 gauge (ga) for stainless steel and 16 ga for carbon steels.

The inner metallic duct 210 can be fabricated or formed in a number of ways including: (1) forming a piece of metal into a tube; (2) forming two pieces of metal into "L" shaped sections and joining the two sections together to form a rectangle (or a square profile); (3) forming a single piece of metal into a "U" shaped section and joining a flat piece of metal to the open end of the "U" shaped section; or (4) using four separate pieces or panels of steel and joining them to form a rectangular (or square) profile tube. The longitudinal joint or joints are continuously welded to provide a liquid and air tight seal between the edges of the panels. Other connection techniques, such as Pittsburgh type mechanical locks or pocket locks which are sealed with stitch welding, can be utilized as will be understood by one skilled in the art. Such techniques can provide mechanical strength to pass the fire exposure tests.

The flange 214 (FIGS. 2 and 4) is formed at each transverse end of the inner metallic duct 210 and serves to define the duct section length. The flange 214 is formed at a right angle and provides a smooth flat surface for coupling adjacent duct sections and assisting in providing a liquid and air-tight surface, as described in more detail below.

According to an embodiment, the external flange connector 212 is formed or fabricated from the same type of metal as the inner metallic duct 210 in order to avoid the potential for galvanic action which can occur with the joining of dissimilar metals. According to an embodiment, the external flanged 212 comprises four individual sections that are formed into right angle sections (as shown for external flange connectors 212a and 212b in FIG. 2), for instance, from flat metal strips or cut from hot rolled right angle formed structural steel and which are cut into the required lengths for the top and bottom pieces and the side pieces. The corners of the four individual sections for each of the external flange connectors 212 are suitably mitered, or in the alternative square cut, to achieve closed corners in the

US 10,024,569 B2

5                                                          6

external flange connector **212**, and thereby allow the external flange connectors **212** to provide a better seal (liquid or air tight) at the joints formed from joining the external flange connectors **212** together for respective exhaust duct sections **110**a and **110**b (FIG. **1**). The external flange connectors **212** are fabricated with a thickness sufficient to support the duct assembly and prevent the duct assembly from collapsing due to fire exposure, and for typical installations, will have a thickness in the range of 0.125″ to 0.250″, depending on the width or depth of the duct and/or the size of the flanged connection section. As shown in FIG. **2** and according to an exemplary implementation, each of the external flange connectors **212** includes six holes **600** (punched or drilled) at nominal 4″ to 8″ centers for receiving bolts **610** and corresponding nuts **620** for joining the duct sections **110** and **112** together, for example, as shown in FIGS. **6** and **8**.

According to another aspect, the external flange connector **212** is formed by joining, for instance, welding, the four individual sections together. The external flange connectors **212** are then joined to the respective ends of the inner metallic duct **210**, for instance, using a continuous weld or a stitch weld, at the outer flange or return **214** at a contact point or surface indicated generally by reference **510** in FIG. **5**(a), and at the interface between the external flange connector **212** and the inner metallic duct **210** at a contact point or surface indicated generally by reference **520** in FIG. **5**(b).

Reference is next made to FIG. **3**, which shows an exploded view of one of the exhaust duct modules or sections **110** according to an embodiment of the invention. The exhaust duct section **110** comprises the inner metallic duct **210**, the first **212**a and the second **212**b external flange connectors (as described above), and an outer casing indicated generally by reference **300**. According to another aspect, there is a void or space **402** between the outer casing **300** (i.e. the outer casing panels **310**) and the inner duct assembly **200** (i.e. the inner metallic duct **210**) that is filled with an insulating material indicated generally by reference **410** in FIG. **4**. According to another aspect, the exhaust duct module or section **110** includes a thermal spacer indicated generally by reference **420** in FIG. **4**, as will be described in more detail below. According to an embodiment, the outer casing **300** comprises separate metallic sheets (or fire resistant board panels as described below) or sections indicated individually by references **310**a, **310**b, **310**c and **310**d. According to another aspect, the outer casing **300** comprises inner connection angle members **320**, indicated individually by references **320**a, **320**b, **320**c and **320**d in FIG. **3**.

According to an embodiment of the present invention, the outer casing **300** may be formed as follows: (a) forming two pieces of metal into "L" sections and joining the L-formed sections together, for example, at the corners; (b) forming one piece of metal into "U" shaped section and joining a flat piece to the top corners of the "U" shaped section; (c) using four separate metallic and joining them together at the edges; or (d) using four separate panels or boards fabricated from a fire resistant material. The outer casing **300** further includes edge reinforcement members **312**, indicated individually by references **312**a, **312**b, **312**c and **312**d. The edge reinforcement members **312** may comprise "J" shaped metallic edge reinforces which are configured to be fitted over the traverse edges of the respective outer casing panels **310**. The edge reinforcement members **312** provide additional stiffness to the outer casing panel **310**, for instance, when the outer casing panels **310** comprise fire resistant boards. The edge reinforcement members **312** also provide a metallic attachment point, for instance, for field installation of the joint encapsulation member **120** (as shown in

FIGS. **1**, **8** and **9**). For outer casing panels **310** fabricated from a metallic material, the edge reinforcement members **312** may be formed directly in the traverse edge of the respective metallic sections or panels **310** of the outer casing **300**.

Referring again to FIG. **3**, for outer casing panels **310** formed from a metal or metallic material, the longitudinal edges may be connected using Pittsburgh or Button type mechanical locks or mechanisms as will be understood by those skilled in the art. According to another implementation, other connection mechanisms or techniques may be utilized, such as, pocket locks that are stitch welded or screwed to provide positive connection, or welding techniques, such as continuous welding of the panels, provide the resulting mechanical structure meets the required mechanical strength and/or fire exposure tests. For outer casing panels **310** formed from a fire resistant board, the outer casing **300** comprises outer flashing members **330**, indicated individually by references **330**a, **330**b, **330**c and **330**d in FIG. **3**. The outer flashing members **330** are configured to protect the edges of the fire resistant board panels **310** and according to an exemplary implementation, the outer flashing members **330** are fastened through the outer casing panel **310** and into the respective inner connection angle members **320**, for example, using self-tapping screws or similar fasteners, indicated generally by reference **332** and shown in FIGS. **5**(a), **5**(b) and **5**(c).

According to another aspect, the options as to size, shape, width-to-depth ratio, and types of insulating materials for configuring the exhaust duct modules or sections **110**, the assembly and/or insulating of the outer casing assembly **300** may be performed in a number of ways, which can serve to simplify assembly. For a duct assembly with a smaller cross section, the inner metallic liner **210** may be wrapped with a blanket type insulating material **410** prior to assembly of the outer casing assembly **300** around the inner duct assembly **200**. For a duct assembly with a larger cross section, or where the insulating material **410** comprises a batt-type or blanket type insulation (or a board type insulation), the outer casing assembly **300**, i.e. the outer casing panels **310**, may be assembled into a "U" shaped section (e.g. formed from the outer casing panels **310**b, **310**c and **310**d in FIG. **3**), followed by the insulating material **410** for the bottom horizontal section (i.e. the outer casing panel **310**c (FIG. **4**). The inner duct assembly **200** would then be positioned inside the "U" shaped section for the outer casing **300** and supported at the bottom corners by the thermal spacers **420**, for example, as shown in FIG. **4**. The void between the two respective side outer panels **310**b and **310**c, and the top panel of the inner metallic liner **210** would then be insulated and two thermal spacers **420** would be positioned to support the top outer panel **310**a and the top outer panel **310**a would be installed and affixed as described above.

According to another aspect and as depicted in FIGS. **4** and **5**(a), the thermal spacers **420** are recessed into the insulation material **410** in order to maintain or provide a flat insulation face indicated by reference **422** in FIGS. **4** and **5**(a). According to another aspect, the flat insulation face **422** is inset from the transverse edge of the respective outer casing panel **310**, for example, the top **310**a and the bottom **310**c outer casing panels as shown in FIG. **4**. Once the thermal spacers **420** are correctly positioned, the spacers **420** are secured or connected to the outer casing panels **310** using staples or screws indicated generally by reference **424** in FIG. **5**(c), or a suitable adhesive, to ensure that the thermal spacers **420** stay in the desired position for supporting the outer casing panels **310** and maintaining the gap or void so

US 10,024,569 B2

7

8

that the insulating material **410** is not unnecessarily compressed or crushed. For a duct assembly with a smaller cross section, the thermal spacers **420** may be positioned or located at the corners, for example, as shown in FIG. 5(*b*). For a duct assembly with a larger cross section, additional thermal spacers may be positioned along the space between the outer casing panels **310** and the inner metallic liner **410** to provide additional support and maintain the space or separation for the insulating material **410**.

Reference is made back to FIG. 1 and as shown, the two exhaust duct sections **110***a* and **110***b* are joined or coupled together by the mechanical joint **120**. According to an embodiment, the mechanical joint **120** comprises a joint encasement having a configuration as shown in FIGS. 7, 8 and 9, and is indicated generally by reference **700**. The joint encasement **700** is configured to encase or surround the joint formed between two adjacent exhaust duct sections **110***a* and **110***b* when the exterior flange connectors **212** are connected together, for example, bolted.

As shown in FIG. 7, joint encasement **710** comprises four sections **720**, indicated individually by references **720***a*, **720***b*, **720***c* and **720***d*. Each of the sections **720** comprises a formed outer metallic profile **730** and an insulating material (or layers of insulating material) **740**. The insulating material **740** is affixed to the inner face or side of the outer metallic layer **730** using suitable adhesives and/or mechanical fasteners, in order to provide for pre-fabrication at the factory and thereby minimize the number of components transported to and assembled on site. However, there may be applications where size and weight limitations and/or characteristics of the insulating material **740** may require the insulating material **740** and the outer metallic profile **730** be kept as separate components and then field installed over joint between the exhaust duct sections **110**. As shown in FIGS. 8 and 9, the outer metallic layer **730** has a width sufficient to overlap the transverse edges of the outer casing panels **310**. According to another aspect, the sections **720** having longitudinal edges formed with a safety or hemmed edge in order to stiffen the edge so that it lies flat against the outer casing panel **310** when installed.

As shown in FIGS. 8 and 9, the joint encasement sections **720** comprise a hat configuration having a channel-like configuration with flanges or returns **760** formed outward from the legs of the channel to create an attachment surface or points for connecting to the outer casing panels **310** using fasteners **722**, for example, screws, through holes (i.e. punched through holes) in the flanges **760**. According to another aspect, a thermal gasket indicated by reference **724** in FIG. 9 can be included to thermally isolate the joint encasement sections **720** from the outer casing panel **310**.

In accordance with an exemplary embodiment, the fire-rated exhaust duct sections **110** and encasement joint **120** is fabricated and assembled on a component level as described above in the factory and delivered to the installation site. According to an exemplary embodiment, a 0.250 to 0.500 inch diameter bead of high temperature sealant may be applied to the face of one of the exterior flange connectors **212** adjacent the edge of the flange or return **214** (FIG. 4(*a*)) on the inner metallic duct **210**. The second duct section **110***b* is aligned with the first duct section **110***a* and brought together so that the faces of the flanges **212** on both of the inner metallic ducts **210** are in contact. The bolts **610** (FIG. 6) are then installed through each hole **600** in the exterior flange connector **212** and the bolts **610** are secured by the nuts **620** (FIG. 6). The fasteners are tightened in a circular and progressive manner to a torque setting defined by the exhaust duct manufacturer's specifications, for example,

according to fastener size being utilized. Once the adjacent exhaust duct sections **110***a* and **110***b* are connected together, the encapsulation sections **720** are installed. Each encapsulation section **720** is fitted into the space between the outer casing panels **310** of the adjacent duct sections **110***a* and **110***b* until the outer metallic layer **730** comes into contact with outer casing panel **310**. The outer metallic layer **730** is secured to the outer casing panel **310** using the screws **722**, which may be drilled and threaded into the outer casing panel **310** (metal) through pre-drilled or punched holes. This procedure is repeated for each exhaust duct section until the duct assembly extends from the source of vapours, gases or materials to the point of discharge or treatment.

In summary and according to another embodiment, the present invention comprises an exhaust duct system comprising a plurality of individual duct sections which are factory fabricated and then mechanically assembled on site. The void is configured with thermal spacers to prevent the insulation from being unduly compressed or crushed. This eliminates the need to do on site fabrication of the duct sections, e.g. welding and other hot work. The exhaust sections are connected together to form longer sections and runs to create a fire-rated exhaust duct system in a building or other type of facility for exhausting or moving flammable or hazardous gases, vapours and materials from an originating source, e.g. an exhaust hood or another duct inlet, to a location where the flammable or hazardous gases, vapours or materials can be safely discharged, for example into the atmosphere, or into a collection or treatment system. According to an embodiment, the exhaust duct system is configured to utilize batted insulation material which is carried in a void between the inner duct liner and the outer casing. According to another embodiment, the outer casing comprises non-metallic fire resistant panels.

The present invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. Certain adaptations and modifications of the invention will be obvious to those skilled in the art. Therefore, the presently discussed embodiments are considered to be illustrative and not restrictive, the scope of the invention being indicated by the appended claims rather than the foregoing description, and all changes which come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.

What is claimed is:

1. A modular fire-rated exhaust duct assembly comprising:

    two or more exhaust duct modules;

    each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

    a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector;

    a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of each of said

US 10,024,569 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

exhaust duct modules being configured for receiving said second exterior flange connector;

said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and

a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction.

**2**. The modular fire-rate exhaust duct assembly as claimed in claim **1**, said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

**3**. The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said exhaust duct modules have a generally rectangular cross-section.

**4**. The modular fire-rated exhaust duct assembly as claimed in claim **2**, wherein said inner duct liner comprises a return flange configured to be affixed to said first and said second exterior flange connectors.

**5**. The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said field assembly junction comprises a plurality of holes in each of said first and said exterior flanges, said plurality of holes being in alignment on said first and said exterior flanges, and being configured to receive a detachable fastener.

**6**. The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

**7**. The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said joint encasement section comprises a plurality of joint encasement sections, each of said joint encasement sections comprising an outer layer and an inner layer, and said outer layer having a flange on each longitudinal edge for affixing said encasement section to respective ends of said adjacent exhaust duct modules.

**8**. The modular fire-rated exhaust duct assembly as claimed in claim **7**, wherein said outer casing is formed from a metallic material having a thickness sufficient to provide a specified fire rating and said outer layer of said joint encasement section comprises the same metallic material.

**9**. The modular fire-rated exhaust duct assembly as claimed in claim **8**, wherein said joint encasement sections are configured to be field attachable to said respective surfaces of the said exhaust duct modules.

**10**. An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

**11**. The exhaust duct module as claimed in claim **10**, further including a thermal insulation material substantially filling said void space between said inner duct liner and said outer casing.

**12**. The exhaust duct module as claimed in claim **11**, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

**13**. The exhaust duct module as claimed in claim **12**, wherein said thermal insulation material comprises one of a batt insulation material and an insulation board.

**14**. The exhaust duct module as claimed in claim **11**, wherein said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

**15**. The exhaust duct module as claimed in claim **14**, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation and an insulation board.

**16**. An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving a compressible insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to another end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

**17**. The exhaust duct module as claimed in claim **16**, wherein said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

**18**. The exhaust duct module as claimed in claim **17**, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation material and an insulation board.

**19**. The exhaust duct module as claimed in claim **16**, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

US 10,024,569 B2

**11**

**12**

20. The exhaust duct module as claimed in claim **19**, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation material and an insulation board.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1537

**Short Case Caption:** Dura Systems Barriers, Inc. v. Van-Packer Co.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes 3,157 words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/06/2024

Signature: /s/ George Summerfield

Name: George Summerfield

Save for Filing