**No. 24-1537**

# United States Court of Appeals
# for the Federal Circuit

DURA SYSTEMS BARRIERS, INC.,

*Plaintiff-Appellee*

v.

VAN-PACKER CO., JEREMIAS, INC.,

*Defendants-Appellants*

Appeal from the United States District Court for the Central District of Illinois in
No. 1:19-cv-01388-SLD-JEH, Judge Sara Darrow.

## JOINT APPENDIX

**WORKMAN NYDEGGER**

Chad E. Nydegger
Brian N. Platt
Ryan C. Morris
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 533-9800

**K&L GATES LLP**

George C. Summerfield
Nathan J. Fuller
70 W. Madison Street
Suite 3300
Chicago, IL 60602
(312) 372-1121

Courtney A. Neufeld
925 Fourth Avenue
Suite 2900
Seattle, WA 98104
(206) 623-7580

*Attorneys for Plaintiff-Appellee*        *Attorneys for Defendants-Appellants*

July 31, 2024

# TABLE OF CONTENTS

| Date | Description | Appendix Page No. |
|------|-------------|-------------------|
| 9/3/2021 | Claim Construction Order (Dist. Ct. Dkt. No. 45) | Appx1-60 |
| 3/31/2023 | Order Granting Summary Judgment of Infringement (Dist. Ct. Dkt. No. 85) | Appx61-94 |
| 1/19/2024 | Final Judgment (Dist. Ct. Dkt. No. 95) | Appx95 |
| | Docket Sheet | Appx96-110 |
| | U.S. Patent No. 10,024,569 | Appx111-127 |
| | Prosecution History of U.S. Patent No. 10,024,569, Excerpts from 11/09/2015 Office Action | Appx365 |
| | Prosecution History of U.S. Patent No. 10,024,569, Excerpts from 4/11/2016 Response to Office Action | Appx396 |
| | Prosecution History of U.S. Patent No. 10,024,569, Excerpts from 6/30/2016 Office Action | Appx410 |
| | Prosecution History of U.S. Patent No. 10,024,569, Excerpts from 12/29/2016 Response to Office Action | Appx430 |
| | Prosecution History of U.S. Patent No. 10,024,569, Excerpts from Notice of Allowability | Appx451 |
| 12/23/2020 | Excerpts from Defendants' Opening Claim Construction Brief (Dist. Ct. Dkt. No. 31) | Appx538 |
| | Excerpts from Declaration of Barry M. Cheek *(Ex. B to Defendants' Opening Claim Construction Brief)* (Dist. Ct. Dkt. No. 31-3) | Appx585 |

| Date | Description | Appendix Page No. |
|------|-------------|-------------------|
|  | U.S. Patent No. 2,916,054 (Callan) *(Ex. U to Defendants' Opening Claim Construction Brief)* (Dist. Ct. Dkt. No. 31-22) | Appx1218-1223 |
| 2/5/2021 | Excerpts from Plaintiff's Responsive Claim Construction Brief (Dist. Ct. Dkt. No. 36) | Appx1782 |
|  | Excerpts from Declaration of Tony Crimi, Plaintiff's Technical Expert Witness *(Ex. AA to Plaintiff's Responsive Claim Construction Brief)* (Dist. Ct. Dkt. No. 39-1) | Appx1815 |
|  | Excerpts from Transcript of Deposition of Barry Cheek, P.E., Defendants' technical expert witness, held on January 14, 2021 *(Ex. BB to Plaintiff's Responsive Claim Construction Brief)* (Dist. Ct. Dkt. No. 36-2) | Appx1887 |
| 3/3/2021 | Excerpts from Defendants' Reply Claim Construction Brief (Dist. Ct. Dkt. No. 41) | Appx1966 |
|  | Excerpts from *Materials Science and Engineering, An Introduction*, Eighth Edition (Dist. Ct. Dkt. No. 41-3) | Appx2117 |
| 6/9/2022 | Plaintiff's Motion for Summary Judgment of Patent Infringement (Dist. Ct. Dkt. No. 63) | Appx2160-2176 |
| 6/9/2022 | Excerpts from Corrected Expert Report of Tony Crimi (dated March 24, 2022) *(Ex. A to Plaintiff's Summary Judgment Appendix)* (Dist. Ct. Dkt. No. 66-1) | Appx2203 |
|  | Excerpts from Expert Report of Timothy L. Morse, Ph.D., Regarding Non-Infringement of U.S. Patent No. 10,024,569 *(Ex. C to Plaintiff's Summary Judgment Appendix)* (Dist. Ct. Dkt. No. 66-3) | Appx2273 |
|  | U.S. Patent Application Pub. No. 2019/0293301 *(Ex. D to Plaintiff's Summary Judgment Appendix)* (Dist. Ct. Dkt. No. 66-4) | Appx2305-2325 |
| 6/10/2022 | Defendants' Motion for Summary Judgment of Non-Infringement and Invalidity (Dist. Ct. Dkt. No. 67) | Appx2777-2804 |

| Date | Description | Appendix Page No. |
|---|---|---|
| | Excerpts from Defendants' Rebuttal Expert Report of Timothy L. Morse, PH.D., Regarding Invalidity of U.S. Patent No. 10,024,569<br>*(Ex. A to Defendants' Motion for Summary Judgment)* | Appx2808 |
| | Excerpts from Deposition Transcript of Plaintiff's Expert Tony Crimi taken on May 11, 2022<br>*(Ex. B to Defendants' Motion for Summary Judgment)*<br>(Dist. Ct. Dkt. No. 67-3) | Appx2840 |
| 7/14/2022 | Excerpts from Defendants' Response to Plaintiff's Motion for Summary Judgment of Infringement<br>(Dist. Ct. Dkt. No. 77) | Appx4080 |

E-FILED
Friday, 03 September, 2021  02:44:04 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Consolidated Case No. 1:19-cv-01388-SLD-JEH |
| VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Plaintiff DuraSystems Barriers Inc. ("DuraSystems") accuses Defendants Van-Packer Co. ("Van-Packer") and Jeremias, Inc. ("Jeremias" and together with Van-Packer, "Defendants") of infringing U.S. Patent No. 10,024,569 (the "'569 Patent").  Now before the Court are the parties' respective claim construction briefs, ECF Nos. 31, 36, 41, as well as their respective motions for leave to file under seal various materials in support thereof, ECF Nos. 33, 37.  For the reasons that follow, the Court DEFERS consideration of the claim terms Defendants assert are indefinite, ADOPTS the constructions identified below, and DENIES the motions for leave to file under seal.

## BACKGROUND

**I.      Procedural History**

On December 3, 2019, DuraSystems filed its original complaint, which alleged two claims for patent infringement against Van-Packer, one with regard to the '569 Patent and another to a patent no longer at issue.  *See generally* Compl., ECF No. 1.  The day before, DuraSystems brought a materially identical lawsuit against Jeremias in the United States District

1

**Appx1**

Court for the Northern District of Georgia. *See* Compl., 4:20-cv-04069-SLD-JEH, ECF No. 1. On March 25, 2020, that action was transferred to this Court, *see* Order Transferring Case, 4:20-cv-04069-SLD-JEH, ECF No. 8, and on April 16, 2020, it was consolidated with this case, s*ee* Apr. 16, 2020 Text Order. The Clerk then filed DuraSystems's amended complaint, ECF No. 17, which names both Van-Packer and Jeremias. *See* Apr. 16, 2020 Text Order (directing the Clerk to file DuraSystems's proposed amended complaint, which was attached to the parties' motion to consolidate, ECF No. 16). Defendants' amended answer was filed on November 2, 2020, ECF No. 30. The Court issued a scheduling order on April 13, 2020. *See* Apr. 13, 2020 Text Order; Disc. Plan, ECF No. 14.[1] Fact discovery closed on December 11, 2020, and expert discovery (which shall include the exchange of expert reports and expert depositions) has not yet occurred. *See* Apr. 13, 2020 Text Order; Disc. Plan 2–3.

Defendants filed their opening claim construction brief, ECF No. 31, and motion to seal, ECF No. 33, on December 23, 2020, as well as the parties' joint appendix, ECF No. 32. DuraSystems filed its answering brief, ECF No. 36, and motion to seal, ECF No. 37, on February 5, 2021, and Defendants filed their reply brief, ECF No. 41, on March 3, 2021. DuraSystems filed the parties' status report and joint claim construction chart, ECF No. 42, on March 10, 2021. The Court conducted a *Markman* hearing on June 21, 2021. *See* June 21, 2021 Min. Entry.

---

[1] The parties' discovery plan, which the Court adopted in the April 13, 2020 scheduling order, *see* Apr. 13, 2020 Text Order, heavily cites the Local Patent Rules for the United States District Court for the Northern District of Illinois. This Court has not issued any local rules specific to patent cases and acknowledges its sister court's rules provide helpful guideposts in this action. But they are not controlling: All deadlines in this case, whether they were set in the discovery plan or have yet to be set, are subject to the Court's discretion.

## II.     The '569 Patent

Flammable or hazardous gases, vapors, or particles are generated in commercial and industrial buildings and must be captured and transported to a place where they can be discharged.  U.S. Patent No. 10,024,569 col. 1 ll. 13–17 (filed Oct. 10, 2013), J.A. 0012, ECF No. 32-1.  Ventilation ducts are typically routed throughout these buildings; however, when such ducts must transport flammable or hazardous materials, they must be fire-rated—"capable of minimizing the transfer of heat through or across the duct walls."  *Id.* col. 1 ll. 20–36, J.A. 0012.

The utility of fire-rated ducts can be illustrated by the role they play in commercial kitchens.  In a commercial kitchen, exhaust ducts are configured to capture grease-laden air over deep fryers and grills.  *Id.* col. 1 ll. 40–41, J.A. 0012.  Such air "is extremely flammable, and must be transported through the building to an exterior area where it can be safely discharged." *See id.* col. 1 ll. 42–44, J.A. 0012.  In fact, it is so flammable, a minor kitchen fire "could enter the exhaust duct and quickly spread throughout the duct system."  *Id.* col. 1 ll. 44–47, J.A. 0012. Therefore, any potential duct fire "must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building."  *Id.* col. 1 ll. 47–50, J.A. 0012.

Fire-rated exhaust duct systems are usually fabricated in sections, which are shipped to an installation location and welded together to form conduit sections.  *Id.* col. 1 ll. 61–65, J.A. 0012. These systems "typically require the installation of an additional gypsum fire-rated enclosure . . . around the duct."  *Id.* col. 2 ll. 1–4, J.A. 0012.  This "add[ed] step" represented a "known shortcoming[] in the art," *see id.* col. 2 ll. 5–8, J.A. 0012, which was overcome by chimney manufacturers who "introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems, *see id.* col. 2 ll. 7–10, J.A. 0012.  But their "characteristic

round profile significantly limits the volume of air that can be vertically carried in conventional building footprints" and "is often too large to fit into conventional ceiling . . . spaces or dimensions." *Id.* col. 2 ll. 12–16, J.A. 0012.

Enter the '569 Patent, a general illustration of an embodiment of which can be found below.



*Id.* fig. 1, J.A. 0003.[2]  It concerns a "fire-rated modular duct assembly, and improvements therein, suitable for exhausting flammable or hazardous gases, vapour, and the like," *id.* col. 1 ll. 7–9, J.A. 0012, and "suitable for pre-fabrication and configured for assembly in the field," *id.* col. 2 ll. 24–25, J.A. 0012.  According to an embodiment, this duct assembly comprises "individual duct sections which are factory fabricated and then mechanically assembled on site," *id.* col. 8 ll. 16–17, J.A. 0015, and the individual sections "are connected together to form longer sections and runs to create a fire-rated exhaust duct system in a building or other type of facility for exhausting or moving flammable or hazardous gases, vapours and materials from an

---

[2] Reference 100 points to a "fire-rated modular exhaust duct"; references 110(a) and (b) point to "exhaust duct sections or modules"; and reference 120 points to a "mechanical joint" that "connect[s] or couple[s] together" "individual exhaust sections."  '569 Patent col. 3 l. 67–col. 4 l. 7, J.A. 0013.

originating source, e.g. an exhaust hood . . . to a location where the flammable or hazardous gases, vapours or materials can be safely discharged," *see id.* col. 8 ll. 22–28, J.A. 0015.

Specifically, and according to an embodiment, the '569 Patent describes a modular, fire-rated duct assembly comprising "two or more exhaust duct modules," each of which having an inner duct liner, an outer casing, and a void between them. *Id.* col. 2 ll. 26–31, J.A. 0012. This void includes "one or more thermal spacers" configured to maintain the liner and the casing "in a spaced relationship so that . . . insulation material" occupies it. *Id.* col. 2 ll. 31–35, J.A. 0012. Flange connectors are attached to the modules and "configured to form a field assembly junction for coupling respective ends of . . . [the] modules to form a single exhaust duct run." *Id.* col. 2 ll. 36–44, J.A. 0012. Field assembly junctions are in turn encased by joint encasement sections, which are field connectable to each of the modules. *Id.* col. 2 ll. 44–46, J.A. 0012. According to another embodiment, the inner duct liner is "formed with a generally rectangular cross-section," and the outer casing is "formed with a generally rectangular cross-section . . . sized to substantially surround" the inner duct liner. *Id.* col. 2 ll. 50–54, J.A. 0012.

## DISCUSSION

### I.    Claim Construction

#### A.    Legal Standard

"The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation marks omitted). Indeed, this process "serves to define the scope of the patented invention and the patentee's right to exclude." *See HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017). But a court need only construe claim language that is disputed. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803

(Fed. Cir. 1999).  "Claim construction is ultimately an issue of law . . . ."  *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (citation omitted).

"[T]here is no magic formula or catechism" when it comes to claim construction.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).  But the Federal Circuit has nevertheless articulated general principles that guide courts, including the cardinal principle "the words of a claim are generally given their ordinary and customary meaning."  *Id.* at 1312 (quotation marks and citations omitted).  Perhaps more importantly, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [a "POSITA"] in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313 (citations omitted).  In addition, a POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent."  *Id.*

Sometimes, the ordinary meaning of a claim as understood by a POSITA may be immediately apparent to lay judges, and claim construction involves nothing more than applying the generally accepted meaning of commonly understood words.  *Id.* at 1314.  But courts are usually not so lucky.  When the meaning of a claim term is not readily apparent, courts look to "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean."  *Id.* (quotation marks omitted).  These sources are "the words of the claims themselves, . . . the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* (quotation marks and citations omitted).

Obviously, "the claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id*.  Also instructive are the context in which a claim term is used in the

asserted claim and other claims in the patent, both asserted and unasserted.  *Id.*  (citation omitted).  Indeed, since claim terms are normally used consistently throughout a patent, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Id.*  Differences among claims can be useful as well.  *Id.*

As part of a "fully integrated written instrument," though, claims "must be read in view of the specification."  *Id.* at 1315 (quotation marks omitted).  The specification is not only relevant, it is often dispositive: "[T]he specification is the single best guide to the meaning of a disputed term."  *Network-1 Techs., Inc v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022 (Fed. Cir. 2020) (quoting *Phillips*, 415 F.3d at 1315).  For example, while courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification," *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (citation omitted), "limitations from the specification are not to be read into the claims," *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (citation omitted).  Ultimately, "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Phillips*, 415 F.3d at 1323 (citation omitted).

If it is in evidence, a court should consider a patent's prosecution history, which consists of the record of the proceedings before the United States Patent and Trademark Office (the "PTO") and includes the prior art cited during a patent's examination.[3]  *Id.* at 1317 (citations omitted).  The prosecution history and the specification are similar in that they both show how the PTO and the inventor understood the patent and were both created by the inventor in trying to explain and obtain it.  *Id.*  However, the prosecution history usually "lacks the clarity of the

---

[3] The parties jointly submitted the '569 Patent's prosecution history into the record.  *See generally* J.A. 0018–0426, ECF Nos. 32-2–32-3.

specification" because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Id.* (citation omitted). Overall, while the prosecution history is useful because it can show how an inventor understood the invention, it is not as prominent as the claims and the specification in the claim construction analysis. *See id.* (citations omitted).

"In some cases . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) (citation omitted). Such evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."[4] *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1317). For example, expert testimony can "provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA], [and] . . . establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318 (citations omitted). But "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court," and a court "should discount any expert testimony that is clearly at odds with" the intrinsic evidence. *Id.* (quotation marks omitted). In sum, while extrinsic evidence "can help educate the court regarding the field of the invention and can help the court determine what a [POSITA] would understand claim terms to mean," *id.* at 1319, it is "less

---

[4] Both parties rely on extrinsic evidence. For example, both DuraSystems and Defendants rely on expert testimony. *See* Decl. of Tony Crimi ("Crimi Decl."), Pl.'s Br. Ex. AA, ECF No. 36-1 (testifying for DuraSystems); Decl. of Barry M. Cheek, Opening Br. Ex. B, ECF No. 31-3 (testifying for Defendants).

reliable" than intrinsic evidence, *id.* at 1318, and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," *id.* at 1319.

## B.    Analysis

At issue are the following nine claim terms: (1) "fire rated," (2) "specified fire rating," (3) "compressible insulation material," (4) "thermal spacers," (5) "thermally isolating," (6) "thermal spacers thermally isolating," (7) "exhaust duct module," (8) "joint encasement section," and (9) "joined directly."  Joint Claim Construction Chart.  Defendants argue the first three claim terms are indefinite and do not propose constructions thereof; DuraSystems disagrees and provides accompanying constructions.  *See id.* at 2.  Constructions of the other six claim terms have been presented.  *Id.* at 2–3.

### 1.    The Allegedly Indefinite Claim Terms

Defendants argue the terms "fire rated," "specified fire rating," and "compressible insulation material" are indefinite.  *Id.* at 2.  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The doctrine of indefiniteness derives from 35 U.S.C. § 112, under which a patent's claims, "evaluated from the perspective of someone skilled in the relevant art" "at the time the patent was filed" "in light of the patent's specification and prosecution history," must "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* at 908, 910 (emphasis omitted) (citations omitted); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("It has long been understood that a patent must describe the exact scope of an invention and its

manufacture . . . .").  This definiteness requirement "mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus*, 572 U.S. at 910.

But what is not clear is whether the Court should address Defendants' indefiniteness arguments now, at the claim construction stage, or later, at the summary judgment stage.  The Federal Circuit has not determined whether indefiniteness determinations should be made during claim construction.  But while it has "acknowledged that an indefiniteness analysis . . . is inextricably intertwined with claim construction" and "training questions of indefiniteness on individual claim terms is a helpful tool," the key question regarding indefiniteness is "whether the *claims*, not particular *claim terms*," meet the *Nautilus* indefiniteness standard.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1231–32 (Fed. Cir. 2016) (emphases added) (quotation marks and citations omitted).  Moreover, "the Federal Circuit's statements that indefiniteness is intertwined with claim construction mean only that the [c]ourt must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness, and not that the [c]ourt must determine indefiniteness during the claim construction proceedings." *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190-EDL, 2002 WL 1892200, at *15 (N.D. Cal. Aug. 15, 2002), *amended,* 2003 WL 21033555 (N.D. Cal. Jan. 10, 2003), *aff'd*, 401 F.3d 1340 (Fed. Cir. 2005).  And it "ha[s] certainly not endorsed a regime in which validity analysis is a regular component of claim construction." *Phillips*, 415 F.3d at 1327.

Many lower courts have not endorsed such a regime either; in fact, "district courts frequently decline to rule on indefiniteness at the *Markman* stage*," 0912139 B.C. Ltd. v. Rampion USA Inc.*, CASE NO. C18-1464JLR, 2019 WL 3426058, at *16 (W.D. Wash. July 30, 2019) (collecting cases), and numerous courts have "opine[d] that rulings on indefiniteness are

inappropriate at claim construction," *Kaneka Corp. v. JBS Hair, Inc.*, No. 3:10-cv-01430-P, 2012 WL 5364699, at *5 (N.D. Tex. Oct. 31, 2012) (collecting cases).

But should this Court join them, it would face another issue: how to proceed here given Defendants have not proposed alternative constructions for the claim terms they assert are indefinite. The Federal Circuit has not prescribed a solution, although some district courts have tried. *See infra* Section I.B.1.b.

For the following reasons, the Court defers (a) considering Defendants' indefiniteness contentions and (b) construing the claim terms attacked as indefinite—"fire rated," "specified fire rating," and "compressible insulation material"—until the summary judgment stage.

a.    Indefiniteness Shall Be Addressed at the Summary Judgment Stage

The Court defers consideration of Defendants' indefiniteness assertions given the "[s]everal well-settled principles . . . [that] tend to discourage rulings on indefiniteness at the *Markman* stage." *See CSB-Sys. Int'l Inc. v. SAP Am., Inc.*, Civil Action No. 10-2156, 2011 WL 3240838, at *17 (E.D. Pa. July 28, 2011). First, while indefiniteness is a question of law to which "[g]eneral principles of claim construction apply," *see HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019) (citation omitted), indefiniteness is an "invalidity defense[] [that must] be proven by clear and convincing evidence," *see Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1009 (E.D. Wis. 2017) (citing *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017)) (other citation omitted); *see also Am. GNC Corp. v. LG Elecs., Inc.*, Case No. 17-cv-01090-BAS-BLM, 2018 WL 400346, at *10 (S.D. Cal. Jan. 12, 2018) (finding this "demanding evidentiary requirement counsels that consideration of indefiniteness challenges would be best addressed separately from the claim construction hearing" (citation omitted)); *cf. Uretek Holdings, Inc. v. YD W. Coast Homes, Inc.*, Case No:

8:15-cv-472-T-36JSS, 2016 WL 3021880, at *3 (M.D. Fla. May 26, 2016) ("[T]he burden of proof is higher for establishing indefiniteness than it is for establishing a term's construction.").[5] Second, and more importantly, while claim construction proceedings give meaning to claim terms, "indefiniteness invalidates the claims entirely." *See 3-D Matrix, Inc. v. Menicon Co.*, Civil Action No. 14-cv-10205-IT, 2016 WL 111410, at *13 (D. Mass. Jan. 11, 2016) (citation omitted); *see also Nautilus*, 572 U.S. at 901 ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

Citing these principles, "district courts throughout the country have generally been reluctant to consider whether a patent is indefinite at the claim construction phase, rather than at the summary judgment phase." *See Junker v. Med. Components, Inc.*, CIVIL ACTION No. 13-4606, 2017 WL 4922291, at *2 (E.D. Pa. Oct. 31, 2017) (collecting cases); *Gilead Scis., Inc. v. Mylan Inc.*, Civil Action No. 1:14CV99, 2015 WL 1534067, at *2 (N.D. W. Va. Apr. 6, 2015) (noting "many judges have elected to wait and tackle indefiniteness at the summary judgment stage" due to "the high burden of proof on the party challenging a patent claim for indefiniteness," "the fact that a claim is not indefinite merely because the parties dispute its meaning," and "the dispositive effect of a ruling on indefiniteness" (collecting cases)); *see also 2-Way Computing, Inc. v. Nextel Fin. Co.*, No. 2:11-cv-00012-JCM-PAL, 2012 WL 4846145, at *20 (D. Nev. Oct. 9, 2012) (noting "it is more appropriate to defer these [indefiniteness] arguments until summary judgment because they are potentially dispositive and would invalidate

---

[5] Though, this evidentiary standard only applies to factual issues underlying indefiniteness disputes, not legal ones. *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (citation omitted); *cf. Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 114 (2011) (Breyer, J., concurring) (emphasizing that when evaluating patent invalidity claims, "the evidentiary standard of proof applies to questions of fact and not to questions of law," explaining "[m]any claims of invalidity rest, however, not upon factual disputes, but upon how the law applies to facts as given" and that "[w]here the ultimate question of patent validity turns on the correct answer to legal questions," the clear and convincing standard "has no application").

the patent, and because of the burden of proof required to show indefiniteness"), *amended on reconsideration on other grounds sub nom. 2-Way Computing, Inc. v. Sprint Nextel Corp.*, No. 2:11-CV-12 JCM (PAL), 2013 WL 2218010 (D. Nev. May 17, 2013).

The Court is similarly reluctant and finds Defendants' indefiniteness arguments should be decided on a motion for summary judgment. Indefiniteness decisions here could be dispositive. For example, since the term "fire rated" is included in every independent claim in the '569 Patent, *see, e.g.*, '569 Patent col. 8 l. 47, J.A. 0015, indefiniteness rulings could invalidate the entire patent. Indeed, as Defendants noted at the *Markman* hearing, "the entire case sort of rests on this term." *See Markman* Hr'g Tr. 25:2–3, ECF No. 44. Given these raised stakes (along with the raised burden on indefiniteness), the Court sees little harm in waiting until it has a fuller picture of this case to make them. This means waiting until the parties have produced a complete discovery record at the summary judgment stage.

At the *Markman* hearing, Defendants argued their indefiniteness contentions should be decided now because both parties have submitted declarations from experts in support of their claim construction briefs and those experts have been deposed. *Id.* at 24:22–23, 27:3–11. Nevertheless, as DuraSystems noted, full expert discovery has not yet taken place. *See id.* at 26:18–24 ("[E]xpert discovery, I think, would be very relevant as to the date of that claim because experts will give additional insight into the understanding of a person of ordinary skill in the art, and how a person of ordinary skill in the art would be applying that term to the prior art, the accused products and so forth."); *see also* Apr. 13, 2020 Text Order; Disc. Plan 2–3. Moreover, Defendants heavily rely on extrinsic evidence in making their indefiniteness assertions, *see generally* Opening Br. 8–10, 12–13 (relying on the testimony of its expert witness), and "where extrinsic evidence of the perspective of someone skilled in the art is

13

**Appx13**

relevant to the indefiniteness inquiry, it is appropriate to defer the indefiniteness determination until after the close of discovery." *Lifescan Scot., Ltd. v. Shasta Techs., LLC*, Case No. 11-cv-04494-WHO, 2014 WL 11206411, at *3 (N.D. Cal. Nov. 10, 2014) (citations omitted). Ultimately, "it would be more appropriate and logical to defer the full consideration of any potential indefiniteness challenge to the summary judgment stage, after all fact and expert discovery has been completed." *Uretek Holdings*, 2016 WL 3021880, at *3.

>   b.   These Claim Terms Shall Be Construed at the Summary Judgment Stage

Deferring indefiniteness until summary judgment creates another issue: how to move forward when Defendants have not proposed alternative constructions for "fire rated," "specified fire rating," and "compressible insulation material." District courts have encountered this situation before and dealt with it in various ways. For example, one court, citing a lack of alternative constructions, rejected an indefiniteness argument without prejudice to it being raised again at a later stage. *Kaneka*, 2012 WL 5364699, at *5. Another court simply chose to ignore indefiniteness at the claim construction stage. *See Steuben Foods, Inc. v. Oystar Grp.*, 1:10-CV-00780-EAW-JJM, 1:10-cv-00781-EAW-JJM, 1:12-cv-00904-EAW-JJM, 1:13-cv-00892-EAW-JJM, 1:13-cv-01118-EAW-JJM, 2017 WL 3842136, at *3 (W.D.N.Y. June 6, 2017) (electing to "defer consideration of [a party's] indefiniteness argument . . . until after claim construction").

Another court made preliminary indefiniteness rulings. In *Britax Child Safety, Inc. v. Nuna International B.V.*, No. 17-cv-2724, 2019 WL 7161687 (E.D. Pa. Dec. 23, 2019), the district court identified a "conundrum": the defendants "rais[ed] an indefiniteness argument as to multiple claim terms," their argument was "premature at such an early stage of the litigation," and they did not "either (a) offer[] an alternative proposed construction for such terms or (b) mov[e] for summary judgment on invalidity grounds," *id.* at *15 (quotation marks omitted). After observing it "must first attempt to determine what a claim means before it can determine

whether the claim is invalid for indefiniteness, *id.* (quotation marks omitted), the district court identified a solution: "engag[ing] in claim construction analysis with respect to the terms [the defendants] allege[] are indefinite, while making only preliminary findings as to indefiniteness in light of the intrinsic record" "without prejudice to [the defendants'] ability to reassert [their] indefiniteness arguments at the close of discovery by way of a motion for summary judgment, *see id.* (citations and footnotes omitted). *See also, e.g.*, *Cap. Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-cv-1516-WSD, 2016 WL 3517595, at *4 (N.D. Ga. June 28, 2016) (embracing this approach); *Uretek Holdings*, 2016 WL 3021880, at *3 (adopting this approach).

The Court prefers to defer construction of the pertinent claim terms to summary judgment so indefiniteness and claim construction can be assessed together on a full discovery record. Indeed, these two analyses should be considered together, as despite the aforementioned material differences between them, "[i]ndefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). An indefiniteness analysis "involves consideration of primarily the intrinsic evidence," *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377–78 (Fed. Cir. 2015), and "[a]s in claim construction, in making an indefiniteness determination, the district court may make 'any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art . . . .'" *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 388 F. Supp. 3d 362, 364 (D. Del. 2019) (quoting *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017)), *aff'd*, 854 F. App'x 379 (Fed. Cir. 2021). With regard to "fire rated," "specified fire rating," and "compressible insulation material," claim construction and indefiniteness should be considered together, and since

15

indefiniteness is deferred until the summary judgment stage, it follows claim construction should occur then as well.[6]

*   *   *

Should either party file a motion for summary judgment, the parties shall, in light of any new evidence produced via expert discovery, address the constructions of the terms "fire rated," "specified fire rating," and "compressible insulation material."  Defendants can then reassert their indefiniteness arguments.  On a motion for summary judgment, these claims shall be construed before any indefiniteness arguments are considered.  *See ASM Am.*, 2002 WL 1892200, at *15.

In the meantime, the remaining claim terms—"thermal spacers," "thermally isolating," "thermal spacers thermally isolating," "exhaust duct module," "joint encasement section," and "joined directly"—are addressed below.

### 2.      The Remaining Claim Terms

As an initial matter, it is necessary to identify those to whom the below claim terms are addressed: POSITAs.  *See Nautilus*, 572 U.S. at 909 (noting "patents are not addressed to lawyers, or even to the public generally, but rather to those skilled in the relevant art" (quotation

---

[6] Indeed, the preliminary indefiniteness approach employed by the *Britax Child Safety* court is not optimal.  For one thing, tentative decisions on issues as potentially dispositive as indefiniteness without the benefit of a complete discovery record could greatly elongate discovery proceedings and put certain parties in an unfounded position of strength in settlement negotiations.  Another problem with this approach is it assumes should indefiniteness be deferred until summary judgment, construction of ostensibly indefinite claim terms must occur beforehand.  But "claim construction can occur at virtually any point in the case: prior to discovery, pursuant to motions for summary judgment, or following the close of evidence at trial."  *CellCast Techs., LLC v. United States*, 152 Fed. Cl. 414, 432 n.5 (Fed. Cl. 2021) (quotation marks omitted); *cf. Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("District courts have wide latitude in how they conduct the proceedings before them, and there is nothing unique about claim construction that requires the court to proceed according to any particular protocol.  As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.").  While there are good reasons why claim construction should generally occur before the summary judgment phase, *see* Edward Brunet, Markman *Hearings, Summary Judgment, and Judicial Discretion*, 9 Lewis & Clark L. Rev. 93, 97 (2005) ("Cost-cutter sorts recommended a Markman hearing well in advance of trial and before expensive complex case discovery."), this does not mean some (or even all) disputed claim terms must be construed before then.

16

marks omitted)).  The parties agree a POSITA "would have a technical certification as a sheet metal worker or sheet metal mechanic, which is typically a five-year certification, or with equivalent work experience in the field of fire-rated duct systems."  *See* Opening Br. 5–6 (citations omitted).  Further, he or she "may also have a bachelor's degree in mechanical engineering or [a] related field, and . . . experience could replace formal training, such that a person with five or more years of experience working in the exhaust duct field would have appropriate training to be a POS[IT]A."  *Id.* at 6 (citations omitted).

      a.    <u>"thermal spacers" / "thermally isolating" / "thermal spaces thermally isolating"</u>

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
| --- | --- | --- | --- |
| "thermal spacers" | "thermal spacers thermally isolating" addressed below | "a spacer having a specific thermal isolation property" where a spacer is something that maintains two components in a spaced relationship | "thermal spacers thermally isolating" addressed below |
| "thermally isolating" | "thermal spacers thermally isolating" addressed below | "preventing the thermal transfer of heat" | "thermal spacers thermally isolating" addressed below |
| "thermal spacers thermally isolating" | "components that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or | "thermal spacers" and "thermally isolating" addressed separately above | "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" |

17

| | outer casing during fire rating testing" | | |
|---|---|---|---|

The terms "thermal spacers" and "thermally isolating" are present in claims 1, 10, and 16 (the "Independent Claims") of the '569 Patent and appear similarly in each claim. Claim 1 provides a representative example; it claims:

> two or more exhaust duct modules; each of [which] having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing.

'569 Patent col. 8 ll. 49–59, J.A. 0015 (describing the first embodiment); *see also id.* col. 9 ll. 50–62, J.A. 0016 (describing the second embodiment); col. 10 ll. 30–43, J.A. 0016 (describing the third embodiment). A figure depicting a thermal spacer configuration according to an embodiment is included below. *See id.* col. 3 ll. 43–44, J.A. 0013.



SECTION A-A

FIG. 5b

18

*Id.* fig. 5(b), JA0007.[7]  As both parties heavily rely upon the prosecution history concerning these claim terms, that should be examined as well.

The claim language regarding thermal spacers in the original draft of the '569 Patent was notably different from the language ultimately approved by the PTO, as it did not include the term "thermally isolating."  It reads:

> two or more exhaust duct modules; each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and *including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship* so that said insulation material occupies said void.

*E.g.*, Fire-Rated Modular Duct Assembly and Improvements Therein 14, J.A. 0037, ECF No. 32-2 (emphasis added).

In a non-final communication rejecting the original draft on obviousness grounds,[8] the examiner noted the relevant prior art, U.S. Patent No. 2,916,054 ("Callan"),

> teaches a modular fire-rated exhaust duct assembly comprising: two or more exhaust duct modules . . . each of [which] having an outer casing . . . and an inner flange . . . and a void . . . being formed between at least a portion of space between said inner flange and said outer casing, said void being configured for receiving an insulation material . . . *and including one or more thermal spacers . . . configured to maintain said inner flange and said outer casing in a spaced relationship* so that said insulation material occupies said void.

*E.g.*, Non-Final Rejection ¶ 4, J.A. 0257–58, ECF No. 32-3 (emphasis added).  While the term "thermal spacers" was not the focal point of this first round of negotiations, the applicant (and

---

[7] Reference 212 points to an "external flange connector," '569 Patent col. 4 l. 24, J.A. 0013; reference 214 points to a "flange," *id.* col. 4 l. 23, J.A. 0013; reference 320 points to an "inner connection angle member[]," *id.* col. 6 ll. 24-25, J.A. 0014; reference 330 points to an "outer flashing member[]," *id.* col. 6 l. 20, J.A. 0014; reference 332 points to "self-tapping screws or similar fasteners," *id.* col. 6 ll. 25–26, J.A. 0014; reference 420 points to a "thermal spacer[]," *id.* col. 6 l. 51, J.A. 0014; and reference 600 points to "holes," *id.* col. 5, l. 13, J.A. 0014.

[8] *See* 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.").

eventual patentee), William C. Duffy,[9] amending the original draft with respect to different claim language and responding to the examiner, argued Callan does not teach thermal spacers, explaining "the sidewalls . . . according to Callan do not comprise thermal spacers as being alleged and furthermore there is no description, teaching or suggestion by Callan that the sidewalls . . . are intended to maintain an inner duct in a spaced relationship from an outer casing, as recited in claim 1 [of the amended draft '569 Patent]."  Amendment 10, J.A. 0295, ECF No. 32-3 (quotation marks omitted).

    The examiner rejected the amended draft.  *See* Final Rejection ¶ 4, J.A. 0302, ECF No. 32-3.  In responding to Duffy's thermal spacers assertion, the examiner explained the spacers in the amended draft "are only there to keep duct components in a spaced relationship without requiring any specific thermal properties" and that since Callan's spacers keep an inner flange and an outer casing in a spaced relationship, Callan does indeed teach "thermal spacers."  *Id.* at 12, J.A. 0312.  In other words, the amended draft and Callan both disclosed "thermal spacers," precluding Duffy from claiming them.

    Duffy then amended the claim language concerning thermal spacers and responded to the examiner's explanation.  First, he amended the rejected language by adding the language in the '569 Patent, which, as indicated above, includes the term "thermally isolating."  Request for Continued Examination and Amendment 3, J.A. 0322, ECF No. 32-3.  Second, he provided context for his amendment, explaining "[t]he thermal isolation function of the thermal spacers . . . is entirely consistent with" the function fire-rated duct systems serve in commercial kitchens as recited in the background section of the '569 Patent.  *See id.* at 10, J.A. 0329; *see also* '569 Patent col. 1 ll. 47–50, J.A. 0012 ("[A]ny potential fire inside the duct system must be contained

---

[9] Duffy founded DuraSystems, which owns the '569 Patent by assignment.  Am. Compl. ¶¶ 9, 34.

and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building.").

He also stated "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating." Request for Continued Examination and Amendment 9, J.A. 0328. In addition, he noted "[a]ccording to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat . . . from the inner duct to the outer casing." *Id.* at 10, J.A. 0329. After rehashing his argument regarding Callan's sidewalls, he concluded "even if the sidewalls are construed as thermal spacers, which is not herein being conceded, Callan fails to describe and teach 'one or more thermal spacers thermally isolating said inner duct liner from said outer casing' as . . . amended and currently presented." *See id.* at 11, J.A. 0330 (quotation marks omitted).

The examiner then granted Duffy's application. Not. of Allowability 1, J.A. 0341, ECF No. 32-3. In his statement of reasons for the allowance, the examiner stated "the primary reason for allowance is the inclusion of limitations 'said one or more thermal spacers thermally isolating said inner duct liner from said outer casing' in claims 1, 10, and 16." *Id.* at 2, J.A. 0342. Further, he noted while Callan "teaches an insulated section, an inner duct liner, a first and second flange connector and a joint encasement section," it "does not teach an outer casing and thermal spacers which thermally isolate the inner duct liner from said outer casing." *Id.*

       i.        *"thermal spacers"*

Two issues concern the construction of "thermal spacers," one the parties vigorously address and the other they all but ignore: (1) whether thermal spacers require a spacer to have a specific thermal isolation property and (2) whether thermal spacers by themselves thermally

isolate.  For the reasons stated below, (1) thermal spacers must themselves thermally isolate, but (2) thermal spacers need not have a specific thermal isolation property.

Thermal Spacers Must Thermally Isolate

The intrinsic evidence shows thermal spacers themselves thermally isolate.  While DuraSystems argues a POSITA would understand "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat," Pl.'s Br. 17 (emphasis omitted) (quoting Request for Continued Examination and Amendment 10, J.A. 0329), the Independent Claims make clear the "thermal spacers thermally isolate[e]."  *See, e.g.*, '569 Patent col. 8 ll. 58–59, J.A. 0015.  While the word "configured" is used six times in each of the Independent Claims, *e.g.*, *id.* col. 10 ll. 27–56, J.A. 0016, it is never used to indicate the "thermal spacers" do not, on their own, thermally isolate the inner duct liner from the outer casing.

This idea is supported by the prosecution history.  First, despite Duffy arguing the arrangement of the inner duct liner, outer casing, insulation material, and thermal spacers is configured to prevent heat transfer, he nevertheless indicated "thermal spacers" have a "thermal isolation function."  *See* Request for Continued Examination and Amendment 10, J.A. 0329.  Second, and more importantly, by amending the draft independent claims to include the limitation "thermally isolating" in an attempt to overcome Callan, *see id.* at 11, J.A. 0330, he restricted the meaning of "thermal spacers" to spacers that thermally isolate the inner duct liner from the outer casing.  *Cf. Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [limit the meaning of a claim term] by clearly characterizing the invention in a way to try to overcome rejections based on prior art." (citations omitted)); *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) ("[A]n

amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope.").

Thermal Spacers Need Not Have a Specific Thermal Isolation Property

Just because thermal spacers thermally isolate does not mean they must have a specific thermal isolation property. Defendants first argue the Independent Claims "make[] clear that 'thermal spacers' are spacers that have a specific thermal isolation property." Opening Br. 14 (emphasis and citation omitted). But it is far from clear these claims—which make no mention of thermal isolation properties, let alone any particular one—mean what Defendants say. They provide little support for this proposition; their primary citation is to the background section of a Federal Circuit case, *see Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1372 (Fed. Cir. 2004) (citation omitted), the relevance of which they fail to explain. This argument is so lightly addressed, DuraSystems declined to respond to it.

Heavier, though, is the focus on the prosecution history. Defendants contend Duffy "defined 'thermal spacer' to be a spacer with a specific property" by "disclaim[ing] . . . any spacer that does not have a specific thermal isolation property and that does not prevent the transfer of heat" in prosecuting the '569 Patent. Opening Br. 16 (citations omitted). They rely on Duffy stating "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating" and "the thermal spacers is [sic] configured to prevent the thermal transfer of heat." *Id.* at 15–16 (citation and emphases omitted). For its part, DuraSystems points out Duffy never limited thermal spacers to one thermal property, as it explicitly referred to "multiple thermal properties." *See* Pl.'s Br. 15 (quotation marks, citation, and emphasis omitted) ("Defendants misconstrue this statement that clearly

includes multiple thermal 'properties' to be a definition and/or disavowal limiting 'thermal spacers' to one thermal property . . . .").

There are two exceptions to the rule claim terms are given their ordinary meaning: (1) "when a patentee sets out a definition and acts as his own lexicographer" and (2) "when [a] patentee disavows the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). The doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citations omitted). When a patentee has disavowed a particular meaning to obtain a patent, prosecution disclaimer applies and "narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324. This doctrine "plays an important role in the patent system," as "[i]t 'promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.'" *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (quoting *Omega*, 334 F.3d at 1324)). "Such disclaimer can occur through amendment or argument." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted).

But "for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) (quotation marks and alteration omitted). "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations," prosecution disclaimer does not apply. *Id.* (quotation marks omitted); *see also Omega*, 334 F.3d at 1325 ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim

scope."). A party seeking to invoke this doctrine "bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art." *Shire Pharms.*, 839 F.3d at 1119 (quotation marks omitted). This is a heavy burden. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[T]he standard for disavowal is exacting . . . ."); *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

While "[a] disavowal must be clear, . . . it need not be explicit." *Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) (citation omitted). Indeed, patent applicants "rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following'" and "need not do so to meet the applicable standard." *Saffran v. Johnson & Johnson,* 712 F.3d 549, 559 (Fed. Cir. 2013). "Disavowal may be inferred from clear limiting descriptions of the invention in the . . . prosecution history." *Techtronic*, 944 F.3d at 907 (quotation marks and citation omitted). Further "[a]n inventor may also disavow claim scope by distinguishing the claimed invention over the prior art." *Id.* (quotation marks and citation omitted). And "an amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope." *Schindler*, 593 F.3d at 1285.

Defendants fail to show DuraSystems disclaimed any spacer that does not have a specific thermal isolation property. While Defendants rely on Duffy explaining "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating," Request for Continued Examination and Amendment 9, J.A. 0328, "a clear

disclaimer of any spacer that does not have a specific thermal isolation property" this is not, *see* Opening Br. 16 (citations omitted).  On one side of the coin, it is doubtful Duffy was referring to one particular property when indicating "thermal" refers to "specific thermal proper*ties*."  But on the other, when referring to "specific thermal properties," Duffy did not refer to multiple properties—just "thermally isolating."  Though one could argue "thermally isolating" is the property Defendants are looking for, whether "thermally isolating" is a property is not entirely clear either.  As Defendants assert, "a property is a material trait," Reply Br. 8; *cf. id.* ("'[H]eat transfer' is not a thermal property of a material." (citing Dep. of Tony Crimi ("Crimi Dep.") 181:7–187:13, 245:8–14, Reply Br. Ex. 1, ECF No. 41-1), and material traits "are ones such as thermal conductivity, thermal capacity, etc. that *result* in 'thermal isolation,'" *id.* (emphasis added).  By this argument, thermal isolation[10] is not a property, but a result—or, as Duffy would put it, a "function."  *See* Request for Continued Examination and Amendment 10, J.A. 0329 (discussing "[t]he thermal isolation function of the thermal spacers").

From this fuzziness comes a clear conclusion: Duffy's prosecution statement is "too vague or ambiguous to qualify as a disavowal of claim scope."  *See Omega*, 334 F.3d at 1325. Accordingly, the term "thermal spacers" cannot be construed as spacers that possess a specific thermal isolation property and "thermal spacers" are therefore spacers that thermally isolate.

That "thermal spacers" cannot be construed this way is further supported by the examiner's rejection of the drafts of the '569 Patent.  "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."  *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).  The examiner noted Callan, which "teaches a modular

---

[10] Whether "thermal isolation" and "thermally isolating" can or should be addressed in the same discussion is also unclear.

26

**Appx26**

fire-rated exhaust duct assembly . . . including one or more thermal spacers . . . configured to maintain said inner flange and said outer casing in a spaced relationship, *e.g.*, Non-Final Rejection ¶ 4, J.A. 0257–58, "teach[es] thermal spacers," Final Rejection 12, J.A. 0312, even though it does not require thermal spacers to have any specific thermal properties.  In rejecting the amended draft, the examiner concluded it could not overcome Callan because its spacers were "only there to keep duct components in a spaced relationship without requiring any specific thermal properties."  *Id.*  "Thermal spacers," devoid of any accompanying language (such as "thermally isolating") therefore only refer to spacers *without* specific thermal properties.  Indeed, only after the amended draft was amended to pair "thermally isolating" with "thermal spacers" did the examiner determine it distinguished Callan.[11]

> ii.    *"thermally isolating"*

Chiefly at issue here is the extent to which "thermal spacers" must "thermally isolate." DuraSystems argues they must limit heat transfer and Defendants contend they must prevent it. *See* Joint Claim Construction Chart 2–3.  A construction favoring DuraSystems would trigger another issue: whether limiting heat transfer means "limit[ing] the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  *See id.*

The four corners of the '569 Patent provide little guidance; the claims do not explain what "isolating" means and the specification does not either.  While DuraSystems asserts language in the background section shows "isolating" means "minimizing," *see* Pl.'s Br. 18

---

[11] To be sure, the examiner ultimately granted Duffy's application, explaining "the primary reason for allowance is the inclusion of limitations 'said one or more thermal spacers thermally isolating said inner duct liner from said outer casing' in claims 1, 10, and 16."  Not. of Allowability 2, J.A. 0342.  But his explanation did not contain any reference to any specific thermal properties, and even if it did, unilateral statements by an examiner do not give rise to a "clear disavowal of claim scope by an applicant."  *See Salazar*, 414 F.3d at 1347.

(emphasis and quotation marks omitted), that language refers to the capabilities of the entire fire-rated exhaust duct system, not the thermal spacers—which as explained above, must *themselves* thermally isolate. *See supra* section I.B.2.a.i. Indeed, that "a fire-rated duct must be capable of minimizing the transfer of heat," '569 Patent col. 1 ll. 34–36, J.A. 0012, only speaks to a fire-rated duct. Although DuraSystems contends other language shows "isolating" means "limit[ing]," *see* Pl.'s Br. 18 (emphasis and quotation marks omitted), that language doesn't even indicate what part of an exhaust duct module does the limiting. *See* '569 Patent col. 1 ll. 47–50, J.A. 0012 ("[A]ny potential fire inside the duct system must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building.").

Perhaps for this reason, the parties primarily focus on the prosecution history. Defendants argue Duffy's statement that "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat . . . from the inner duct to the outer casing," Request for Continued Examination and Amendment 10, J.A. 0329, "form[s] the basis for [their] construction," Opening Br. 19 (citation omitted). DuraSystems contends Duffy was referring to the arrangement of multiple parts of the exhaust duct system, rather than just the thermal spacers, *see* Pl.'s Br. 17 (citation omitted), and argues a POSITA would understand "'prevent the thermal transfer of heat' to be a colloquial, rather than a literal, use of 'prevent,'" *id.* (citing Decl. of Tony Crimi ("Crimi Decl.") ¶ 50, Pl.'s Br. Ex. AA, ECF No. 36-1), reasoning preventing the thermal transfer of heat is a "physical impossibility" and a construction of "isolating" as "preventing" would therefore exclude every embodiment in the '569 Patent, *see id.* (citation omitted).

**Appx28**

This statement does not directly address "thermal spacers."  Indeed, it means an exhaust duct system as a whole "prevent[s] the thermal transfer of heat," *see* Request for Continued Examination and Amendment 10, J.A. 0329—and not "thermal spacers," which themselves must thermally isolate, *supra, e.g.*, section I.B.2.a.i.  But when read in the context of the '569 Patent, it demonstrates "isolating" is best understood as "limiting."

First, the word "prevent" should be read restrictively.  While DuraSystems's expert testified it is not possible to truly prevent the transfer of heat, *see* Crimi Dep. 185:22–186:8, and declared a POSITA would understand Duffy used the word "prevent" colloquially, *see* Crimi Decl. ¶ 50, he nevertheless testified "preventing" means "stopping," as opposed to "limiting," *see* Crimi Dep. 189:9–12.  And as he acknowledged it is possible to "effectively" prevent the thermal transfer of heat, *id.* at 186:11–14, DuraSystems's concern about excluding every embodiment in the '569 Patent, *see* Pl.'s Br. 17 (citation omitted), (even if Duffy's statement were about "thermal spacers") is unfounded.  "Prevent" is therefore akin to "effectively stop."

Second, given this necessarily restrictive reading, construing "isolating" as "preventing" would be improper.  If an exhaust duct system "prevents the thermal transfer of heat," finding thermal spacers must do so as well renders the term "thermally isolating" superfluous—a result the Federal Circuit would not countenance.  *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (citation omitted)).  Indeed, there would be no need for thermal spacers to prevent the thermal transfer of heat if an exhaust duct system already does the same thing.

Third, because thermal spacers still have a "thermal isolation function," *see* Request for Continued Examination and Amendment 10, J.A. 0329, the definition of "isolating" must take a

29

middle ground between "preventing" (i.e., "effectively stopping") the thermal transfer of heat and doing nothing.  Indeed, "thermal spacers" must still thermally isolate.  The word "limiting," which Defendants acknowledge is broader than "preventing," *cf.* Opening Br. 19 (arguing against "broaden[ing] [the definition of] 'isolation' to mean 'limitation'" (citations omitted)), fits the bill.

Defendants, citing a dictionary, argue "the plain and ordinary meaning of isolate . . . is 'to set apart or cut off from a group or whole' or 'to place in quarantine,'" *id.* at 18 (quoting *The American Heritage Dictionary* 453 (4th ed. 2000), Opening Br. Ex. S, ECF No. 31-20), and accordingly, "the plain and ordinary meaning of 'thermally isolate' would then be to keep heat in one component from getting to the other," *id.* (footnote omitted).  While the Court can rely upon dictionary definitions in construing claim terms, *see Cont'l Circuits*, 915 F.3d at 799, it can only do so if they "do[] not contradict the meaning otherwise apparent from the intrinsic record," *see Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1321 ("[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract.").  Because the definition proffered by Defendants contradicts the meaning of "isolating" based on the intrinsic record, it is not considered.  *See Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1222 (Fed. Cir. 2020) (finding "the intrinsic record trumps" after observing "the meaning of [a claim term] as discerned from the intrinsic evidence squarely conflicts with the meaning that [the plaintiff] would distill from its selected extrinsic evidence" (citation omitted)).  Moreover, Defendants' definition does not even mention the word "prevent," the linchpin of their proposed construction.  Even if the definition did not contradict the meaning suggested by the intrinsic evidence, it is accordingly overbroad.  *See Luv N' Care, Ltd. v.*

30

**Appx30**

*Laurain*, CIVIL ACTION NO. 3:16-cv-00777, 2018 WL 3213149, at *6 (W.D. La. June 29, 2018) ("This Court does not rely on the dictionary definitions submitted by the LNC Parties as they are extrinsic evidence, are overly broad, and are contradicted by the intrinsic record.").

Finally, since "isolating" means "limiting," it is necessary to determine whether the rest of DuraSystems's proposed construction should be accepted. In other words, the Court must determine whether limiting heat transfer means "limit[ing] amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." *See* Joint Claim Construction Chart 2–3.

Both parties ground their arguments in indefiniteness concerns. Defendants argue DuraSystems's proposed construction "would be indefinite because there is no standard for how much heat the spacers need to 'limit' in order to avoid 'failure points,'" *see, e.g.*, Opening Br. 17 (citing Decl. of Barry M. Cheek ¶¶ 77–78, Opening Br. Ex. B, ECF No. 31-3) (other citation omitted), and thereby ties its position back to its indefiniteness contentions regarding the terms "fire rated" and "specified fire rating," *see* Reply Br. 9 ("[L]inking the meaning of the term 'thermally isolating' to a fire rating test makes the definition [of the term 'thermally isolating'] indefinite . . . ." (internal cross reference omitted)). DuraSystems reasons a POSITA must know "to what degree the thermal spacer must 'limit' or 'minimize' the thermal transfer of heat to be a 'thermal spacer thermally isolating'" and references Defendants' indefiniteness argument concerning the term "compressible insulation material." Pl.'s Br. 18. Just as Defendants rely upon extrinsic evidence to support their indefiniteness position, DuraSystems relies upon extrinsic evidence to support its proposed construction. *See id.* at 18–19.

As explained above, *supra* section I.B.1.a., indefiniteness arguments are best addressed on a motion for summary judgment. Accordingly, the indefiniteness contentions regarding

"thermally isolating," like those regarding "fire rated," "specified fire rating," and "compressible insulation material," are deferred until the summary judgment stage. Whether DuraSystems's proposed construction is proper is tied to this indefiniteness dispute and will not be decided now.

In fact, it is even more justified to defer consideration of these indefiniteness contentions. Here, Defendants do not argue "thermally isolating" is facially indefinite and cannot be construed; rather, they say "thermally isolating" is indefinite if the Court adopts DuraSystems's proposed construction thereof. In other words, they raise an "as-applied" indefiniteness challenge—one which is especially well-suited to resolution at the summary judgment stage. *See, e.g.*, *3-D Matrix*, 2016 WL 111410, at *13 ("[C]ourts have recognized that there are reasons to defer ruling on indefiniteness until the summary judgment stage. This is especially so if the claim language itself is amenable to construction but is alleged to be indefinite as applied." (quotation marks and citations omitted)). Indeed, the parties' "battle of the experts" is precisely the kind of dispute that should not be decided at the claim construction stage. *See Steuben Foods*, 2017 WL 3842136, at *2 (citations omitted).

*   *   *

Most of the disputes regarding "thermal spacers" and "thermally isolating" having now been resolved, the Court turns to the first issue the parties present thereon: whether "thermal spacers" and "thermally isolating" should be construed separately or together. Defendants argue they should be construed separately because "the latter is the function the thermal spacers performs [sic], not what the thermal spacers are." *See* Opening Br. 13 n.5; *cf.* Reply Br. 7 ("Plaintiff is desperate to have the Court not say what a 'thermal spacer' is . . . ." (emphasis omitted)). DuraSystems contends they should be construed together because they "appear in the

32

**Appx32**

claims as 'thermal spacers thermally isolating,'[12] [and] it makes more sense to construe the phrase as a whole."  Pl.'s Br. 12–13 n.6.

While the Court analyzed these terms separately, it construes them together, given they largely appear together in the Independent Claims, their separate constructions are primarily based on the same aspects of the '569 Patent's prosecution history, and each construction influences the other.

Accordingly, "thermal spacers thermally isolating" is construed as "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  The language subject to the aforementioned as-applied indefiniteness challenge is tentative; whether it shall remain so shall be decided, like the indefiniteness arguments, at the summary judgment stage.

### b.    "exhaust duct module"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "exhaust duct module[s]" | "a section of pre-fabricated, factory-built exhaust duct" | "a section of an exhaust duct" | "a section of pre-fabricated, factory-built exhaust duct" |

The term "exhaust duct module" appears in claims 1, 3, 7, and 9–20.  As Defendants acknowledge, the parties agree "a 'module' is a 'section' of an overall exhaust duct."  *See* Opening Br. 20.  They dispute whether an "exhaust duct module" is a "pre-fabricated, factory-built" duct.  *See* Joint Claim Construction Chart 3.

---

[12] While the terms "thermal spacers" and "thermally isolating" do often appear together, *e.g.*, '569 Patent col. 8 ll. 58–59, J.A. 0015, the term "thermal spacers" sometimes appears on its own, *e.g.*, *id.* col. 8 l. 55, J.A. 0015.

The claims do not provide an answer, and the parties focus their attention on the specification. Defendants, arguing an "exhaust duct module" is not necessarily "pre-fabricated, factory built," contend DuraSystems's construction impermissibly reads into the claims a preferred embodiment. Opening Br. 20. DuraSystems contends the '569 Patent describes the invention as an exhaust duct system "configured to be assembled in the field," *see* Pl.'s Br. 20 (quotation marks omitted), and a POSITA would understand a system configured this way "is a pre-fabricated or factory-built exhaust duct," *id.* (citing Crimi Decl. ¶ 65). Both parties understand a "pre-fabricated duct" is a "factory-built" duct. *See* Pl.'s Br. 20 (positing "those in the relevant industry distinguish between 'field-fabricated' versus 'pre-fabricated' / 'factory-built' fire-rated exhaust ducts"); Reply Br. 13 (referring to "an exhaust duct that is pre-fabricated and factory-built"); *cf.* '569 Patent col. 7 ll. 24–29, J.A. 0015 ("The insulation material . . . is affixed to the inner face or side of the outer metallic layer . . . using suitable adhesives and/or mechanical fasteners, in order to provide for pre-fabrication at the factory and thereby minimize the number of components transported to and assembled on site.").

"[P]atents disclose 'embodiments' and 'preferred embodiments' of the claimed invention, the purposes of which are 'to provide a disclosure to the public of [the inventor's] best mode of carrying out the invention when the applications were filed." *Edelbrock, LLC v. Whipple Indus., Inc.*, Case No. 1:19-cv-01502-DAD-EPG, 2021 WL 321643, at *3 (E.D. Cal. Feb. 1, 2021) (alteration in original) (quoting *Constr. Tech., Inc. v. Cybermation, Inc.*, 965 F. Supp. 416, 431 (S.D.N.Y. 1997)). "Such a disclosure is included for the benefit of the public, rather than to limit the scope of the invention." *Id.* (citing *Constr. Tech., Inc.*, 965 F. Supp. at 431) (other citation omitted). Accordingly, a patent's "*claims*, not specification embodiments, define the scope of patent protection," *see Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009)

(emphasis added), and "although the specification[] may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments," *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (quotation marks and alteration omitted). As the Federal Circuit has often explained, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quotation marks and alteration omitted). Stated differently, for the specification to disavow claim scope, it "must contain expressions of manifest exclusion or restriction." *See Cont'l Circuits*, 915 F.3d at 797 (quotation marks omitted).

But a specification disavowal, like a prosecution history disavowal, "need not be explicit." *Poly-Am.*, 839 F.3d at 1136 (citation omitted); *see Rembrandt Patent Innovations, LLC v. Apple, Inc.*, 716 F. App'x 965, 972 (Fed. Cir. 2017) ("[D]isclaimer does not require express statements by the patentee identifying the surrendered claim scope. Rather, it may be implicit, so long as it is sufficiently clear." (citing *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015)). Two types of implicit specification disavowal are relevant here. First, "an inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *See Poly-Am.*, 839 F.3d at 1136 (citation omitted). In other words, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon*, 503 F.3d at 1308; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only

**Appx35**

preferred embodiments, [can] . . . support a limiting definition of a claim term." (citation

omitted)). Such statements "are more likely to be found in certain sections of the specification,

such as the Summary of the Invention," *C.R. Bard*, 388 F.3d at 864 (citation omitted), as well as

the abstract, *see, e.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed.

Cir. 2012), the background, *see, e.g.*, *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321

(Fed. Cir. 2011), and even the title, *see, e.g.*, *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d

816, 823 (Fed. Cir. 2016). Second, "an inventor may disavow claims lacking a particular feature

when the specification distinguishes or disparages prior art based on the absence of that feature."

*Poly-Am.*, 839 F.3d at 1136 (citations omitted); *see also Astrazeneca AB v. Mut. Pharm. Co.*, 384

F.3d 1333, 1340 (Fed. Cir. 2004) ("Where the general summary or description of the invention

describes a feature of the invention . . . and criticizes other products . . . that lack that same

feature, this operates as a clear disavowal of these other products . . . ." (citation omitted)).

"[I]n either case, an implied disavowal must be clear and may be undermined by other

intrinsic evidence from the patent's specification." *Kranos IP Corp. v. Riddell, Inc.*, 339 F.

Supp. 3d 850, 853 (N.D. Ill. 2018). Indeed, "[t]he standard for disavowal of claim scope is . . .

exacting. . . . [and] [t]o find disavowal, [the Court] must find that the specification is both so

clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous

evidence of disclaimer." *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015)

(quotation marks omitted). Ultimately, whether the specification disavows the scope of a claim

must be determined in light of the specification as a whole. *See id.* at 514–16 (finding a patent's

specification disavowed the scope of a claim after reviewing the specification's "Background of

the Invention," "Summary of the Invention," and "Detailed Description" sections).

DuraSystems satisfies this heavy burden. First, it points to the first sentence of the '569 Patent's "Brief Summary of the Invention." *See* Pl.'s Br. 21 (quotation marks omitted). This sentence provides "[t]he present invention comprises embodiments of a modular fire-rated duct system and improvements therein and *suitable for pre-fabrication and configured for assembly in the field*," '569 Patent col. 2 ll. 22–25, J.A. 0012 (emphasis added), and thereby makes clear "pre-fabrication" is a "characteristic feature" of the invention as a whole, *see Poly-Am.*, 839 F.3d at 1136–37 (determining one sentence in the specification of the patent at issue "describe[d] a characteristic feature of the invention" and found, based in part on this sentence, that the patent "clearly and unequivocally disavow[ed] claims" lacking that feature). Indeed, by indicating the invention is "suitable for pre-fabrication," it describes "pre-fabrication" as a feature thereof. *See Astrazeneca*, 384 F.3d at 1340 (holding the specification disavowed "nonsurfactant solubilizers" in part because the specification "twice describe[d] micelle structures as a feature of the [invention]" by stating "[t]his form of controlled release mechanism is a suitable way to control the release of the micelles of drug and solubilizer" and it was "undisputed that surfactants are the only solubilizers believed to form micelle structures in [the relevant environment]" (quotation marks and citations omitted)). This sentence, which prefaces three paragraphs separately describing embodiments of the invention, is precisely the kind of "summation sentence" that can effectuate an implicit disavowal. *See GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) (finding a single sentence in the specification could limit claim language because it was "a summation sentence which describe[d] the invention as a whole" (emphasis and quotation marks omitted)).

Second, DuraSystems claims the "Background of the Invention" disparages fire-rated ducts that are not pre-fabricated and compares them to pre-fabricated ducts in a way that

"confirm[s] to a P[]OSITA that the '569 patent distinguishes between field-applied and pre-fabricated or factory-built fire-rated exhaust ducts."  Pl.'s Br. 20–21 (citations omitted).  In relevant part, the Background of the Invention provides:

> Known fire-rated exhaust duct systems are typically fabricated in sections, and the sections are shipped to the installation location.  At the installation location, the sections are welded together to form continuous conduits or conduit sections.  Due to field conditions, the welding could be of poor work quality, for instance, due to limited space and/or setup.  This means expensive rework and re-welding to seal leaks in the duct system during pressure testing.  Conventional fire-rated duct systems typically require the installation of an additional gypsum fire-rated enclosure (approximately 10" thick) around the duct.  In addition to requiring an additional step, the gypsum enclosure is typically constructed/installed by another trade.

'569 Patent col. 1 ll. 61–67, col. 2 ll. 1–6, J.A. 0012.  It then explains:

> In an attempt to overcome the known shortcomings in the art, chimney manufacturers introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems.  While these pre-fabricated fire-rated exhaust ducts addressed shortcomings of existing systems, the characteristic round profile significantly limits the volume of air that can be vertically carried in conventional building footprints, and in a horizontal configuration, the round profile or cross section is often too large to fit into conventional ceiling spaces or dimensions.

*Id.* col. 2 ll. 7–16, J.A. 0012.

These passages disavow ducts that are not pre-fabricated.  As DuraSystems notes, the first passage explains and discusses the disadvantages of fire-rated exhaust ducts that have to be augmented with "gypsum fire-rated enclosure[s]" at "the installation location"—which a POSITA would understand to be "field-applied."  *See id.* col. 1 ll. 61–67, col. 2 ll. 1–6, J.A. 0012; Pl.'s Br. 20–21 (citing Crimi Decl. ¶¶ 61–62).  The second passage then, after referencing "the known shortcomings in the art," introduces "pre-fabricated fire-rated exhaust ducts."  *Id.* col. 2 ll. 7–9, J.A. 0012.  While it describes another shortcoming with these ducts, the issue is not that they are "pre-fabricated" or otherwise cumbersome to put together but that they are round.

38

*Id.* col. 2 ll. 10–14, J.A. 0012.[13]  While the "Detailed Description of the Embodiments"

contemplates "applications . . . [in which] the insulating material . . . and the outer metallic

profile . . . be kept as separate components and then *field installed* over [the] joint between the

exhaust duct sections," '569 Patent col. 7 ll. 30–34, J.A. 0015 (emphasis added), such

applications are only contemplated "where size and weight limitations and/or characteristics"

require them, *id.*, "thus even further disparaging" ducts that are not pre-fabricated, *see*

*UltimatePointer*, 816 F.3d at 823 ("Although the [patent at issue] does include one embodiment

where the handheld device 'may include a conventional, indirect pointing device,' indirect

pointing is only used 'where direct pointing is not possible or not desired,' thus even further

disparaging indirect pointing." (citation omitted)).  Ultimately, by distinguishing between "field

applied" and "pre-fabricated" ducts, the Background of the Invention disavows the former and

thereby limits the scope of the claims to the latter.  *See Poly-Am.*, 839 F.3d at 1136 (finding the

inventor of a patent for certain trash bags "disavow[ed] claims lacking a particular feature" by

stating in the specification that prior art trash bags "are difficult to secure over trash receptable

lips").

     To be sure, some Federal Circuit decisions arguably held statements characterizing an

invention as a whole can only disavow subject matter if they are made "repeatedly and

consistently."  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1346–48 (Fed. Cir.

2004) (holding a claim term was properly construed in accordance with a limitation that was

"repeatedly and consistently" indicated in the specification by statements that "broadly

---

[13] Not surprisingly, the invention addresses this shortcoming.  *See, e.g.*, '569 Patent col. 9 ll. 14–16, J.A. 0016
(claiming "[t]he modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said exhaust duct modules
have a generally rectangular cross-section"); *id.* col. 9 ll. 47–51, J.A. 0016 (claiming "[a]n exhaust duct module
configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module
comprising: an inner duct liner formed with a generally rectangular cross-section").

describe[d] the overall inventions of [the] patent[]"); *Sunovion Pharms., Inc. v. Teva Pharms., Inc.*, 731 F.3d 1271, 1277 (Fed Cir. 2013) ("The applicants' repeated and consistent attribution of the purity level of less than 0.25% levorotatory isomer to 'the invention' and 'the instant invention' thus gives meaning to the term 'essentially free.'" (citing *Microsoft*, 357 F.3d at 1348) (other citation omitted)); *see also Thermal Sols., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2009 WL 3126227, at *4 (D. Kan. Sept. 29, 2009) (referring to the "*Microsoft* standard . . . which allows the claim scope to be limited if the patent 'repeatedly and consistently' describes the scope of the invention (and not a mere embodiment) as limited").[14]  And the Federal Circuit has also said "[t]o find disavowal of claim scope through disparagement of a particular feature, we ask whether 'the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements . . . may be viewed as a disavowal.'"  *Openwave Sys., Inc.*, 808 F.3d at 513 (quoting *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)) (citing *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269–70 (Fed. Cir. 2007)).

As mentioned above, the specification only contains one statement describing the invention as a whole.  Whether it "repeatedly" disparages the prior art is not clear.  But it is also not clear whether the aforementioned caselaw signals it is necessary or sufficient for statements describing an entire invention or disparaging the prior art to be repeated.  More importantly,

---

[14] In addition, the Federal Circuit in *GPNE*, before finding a single summation sentence can limit claim language if it describes an invention as a whole, 830 F.3d at 1371, recognized "when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization," *id.* at 1370 (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374–75 (Fed. Cir. 2009)), and noted limiting words in the patent at issue were employed in the specification over 200 times, *id.*  While the court did not indicate those words addressed the invention as a whole, one of the cases it cited, *VirnetX*, speaks to words that do.  *See VirnetX*, 767 F.3d at 1318 ("The fact that anonymity is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim." (citation omitted)).

numerous other Federal Circuit decisions indicate both of these types of implicit disavowal are considered together when determining whether a specification disavows subject matter. *See UltimatePointer*, 816 F.3d at 823 ("Taken together, the repeated description of the invention as a direct-pointing system, the repeated extolling of the virtues of direct pointing, and the repeated criticism of indirect pointing clearly point to the conclusion that the "handheld device" in claims 1, 3, 5, 6, and 12 is limited to a direct-pointing device."); *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (affirming the district court's construction of a claim term after observing the specification, among other things, "describe[d] the features of the present invention as a whole" and "explained the benefits [thereof] over the prior art" (quotation marks and citation omitted)).[15]  Considering these two forms of implicit disavowal together makes sense, as whether a specification can disavow claim scope is determined with reference to the entire specification, not just to certain sections. *Cf., e.g.*, *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[T]his court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification *read as a whole* suggests that the very character of the invention requires the limitation be a part of every embodiment." (emphasis added)).  And it would make no sense to ignore demonstrable evidence of disavowal simply because two statements may be off in slightly different doctrinal silos.  Implicit disavowal by a statement describing an entire invention and by one disparaging

---

[15] On at least one occasion, the Federal Circuit even blended these types of implicit disavowal together.  In *Eon-Net LP*, the Federal Circuit affirmed the district court's decision to limit the claim terms "document," "file," "extract," and "template" to "information that originates from a hard copy document," 653 F.3d at 1321.  In doing so, it noted the specification of the relevant patent "repeatedly and consistently define[d] the invention as a system that processes information from hard copy documents."  *Id.*  However, in supporting this proposition, it cited (among other things) language that, instead of describing the entire invention, disparaged the prior art.  *See id.* ("The written description repeatedly and consistently defines the invention as a system that processes information derived from hard copy documents. The Background of the Invention section explains that 'conventional systems have limitations which decrease the efficiency of processing information from a hard copy document.'" (citation omitted)).

the prior art are two sides of the same coin: two concepts that help courts answer the ultimate question of whether a specification disavows claim scope. Here, based on the summation sentence and the passages disparaging the prior art mentioned above, the '569 Patent's specification limits the reach of "exhaust duct modules" to those that are "pre-fabricated" in accordance with DuraSystems's proposed (and herein adopted) construction.

Defendants also argue "claim 1 explicitly requires 'field assembly' when other independent claims do not, creating a presumption that the 'exhaust duct module' in all the independent claims cannot be as limited." Reply Br. 13 (citation omitted). In other words, they, assuming *arguendo* "field assembled" means "pre-fabricated," *see id.*,[16] contend because claim 1 refers to "field assembly" and the rest of the Independent Claims do not, "field assembly"—and by extension, "pre-fabrication"—can only relate to that claim and therefore only describes one embodiment in the '569 Patent, and not the invention itself.

This argument implicates the doctrine of claim differentiation:

> The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope. Although the doctrine is at its strongest where the limitation sought to be "read into" an independent claim already appears in a dependent claim, there is still a presumption that two independent claims have different scope when different words or phrases are used in those claims.

*Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) (quotation marks and citations omitted). "However, claim differentiation is a rebuttable presumption that may be

---

[16] "Field assembled" (as opposed to "field applied," *see* Crimi Decl. ¶¶ 56–57, 65) does mean "pre-fabricated." This is demonstrated by the testimony of DuraSystems's expert, who explained "[a] P[]OSITA would understand . . . a fire-rated exhaust duct 'suitable for pre-fabrication' that is 'configured for assembly in the field' to refer to a pre-fabricated or factory-built fire-rated exhaust duct because that is precisely what a pre-fabricated or factory-built fire-rated exhaust duct is." *Id.* ¶ 64; *see generally id.* ¶¶ 61–65. Defendants do not seriously attack this testimony, and the Court can rely upon it. *See Phillips*, 415 F.3d at 1318 (explaining expert testimony can "provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA], . . . [and] establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field" (citations omitted)).

overcome by a contrary construction dictated by the written description or prosecution history." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016) (citation omitted).  Indeed, "claim differentiation is a rule of thumb that does not trump the clear import of the specification," *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009) (citation omitted), and "[w]hile claim differentiation may be helpful in some cases, it is just one of many tools used by courts in the analysis of claim terms," *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1400 n.1 (Fed. Cir. 2008).

Here, for the reasons stated above, this presumption has been rebutted by the specification.  Accordingly, "exhaust duct module" is construed as "a section of pre-fabricated, factory-built exhaust duct."[17]

     c.     "joint encasement section"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "joint encasement section" | "one or more parts configured to encase the junction between two exhaust duct modules" | "one of multiple parts having a 3-dimensional profile that together encase the junction between two duct modules" | "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules" |

The term "joint encasement section" appears in claims 1 and 7–9.  In relevant part, Claim 1 claims "[a] modular fire-rated exhaust duct assembly comprising: . . . a joint encasement

---

[17] In their reply brief, Defendants for the first time argue DuraSystems's proposed construction (which the Court herein adopts) "impermissibly reads out disclosed embodiments," Reply Br. 13 (citation omitted), because their expert "testified that Plaintiff's proposed construction excludes laboratory exhaust ducts," *id.* (citing Crimi Dep. 52:9–24).  But Crimi said no such thing.  The cited passage shows he only testified the '569 Patent's *claims* do not relate to laboratory exhaust ducts, not DuraSystems's proposed construction of "exhaust duct module."  *See* Crimi Dep. 52:9–15.  Moreover, when asked whether the term "exhaust duct module" excludes laboratory exhaust ducts, he answered in the negative, explaining "when I see the term 'fire-rated exhaust duct modules[,'] that, based on present knowledge of the art, such a thing doesn't exist in certainly consensus standards."  *Id.* at 52:18–24.

section configured to be field connectable to each of said exhaust duct modules and encase said junction." '569 Patent col. 8 ll. 47–48, col. 9 ll. 7–9, J.A. 0015–16.  The parties do not dispute a "joint encasement section" is meant to "encase the junction between two exhaust duct modules." *See* Joint Claim Construction Chart 3.  But, as explained below, they dispute the meanings of the terms "encasement" and "section."

             i.      *"Encasement"*

The parties agree the plain and ordinary meaning of "encase" is "to enclose in or as if in a case."  Opening Br. 22 (citing *The American Heritage Dictionary*, *supra* at 284); *cf.* Pl.'s Br. 23 (referring to this definition as that of "encasement").  They differ on whether this definition means a joint encasement section must have a 3-dimensional profile.  Defendants assert "[a] case has thickness—a 3-D profile," Opening Br. 22, and cite (albeit with little explanation) three figures from the '569 Patent, *id.* (citations omitted).  They also cite the prosecution history, arguing Duffy disclaimed a "joint encasement section" that does not have a 3-dimensional structure by distinguishing Callan, which teaches a joint encasement section that has a channel strip.  *See* Opening Br. 23.  DuraSystems asserts Defendants' figure-based argument is legally improper because limitations from the specification cannot be imported into the claims and their prosecution history-based argument is factually improper because Duffy did not mention 3-dimensional profiles when attempting to distinguish Callan.  Pl.'s Br. 23.

The claims do not say anything about a "joint encasement section" having a 3-dimensional profile.  Defendants' attempts to limit their scope by arguing a "joint encasement section" must have a 3-dimensional profile fail.  *See Fujifilm Corp. v. Motorola Mobility LLC*, Case No. 12-cv-03587-WHO, 2015 WL 757575, at *12 (N.D. Cal. Feb. 20, 2015) ("[N]either a patent's specification nor its prosecution history may be used to 'narrow a claim term or deviate

from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope.'" (quoting *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013)); *see also* discussion on prosecution history disavowal *supra* pp. 24–25; discussion on specification disavowal *supra* pp. 34–36.

First, Defendants' reliance on Figures 7–9 of the '569 Patent is misplaced. Defendants chiefly rely on Figure 7 (which is referenced by Figures 8 and 9) in arguing their "proposed construction is . . . consistent with the specification which depicts multiple parts having [a] 3-dimensional profile, that when arranged together, encase the joint." Opening Br. 22–23 (citation omitted). But "courts may not limit patent claims to what is depicted in the drawing figures, because this would wrongly import limitations onto the claim from the specification, which is fraught with danger." *Net Results, Inc. v. United States*, 112 Fed. Cl. 133, 149 (Fed. Cl. 2013) (quotation marks and citation omitted). Indeed, "a patent need not illustrate the full scope of the invention," *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) (citation omitted), and "patent coverage is not necessarily limited to inventions that look like the ones in the figures," *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (citation omitted). While figures can be limiting if they represent an entire invention or are described using strict language, *see TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1300–01 (Fed. Cir. 2008) (rejecting an attempt to discount the limiting effect of a figure because the figure was not described with reference to a preferred embodiment and used language such as "must" and "necessary"), the '569 Patent's "Brief Description of the Drawings" makes clear Figure 7 only depicts an embodiment of the claimed invention, '569 Patent col. 3 ll. 49–53, J.A. 0013. The Federal Circuit "will not countenance the importation of claim limitations from a few specification statements or figures into the claims, particularly if those specification

extracts describe only embodiments of a broader claimed invention," *Comput. Docking Station*, 519 F.3d at 1374 (citation omitted), and neither will this Court.[18]

Second, Defendants do not demonstrate Duffy disclaimed a joint encasement section that does not have a 3-dimensional structure while prosecuting the '569 Patent.  In rejecting the first draft of the '569 Patent, the examiner noted Callan "teaches a modular fire-rated exhaust duct assembly comprising: . . . a joint encasement section . . . configured to be field connectable to each of said exhaust duct modules and encase said junction."  Non-Final Rejection ¶ 4, J.A. 0257–58.  Duffy countered that Callan does not teach a joint encasement section because "the locking clip . . . described and taught by Callan" "does not encase the junction," as it "merely comprises a channel strip that makes a physical connection between adjacent sections." Amendment 11, J.A. 0296.

This did not change the examiner's mind.  In rejecting the second draft of the '569 Patent, the examiner explained that based on the language of claim 1 thereof,

> the joint encasement section only functions to connect the duct modules and encase the junction.  As seen in figures 1 and 10 of Callan, the locking clip . . . joins two duct sections together and also covers the junction of the joint and thus satisfies the requirements of the claims.  Therefore, Callan does indeed teach a joint encasement section as recited in the claims.

Final Rejection ¶ 8, J.A. 0312.  Duffy neither amended nor addressed the language regarding the joint encasement section in his Request for Continued Examination and Amendment, and the examiner did not address it in the Notice of Allowability.

Defendants say Duffy disclaimed a joint encasement section that does not have a 3-dimensional structure in responding to the examiner's first rejection because he "confirm[ed] that

---

[18] Moreover, it appears Defendants abandoned their figures-based argument in their reply brief.  *See* Reply Br. 13–14 (stating "Defendants' proposed construction [does not] import[] limitations from the specification" and "Defendants' proposed construction flows specifically from *arguments made during prosecution*, not a particular embodiment" (emphasis added) (citations omitted)).

[his] 'joint encasement section' must 'encase the junction,'" whereas Callan's joint encasement section is "a flat 'channel strip' or locking clip [that] merely sits on top of the junction." Opening Br. 23; *see also id.* ("Plaintiff distinguished its application claims from Callan, a 3-dimensional structure (as opposed to a mere flat strip) that encloses the junction on all sides (as opposed to just one side) would be necessary."). However, as DuraSystems notes, Duffy did not "distinguish Callan based on the lack of a 3-dimensional profile," but because Callan's "joint encasement section" "does not 'encase the junction.'" *See* Pl.'s Br. 23 (quotation marks and citation omitted). In fact, the term "3-dimensional" does not appear once in Duffy's rebuttal. Defendants' position rests on the idea "[a] case has thickness—a 3-D profile," and that because Duffy emphasized his joint encasement section must "encase the junction," he declared his joint encasement section must have a 3-dimensional profile. But Defendants cite nothing in the prosecution history or anywhere else that supports the idea a joint encasement section that encases a junction must be 3-dimensional—the threshold proposition "[a] case has thickness—a 3-D profile" is not accompanied by a single citation. Duffy's rebuttal can hardly be classified as a "clear and unmistakable" disclaimer of a joint encasement section without a 3-dimensional structure. *See Mass. Inst. of Tech.*, 839 F.3d at 1119 (noting "for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable" (quotation marks omitted)).

This conclusion is further supported by the examiner's response to Duffy's rebuttal. *See Salazar*, 414 F.3d at 1347 ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."). In their reply brief, Defendants note DuraSystems "offers no explanation why the locking clip [in Callan] did not 'encase' the joint." Reply Br. 14. But the examiner noted it did, explaining Callan teaches a joint encasement section because "the

joint encasement section only functions to connect the duct modules and encase the junction" and "the locking clip . . . joins two duct sections together and also covers the junction of the joint and thus satisfies the requirements of the claim." Final Rejection ¶ 8, J.A. 0312. While the examiner ultimately granted Duffy's application (and therefore may have taken a different view of Duffy's rebuttal), he said nothing in the Notice of Allowability to suggest Duffy's "joint encasement section" has a 3-dimensional profile, and his silence certainly cannot constitute a disclaimer. *Cf. Salazar*, 414 F.3d at 1345 ("[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a clear and unmistakable disavowal of claim scope." (citation omitted)).

    ii.  *"Section"*

   The parties next dispute whether a joint encasement section must have multiple parts. *See* Joint Claim Construction Chart 3. Defendants say yes and note a dictionary defines "section" as "one of several component parts that may be assembled or reassembled." *See* Opening Br. 23–24 (emphasis omitted) (citing *Webster's New Collegiate Dictionary* 1036 (1980), Opening Br. Ex. T, ECF No. 31-21). DuraSystems takes no issue with this definition, *see* Pl.'s Br. 23 (citation omitted), arguing it does nothing to support Defendants' construction because a joint encasement section "is only one of several component parts of the 'exhaust duct assembly' and 'exhaust duct module' of the claims, the other component parts including . . . the inner duct liner, outer casing, thermal spacers, insulation, and flange connector," *see id.* (citation omitted).

   Nothing in the intrinsic record indicates a joint encasement section must have multiple parts. Therefore, the issue here is whether this definition supports Defendants' proposed construction. *See Helmsderfer*, 527 F.3d at 1382 (noting a court can rely upon a dictionary

definition in construing a claim term so long as it "does not contradict the meaning otherwise apparent from the intrinsic record"). Defendants contend the language "one of several component parts" shows a joint encasement section must in turn have multiple parts; "parts" are therefore parts of a "joint encasement section." DuraSystems asserts "parts" are not parts of a joint encasement section but parts of an exhaust duct module as a whole.

The '569 Patent shows DuraSystems is correct. The '569 Patent teaches an exhaust duct system that is "configured for assembly in the field," '569 Patent col. 2 ll. 24–25, J.A. 0012, and contains a number of exhaust duct modules, each of which having a number of distinct parts, including an inner duct liner, *id.* col. 8 ll. 50–51, J.A. 0015, an outer casing, *id.* col. 8 ll. 51, J.A. 0015, and thermal spacers, *id.* col. 8 l. 55, J.A. 0015. A joint encasement section is one of those parts. *See id.* col. 9 l. 7, J.A. 0016. Accordingly, the dictionary definition of "section" merely supports the unremarkable proposition that a joint encasement section is a part of an exhaust duct module and "parts" are not parts of a joint encasement section but of an exhaust duct module. It does not support adopting Defendants' proposed construction.

Moreover, Defendants' proposed construction does not make sense if "parts" were parts of a joint encasement section. If that were so, Defendants' proposed construction would provide that a joint encasement section is "one of multiple parts of a joint encasement section." And their proposed construction still does not hold water with "parts" constituting parts of an exhaust duct module. Indeed, if a joint encasement section is one of multiple parts of an exhaust module, it would be erroneous to note they (the inner duct, the outer casing, and such) "together encase the junction between two duct modules" when not all of them have that function; only the joint encasement section does.

Appx49

But DuraSystems's construction is faulty as well, as it is unnecessary to note a joint encasement section has "one or more parts," given there is no guidance on how many parts it must have.  Moreover, even including the word "parts" could cause confusion, as it may not be entirely clear whether "parts" refer to parts of a joint encasement section or parts of an exhaust duct module.  *See, e.g.*, *j2 Glob. Commc'ns, Inc. v. Vitelity Commc'ns, LLC*, No. CV 11-07904 DDP (Ex), 2013 WL 5220173, at *6 (C.D. Cal. Sept. 13, 2013) (finding a word in a proposed claim construction was "unnecessary surplusage" and noting "[a]dding unnecessary verbiage is likely to confuse the jury, and, thus, frustrate one of claim construction's chief purposes" (citation omitted)).  Indeed, the briefing has borne out this concern.

Defendants' other arguments as to why a joint encasement section should be construed to have multiple parts are without merit.  First, they assert Figures 7–9 of the '569 Patent show a joint encasement section must have multiple parts.  But just as it is improper to rely upon these figures to argue a joint encasement section must have a 3-dimensional profile, it is improper to rely upon them to argue it must have multiple parts.  *See supra* at p. 45–46.

Second, they argue if a section is a part of an exhaust duct module, the word "section" would be surplusage.  *See* Reply Br. 14–15 ("Plaintiff chose to attach the word 'section' to the term 'joint encasement'; other components in the claim (e.g., flange connectors) are not modified by the word 'section.'  To read the word 'section' into every claimed component would improperly render the word 'section' in 'joint encasement section' surplusage." (citation omitted)).  In a vacuum, this argument is appealing, as "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."  *See Wasica*, 853 F.3d at 1288 n.10 (citation omitted).  But the rule against surplusage is not a hard and fast one.

50

First, the Federal Circuit has tolerated surplusage when the terms involved do not have different meanings. In *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365 (Fed. Cir. 2002), the Federal Circuit examined the terms "computer" and "computer system" and found the patent at issue used them as synonyms. *Id.* at 1373. While the court noted it usually would have been inclined to give meaning to the word "system," *see id.* (citation omitted), there was no reason to because the patent "provides no indication that the two terms mean different things," *id.* "Instead, the patent uses the term 'computer system' in the specification and the term 'computer' in the claims; nothing in the patent itself explicates their relationship or indicates any difference in meaning." *Id.*; *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("[S]urplusage may exist in some claims." (citing *Pickholtz*, 284 F.3d at 1373)).

*Pickholtz* is instructive, as the terms "joint encasement" and "joint encasement section" are used interchangeably in the '569 Patent. Indeed, while the '569 Patent often employs the term "joint encasement section," *e.g.*, '569 Patent col. 9 l. 32, J.A. 0016, it also uses the term "joint encasement" three times in the specification, *e.g.*, *id.* col. 7 ll. 15–16, J.A. 0015 ("The joint encasement . . . is configured to encase or surround the joint . . . ."), and does not indicate they mean anything different. While the terms "joint encasement" and "joint encasement section" both appear in the specification, *see, e.g.*, *id.* col. 7 ll. 15–16, 41 J.A. 0015, only one of them ("joint encasement section") appears in the claims, *see, e.g.*, *id.* col. 9 l. 32, J.A. 0016; *see also Bioverativ Inc. v. CSL Behring LLC*, Civil Action No. 1:17-cv-00914-RGA, 2019 WL 1276030, at *7 (D. Del. Mar. 20, 2019) (noting while its construction of a term rendered language superfluous, the construction was permissible because "[t]he individual words of the term have

meaning, but the term does not add a new limitation because it is inherent in the rest of the claim" and it was "the only reasonable result considering the intrinsic record").

Second, in any case, "no canon of claim construction is absolute in its application," *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998), and, like the canon of claim differentiation, this canon can be overcome by the weight of the rest of the intrinsic evidence. Indeed, in *Decisioning.com, Inc. v. Federated Department Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008), the Federal Circuit realized its construction of one claim term may have rendered the construction of another surplusage but stood by it in light of the intrinsic evidence. *See id.* at 1312 n.6 ("In light of the intrinsic evidence that we have discussed, we conclude that the claims of the '007 patent are limited to a publicly-accessible 'remote interface' despite the fact that such a construction may render the term 'public' in claim 16 surplusage."). In light of the foregoing discussion, the Court stands by its construction of "joint encasement section."[19]

Finally, Defendants argue a portion of Duffy's deposition testimony supports their proposed construction. They posit he "testified that, when developing his '569 Patent invention, he considered using a non-modular, single piece to 'wrap-around' the duct, but rejected the approach because the single piece did not work well," Opening Br. 24 (citation omitted), admitting "[w]e have sometimes situations in . . . real life, in construction, where you can't wrap around a duct on a site," *id.* (quoting Dep. of William Duffy ("Duffy Dep.") 135:20–22, Opening Br. Ex. O, ECF No. 31-16). A joint encasement section, therefore, cannot have only one part.

---

[19] Also, even if Defendants' surplusage argument were meritorious, it would not mean Defendants' proposed construction would be adopted. Indeed, accepting their argument would only entail rejecting their dictionary definition, which provides the primary authority for their proposed construction.

**Appx52**

This argument fails.  As DuraSystems notes, "[a]n applicant is not required to disclose all possible embodiments covered by a claim."  Pl.'s Br. 24 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[O]ur case law makes clear that a patentee need not describe in the specification every conceivable and possible future embodiment of his invention." (quotation marks omitted))).  While Defendants reason applicants cannot disclose "inoperative embodiments" and Duffy's testimony shows he "disclos[ed] the only working embodiment using 'joint encasement sections,'" Reply Br. 15 (emphasis omitted) (citing *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362–65 (Fed. Cir. 2018)), they are off base for two reasons.  First, the case they rely upon is inapposite.  *Everlight* concerns not claim construction, but the patent code's enablement requirement, under which a specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  *See* 35 U.S.C. § 112(a); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) ("[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." (alteration in original) (quotation marks omitted)).  Indeed, the issue there was whether a specification taught a POSITA how to make the claimed device without undue experimentation as of the patent's effective filing date.  *Everlight*, 896 F.3d at 1363.  "Determining whether written-description and enablement requirements are met is distinct from determining claim scope."  *Optis Wireless Tech., LLC v. Apple Inc.*, Case No. 2:19-cv-00066-JRG, 2020 WL 1692968, at *10 (E.D. Tex. Apr. 7, 2020) (citing *Phillips*, 415 F.3d at 1327 (cautioning "we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction")).

Second, in any event, Duffy did not even testify a one-section joint encasement section is "inoperative" or does not work.  Duffy testified such a joint encasement section does not work in some situations, not that it does not work at all.  *See* Duffy Dep. 135:16–24 (explaining he used four separate pieces as opposed to one because while one, wrap-around joint encasement section could work, "[w]e have *sometimes* situations . . . in construction, where you can't wrap around a duct on a site," as "[t]here is just no room." (emphasis added)).  There may well be some sites in which there is sufficient room to "wrap around" a duct, and in those situations, a one-section "joint encasement section" would work.

\*    \*    \*

For the foregoing reasons, the term "joint encasement section" is construed as "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules."

      d.     "joined directly"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "joined directly" | Plain and ordinary meaning; no construction needed | "joined without any intervening components" | No construction needed |

The term "joined directly" appears in each of the Independent Claims.  For example, Claim 1 partly teaches "a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector."  '569 Patent col. 8 ll. 60–64, J.A. 0015.  Defendants purport to "propose[] a construction that is based on the plain and ordinary meaning but ensures necessary clarification that no intervening components are between the exterior flange connector and the inner duct liner."  Opening Br. 24–25 (citation

54

omitted). DuraSystems argues this term should not be construed because there is no dispute regarding its construction and construing it "would not change the outcome of any claim or defense in the case." Pl.'s Br. 25.

Only terms that are in controversy must be construed, "and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc.*, 200 F.3d at 803 (citation omitted). Indeed, just because claim construction is an issue of law does not mean a district judge "must repeat or restate every claim term." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *Id.*; *cf. Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims . . . ."). When a court is presented with a purported claim construction dispute, "[a] threshold question . . . is [therefore] whether and to what extent construction is even necessary." *Warner Chilcott Co. v. Mylan Inc.*, Civil Action Nos. 11-6844 (JAP), 11-7228(JAP), 2013 WL 3336872, at *3 (D.N.J. July 2, 2013) (citation omitted).

As the term "joined directly" is not in controversy, it is not necessary to construe it. Indeed, while Defendants claim "[t]he parties dispute the meaning of the word 'directly' tied to the word 'joined,'" Opening Br. 25, they do not identify any dispute. In fact, they do not even identify DuraSystems's supposedly contrary position. While they say their proposed construction "ensures necessary clarification," *id.* at 24–25, and cite a Federal Circuit case that explains a term may need to be construed when it has "more than one 'ordinary' meaning or

when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute," *id.* at 25 (quoting *O2 Micro Int'l*, 521 F.3d at 1361), they neither explain why clarification is necessary nor identify more than one "ordinary meaning" of "joined directly."

Defendants implicitly argue this term should be construed because it is relevant to whether they can show the existence of an acceptable non-infringing alternative to the invention claimed in the '569 Patent. *See* Reply Br. 15. They are correct that the existence of a non-infringing alternative is relevant to two types of patent infringement damages: lost profits, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("[L]ost profits, . . . cannot be recovered if acceptable non-infringing alternatives were available during the period of infringement."), and royalties, *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996) (directing a district court to reconsider its reasonable royalty award in light of the defendant's ability to market a non-infringing alternative). But "[w]hether a non-infringing alternative is acceptable is a question of fact," *Meridian Mfg., Inc. v. C & B Mfg., Inc.*, 340 F. Supp. 3d 808, 846 (N.D. Iowa 2018) (citing *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991)), and "while claim construction involves determining the scope of the claim terms as a matter of law, it is not the task of the court to determine whether" a non-infringing alternative exists, *cf. Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2993856, at *6 (N.D. Cal. July 20, 2012) (citation omitted) (declining to construe a claim term because the dispute thereon was not about its construction but about the factual issue of whether it was disclosed by a prior art reference). This Court will not, under the guise of claim construction, give the term "joined directly" whatever clarification is required to facilitate a non-infringing alternative determination and thereby take that issue away from a jury. *Cf. PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (determining a court may

not "under the rubric of claim construction, . . . give a claim whatever additional precision or specificity is necessary to facilitate a comparison between the claim and [an anticipatory reference] . . . the task of determining whether the [reference discloses the claim limitation] is for the finder of fact").

Accordingly, the claim term "joined directly" shall not be construed.

## II.     The Motions for Leave to File Under Seal

DuraSystems and Defendants both move for leave to file under seal documents supporting their respective claim construction briefs.  Defendants move for leave to file under seal excerpts from Duffy's deposition because they contain "information represented by [DuraSystems] as being highly sensitive business information, the disclosure of which is likely to cause significant harm to [DuraSystems]."  Defs.' Mot. Leave File Under Seal 1.  DuraSystems moves for leave to file under seal excerpts of the deposition of Billie Joe Sims because the transcript thereof was "designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY and therefore falls under the protection of the parties' Stipulated Protective Order and the protection of the Court."  *See* Pl.'s Mot. Leave File Under Seal 1.  Both motions are unopposed.

Generally, "the record of a judicial proceeding is public." *Jessup v. Luther*, 277 F.3d 926, 927 (7th Cir.[20] 2002).  Those "who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by

---

[20] A motion for leave to file under seal, which does not involve substantive issues of patent law, is governed by the law of the regional circuit in which a district court sits.  *See Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1220 (Fed. Cir. 2013) (citation omitted) (applying regional circuit law to determine whether the district court abused its discretion in denying a motion for leave to file under seal); *see also ABS Glob., Inc. v. Inguran, LLC*, 14-cv-503-wmc, 2017 WL 3588290, at *1 n.2 (W.D. Wis. Apr. 5, 2017) ("As with other issues not exclusive to patent law, the Federal Circuit applies regional circuit law regarding confidentiality." (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 497 F. App'x 66, 67 (Fed. Cir. 2013))).  Therefore, the Court shall follow Seventh Circuit law.

public (and publicly accountable) officials." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). As such, "when a court finds it necessary to consider certain information in making a decision, that information should ordinarily be made available to public scrutiny in order to preserve the integrity of the judicial process." *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, Case No. 4:13-cv-4021-SLD-JAG, 2013 WL 5973938, at *20 (C.D. Ill. Nov. 8, 2013) (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002); *Union Oil*, 220 F.3d at 567–68)). As the Seventh Circuit has explained, "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter*, 297 F.3d at 545.

These principles are supplemented by this Court's Local Rules. Under Local Rule 5.10:

A party who has a legal basis for filing a document under seal without prior court order must electronically file a motion for leave to file under seal. The motion must include an explanation of how the document meets the legal standards for filing sealed documents. The document in question may not be attached to the motion as an attachment but rather must be electronically filed contemporaneously using the separate docket event "Sealed Document."

CDIL-LR 5.10(A)(2).

If a motion for leave to file under seal is denied, "the document tendered will remain under seal, and it will not be considered by the presiding judge for any purpose." *Id.* 5.10(A)(4).

As an initial matter, both motions are substandard. First, Defendants erroneously filed their motion both in regular order and under seal. Defs.' Mot. Leave File Under Seal (filed publicly); Defs.' Mot. Leave File Under Seal Certain Docs., ECF No. 34 (filed under seal with the sealed documents attached as exhibits thereto). Second, and more importantly, both motions contain little to no explanation as to how they "meet[] the legal standards for filing sealed documents." *See* CDIL-LR 5.10(A)(2). While Defendants say the sealed excerpts from Duffy's

deposition contain information that constitutes "highly sensitive business information, the disclosure of which is likely to cause significant harm to [DuraSystems]," Defs.' Mot. Leave File Under Seal 1, they do not explain how disclosure could harm DuraSystems or why such harm could justify secrecy. *See Baxter*, 297 F.3d at 547 ("Beyond asserting that the document must be kept confidential because we say so (the 'agreement is, by its terms, confidential'), this contends only that disclosure 'could . . . harm Abbott's competitive position.' How? Not explained. Why is this sort of harm (whatever it may be) a legal justification for secrecy in litigation? Not explained." (alteration omitted)). While DuraSystems states the transcript of the deposition of Billie Joe Sims was "designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY," *see* Pl.'s Mot. Leave File Under Seal 1, just because Defendants' counsel said they are confidential does not make them so under Seventh Circuit precedent, *see Orthofix Inc. v. Gordon*, Case No. 1:13-cv-01463-SLD-TSH, 2016 WL 1273160, at *5 (C.D. Ill. Mar. 31, 2016) ("[T]he parties have simply indicated in their motions that the documents in question have been designated 'Confidential' by agreement of the parties, and offer this as sufficient reason that the documents be filed under seal. This is inadequate; as the [Local Rules] state[], motions to file under seal must provide a legal basis for granting the request."); *cf. Union Oil*, 220 F.3d at 567–68 (explaining "[c]alling a settlement confidential does not make it a trade secret, any more than calling an executive's salary confidential would require a judge to close proceedings if a dispute erupted about payment (or termination)" and noting "requests to seal proceedings in order to implement the parties' preference for seclusion. . . . have been uniformly rejected" (collecting cases)).

However, the Court has not relied on any portion of the documents filed under seal in addressing the parties' claim construction disputes. Accordingly, both motions for leave to file

**Appx59**

under seal are denied, and the sealed documents shall remain sealed. *See Bd. of Trs. of Univ. of Ill. v. Micron Tech., Inc.*, 245 F. Supp. 3d 1036, 1043 (C.D. Ill. 2017) (denying a motion for leave to file under seal after noting the material portions of the documents relevant thereto were not relied upon). The Court will not consider them for any purpose. *See* CDIL-LR 5.10(A)(4).

## CONCLUSION

For the foregoing reasons, consideration of the claim terms asserted to be indefinite is DEFERRED and the motions for leave to file under seal, ECF Nos. 33, 37, are DENIED. The claim terms not asserted to be indefinite are, in accordance with and subject to the above discussion, construed as follows:

- "thermal spacers thermally isolating": "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing"

- "exhaust duct module": "a section of pre-fabricated, factory-built exhaust duct"

- "joint encasement section": "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules"

- "joined directly": No construction needed

Entered this 3rd day of September, 2021.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

E-FILED
Friday, 31 March, 2023  02:07:32 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DURASYSTEMS BARRIERS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Consolidated Case No. 1:19-cv-01388- |
| | ) | SLD-JEH |
| VAN-PACKER CO. & JEREMIAS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Before the Court are Plaintiff DuraSystems Barriers Inc.'s Motion for Summary

Judgment of Patent Infringement, ECF No. 63; Motion for Summary Judgment of No Invalidity,

ECF No. 64; and Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct

Affirmative Defense, ECF No. 65.  Also before the Court is Defendants Van-Packer Co. ("Van-

Packer") & Jeremias, Inc.'s Motion for Summary Judgment of Noninfringement and Invalidity,

ECF No. 67.[1]  Defendants moved to file certain exhibits under seal, ECF No. 68, as did Plaintiff,

ECF No. 75.  For the following reasons, Plaintiff's Motion for Summary Judgment of Patent

Infringement is GRANTED; Plaintiff's Motion for Summary Judgment of No Invalidity is

DENIED; Plaintiff's Motion for Summary Judgment Dismissing Defendants' Inequitable

Conduct Affirmative Defense is GRANTED; and Defendants' Motion for Summary Judgment of

Noninfringement and Invalidity is DENIED as to non-infringement, DENIED as to

indefiniteness, DENIED as to written description, DENIED as to enablement, DENIED as to lost

profits, and GRANTED as to convoyed sales.  Both motions to seal are DENIED.

---

[1] Defendants moved for leave to file excess pages in their summary judgment motion, ECF No. 62, but later moved to withdraw that motion, ECF No. 71.  Defendants seek to withdraw the motion as their summary judgment motion in fact complies with the type volume limitation set out by the Local Rules.  *See* Mot. Withdraw 1.  The motion to withdraw is accordingly granted.  The Clerk is directed to strike Defendants' motion for leave to file excess pages.

1

## BACKGROUND

This is a patent dispute.  Much of its procedural history and many of the underlying facts have already been recited.  *See* Sept. 3, 2021 Order 1–5, ECF No. 45.  The Court will introduce additional facts throughout its analysis; a high-level overview here will suffice.

It is undisputed that Plaintiff owns U.S. Patent No. 10,024,569 (the "'569 Patent").  *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 1–2, ECF No. 77.  Inventor William Duffy is Plaintiff's president.  *See* Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 3, ECF No. 79.  The '569 Patent describes "a modular fire-rated exhaust duct assembly" containing "two or more exhaust duct modules."  U.S. Patent 10,024,569 col. 2 ll. 26–28, ECF No. 32-1.  The exhaust duct modules have an inner duct liner, an outer casing, and a void between them.  *Id.* col. 2 ll. 28–31.  The void is configured to "receiv[e] . . . insulation material."  *Id.* col. 2 ll. 31–32.  Most important here is that the void includes "one or more thermal spacers," which are "configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void."  *Id.* col. 2 ll. 33–36.

Defendants sell certain exhaust duct products (the "Accused Products") that Plaintiff alleges infringe various claims of the '569 Patent (the "Asserted Claims").  *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 1–2.  This litigation arises from those allegations.  *See* First Am. Compl. ¶¶ 33–49, ECF No. 17.  Both parties now seek summary judgment as to myriad aspects of this case: liability, various defenses, and certain damages.

## DISCUSSION

### I.    Motions to Seal Exhibits

Defendants seek to file Exhibits A, G, H, and I to their motion for summary judgment under seal because those exhibits "contain information designated as confidential."  Defs.' Mot.

Leave File Under Seal 1.  Plaintiff, meanwhile, seeks to file Exhibits Q and S to its supplemental appendix under seal because those exhibits "are excerpts of deposition transcripts designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY and therefore fall under the protection of the parties' Stipulated Protective Order."  Pl.'s Mot. Leave File Under Seal 1.  Neither motion cures the deficiencies previously identified by the Court.  *See* Sept. 3, 2021 Order 57–60 (denying the parties' "substandard" motions for leave to file certain exhibits to their respective claim construction briefs under seal, explaining that "just because . . . counsel said they are confidential does not make them so under Seventh Circuit precedent"). Claims of confidentiality must be specifically justified.  *See Baxter Int'l, Inc. v. Abbott Lab' ys*, 297 F.3d 544, 546 (7th Cir. 2002) (outlining the requisite analysis and describing a motion that "did not analyze the applicable legal criteria or contend that any document contains a protectable trade secret or otherwise legitimately may be kept from public inspection despite its importance to the resolution of the litigation" as "[s]o perfunctory . . . that it could have been summarily rejected"); *United States v. Foster*, 564 F.3d 852, 854 (7th Cir. 2009) (emphasizing that "[t]he law could not be clearer" in light of *Baxter International*); *see also Diamond Servs. Mgmt. Co. v. C&C Jewelry Mfg., Inc.*, Case No. 19 C 7675, 2021 WL 4258800, at *7 (N.D. Ill. May 11, 2021) ("[U]nder the common law of the Seventh Circuit, material . . . may not be sealed simply because one or more parties sought to give it confidential treatment under a protective order. Rather, a basis must exist for keeping from the public the material requested for sealing.").

The parties have been already admonished that motions to seal must be specific and "include an explanation of how the document[s] meet[] the legal standards for filing sealed documents," Civil LR 5.10(A)(2).  Civil Local Rule 5.10(A)(4) permits the Court to, "in its discretion, order a sealed document to be made public if (1) the document is filed in disregard of

3

**Appx63**

legal standards, or (2) if the document is so intricately connected with a pending matter that the interests of justice are best served by doing so." The former is the case here as the parties' motions have been filed in contravention of the Local Rules and Seventh Circuit precedent. And the latter is the case here because documents such as expert reports on infringement and damages are without doubt of critical importance to this matter. *See Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-298, 2014 WL 2894898, at *6 (E.D. Wis. June 26, 2014) ("Damages are a key component of any civil action, and thus the underlying evidence must be largely open to public scrutiny."); *cf. City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 698 (7th Cir. 2014) ("Public access depends on whether a document influenc[ed] or underpin[ned] the judicial decision." (alterations in original) (quotation marks omitted)). For these reasons, the parties' motions to seal are DENIED. The Clerk is DIRECTED to unseal the exhibits on the docket at ECF No. 69-1, ECF No. 69-2, ECF No. 69-3, ECF No. 69-4, ECF No. 76-1, and ECF No. 76-2.

## II.    Motions for Summary Judgment

### a.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where one party has properly moved for summary judgment, the non-moving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The court's function is

4

not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence "in the light most favorable to the non-moving party[] and draw[] all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

### b. Analysis

#### i. Infringement

Both parties have moved for summary judgment as to infringement. "A determination of infringement generally requires a two-step analysis—the court first determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022). "Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device." *In re Gabapentin Pat. Litig.*, 503 F.3d 1254, 1259 (Fed. Cir. 2007). "[O]n summary judgment, the issue is whether there is no genuine issue of material fact regarding infringement." *Id.* "Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

The parties have narrowed the inquiry to a single question. As Plaintiff puts it, "[t]he issue . . . has been reduced to whether the Accused Products satisfy the 'thermal spacers thermally isolating' claim limitation because Defendants do not dispute that every other

limitation of the Asserted Claims is present in the Accused Products." *See* Pl.'s Mot. Summ. J. Infringement 7. In Defendants' words, Plaintiff's "case depends entirely on whether [their Accused Products] include[] a thermal spacer." *See* Defs.' Mot. Summ. J. 7.

The Court previously construed "thermal spacers thermally isolating" to mean "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." *See* Sept. 3, 2021 Order 33 (quotation marks omitted). Defendants primarily argue that their spacers do not limit heat and therefore cannot be thermal spacers. Defs.' Mot. Sum. J. at 14–17. Defendants' spacers are made of steel, *id.* at 15; Pl.'s Resp. Defs.' Mot. Summ. J. 17–18, and Van-Packer's infringement expert, Timothy Morse, conducted modeling demonstrating that the Accused Products' steel spacers increase the transfer of heat between the inner duct and outer casing such that portions of the outer casing become hotter when metal spacers are included. *See* Defs.' Mot. Summ. J. 15–17 (citing Morse Rebuttal Report 17–20, ECF No. 69-1). As a result, Defendants contend that their spacers cannot be thermal spacers as their spacers do not limit the amount of heat conducted through the components. *See id.* at 17 ("Because both expert witnesses agree that the . . . spacers increase the transfer of heat between the inner and outer walls, rather than limit it, the Accused Products do not include one or more thermal spacers and cannot infringe."); *see also* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 9–12, ECF No. 77 (advancing the same argument—that "the transfer of heat between the inner duct liner and the outer casing actually increases when [Defendants'] spacers are used" and therefore the spacers are not thermal spacers—in response to Plaintiff's Motion for Summary Judgment of Patent Infringement (emphasis omitted)).

6

Plaintiff responds that Defendants improperly truncate and misapply the Court's full construction.  *See* Pl.'s Resp. Defs.' Mot. Summ. J. 32–33; *see also* Pl.'s Mot. Summ. J. Infringement 9–11 (advancing this argument affirmatively in support of summary judgment). That is, thermal spacers may increase the transfer of heat to certain portions of the outer casing but still "limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  *See* Pl.'s Resp. Defs.' Mot. Summ. J. 32–33 (quotation marks omitted) ("Defendants' argument that their thermal spacers conduct more heat than no spacers at all is irrelevant to whether they limit the amount of heat conducted through the thermal spacers to the degree required by the claims . . . ."). The Court agrees with Plaintiff that its construction of "thermal spacers" does not require thermal spacers to decrease or fail to increase heat as compared to the absence of spacers, but rather to limit or cap the amount of heat conducted such that fire testing does not create fail points.  *See* Sept. 3, 2021 Order 27–31; *cf. id.* at 27–28 (distinguishing "isolating" and "limiting" from "minimizing").

The question then becomes, do Defendants' spacers perform that function?  Defendants argue their spacers do not because their spacers "are designed with holes . . . where the insulation creeps through the . . . metal spacers."  *See* Defs.' Mot. Summ. J. 17–18.  Because the "air occupying the holes is what limits heat transfer," Defendants' spacers cannot be thermal spacers because "the spacer *itself* must thermally isolate."  *See id.* at 17 (emphasis altered).  Defendants point to the deposition of Plaintiff's infringement and invalidity expert Tony Crimi to suggest that Crimi agrees that the "air [in the holes] . . . limits the flow of heat," not the spacers themselves.  *See id.*

Plaintiff responds that Defendants misrepresent Crimi's opinion. *See* Pl.'s Resp. Defs.' Mot. Summ. J. 33–34. Crimi's expert report as to infringement and May 11, 2022 deposition testimony provide clarity as to his perspective. For example, in the former, Crimi opines that Defendants' spacers are thermal spacers because

> they are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing. Specifically, the cutout portions of the spacers are designed to limit the transfer of heat through the spacer between the inner duct liner and the outer casing.

*See id.* at 34 (quoting Crimi Report 17, ECF No. 67-12); *see also* Crimi May 11, 2022 Dep. 45:3–12, ECF No. 67-3 (expressing a belief that Defendants' spacer "has the holes in it . . . to reduce heat transfer"); *id.* at 91:8–14 (explaining that the spacers' holes "provide[] an outlet for radiation of heat" to be absorbed by the insulation rather than transmitted through the cavity); *id.* at 96:11–22 (explaining that holes in the spacer "radiat[e heat] into the cavity where the insulation is"); *id.* at 219:7–11 (defining the metal spacer "[a]s the entirety of that part that includes both the metal strip and the voids").

Defendants characterize the parties' dispute as "center[ing] on what is actually performing the step of limit[ing] the amount of heat." *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 13 (second alteration in original). The Court finds that the parties generally agree as to how Defendants' spacers *work* but dispute whether a spacer can *be* a thermal spacer if its design includes holes, cutout portions, voids, or perforations (the parties have used all of these terms) that facilitate thermal isolation. *Cf.* Pl.'s Resp. Defs.' Mot. Summ. J. 34 ("Mr. Crimi's explanation that the cutouts or 'voids' in the thermal spacers allow the thermal spacers to limit the transfer of heat by dissipating heat into 'air' of the openings is entirely consistent with the position set forth in his expert report.").

Defendants argue that the Court's claim construction makes clear a spacer cannot have holes. *See* Defs.' Mot. Summ. J. 17 (citing Sept. 3, 2021 Order 22). First, Defendants argue that a thermal spacer cannot contain holes because a thermal spacer must maintain the space between the inner duct liner and the outer casing and holes do not maintain space. *See id.* To be sure, holes *without* a spacer could not maintain a spaced relationship, but that a spacer is not solid does not preclude its overall ability to maintain a space between the inner duct liner and outer casing.

Defendants also argue that the holes cannot be considered part of the spacer in light of the claim language. Per Defendants, the '569 Patent "distinctly claims *the void* separately." *See id.* at 18 (emphasis added). The '569 Patent does make clear that the duct modules contain *a* void between the inner duct liner and outer casing. *See id.* at 17–18. But Defendants' argument relies too heavily on the word "void" and offers too little in the way of analysis of the actual claim language. Perforations *in the spacer* are not themselves a "void . . . between at least at least a portion of space between said inner duct liner and said outer casing," *id.* at 17 (emphasis and quotation marks omitted).

To review, a "thermal spacer thermally isolating" is a component that "maintain[s] a space between the inner duct liner and outer casing that limit[s] the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing," Sept. 3, 2021 Order 33. The Court concludes that spacers with perforations or holes maintain a spaced relationship and limit the amount of heat conducted through the components so that they do not create fail points. This conclusion compels the Court to grant summary judgment as to infringement in Plaintiff's favor. Thus, Plaintiff's Motion for Summary Judgment of Patent Infringement is GRANTED and Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is DENIED as to non-infringement.

9

**Appx69**

A final point: Defendants argue in their response to Plaintiff's Motion for Summary Judgment of Patent Infringement that Plaintiff "argues for an infringement read that renders its claims invalid." *See* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 16 (emphasis omitted). Defendants therefore ask the Court to "find that the Asserted Claims are indefinite." *See id.* at 17. However, the indefiniteness arguments raised in Defendants' response do not match the indefiniteness arguments raised in Defendants' own summary judgment motion. *Compare id.* at 16–17 *with* Defs.' Mot. Summ. J. 23. Most confusingly, Defendants' motion suggests Defendants intend to only incorporate certain arguments by reference, *see* Defs.' Mot. Summ. J. 23–24 (noting that Defendants "fully briefed" the indefiniteness of "compressible insulation material" at claim construction but not addressing Defendants' prior briefing with regard to the indefiniteness of "fire-rated" and failing entirely to address the indefiniteness of "specified fire rating"), but Defendants' response suggests otherwise, *see* Defs.' Resp. Pl.'s Mot. Summ. J. Infringement 16 ("During claim construction briefing, Defendants explained how the terms 'fire-rated' and 'specified fire rating' . . . are indefinite."). This muddies the record, is arguably an end run around the summary judgment rules (because the claim construction briefs did not apply those rules or engage with the summary judgment standard), and ignores the Court's explicit instruction for Defendants to "*reassert* their indefiniteness arguments" at summary judgment, Sept. 3, 2021 Order 16 (emphasis added)—that is, to assert their arguments again in light of any new evidence to refine the issues before the Court and promote clarity in the record. The Court will endeavor in the forthcoming invalidity analysis to address all relevant arguments that appear to have been raised by either party; however, any holes reflect the briefing.

## ii. Invalidity

"[A]n alleged infringer may assert the invalidity of the patent—that is, he may attempt to prove that the patent never should have issued in the first place." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 96 (2011). Because "[p]atents are presumed to be valid," *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009), invalidity must be "prove[n] . . . with clear and convincing evidence," *Impax Lab'ys, Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). "[A] judgment of invalidity necessarily moots the issue of infringement." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir. 2004); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 648 (2015) (Scalia, J., dissenting) ("It follows, as night the day, that only valid patents can be infringed. To talk of infringing an invalid patent is to talk nonsense.").

Defendants raise four invalidity defenses: (1) obviousness, Def.'s Sec. Corrected Final Unenforceability & Invalidity Contentions 10–11, ECF No. 66-16; (2) lack of enablement, *id.* at 13; (3) lack of written description, *id.* at 14; and (4) indefiniteness, *id.* at 14. Defendants seek summary judgment as to lack of enablement, lack of written description, and indefiniteness. *See* Def.'s Mot. Summ. J. 18–24. Plaintiff, meanwhile, seeks summary judgment as to Defendants' obviousness defense. *See generally* Pl.'s Mot. Summ. J. No Invalidity.

### 1. Indefiniteness

A patent specification must "particularly point[] out and distinctly claim[]" its subject matter. 35 U.S.C. § 112(b). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The key question regarding indefiniteness is

"whether the claims, not particular claim terms," meet the *Nautilus* indefiniteness standard.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1231–32 (Fed. Cir. 2016) (quotation marks and citations omitted).  Nevertheless, the Federal Circuit has recognized that "the common practice of training questions of indefiniteness on individual claim terms is a helpful tool.  Indeed, if a person of ordinary skill in the art cannot discern the scope of a claim with reasonable certainty, it may be because one or several claim terms cannot be reliably construed."  *Id.* at 1232.

At claim construction, Defendants argued the indefiniteness of the terms "fire-rated," "specified fire rating," and "compressible insulation material."  Def.'s Opening Claim Const. Brief 6, ECF No. 31.  The Court deferred construction of those terms so that indefiniteness and claim construction could "be assessed together on a full discovery record" and instructed Defendants to "reassert their indefiniteness arguments" at summary judgment.  *See* Sept. 3, 2021 Order 15–16.  Defendants now argue the terms "fire-rated," "compressible insulation material," and "thermal spacer" are indefinite.  Def.'s Mot. Summ. J. *Id.* at 23–24.  The Court considers each claim term in turn to determine whether it is indefinite.

### a.   "Fire-Rated"

The Court must first determine whether the term "fire-rated" can be construed.  *See* Sept. 3, 2021 Order 16.  The ground rules of claim construction have already been established, *see id.* at 5–9, as has the identity and background of a person of ordinary skill in the art (sometimes called a "POSITA," among other permutations), *see id.* at 16–17.[2]

---

[2] At claim construction, the parties agreed that

> a POSITA would have a technical certification as a sheet metal worker or sheet metal mechanic, which is typically a five-year certification, or with equivalent work experience in the field of fire-rated duct systems.  Further, he or she may also have a bachelor's degree in mechanical engineering or [a] related field, and . . . experience could replace formal training, such that a person with five or

The term "fire-rated" appears in a similar manner throughout the Asserted Claims. Claim 6, for example, claims in relevant part a "modular **fire-rated** exhaust duct assembly." '569 Patent col. 9 l. 27 (emphasis added). The term also appears elsewhere throughout the specification. For instance, the specification explains that "ventilation or exhaust ducts for flammable or hazardous materials cannot be configured with fire dampers, so the duct itself **must be fire-rated**." *Id.* col. 1 ll. 27–29 (emphasis added). The specification continues:

> To be classified as a **fire-rated** duct, an exhaust duct must be capable of preventing the release of flammable materials from inside the duct and/or combustible materials adjacent the exterior of the exhaust duct from catching fire if a fire exists on the other side of the duct. In other words, a **fire-rated** duct must be capable of minimizing the transfer of heat through or across the duct walls.

*Id.* col. 1 ll. 30–36 (emphasis added).

At claim construction, Defendants argued that this language was "confusing" because it "posits that, to be 'fire[-]rated,' a duct does not need to pass any test, but rather need only be 'capable of minimizing the transfer of heat through or across the duct walls.'" Defs.' Opening Claim Const. Brief 8. (quoting '569 Patent col. 1 ll. 30–37). Defendants went on to argue that many different fire rating tests exist and therefore a POSITA would not understand which test to apply. *See id.* at 9–11. Plaintiff proposed (and presumably still supports) the construction "rated for fire resistance with reference to its ability to withstand a standard fire resistance test," arguing that all that is required is that the duct pass *a* fire test. *See* Pl.'s Resp. Claim Const. Brief 5–10, ECF No. 36.

At summary judgment, Defendants primarily argue the term "fire-rated" is indefinite because "no fire rating standards exist for laboratory ducts." Defs.' Mot. Summ. J. 23. This

---

more years of experience working in the exhaust duct field would have appropriate training to be a POS[IT]A.

Sept. 3, 2021 Order 17 (alterations in original) (quotation marks and citations omitted).

argument appears to be in tension with Defendants' prior two indefiniteness arguments. Now the POSITA is not confused as to whether fire-rated refers to the capabilities of the duct.[3] Nor is the POSITA paralyzed in the face of the *entire universe* of fire tests. Instead, the POSITA lacks reasonable certainty as to the scope of the claims because he seeks to apply an installation-specific test that does not exist. *See id.*

However, the specification does not support that an installation-specific fire test must be applied. If anything, it dispels that conclusion: If "[f]ire-rated ducts are typically found in installations such as commercial kitchens and laboratories," *see* '569 Patent col. 1 ll. 38–39, and the POSITA knows there is no installation-specific test for laboratories, then "fire-rated" cannot mean "rated for fire resistance with reference to its ability to withstand an *installation-specific* fire resistance test."

The POSITA must know, then, that the "specified fire rating" that must be provided, *see id.* col. 9 ll. 27–30 (claiming "a modular fire-rated exhaust duct . . . wherein said inner duct liner and said outer casing . . . hav[e] a thickness to provide a specified fire rating"), is not determined by whether the duct is in a kitchen or a laboratory; rather, it reflects the standards promulgated by nationally and internationally recognized organizations existing to determine those standards, *see id.* col. 4 ll. 28–31 (referring to "requirements under the UL 2221 and ASTM E2336

---

[3] Although "words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history," a patentee may "set[] out a definition and act[] as his own lexicographer." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). At claim construction, Defendants suggested based on the specification language regarding classification that "the patentee chose to 'classify' (i.e., define) the term 'fire[-]rated,' not, as one might expect with reference to a very specific standard test, but instead with reference to a vague 'capability' of an exhaust duct." Defs.' Opening Claim Const. Brief 7–8. This argument was and remains underdeveloped. To act as a lexicographer, a patentee must "clearly set forth a definition of the disputed claim term, and clearly express an intent to define the term." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quotation marks omitted). Given that the standard for finding lexicography is "exacting," *id.*, the Court cannot agree that the specification language regarding classification constitutes lexicography. That the patent specification references "fire exposure tests" in several places also undermines that conclusion. *See* '569 Patent col. 4 ll. 46–47 (referencing techniques that "can provide mechanical strength to pass the fire exposure tests"); *id.* col. 6 ll. 9–16.

standards"). Thus, a fire-rated exhaust duct is simply an exhaust duct that has attained a fire rating, the determination of which is a straightforward inquiry based on whether or not the duct has been rated.

Thus, the Court concludes that fire-rated is not an indefinite claim term. The Court adopts the construction "rated for fire resistance with reference to its ability to withstand a recognized standard fire resistance test."

### b. "Compressible Insulation Material"

Defendants reassert their arguments at claim construction with respect to the indefiniteness of the term "compressible insulation material." Defs.' Mot. Summ. J. 23–24. At claim construction, Defendants argued that "compressible insulation material" was indefinite because "[t]he specification of the '569 Patent does not provide a standard for measuring the scope of 'compressible'" and "[t]he claims as a whole require a non-customary, ill-defined meaning" of the term. Defs.' Opening Claim Const. Brief 11–12. Plaintiff, meanwhile, proposed the construction "insulation material whose thickness changes under the weight of the inner duct." Pl.'s Resp. Claim Const. Brief 10.

The parties agree that "compressible" is a term of degree, *see id.* at 11 ("Plaintiff does not dispute that 'compressible' is a term of degree . . . ."), which frames the analysis. The Federal Circuit "ha[s] time and again had the occasion to consider the definiteness of claims containing descriptive words or terms of degree." *Niazi Licensing Corp.*, 30 F.4th at 1347. "Ultimately, patent claims with descriptive words or terms of degree must provide objective boundaries for those of skill in the art in the context of the invention to be definite." *Id.* at 1349 (quotation marks omitted). That is, terms of degree are permissible so long as they "provide[] enough

certainty to one of skill in the art when read in the context of the invention." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quotation marks omitted).

"[T]he written description is key to determining whether a term of degree is indefinite." *Id.* at 1378. Thus, the Court begins with the language of the '569 Patent itself. Its language makes clear that the "compressible insulation material" must occupy the void between the inner duct and outer casing. '569 Patent col. 3. ll. 10–14. Indeed, in summary and according to an embodiment, "[t]he void is configured with thermal spacers to prevent the insulation from being unduly **compressed** or crushed." *Id.* col. 8 ll. 14–19 (emphasis added). Thus, the '569 Patent suggests that compressible insulation must occupy the void between the inner duct and outer casing and also be compressible enough such that the thermal spacers effectuate the prevention of undue crushing compromising the material's insulative properties.

Thus, the Court disagrees with Defendants' assertion there are no objective boundaries for "compressible" contained in the '569 Patent, *see* Defs.' Opening Claim Const. Brief 12, as well as Defendants' related insinuation that the importance of preventing the crushing of the insulation appears nowhere in the '569 Patent, *see* Defs.' Reply Claim Const. Brief 5, ECF No. 41. Defendants seem to assume that objective boundaries must be numerical or tethered to a precise measurement (such as threshold density or elasticity) in order to be objective. *See* Defs.' Opening Claim Const. Brief 12–13. But this focus on "numerical values" is misplaced. *See* Defs.' Reply Claim Const. Brief 5. "[A]bsolute or mathematical precision is not required," as the question is whether a patent "provide[s] objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014). The specification provides this exact guidance.

16

Extrinsic evidence, to the extent the Court must consider it, bolsters this conclusion. Presumably in response to Defendants' argument at claim construction that pegging compressibility to the efficacy of the insulation would yield "ridiculous results" and be technically unworkable, *see* Defs.' Reply Claim Const. Brief 6, Plaintiff enlisted expert Mark Colton to determine whether the insulation material in Van-Packer's duct was compressible, *see generally* Colton Report, ECF No. 74-5. Defendants respond that "reliance on an expert report relating to the compressibility of Defendants' Accused Products is insufficient to avoid indefiniteness" because "[i]t is undisputed" Defendants use compressible insulation. *See* Defs.' Reply Supp. Defs.' Mot. Summ. J. 11, ECF No. 81 (emphasis omitted). But Plaintiff explained that the purpose of the report was not to prove that Defendants use compressible insulation material, but disprove Defendants' argument that it would be necessary to perform a complicated and uncertain fire test to determine if compressible insulation material qualifies as such. *See* Pl.'s Resp. Mot. Summ. J. 48.

Defendants' only remaining argument is that dependent claim 18 invokes "insulation board." *See* Defs.' Reply Claim Const. Brief 6–7 (quoting '569 Patent col. 10 ll. 60–63). Defendants argue Plaintiff's construction is incompatible with claim 18 because insulation board cannot be compressed. *See id.* But insulation board can be compressed, even according to Defendants' expert Barry Cheek, who testified at deposition that a person of ordinary skill in the art would understand that compressible insulation is insulation that would be compressed in the absence of the spacers, that ducts may contain fiberglass insulation boards, and that "you don't want them to compress because you're negating some of that insulating capability because the air gaps [in the board] are what is your friend when it comes to insulating." *See* Cheek Dep. Excerpt 108:4–20, ECF No. 36-2; *see also id.* at 110:9–15 (responding "[y]eah, you would definitely

want to have some type of spacer in there for sure" after Plaintiff's counsel asked if it was important to have spacers maintain the void when using fiberglass insulation board because "there's a risk that the fiber insulation board would become compressed").

Thus, the Court concludes that compressible insulation material is not an indefinite claim term. The Court adopts the construction "insulation material whose thickness changes under the weight of the inner duct."

### c. "Thermal Spacers"

Finally, Defendants argue that the claim term "thermal spacers," which the Court already construed in conjunction with the claim term "thermally isolating," *see* Sept. 3, 2021 Order 32–33, is indefinite because a POSITA would need to run a fire test to know if a thermal spacer thermally isolates, *see* Defs.' Mot. Summ. J. 23. Defendants go on to assert that "[a] claim that recites both a system (the duct) and a method (testing that must be done to know if a spacer is a thermal spacer)" fails to "apprise one of ordinary skill in the art of its scope and is invalid as being indefinite." *See id.*

The Court finds no support for Defendants' argument that "thermal spacers" must be indefinite because a POSITA must run a fire test to determine if a thermal spacer thermally isolates. To the contrary, "[d]efiniteness does not require that a potential infringer be able to determine *ex ante* if a particular act infringes the claims." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 40 (Fed. Cir. 2020).

Defendants' bare assertion that claims in the '569 Patent constitute impermissible hybrid claims is perfunctory and undeveloped and thus cannot be persuasive. That a POSITA may have to run a fire test to determine that a thermal spacer thermally isolates does not mean that any claim in the '569 Patent recites a method of use, a practice that is impermissible because it

obscures "whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]." *See UltimatePointer, LLC v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (alterations in original) (quotation marks omitted). "[A] . . . claim covering both an apparatus and a method of use of that apparatus is invalid," *see IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005), but Defendants neither identify nor analyze any claims, *cf.* Defs.' Mot. Summ. J. 23; Defs.' Reply Supp. Defs.' Mot. Summ. J. 10–11. "Thermal spacers" necessarily cannot fail as a claim reciting a system and a method because "thermal spacers" is not a claim. *Cf.* Pl.'s Resp. Defs.' Mot. Summ. J. 46 ("The *claims* recite a 'thermal spacer thermally isolating.' That is a structure, not a method." (emphasis added)). As a matter of law, Defendants cannot succeed on a threadbare argument that is entirely untethered from the claims of the '569 Patent and offer the Court no reason to disturb its prior conclusion as to the indefiniteness of "thermal spacers." Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is therefore DENIED as to indefiniteness. The Court concludes no claims challenged by Defendants in the motion are indefinite.

## 2. Written Description

"The test for sufficiency of a written description is whether the disclosure clearly allow[s] persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (alterations in original) (quotation marks omitted); *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019) ("Th[e] requirement is satisfied only if the inventor convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and

demonstrate[s] that by disclosure in the specification of the patent." (second and third alteration in original) (quotation marks omitted)).  "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party."  *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Defendants advance two arguments as to invalidity under the written description umbrella.  First, Defendants argue that the written description requirement is not met because the '569 Patent "does not describe a 'fire-rated' laboratory duct."  Defs.' Mot. Summ. J. 18 (capitalization altered); *see also id.* at 20 ("[T]he '569 Patent simply does not provide any description of a fire-rated laboratory duct.").  As the Court understands it, Defendants are arguing that the '569 Patent claims "fire-rated" laboratory ducts but "that is more than what was invented and described in the patent" because no standards for laboratory ducts exist.  *Id.* at 19.

To support this argument, Defendants point to *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336 (Fed. Cir. 2010).  *Id.* at 18.  Defendants tell the Court that, in that case, the Federal Circuit "invalidated a claim directed to any vertebrate and mammalian cDNA as being unsupported by a specification that only discussed one species, namely rat cDNA."  *Id.* (quotation marks omitted)  Defendants are actually describing *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1566–69 (Fed. Cir. 1997), which the Federal Circuit referenced throughout its opinion, *Ariad Pharms.*, 598 F.3d at 1349–57.  In any event, neither case appears particularly instructive absent analysis and application from Defendants.  *See Eli Lilly*, 119 F.3d at 1568 ("[A] description of rat insulin cDNA is not a description of the broad classes of vertebrate or mammalian insulin cDNA.  A written description of an invention involving a *chemical* genus, like a description of a chemical species, requires a precise definition

. . . ." (emphasis added) (quotation marks omitted)); *Ariad Pharms.*, 598 F.3d at 1354–55. Defendants' passing reference to *Gentry Gallery, Inc. v. Berkline Corporation*, 134 F.3d 1473 (Fed. Cir. 1998), Defs.' Mot. Summ. J. 20, similarly lacks explanation. *See Gentry Gallery*, 134 F.3d at 1478–80 (concluding that claims in a sofa patent "directed to sectional sofas in which the location of the recliner controls [wa]s not limited to the console" were invalid because "the original disclosure clearly identifie[d] the console as *the only possible location* for the controls" and "the scope of the right to exclude may be limited by a narrow disclosure" (emphasis added)). The experts agree that a fire-rated duct can be used in a laboratory regardless of whether that duct has a rating specific for laboratory installations, *see* Crimi Feb. 24, 2021 Dep. 224:21–225:5, ECF No. 67-6; Morse Dep. 99:7–15, ECF No. 74-3, and neither the construction of the term "fire-rated" nor the language of the specification compels a conclusion that the rating must be specific to the installation, *see* '569 Patent col. 1 ll. 38–39 ("Fire-rated ducts are typically found in installations such as commercial kitchens and laboratories.").

Defendants' second argument is more promising. Defendants argue that the '569 Patent fails the written description requirement as to "thermal spacers" and "thermally isolating." *See* Defs.' Mot. Summ. J. 20–21. Defendants also contend that the '569 Patent contains insufficient information regarding the thermal gasket. *See id.* at 21. Defendants emphasize that even Crimi agreed when asked by Defendants' counsel if he would agree that the '569 Patent describes the thermal spacer in terms of the function it performs rather what the thermal spacer is. *See id.* at 20.

Plaintiff protests that Crimi's answer "was solicited through distraction and trickery" and "[s]uch litigation tactics should not be condoned." Pl.'s Resp. Defs.' Mot. Summ. J. 43–44. This is attorney argument and not obvious from the record. Though the Court agrees with

Plaintiff that summary judgment in Defendants' favor is not appropriate as to written description, it does not find Plaintiff has shown Defendants could not prevail given the intensely factual nature of the written description inquiry and the nature of the written description here.  *See Nat'l Graphics, Inc. v. Brax Ltd*, 151 F. Supp. 3d 903, 915 (E.D. Wis. 2015) (noting that "generic directives simply instruct[ing] the public to accomplish the patent's stated goal . . . suggest[] that the inventor . . . had not actually reduced [the invention] to practice" and denying summary judgment in light of conflicting expert reports); *see also Crown Packaging Tech.*, 635 F.3d at 1384 ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate.").  Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is thus DENIED as to written description.  Whether the written description requirement has been satisfied cannot be resolved at summary judgment.

### 3.  Enablement

The enablement requirement "enforces the essential *quid pro quo* of the patent bargain by requiring a patentee to teach the public how to practice the full scope of the claimed invention." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1099–1100 (Fed. Cir. 2020) (quotation marks omitted); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997) ("Patent protection is granted in return for an enabling disclosure of an invention . . . .").  The Federal Circuit has stated that this requirement "is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Auto. Techs. Int'l., Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007)) (quotation marks omitted).

Appx82

"[W]hether a patent satisfies the enablement requirement is a question of law based on underlying factual findings." *McRO*, 959 F.3d at 1096; *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) ("Enablement is a question of law based on underlying facts."). To prevail, the challenger "must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without undue experimentation." *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (quotation marks omitted). To do so, the challenger must first "put forward evidence that some experimentation is needed to practice the patented claim." *Id.* After the challenger makes this "threshold showing," *id.* at 1189, the Court then turns to the factors articulated in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988), to "determin[e] whether the amount of that experimentation is . . . 'undue' or sufficiently routine such that an ordinarily skilled artisan would reasonably be expected to carry it out." *Alcon Rsch. Ltd.*, 745 F.3d at 1188. These factors include

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d at 737.

Defendants contend that the '569 Patent requires undue experimentation and therefore fails the enablement requirement. *See* Defs.' Mot. Summ. J. 21–22. This is because, essentially, the '569 Patent does not teach how to pass a fire test and fire tests are uncertain, complex, and time-consuming. *See id.* Defendants assert that this is "exactly the 'starting point, the direction for further research,' that is not enabling." *Id.* at 22 (quoting *Auto. Techs. Int'l*, 501 F.3d at 1284).

Plaintiff responds that "[e]nablement is not precluded by some experimentation," Pl.'s Resp. Defs.' Mot. Summ. J. 36 (alteration in original) (quoting *Wands*, 858 F.2d at 736),[4] arguing that the experimentation here is not undue because how to perform and pass a fire test is "well known in the art," *id.* at 37 (quotation marks omitted).  The Court finds the parties' (and their experts') dispute over the extent of the experimentation required by the '569 Patent is intensely factual, with the disputed facts precluding summary judgment as to enablement in either party's favor.  *See Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 980 (N.D. Ill. 2010) (denying summary judgment as to enablement where parties presented conflicting expert reports).  Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is thus DENIED as to enablement.  Whether the enablement requirement has been satisfied cannot be resolved at summary judgment.

### 4.  Obviousness

A patent is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103.  Obviousness "is a question of law based on underlying facts." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007) ("The ultimate judgment of obviousness is a legal determination.").  The underlying factual inquiries include "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness." *ZUP, LLC*

---

[4] This is not an exact quote: Rather, the Federal Circuit stated in *Wands* that "[e]nablement is not precluded *by the necessity for* some experimentation."  *Wands*, 858 F.2d at 736 (emphasis added).

*v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).

Plaintiff argues all four of Defendants' obviousness defenses, each based on a different combination of prior art, fail as a matter of law. As to the Coleman Combination, Zogg Combination, and SMACNA Manual Combination, Plaintiff argues that they "do not teach 'thermal spacers thermally isolating' that 'limit the amount of heat conducted through the components.'" *See* Pl.'s Mot. Summ. J. No Invalidity 1. As to the Duffy Combination, Plaintiff argues it does not teach spacers. *See id.* at 1–2.

Defendants respond that Plaintiff focuses on only a single issue: the teachings of the prior art, which are questions of fact. *See* Defs.' Resp. Pl.'s Mot. Summ. J. No Invalidity 9, ECF No. 78. As a general matter, the Court agrees that a motion for summary judgment cannot get very far by ignoring the relevant inquiry. Here, Plaintiff tells the Court it must consider three *Graham* factors to evaluate obviousness, yet only analyzes one and does not explain why its analysis is dispositive in light of the multipronged inquiry. *See* Pl.'s Mot. Summ. J. Invalidity 5–18. This appears to be error, because "[a] determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors" because "each of the *Graham* factors helps to inform the ultimate obviousness determination." *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016); *see also Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) ("[T]he obviousness inquiry requires examination of all four *Graham* factors. Indeed, courts must consider all of the *Graham* factors prior to reaching a conclusion with respect to obviousness." (citation omitted)). "[T]he strength of *each* of the *Graham* factors must be weighed in every case and must be weighted en route to the final determination of obviousness or non-obviousness." *WBIP, LLC*, 829 F.3d at 1328. Plaintiff's

art-by-art approach is too narrow.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

In any event, "[t]he teachings of a prior art reference are underlying factual questions in the obviousness inquiry."  *In re Kubin,* 561 F.3d 1351, 1355 (Fed. Cir. 2009).  Because those teachings are disputed here, and because Plaintiff offers no roadmap for the Court's consideration of the other *Graham* factors nor explains why its arguments are dispositive in light of the governing law, Plaintiff's Motion for Summary Judgment of No Invalidity is DENIED. Whether the '569 Patent is nonobvious (or obvious) cannot be resolved at summary judgment.

### iii.  Unenforceability

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc).  The Federal Circuit has called inequitable conduct the "atomic bomb" of patent law because "inequitable conduct regarding any single claim renders the entire patent unenforceable."  *Id.* at 1288 (quotation marks omitted).

Inequitable conduct takes multiple forms; one occurs when the patentee withholds material information.  *See Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed. Cir. 1998) ("Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.").  Defendants contend Plaintiff's failure to disclose the SMACNA Manual constitutes inequitable conduct that renders the '569 Patent unenforceable.  *See, e.g.*, Defs.' Sec. Corrected Final Unenforceability & Invalidity Contentions 14–16.

Plaintiff seeks summary judgment as to inequitable conduct, arguing that Defendants cannot establish either prong of the defense, Pl.'s Mot. Summ. J. Inequitable Conduct 9; that is, Defendants cannot "establish both the materiality of the withheld reference *and* the applicant's intent to deceive," *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1352 (Fed. Cir. 2021) (emphasis added) (quotation marks omitted).  Defendants' response makes clear that Defendants cannot establish the second element as a matter of law.

Intent requires that "the accused infringer . . . prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.  Crucially, "[i]ntent to deceive may be found only if specific intent to deceive is the single most reasonable inference able to be drawn from the evidence.  If more than one reasonable inference is possible, intent to deceive cannot be found." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016) (quotation marks and citations omitted).

Plaintiff argues in its motion that Defendants lack evidence demonstrating that Duffy knew of the SMACNA Manual's materiality and withheld it with deceptive intent.  Pl.'s Mot. Summ. J. Inequitable Conduct 14–18.  In particular, Plaintiff points to Duffy's deposition testimony that he has never read (or even "touched") a SMACNA Manual. *Id.* at 15 (quotation marks omitted).  Plaintiff also argues that "there is no evidence that Mr. Duffy . . . knew about or had ever before seen" the relevant figures in the SMACNA Manual. *Id.*

Defendants respond that "[t]here is at least a genuine dispute regarding an intent to deceive."  Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 28 (emphasis omitted). Defendants suggest Duffy's testimony may not be credible, *see id.* at 29 ("[S]uch testimony is directly at odds with Mr. Duffy's demonstrable familiarity with the SMACNA Manual . . . ."),

**Appx87**

but begin and end with the argument that it is "equally problematic" if Duffy "refused" to read the SMACNA Manual to avoid learning of its materiality and withheld it on that basis, *see id.* at 28–30. However, the case Defendants cite to for that proposition, *id.* at 2, 30, stands for the opposite conclusion, *see Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1378 (Fed. Cir. 2010), *overruled on other grounds by Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) ("[I]f [the inventors] did not read the brochure (and did not do so to avoid learning of damaging information), those actions regarding the failure to disclose the information on the inside of the brochure would at most, amount to gross negligence. Gross negligence is not inequitable conduct."). As a matter of law, Defendants cannot succeed on their "heads I win, tails you lose" theory of inequitable conduct. *See Therasense*, 649 F.3d at 1290 ("[T]he evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." (quotation marks omitted)). The conduct they argue is most likely to have occurred is not inequitable conduct as a matter of law. And in any event, Defendants' evidence, at best, establishes that Duffy has a cursory awareness of (not "demonstrable familiarity" with) the SMACNA Manual because some of its contents generally relate to his work. *See, e.g.*, Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 29 (arguing that Duffy "knew of" the SMACNA Manual and was "familiar enough" with the SMACNA Manual to *infer* that it contains a particular teaching (quotation marks omitted)). Accordingly, Plaintiff's Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct Affirmative Defense is GRANTED.[5] *Cf.*

---

[5] Defendants ask pursuant to Federal Rule of Civil Procedure 56(d) for more time to obtain discovery from Plaintiff's patent prosecution counsel, a Canadian attorney. Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 30–31. Federal Rule of Civil Procedure 56(d) permits a court to deny or defer consideration of a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." The Court finds that Defendants have not made such a showing: Defendants' counsel's declaration, Shimota Decl., ECF No. 80-8, and the attached exhibits show only that Defendants have had difficulty securing discovery from the Canadian attorney and that there is a possibility they could have relevant information related to a separate, entirely speculative theory of inequitable conduct. *Cf.* Defs.' Resp. Pl.'s Mot. Summ. J. Inequitable Conduct 30 (arguing that "testimony of prosecution counsel is ordinarily highly

28

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1367 (Fed. Cir. 2008) ("If a threshold level of intent to deceive or materiality is not established by clear and convincing evidence, the district court does not have any discretion to exercise and cannot hold the patent unenforceable regardless of the relative equities or how it might balance them.").

### iv.  Damages

Defendants finally argue that "the evidence is insufficient to support an award of lost profits or convoyed sales."  Defs.' Mot. Summ. J. 24 (capitalization altered) (emphasis omitted). The Court addresses each in turn.

### 1.  Lost Profits

A patentee may recover lost profits by establishing "(1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).  The Federal Circuit has commented that "[t]he second factor, absence of acceptable non-infringing alternatives, often proves the most difficult obstacle for patent holders."  *Id.* at 1286.  "Under this factor, if there is a non[-]infringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale."  *Id.*

Defendants argue that "no reasonable jury could find the absence of non-infringing alternatives" in light of the expert reports.  *See* Defs.' Mot. Summ. J. 24–25 ("Dr. Morse[] provided no less than five acceptable non[-]infringing alternatives . . . .  [Defendants' damages expert] Mr. Clemons[] similarly opined on the economic acceptability of . . . existing market

_____

pertinent to a finding of inequitable conduct" because prosecution counsel *also* has a duty to disclose material information).

solutions . . . ." (emphasis omitted) (citation omitted)).  Although Plaintiff's expert John Curtis

opined that "no acceptable non-infringing alternatives appear to have been available," Curtis

Report 16–20, ECF No. 69-3, Defendants argue that Curtis cannot render that conclusion, *see*

Defs.' Mot. Summ. J. 25.

To make this argument, Defendants point to *Webasto Thermo & Comfort North America,*

*Inc. v. BesTop, Inc.*, Case No. 16-cv-13456, 2019 WL 3334563, at *5–7 (E.D. Mich. July 25,

2019).  In *Webasto*, the district court granted a motion to exclude the defendant's damages

expert's testimony regarding a hypothetical non-infringing alternative because the expert's report

and deposition testimony "demonstrate[d] without question that his entire opinion . . . [wa]s

100% a regurgitation of what he was told in conversation" by an engineer.  *Id.* at *5.  Applying

Federal Rules of Evidence 602, 701, and 702, the court reasoned that the expert witness had

"absolutely no independent expertise or knowledge regarding the alleged alternative non-

infringing design-around about which he opines and relie[d] entirely on what he was told in

conversation by [the engineer], who [could not] offer any of the underlying opinions."  *Id.* at *6.

Analogizing to *Webasto*, Defendants argue that Curtis, an accountant, cannot rely on

conversations with Plaintiff's employee Paul Wells to form his various opinions as to market

alternatives.  *See* Defs.' Mot. Summ. J. 25.

Plaintiff distinguishes *Webasto*, arguing that the excluded opinions here concern *existing*

market alternatives rather than a hypothetical product.  *See* Pl.'s Resp. Defs.' Mot. Summ. J. 51.

Defendants reply that *Webasto* "does not recognize such a distinction," Defs.' Reply Supp. Def.

Mot. Summ. J. 12 n.3, but the *Webasto* court had no reason to consider that scenario.

Of course, "[a] party may object that the material cited to support or dispute a fact cannot

be presented in a form that would be admissible in evidence" at summary judgment.  Fed. R.

30

Civ. P. 56(c)(2).  But admissibility is governed by the Federal Rules of Evidence.  Whether the facts at hand are similar to any other case (particularly an unreported district court case) is not the inquiry.  The parties' *Webasto* proxy war thus has limited utility.

Given that neither Defendants' motion nor Plaintiff's response (in which Plaintiff argues that certain *other* expert opinions are inadmissible, *see* Pl.'s Resp. Defs.' Mot. Summ. J. 49–50) engages with the Federal Rules of Evidence whatsoever, the Court is convinced that the best approach is to deny summary judgment as to lost profits.  If this case proceeds to trial, the parties will have the opportunity to file motions *in limine* as to the inadmissibility of certain evidence, including expert evidence.  The parties should engage directly with the relevant rules and explain at that time if those motions have dispositive consequences.  Accordingly, Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is DENIED as to lost profits.  This issue cannot be resolved at summary judgment.

### 2.  Convoyed Sales

"A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit."  *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (quotation marks omitted).  For example, in *American Seating*, the patented invention was a wheelchair restraint system for vehicles, and the unpatented product was passenger seats.  *Id.* at 1265.  The Federal Circuit affirmed the district court's conclusion that the restraint system and seats lacked the requisite functional relationship because, among other reasons, the products operated independently and "[t]he evidence show[ed] that passenger seats command[ed] a market value and serve[d] a useful purpose independent of the patented" restraints.  *Id.* at 1268–

69.  In *Juicy Whip v. Orange Bang*, the Federal Circuit reversed the district court's "clearly erroneous" conclusion that a patented syrup dispenser and unpatented syrup had no functional relationship because "[t]he dispenser needs syrup and the syrup is mixed in a dispenser.  Such is indeed a functional relationship."  *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1371–73 (Fed. Cir. 2004).

Defendants argue that Plaintiff "does not attempt the rigorous functional relationship test."  Defs.' Mot. Summ. J. 26.  In other words, Defendants contend that Plaintiff's unpatented products "have essentially no functional relationship to the patented invention," *Am. Seating Co.*, 514 F.3d at 1268.  But Defendants also have a more elemental grievance: That Plaintiff has not even identified the unpatented product(s) at issue.  *See* Defs.' Mot. Summ. J. 27.  Defendants cite to *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1333 (Fed. Cir. 2009) to suggest that convoyed sales damages cannot be awarded "where [the] damages expert [can]not identify specifically what products he included in his lost-profits analysis."  *Id.* at 27 (quotation marks omitted).  That does not seem to be the exact holding,[6] but Defendants' arguments are well-taken.  Plaintiff has neither identified any unpatented product(s) at issue nor articulated any basis for a functional relationship.

Plaintiff responds with Curtis's report, Pl.'s Resp. Defs.' Mot. Summ. J. 53, in which Curtis explains that Plaintiff's head of mechanical sales informed him that Plaintiff offers a variety of products relating to its patented technology and often generates additional sales because of it, Curtis Report 22.  Curtis also opines that sales of Plaintiff's patented products

---

[6] "[The plaintiff's] damages expert could not identify specifically what products he included in his lost-profits analysis, but speculated [at trial] that [the] pull-through products [that he included in his analysis] included such things as head braces, vests, and other products not used in spinal surgeries."  *DePuy Spine*, 567 F.3d at 1333.  "Because it [wa]s undisputed that [the plaintiff's] unpatented pull-through products neither compete[d] nor function[ed] with its patented . . . [surgical screws] and were sold (i.e., 'pulled-through') only by virtue of [its] business relationship with surgeons," the Federal Circuit held that "[the plaintiff] was not legally entitled to recover lost profits on those unpatented products."  *Id.* at 1333–34.

promote sales of related duct and exhaust products because customers often request that the same manufacturer provide related products.[7]  *Id.* at 26.  This cannot be sufficient to avoid summary judgment.  Plaintiff argues that Defendants have "present[ed] no affirmative evidence to demonstrate the absence of convoyed sales," Pl.'s Resp. Defs.' Mot. Summ. J. 53, but Plaintiff misunderstands its burden, *see* Fed. R. Civ. P. 56(c)(1)(b).  Asked by Defendants to "put up or shut up," *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quotation marks omitted), Plaintiff now must put up facts from which a functional relationship between its patented technology and any accompanying unpatented product(s) could be found, *see Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." (quotation marks omitted)).  No reasonable jury could award convoyed sales damages based on Plaintiff's thin and vague facts.  Defendants' Motion for Summary Judgment of Noninfringement and Invalidity is thus GRANTED as to convoyed sales.

## CONCLUSION

Accordingly, Plaintiff DuraSystems Barriers Inc.'s Motion for Summary Judgment of Patent Infringement, ECF No. 63, is GRANTED; Motion for Summary Judgment of No Invalidity, ECF No. 64, is DENIED; and Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct Affirmative Defense, ECF No. 65, is GRANTED.  Defendants Van-Packer Co. ("Van-Packer") & Jeremias, Inc.'s Motion for Summary Judgment of Noninfringement and Invalidity, ECF No. 67, is DENIED as to non-infringement, DENIED as to

---

[7] A similar link was rejected by the Federal Circuit in *American Seating.  See Am. Seating*, 514 F.3d at 1268 ("The fact that customers prefer that passenger seats and tie-down wheelchair restraint systems come from a single supplier for ease of purchase, repair, and uniform design and appearance, does not compel the conclusion that the seats and tie-down system are analogous to components of a single assembly . . . ." (quotation marks omitted)).

indefiniteness, DENIED as to written description, DENIED as to enablement, DENIED as to lost profits, and GRANTED as to conveyed sales.  Defendants' motion to seal, ECF No. 68, and Plaintiff's motion to seal, ECF No. 75, are DENIED.  Defendants' motion to withdraw, ECF No. 71, is GRANTED.  The Clerk is DIRECTED to strike ECF No. 62 and to unseal the exhibits on the docket at ECF No. 69-1, ECF No. 69-2, ECF No. 69-3, ECF No. 69-4, ECF No. 76-1, and ECF No. 76-2.  The parties are encouraged to explore settlement and should file a status report advising the Court as to how this case will proceed within 60 days of service of this Order.


Entered this 31st day of March, 2023.


s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

34

Appx94

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT
–for the
Central District of Illinois

| | | |
|---|---|---|
| DuraSystems Barriers Inc., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Consolidated Case No.** 1:19-cv-01388- |
| | ) | SLD-JEH |
| | ) | |
| Van-Packer Co. & Jeremias, Inc., | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>JUDGMENT IN A CIVIL CASE</u>

**DECISION BY THE COURT**.    This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendant Van-Packer Co.'s GRZ Grease Duct System and Defendant Jeremias, Inc.'s DWGD-RZ Grease Duct System (collectively the "Accused Products") directly infringe claims 3, 6, 10–13, 16, 19, and 20 ("Asserted Claims") of U.S. Patent No. 10,024,569 ("'569 Patent").

Defendants, their officers, agents, servants, employees, and all persons acting in active concert or participation with them who receives actual notice of the injunction in this case by personal service or otherwise, is hereby permanently enjoined from directly or indirectly making, having made, using, selling, advertising, manufacturing, importing, or distributing the Accused Products, or any colorable imitation thereof, which infringes, literally or equivalently, the Asserted Claims of the '569 Patent until the '569 Patent expires or is no longer in force.

**Dated: 1/19/2024**

AJKV

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

15,42,APPEAL,CONSOL,LEAD,REFER,STAYED,TRANSF

# U.S. District Court
# CENTRAL DISTRICT OF ILLINOIS (Peoria)
# CIVIL DOCKET FOR CASE #: 1:19-cv-01388-SLD-JEH

| | |
|---|---|
| Dura Systems Barriers, Inc. v. Van-Packer Co. | Date Filed: 12/03/2019 |
| Assigned to: Chief Judge Sara Darrow | Jury Demand: Both |
| Referred to: Magistrate Judge Jonathan E. Hawley | Nature of Suit: 830 Patent |
| Case in other court: Federal Circuit Court of Appeals, 24-01537 | Jurisdiction: Federal Question |
| Federal Circuit Court of Appeals, 23-01888 | |
| Cause: 35:145 Patent Infringement | |

**Plaintiff**

**Dura Systems Barriers, Inc.**                    represented by    **Brian N Platt**
WORKMAN NYDEGGER P.C.
Suite 1000
60 East South Temple
Salt Lake City, UT 84111
801-533-9800
Fax: 801-328-1707
Email: bplatt@wnlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad E Nydegger**
WORKMAN NYDEGGER P.C.
Suite 1000
60 East South Temple
Salt Lake City, UT 84111
801-533-9800
Fax: 801-328-1707
Email: cnydegger@wnlaw.com
*ATTORNEY TO BE NOTICED*

**Matthew V Topic**
LOEVY & LOEVY
3rd Floor
311 North Aberdeen St
Chicago, IL 60607
312-243-5900
Fax: 312-243-5902
Email: matt@loevy.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Van-Packer Co.**                                          represented by   **Arthur Martin Scheller , III**
                                                                             ASG LAW LLC
                                                                             Suite 3300
                                                                             20 N Clark Street
                                                                             Chicago, IL 60602
                                                                             312-858-6751
                                                                             Fax: 312-858-3935
                                                                             Email: ascheller@asglawfirm.com
                                                                             *TERMINATED: 05/26/2020*
                                                                             *LEAD ATTORNEY*

                                                                             **Jacob Thomas Michalakes**
                                                                             K&L GATES LLP
                                                                             Suite 3300
                                                                             70 W Madison Street
                                                                             Chicago, IL 60602
                                                                             312-807-4210
                                                                             Email: jacob.michalakes@klgates.com
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **James Andrew Shimota**
                                                                             K&L GATES LLP
                                                                             Suite 3300
                                                                             70 W Madison Street
                                                                             Chicago, IL 60602
                                                                             312-372-1121
                                                                             Fax: 312-827-8000
                                                                             Email: jim.shimota@klgates.com
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Katherine Louise Allor**
                                                                             K&L GATES LLP
                                                                             Suite 3300
                                                                             70 W Madison Street
                                                                             Chicago, IL 60602
                                                                             312-372-1121
                                                                             Fax: 312-827-8000
                                                                             Email: katy.allor@klgates.com
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Nelson Moon Hua**
                                                                             K & L GATES LLP
                                                                             Three First National Plaza
                                                                             Suite 3100
                                                                             70 W Madison St
                                                                             Chicago, IL 60602-4207
                                                                             312-807-4312
                                                                             Email: nelson.hua@klgates.com
                                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Jeremias, Inc.**                                         represented by   **Arthur Martin Scheller , III**
                                                                             (See above for address)
                                                                             *TERMINATED: 05/26/2020*

**Appx97**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob Thomas Michalakes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Andrew Shimota**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine Louise Allor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nelson Moon Hua**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2019 | 1 | COMPLAINT against VAN-PACKER CO. ( Filing fee $ 400 receipt number 0753-3253938.), filed by DURASYSTEMS BARRIERS, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet Civil Cover Sheet, # 4 Exhibit Summons)(Topic, Matthew) (Entered: 12/03/2019) |
| 12/03/2019 | 2 | NOTICE of Appearance of Attorney by Matthew V Topic on behalf of DURASYSTEMS BARRIERS, INC. (Topic, Matthew) (Entered: 12/03/2019) |
| 12/03/2019 | 3 | CERTIFICATE OF INTEREST pursuant to Local Rule 11.3 by DURASYSTEMS BARRIERS, INC.. (Topic, Matthew) (Entered: 12/03/2019) |
| 12/03/2019 | 4 | Summons Issued as to VAN-PACKER CO. (VH, ilcd) (Entered: 12/03/2019) |
| 12/04/2019 | | TEXT ORDER: The allegations of the Complaint 1 include that Defendant Van-Packer Co. has a regular and established place of business in Buda, Illinois. Buda, Illinois is in Bureau County, Illinois which is in the Rock Island of the U.S. District Court for the Central District of Illinois. Yet, the Plaintiff filed its Complaint in the Peoria Division of the U.S. District Court for the Central District of Illinois. The Clerk is directed to TRANSFER this case to the Rock Island Division of the Central District of Illinois. See Local Rule 40.1(C) ("All complaints and subsequent filings in cases which arise from the following counties: Bureau... will be filed at ROCK ISLAND, ILLINOIS"). Entered by Magistrate Judge Jonathan E. Hawley on 12/4/2019. (KZ, ilcd) (Entered: 12/04/2019) |
| 12/04/2019 | 5 | REPORT on the filing or determination of an action regarding Patent by DURASYSTEMS BARRIERS, INC.. (RL, ilcd) (Entered: 12/04/2019) |
| 02/19/2020 | 6 | WAIVER OF SERVICE Returned Executed by DURASYSTEMS BARRIERS, INC.. VAN-PACKER CO. waiver sent on 2/5/2020, answer due 4/6/2020. (Platt, Brian) (Entered: 02/19/2020) |
| 03/23/2020 | 7 | NOTICE of Appearance of Attorney by Chad E Nydegger on behalf of Dura Systems Barriers, Inc. (Nydegger, Chad) (Entered: 03/23/2020) |
| 03/23/2020 | 8 | NOTICE of Appearance of Attorney by Brian N Platt on behalf of Dura Systems Barriers, Inc. (Platt, Brian) (Entered: 03/23/2020) |

**Appx98**

| 03/23/2020 | 9 | Joint MOTION for Extension of Time to File Answer re 1 Complaint, by Plaintiff Dura Systems Barriers, Inc.. Responses due by 4/6/2020 (Platt, Brian) (Entered: 03/23/2020) |
|---|---|---|
| 03/24/2020 | | TEXT ORDER granting 9 Motion for Extension of Time to Answer re 1 Complaint. Dft Dura Systems Barriers, Inc. answer due 3/30/2020. Entered by Magistrate Judge Jonathan E. Hawley on 3/24/20. (WG, ilcd) (Entered: 03/24/2020) |
| 03/26/2020 | 10 | NOTICE of Appearance of Attorney by Arthur Martin Scheller, III on behalf of Van-Packer Co.. (Scheller, Arthur) (Entered: 03/26/2020) |
| 03/30/2020 | 11 | ANSWER to 1 Complaint, AND AFFIRMATIVE DEFENSES by Van-Packer Co.. (Scheller, Arthur) (Entered: 03/30/2020) |
| 03/30/2020 | 12 | CERTIFICATE OF INTEREST pursuant to Local Rule 11.3 by Van-Packer Co.. (Scheller, Arthur) (Entered: 03/30/2020) |
| 03/31/2020 | 13 | TEXT ORDER: This case is set for a Rule 16 scheduling conference before Magistrate Judge Jonathan E. Hawley on 5/1/2020 at 10:15 AMvia telephone (Court to set up the call). If Counsel are to be reached at a number other than what is listed on the docket sheet, they are directed to phone Judge Hawley's courtroom deputy at 309-671-7117 and confirm the phone number where they may be reached for the call. A discovery plan pursuant to Fed. R. Civ. P. 26(f)(3) shall be filed on or before 4/28/2020. The parties may, but are not required to, follow the format of the sample discovery plan set forth as Attachment A to the standing order attached to this text order. The Discovery Plan event may be found in the CM/ECF system within the other Documents category. All counsel must read and be familiar with the standing order attached to this text order prior to their Rule 26(f) planning meeting. Entered by Magistrate Judge Jonathan E. Hawley on 3/31/2020. (WG, ilcd) (Entered: 03/31/2020) |
| 04/10/2020 | 14 | DISCOVERY PLAN - PROPOSED/Report of Rule 26(f)Planning Meeting by Dura Systems Barriers, Inc.. (Nydegger, Chad) (Entered: 04/10/2020) |
| 04/13/2020 | 15 | TEXT ORDER by U.S. Magistrate Judge Jonathan E. Hawley: The Court adopts the Discovery Plan 14 . Fact Discovery due by 12/11/2020. Status Report to be filed by 2/12/2021. Rule 16 conference set 5/1/2020 at 10:15 AM is VACATED. Court stresses the importance of adhering to the schedule and procedures for requests to extend the schedule. The parties are expected to review Judge Hawleys Standing Order that was revised on 12/6/2018. Parties are reminded of their option to consent to proceed before US Magistrate Judge. See attached form. Parties are reminded of option of Court sponsored mediation/Settlement Conference. Counsel/Parties are reminded of the importance of appearing for hearings scheduled via telephone. Failure to appear will result in in-person appearances for all further proceedings. Entered: 4/13/2020. (WG, ilcd) (Entered: 04/13/2020) |
| 04/15/2020 | 16 | Joint MOTION to Consolidate Cases by Plaintiff Dura Systems Barriers, Inc.. Responses due by 4/29/2020 (Attachments: # 1 Exhibit A First Amended Complaint)(Platt, Brian) (Entered: 04/15/2020) |
| 04/16/2020 | 17 | AMENDED COMPLAINT against All Defendants, filed by Dura Systems Barriers, Inc. (RL, ilcd) (Entered: 04/16/2020) |
| 04/16/2020 | | TEXT ORDER entered by Magistrate Judge Jonathan E. Hawley on 4/16/2020 granting the 16 Stipulation to consolidate filed in case 19-1388. The Court additionally on its own motion grants consolidation in case 20-4069. Cases 19-1388 and 20-4069 shall be consolidated with case 19-1388 being the lead case. All future filings shall be filed in case 19-1388 only. Clerk to file the Amended Complaint attached as [16-1] in 19-1388. Due to |

| | | the filing of the Amended Complaint, Defendant Jeremias, Inc. shall be added to case 19-1388 as a Defendant. (RL, ilcd) (Entered: 04/16/2020) |
|---|---|---|
| 04/21/2020 | 18 | CERTIFICATE OF INTEREST pursuant to Local Rule 11.3 by Jeremias, Inc.. (Scheller, Arthur) (Entered: 04/21/2020) |
| 04/30/2020 | 19 | ANSWER to 17 Amended Complaint by Jeremias, Inc., Van-Packer Co..(Scheller, Arthur) (Entered: 04/30/2020) |
| 05/01/2020 | 20 | Joint MOTION for Protective Order by Plaintiff Dura Systems Barriers, Inc.. Responses due by 5/15/2020 (Nydegger, Chad) (Entered: 05/01/2020) |
| 05/04/2020 | 21 | STIPULTED PROTECTIVE ORDER. Entered by Magistrate Judge Jonathan E. Hawley on 5/4/20. (WG, ilcd) (Entered: 05/04/2020) |
| 05/15/2020 | 22 | NOTICE of Appearance of Attorney by Katherine Louise Allor on behalf of Jeremias, Inc., Van-Packer Co. (Allor, Katherine) (Entered: 05/15/2020) |
| 05/21/2020 | 23 | NOTICE of Appearance of Attorney by James Andrew Shimota on behalf of Jeremias, Inc., Van-Packer Co. (Shimota, James) (Entered: 05/21/2020) |
| 05/22/2020 | 24 | MOTION to Withdraw as Attorney by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 6/5/2020 (Scheller, Arthur) (Entered: 05/22/2020) |
| 05/26/2020 | | TEXT ORDER granting 24 Motion to Withdraw as Attorney. Attorney Arthur Martin Scheller, III terminated as counsel in this matter. Entered by Magistrate Judge Jonathan E. Hawley on 5/26/20. (WG, ilcd) (Entered: 05/26/2020) |
| 07/27/2020 | 25 | STIPULATION re 21 Protective Order *(Joint Stipulated Addition to the Protective Order)* by Jeremias, Inc., Van-Packer Co... (Allor, Katherine) (Entered: 07/27/2020) |
| 07/28/2020 | 26 | Order re STIPULATED ADDITION TO THE PROTECTIVE ORDER 21 . Entered by Magistrate Judge Jonathan E. Hawley on 7/28/20. (WG, ilcd) (Entered: 07/28/2020) |
| 09/25/2020 | 27 | MOTION for Issuance of Letters Rogatory by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 10/9/2020 (Attachments: # 1 Exhibit A (Proposed Letter Rogatory), # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Shimota, James) (Entered: 09/25/2020) |
| 10/13/2020 | 28 | REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY) TO THE CENTRAL AUTHORITY OF ONTARIO/ORDER granting 27 Motion for Issuance of Letters Rogatory as unopposed per Local Rule. Entered by Magistrate Judge Jonathan E. Hawley on 10/13/20. (WG, ilcd) (Entered: 10/13/2020) |
| 10/30/2020 | 29 | MOTION to Amend/Correct *(Defendants' Unopposed Motion for Leave to File First Amended Answer and Affirmative Defenses)* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 11/13/2020 (Attachments: # 1 Exhibit A - Amended Answer, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3 (Part 1), # 5 Exhibit 3 (Part 2), # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6)(Shimota, James) (Entered: 10/30/2020) |
| 11/02/2020 | | TEXT ORDER granting 29 unopposed Motion for leave to file first amended Answer and Affirmative Defenses. Clerk to file the Answer and exhibits attached to the motion. Entered by Magistrate Judge Jonathan E. Hawley on 11/2/20. (WG, ilcd) (Entered: 11/02/2020) |
| 11/02/2020 | 30 | AMENDED ANSWER and Affirmative Defenses to first amended complaint (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3 part 1, # 4 Exhibit 3 part 2, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6)(RES, ilcd) (Entered: 11/03/2020) |
| 12/23/2020 | 31 | BRIEF *Defendants' Opening Claim Construction Brief* by Jeremias, Inc., Van-Packer Co.. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 |

| | | |
|---|---|---|
| | | Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O (Redacted), # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R (Redacted), # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 24 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z)(Shimota, James) (Entered: 12/23/2020) |
| 12/23/2020 | 32 | Appendix *Joint Appendix for Claim Construction Pursuant to Patent Rule 4.2(b)* by Jeremias, Inc., Van-Packer Co.. (Attachments: # 1 Joint Appendix (Part 1), # 2 Joint Appendix (Part 2), # 3 Joint Appendix (Part 3))(Shimota, James) (Entered: 12/23/2020) |
| 12/23/2020 | 33 | MOTION to Seal *Defendants' Motion for Leave to File Under Seal Certain Documents in Support of Opening Claim Construction Brief* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 1/6/2021 (Attachments: # 1 Text of Proposed Order)(Shimota, James) (Entered: 12/23/2020) |
| 12/23/2020 | 34 | **+++ SEALED DOCUMENT.. (Attachments: # 1 Exhibit O to Defendants' Opening Claim Construction Brief (Unredacted), # 2 Exhibit R to Defendants' Opening Claim Construction Brief (Unredacted))(Shimota, James) (Entered: 12/23/2020)** |
| 01/21/2021 | 35 | Joint MOTION for Extension of Time to File Response/Reply by Plaintiff Dura Systems Barriers, Inc.. Responses due by 2/4/2021 (Nydegger, Chad) (Entered: 01/21/2021) |
| 01/22/2021 | | TEXT ORDER granting 35 Motion for Extension of Time to File Response/Reply re 33 MOTION to Seal *Defendants' Motion for Leave to File Under Seal Certain Documents in Support of Opening Claim Construction Brief*. Plaintiffs to file their responsive brief to 33 by 2/5/21 and Defendants to file their Reply by 2/19/21. Parties to file a joint claim construction chart and status report by 2/26/2021. Entered by Magistrate Judge Jonathan E. Hawley on 1/22/21. (WG, ilcd) (Entered: 01/22/2021) |
| 02/05/2021 | 36 | BRIEF *Plaintiff's Responsive Claim Construction Brief* re 31 Brief,, by Dura Systems Barriers, Inc.. (Attachments: # 1 Exhibit AA, # 2 Exhibit BB, # 3 Exhibit CC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit FF, # 7 Exhibit GG, # 8 Exhibit HH)(Nydegger, Chad) (Entered: 02/05/2021) |
| 02/05/2021 | 37 | MOTION for Leave to File Document Under Seal by Plaintiff Dura Systems Barriers, Inc.. Responses due by 2/19/2021 (Attachments: # 1 Text of Proposed Order)(Nydegger, Chad) (Entered: 02/05/2021) |
| 02/05/2021 | 38 | **+++ SEALED DOCUMENT.. (Attachments: # 1 Exhibit DD - UNREDACTED) (Nydegger, Chad) (Entered: 02/05/2021)** |
| 02/09/2021 | 39 | NOTICE *of Errata* re 36 Brief, (Attachments: # 1 Exhibit AA - Corrected)(Nydegger, Chad) (Entered: 02/09/2021) |
| 02/09/2021 | 40 | Joint MOTION for Extension of Time to File Response/Reply by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 2/23/2021 (Allor, Katherine) (Entered: 02/09/2021) |
| 02/10/2021 | | TEXT ORDER entered by Chief Judge Sara Darrow on February 10, 2021. The 40 Stipulated Motion for Extension of Time to Complete Claim Construction Briefing is GRANTED. Defendants' reply brief must be filed by March 3, 2021. The parties' joint claim construction chart and status report must be filed by March 10, 2021. (AK, ilcd) (Entered: 02/10/2021) |
| 03/03/2021 | 41 | BRIEF *Defendants' Reply Claim Construction Brief* by Jeremias, Inc., Van-Packer Co.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Shimota, James) (Entered: 03/03/2021) |

| | | |
|---|---|---|
| 03/10/2021 | 42 | BRIEF *Joint Claim Construction Chart and Joint Status Report* re 32 Appendix, 31 Brief,, 36 Brief, by Dura Systems Barriers, Inc.. (Attachments: # 1 Exhibit A)(Nydegger, Chad) (Entered: 03/10/2021) |
| 06/03/2021 | 43 | TEXT ORDER entered by Chief Judge Sara Darrow on June 3, 2021. The Court shall hold a hearing on the parties' claim construction disputes at 1:00 p.m. on June 21, 2021. The hearing shall be conducted by videoconference and last two hours. Each side will receive ten minutes at the outset of the hearing to present a technology tutorial, with Plaintiff going first. The next eighty minutes shall address the disputed claim terms in the order in which they appear in the parties' [42-1] joint claim construction chart. The final twenty minutes shall be reserved for rebuttal, with the two sides evenly splitting the time and Defendants going first. Instructions for accessing the Court's videoconference service are attached hereto.(SV) (Entered: 06/03/2021) |
| 06/04/2021 | | Set/Reset Hearings: Hearing set for 6/21/2021 at 1:00 p.m. by video conference from Rock Island (court to initiate conference) before Chief Judge Sara Darrow. (LN) (Entered: 06/04/2021) |
| 06/21/2021 | | Minute Entry for proceedings held before Chief Judge Sara Darrow on Monday, 6/21/2021 for Hearing. Parties present in open court via video by Attorneys Nydegger and Platt on behalf of Plaintiff Dura Systems Barriers, Inc. and Attorneys Allor, Shimota, and Michalake on behalf of Defendants Van-Packer Co. and Jeremias, Inc. Discussion held. Arguments heard. Plaintiff's response to Defendant's brief due 10 days from today's date. Written Order to issue. (Court Reporter JJ.) (RES) (Entered: 06/21/2021) |
| 07/15/2021 | 44 | NOTICE OF FILING OFFICIAL TRANSCRIPT of Proceedings: CLAIM CONSTRUCTION HEARING held on 6/21/2021, before Judge Sara Darrow. Court Reporter/Transcriber Jennifer Johnson, Telephone number 309-573-0378. Transcript purchased by:Attorneys James Shimota & Chad Nydegger.<br><br>**IMPORTANT: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. Within 21 days of the filing of the transcript, a Motion of Requested Redactions shall be e-filed with the Court. Access to this motion will be restricted to the Court and the attorneys of record in the case. If no such Notice and Motion are filed, the transcript may be made remotely, electronically available to the public, without redaction, 90 days from the date initially filed. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the Clerk's Office public terminal or contact the Court Reporter for purchase. Counsel are strongly urged to share this notice with all clients so that an informed decision about the inclusion of certain materials may be made. The responsibility for redacting these personal identifiers rests solely with counsel and the parties. The Clerk and Court Reporter will not review each transcript for compliance with this rule.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/16/2021. Release of Transcript Restriction set for 10/13/2021. (JRK) (Entered: 07/15/2021) |
| 09/03/2021 | 45 | ORDER entered by Chief Judge Sara Darrow on September 3, 2021. Consideration of the claim terms asserted to be indefinite is DEFERRED and the [33, 37] motions for leave to file under seal are DENIED. The claim terms not asserted to be indefinite are, in accordance with and subject to the attached written order, construed as follows: (1) "thermal spacers thermally isolating": "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the |

| | | |
|---|---|---|
| | | components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing"(2) "exhaust duct module": "a section of pre-fabricated, factory-built exhaust duct"(3) "joint encasement section": "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules"(4) "joined directly": No construction needed(SV) (Entered: 09/03/2021) |
| 09/07/2021 | 46 | MOTION to Seal *Motion to Stay All Upcoming Case Deadlines* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 9/21/2021 (Attachments: # 1 Text of Proposed Order)(Allor, Katherine) (Entered: 09/07/2021) |
| 09/07/2021 | 47 | **+++ SEALED DOCUMENT** by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 9/21/2021 (Attachments: # 1 Text of Proposed Order)(Allor, Katherine) Modified on 9/8/2021 to reflect "sealed document" and not "sealed motion" (WG). (Entered: 09/07/2021) |
| 09/08/2021 | | TEXT ONLY ORDER by Magistrate Judge Jonathan E. Hawley: Court grants the 46 Motion to seal *Motion to stay all upcoming case deadlines*. Defendants to file a redacted motion to stay on the public docket. Sealed Motion 47 is found moot and should have been filed as a SEALED DOCUMENT and not as a motion. Entered on 9/8/21. (WG) (Entered: 09/08/2021) |
| 09/08/2021 | 48 | MOTION to Stay *Unopposed Motion to Stay All Upcoming Case Deadlines for 30-days (Redacted)* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 9/22/2021 (Attachments: # 1 Text of Proposed Order)(Allor, Katherine) (Entered: 09/08/2021) |
| 09/09/2021 | | TEXT ORDER granting 48 Unopposed Motion to Stay all upcoming case deadlines for 30 days. Status Report to be filed by 10/12/2021. Entered by Magistrate Judge Jonathan E. Hawley on 9/9/21. (WG) (Entered: 09/09/2021) |
| 09/30/2021 | 49 | Joint MOTION to Stay *All Upcoming Case Deadlines for 8 Weeks* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 10/14/2021 (Attachments: # 1 Text of Proposed Order)(Allor, Katherine) (Entered: 09/30/2021) |
| 10/01/2021 | | TEXT ORDER granting 49 Motion to Stay. The parties are directed to file a joint status report on or before November 29, 2021. Entered by Magistrate Judge Jonathan E. Hawley on 10/01/21. (Hawley, Jonathan) (Entered: 10/01/2021) |
| 10/01/2021 | | Set/Reset Deadlines: Status Report due by 11/29/2021 pursuant to Text order entered on 10/1/2021. (RES) (Entered: 10/01/2021) |
| 11/29/2021 | 50 | Joint MOTION to Amend Schedule *and Parties' Joint Status Report* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 12/13/2021 (Attachments: # 1 Text of Proposed Order)(Allor, Katherine) (Entered: 11/29/2021) |
| 11/30/2021 | 51 | ORDER entered by Magistrate Judge Jonathan E. Hawley on 11/30/2021. It is hereby ordered that the Parties 50 Joint Motion to Amend the Schedule is granted. See full written Order. (RES) (Entered: 11/30/2021) |
| 12/17/2021 | 52 | NOTICE of Appearance of Attorney by Jacob Thomas Michalakes on behalf of Jeremias, Inc., Van-Packer Co. (Michalakes, Jacob) (Entered: 12/17/2021) |
| 01/04/2022 | | Stay Lifted (RES) (Entered: 01/04/2022) |
| 01/13/2022 | 53 | Joint MOTION to Amend/Correct 51 Order on Motion for Miscellaneous Relief by Plaintiff Dura Systems Barriers, Inc.. Responses due by 1/27/2022 (Attachments: # 1 Text of Proposed Order)(Platt, Brian) (Entered: 01/13/2022) |
| 01/14/2022 | | TEXT ORDER granting 53 Joint Motion to Amend Schedule. Discovery due by 4/8/2022. Dispositive Motions due by 5/6/2022. Proposed Pretrial Order due by 8/9/2022. Final |

|  |  | Pretrial Conference reset for 8/16/2022 at 10:00 AM and Jury Trial reset for 9/26/2022 at 9:00 AM, both hearings set in U.S. Courthouse,131 E 4th Street, Davenport, IA 52801 before Chief Judge Sara Darrow. Entered by Magistrate Judge Jonathan E. Hawley on 1/14/22. (WG) (Entered: 01/14/2022) |
|---|---|---|
| 04/04/2022 | 54 | MOTION for Leave to Serve the Corrected Expert Report of Tony Crimi by Plaintiff Dura Systems Barriers, Inc.. Responses due by 4/18/2022 (Nydegger, Chad) (Entered: 04/04/2022) |
| 04/04/2022 | 55 | AFFIDAVIT re 54 MOTION for Leave to Serve the Corrected Expert Report of Tony Crimi by Dura Systems Barriers, Inc.. (Attachments: # 1 Exhibit 1 - Expert Report of Tony Crimi re Infringement, # 2 Exhibit 2 - Shimota Letter to Counsel re Production of Unidentified Duct System, # 3 Exhibit 3 - 2022-03-16 Ltr to Shimota re Expert Depositions, # 4 Exhibit 4 - RE_ DuraSystems Barriers Inc. v. Van-Packer Co., - Duct Inspection, # 5 Exhibit 5 REDACTED, # 6 Exhibit 6 - 2022-03-24 Corrected Expert Report of Tony Crimi re Infringement)(Nydegger, Chad) (Entered: 04/04/2022) |
| 04/04/2022 | 56 | MOTION for Leave to File Document Under Seal by Plaintiff Dura Systems Barriers, Inc.. Responses due by 4/18/2022 (Attachments: # 1 Text of Proposed Order)(Nydegger, Chad) (Entered: 04/04/2022) |
| 04/04/2022 | 57 | **+++ SEALED DOCUMENT.. (Attachments: # 1 Exhibit 5 - SEALED)(Nydegger, Chad) (Entered: 04/04/2022)** |
| 04/13/2022 | 58 | Joint MOTION to Amend Schedule by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 4/27/2022 (Attachments: # 1 Text of Proposed Order)(Michalakes, Jacob) (Entered: 04/13/2022) |
| 04/14/2022 |  | TEXT ORDER granting 58 Joint Motion to amend schedule. Discovery due by 5/12/2022. Dispositive Motions due by 6/9/2022. Proposed Pretrial Order due by 9/27/2022. Final Pretrial Conference reset for 10/4/2022 at 10:00 AM and Jury Trial reset for 11/14/2022 at 9:00 AM. Both hearings to be held in U.S. Courthouse,131 E 4th Street, Davenport, IA 52801 before Chief Judge Sara Darrow. This is the final extension granted and no further extensions of time will be granted absent a showing of extraordinary circumstances. Entered by Magistrate Judge Jonathan E. Hawley on 4/14/22. (WG) (Entered: 04/14/2022) |
| 04/18/2022 | 59 | RESPONSE to Motion re 54 MOTION for Leave to Serve the Corrected Expert Report of Tony Crimi *(Defendants' Opposition to Plaintiff's Motion for Leave)* filed by Defendants Jeremias, Inc., Van-Packer Co.. (Attachments: # 1 Exhibit 1)(Shimota, James) (Entered: 04/18/2022) |
| 04/19/2022 |  | TEXT ORDER Setting Motion Hearing as to 54 MOTION for Leave to Serve the Corrected Expert Report of Tony Crimi. Motion Hearing set for 5/9/2022 at 2:00 PM in person in Courtroom C in Peoria before Magistrate Judge Jonathan E. Hawley. Entered by Magistrate Judge Jonathan E. Hawley on 4/19/22. (WG) (Entered: 04/19/2022) |
| 05/06/2022 | 60 | NOTICE of Appearance of Attorney by Nelson Moon Hua on behalf of Jeremias, Inc., Van-Packer Co. (Hua, Nelson) (Entered: 05/06/2022) |
| 05/09/2022 |  | Minute Entry for proceedings held before Magistrate Judge Jonathan E. Hawley: Parties present in person in open court by Atty Chad Nydegger for the Plaintiff and Attys Jacob Michalakes and Nelson Hua for the Defendants for Motion Hearing held on 5/9/22. Discussion held regarding 54 Motion for Leave to Serve the Corrected Expert Report of Tony Crimi. The Court GRANTS motion 54 as stated on the record. 56 Motion for Leave to File Document Under Seal is also GRANTED. (Tape #PRC: 1:48 p.m.) (FDS) (Entered: 05/09/2022) |

**Appx104**

| 05/09/2022 | 61 | 🔊 PDF with attached Audio File. Court Date & Time [ 5/9/2022 1:48:38 PM ]. File Size [ 9120 KB ]. Run Time [ 00:19:00 ]. (admin). (Entered: 05/09/2022) |
|---|---|---|
| 06/09/2022 | 62 | STRICKEN pursuant to Order entered on 3/31/2023. MOTION for Leave to File Excess Pages *(Unopposed Motion for Leave to File Additional Pages of Argument in Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment)* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 6/23/2022 (Attachments: # 1 Text of Proposed Order)(Shimota, James) Modified on 4/3/2023 to Strike (RES). (Entered: 06/09/2022) |
| 06/09/2022 | 63 | MOTION for Summary Judgment *of Patent Infringement* by Plaintiff Dura Systems Barriers, Inc.. Responses due by 6/30/2022 (Nydegger, Chad) (Entered: 06/09/2022) |
| 06/09/2022 | 64 | MOTION for Summary Judgment *of No Invalidity* by Plaintiff Dura Systems Barriers, Inc.. Responses due by 6/30/2022 (Nydegger, Chad) (Entered: 06/09/2022) |
| 06/09/2022 | 65 | MOTION for Summary Judgment *Dismissing Defendants' Inequitable Conduct Affirmative Defense* by Plaintiff Dura Systems Barriers, Inc.. Responses due by 6/30/2022 (Nydegger, Chad) (Entered: 06/09/2022) |
| 06/09/2022 | 66 | Appendix re 65 MOTION for Summary Judgment *Dismissing Defendants' Inequitable Conduct Affirmative Defense*, 64 MOTION for Summary Judgment *of No Invalidity*, 63 MOTION for Summary Judgment *of Patent Infringement Exhibits A - O* by Dura Systems Barriers, Inc.. (Attachments: # 1 Exhibit A Corrected Expert Report of Tony Crimi re Infringement, # 2 Exhibit B Morse Depo Tr., # 3 Exhibit C Redacted Expert Report of Timothy Morse re Non-Infringement, # 4 Exhibit D US20190293301A1, # 5 Exhibit E Opening Expert Report of Timothy L. Morse Ph.D. re Invalidity, # 6 Exhibit F-1 Morse Exhibit 8, # 7 Exhibit F-2 Morse Exhibit 9, # 8 Exhibit F-3 Morse Exhibit 10, # 9 Exhibit F-4 Morse Exhibit 11, # 10 Exhibit G Morse Exhibit 103, # 11 Exhibit H SMACNA Excerpts, # 12 Exhibit I Rebuttal Expert Report of Tony Crimi re Validity, # 13 Exhibit J Exhibit 11 to Rebuttal Expert Report of Tony Crimi re Validity, # 14 Exhibit K US10024569, # 15 Exhibit L US2916054, # 16 Exhibit M Defendants_ Second Corrected Final Unenforceability and Invalidity Contentions, # 17 Exhibit N Duffy Depo Tr., # 18 Exhibit O Wells Depo Tr.)(Nydegger, Chad) (Entered: 06/09/2022) |
| 06/09/2022 | 67 | MOTION for Summary Judgment *of Non-Infringement and Invalidity* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 6/30/2022 (Attachments: # 1 Declaration of James Shimota, # 2 Exhibit A (Public), # 3 Exhibit B - Crimi Deposition Transcript (5/11/2022), # 4 Exhibit C - U.S. Patent No. 10,024,569, # 5 Exhibit D - Plaintiffs Amended Final Infringement Contentions, # 6 Exhibit E - Crimi Deposition Transcript (02/24/2021), # 7 Exhibit F - Printout, # 8 Exhibit G (Public), # 9 Exhibit H (Public), # 10 Exhibit I (Public), # 11 Exhibit J - Claim Construction Order, # 12 Exhibit K - Crimi Corrected Expert Report, # 13 Exhibit L - Crimi Rebuttal Expert Report, # 14 Exhibit M - Morse Opening Expert Report, # 15 Exhibit N - Printout, # 16 Text of Proposed Order) (Shimota, James) (Entered: 06/10/2022) |
| 06/10/2022 | 68 | MOTION for Leave to File Document Under Seal *(Exhibits A, G, H, and I to Defendants' Motion for Summary Judgment)* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 6/24/2022 (Attachments: # 1 Text of Proposed Order)(Shimota, James) (Entered: 06/10/2022) |
| 06/10/2022 | 69 | **+++ SEALED DOCUMENT.. (Attachments: # 1 Unredacted Exhibit A to Defendants' Motion for Summary Judgment - Morse Rebuttal Expert Report, # 2 Unredacted Exhibit G to Defendants' Motion for Summary Judgment - Clemons Rebuttal Expert Report, # 3 Unredacted Exhibit H to Defendants' Motion for Summary Judgment - Curtis Expert Report, # 4 Unredacted Exhibit I to Defendants' Motion for Summary** |

| | | |
|---|---|---|
| | | **Judgment - Curtis Deposition Transcript (04/25/2022))(Shimota, James) (Entered: 06/10/2022)** |
| 06/23/2022 | 70 | CERTIFICATE *Defendants' Certificate of Compliance with Type Volume Limitation of Local Rule 7.1 (Dkt. 67)*. (Allor, Katherine) (Entered: 06/23/2022) |
| 06/23/2022 | 71 | MOTION to Withdraw 62 MOTION for Leave to File Excess Pages *(Unopposed Motion for Leave to File Additional Pages of Argument in Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment)* by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 7/7/2022 (Attachments: # 1 Text of Proposed Order) (Allor, Katherine) (Entered: 06/23/2022) |
| 06/23/2022 | 72 | Joint MOTION to Amend Schedule by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 7/7/2022 (Attachments: # 1 Text of Proposed Order)(Allor, Katherine) (Entered: 06/23/2022) |
| 06/29/2022 | | TEXT ORDER entered by Chief Judge Sara Darrow on June 29, 2022. The 72 motion to amend is GRANTED. The response deadline is now July 14, 2022. The Final Pretrial Conference set for October 4, 2022 and Jury Trial set for November 14, 2022 are VACATED to be reset if necessary after resolution of the summary judgment motions. (MLM) (Entered: 06/29/2022) |
| 07/14/2022 | 73 | MEMORANDUM in Opposition re 67 MOTION for Summary Judgment *of Non-Infringement and Invalidity* filed by Plaintiff Dura Systems Barriers, Inc.. (Nydegger, Chad) (Entered: 07/14/2022) |
| 07/14/2022 | 74 | Appendix re 73 Memorandum in Opposition to Motion/Petition by Dura Systems Barriers, Inc.. (Attachments: # 1 Exhibit P, # 2 Exhibit Q, # 3 Exhibit R, # 4 Exhibit S, # 5 Exhibit T)(Nydegger, Chad) (Entered: 07/14/2022) |
| 07/14/2022 | 75 | MOTION for Leave to File Document Under Seal by Plaintiff Dura Systems Barriers, Inc.. Responses due by 7/28/2022 (Attachments: # 1 Text of Proposed Order)(Nydegger, Chad) (Entered: 07/14/2022) |
| 07/14/2022 | 76 | +++ SEALED DOCUMENT.. (Attachments: # 1 Exhibit Q, # 2 Exhibit S)(Nydegger, Chad) (Entered: 07/14/2022) |
| 07/14/2022 | 77 | MEMORANDUM in Opposition re 63 MOTION for Summary Judgment *of Patent Infringement* filed by Defendants Jeremias, Inc., Van-Packer Co.. (Shimota, James) (Entered: 07/14/2022) |
| 07/14/2022 | 78 | MEMORANDUM in Opposition re 64 MOTION for Summary Judgment *of No Invalidity* filed by Defendants Jeremias, Inc., Van-Packer Co.. (Shimota, James) (Entered: 07/14/2022) |
| 07/14/2022 | 79 | MEMORANDUM in Opposition re 65 MOTION for Summary Judgment *Dismissing Defendants' Inequitable Conduct Affirmative Defense* filed by Defendants Jeremias, Inc., Van-Packer Co.. (Shimota, James) (Entered: 07/14/2022) |
| 07/14/2022 | 80 | Appendix re 78 Memorandum in Opposition to Motion/Petition, 79 Memorandum in Opposition to Motion/Petition, 77 Memorandum in Opposition to Motion/Petition by Jeremias, Inc., Van-Packer Co.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 8-1, # 10 Exhibit 8-2, # 11 Exhibit 8-3, # 12 Exhibit 8-4, # 13 Exhibit 8-5, # 14 Exhibit 9, # 15 Exhibit 10, # 16 Exhibit 11, # 17 Exhibit 12, # 18 Exhibit 13, # 19 Exhibit 14)(Shimota, James) (Entered: 07/14/2022) |
| 07/28/2022 | 81 | REPLY to Response to Motion re 67 MOTION for Summary Judgment *of Non-Infringement and Invalidity (Defendants' Reply in Support of Motion for Summary* |

| | | |
|---|---|---|
| | | *Judgment of Non-Infringement, Invalidity, and No Lost Profits or Convoyed Sales)* filed by Defendants Jeremias, Inc., Van-Packer Co.. (Attachments: # 1 Index of Exhibits, # 2 Exhibit O, # 3 Exhibit P, # 4 Exhibit Q, # 5 Exhibit R, # 6 Exhibit S, # 7 Exhibit T) (Shimota, James) (Entered: 07/28/2022) |
| 07/28/2022 | 82 | REPLY to Response to Motion re 63 MOTION for Summary Judgment *of Patent Infringement* filed by Plaintiff Dura Systems Barriers, Inc.. (Nydegger, Chad) (Entered: 07/28/2022) |
| 07/28/2022 | 83 | REPLY to Response to Motion re 64 MOTION for Summary Judgment *of No Invalidity* filed by Plaintiff Dura Systems Barriers, Inc.. (Nydegger, Chad) (Entered: 07/28/2022) |
| 07/28/2022 | 84 | REPLY to Response to Motion re 65 MOTION for Summary Judgment *Dismissing Defendants' Inequitable Conduct Affirmative Defense* filed by Plaintiff Dura Systems Barriers, Inc.. (Nydegger, Chad) (Entered: 07/28/2022) |
| 03/31/2023 | 85 | ORDER entered by Chief Judge Sara Darrow on March 31, 2023. Plaintiff DuraSystems Barriers Inc.'s 63 Motion for Summary Judgment of Patent Infringement is GRANTED; 64 Motion for Summary Judgment of No Invalidity is DENIED; and 65 Motion for Summary Judgment Dismissing Defendants' Inequitable Conduct Affirmative Defense is GRANTED. Defendants Van-Packer Co. ("Van-Packer") & Jeremias, Inc.'s 67 Motion for Summary Judgment of Noninfringement and Invalidity is DENIED as to non-infringement, DENIED as to indefiniteness, DENIED as to written description, DENIED as to enablement, DENIED as to lost profits, and GRANTED as to convoyed sales. Defendants' 68 motion to seal, and Plaintiff's 75 motion to seal are DENIED. Defendants' 71 motion to withdraw is GRANTED. The Clerk is DIRECTED to strike 62 and to unseal the exhibits on the docket at ECF No. 69-1, ECF No. 69-2, ECF No. 69-3, ECF No. 69-4, ECF No. 76-1, and ECF No. 76-2. The parties are encouraged to explore settlement and should file a status report advising the Court as to how this case will proceed within 60 days of service of this Order. (MLM) (Entered: 03/31/2023) |
| 05/01/2023 | 86 | NOTICE OF APPEAL as to 85 Order on Motion for Leave to File Excess Pages, Order on Motion for Summary Judgment, Order on Motion for Leave to File Document Under Seal, and Order on Motion to Withdraw by Jeremias, Inc., Van-Packer Co.. Filing fee $ 505, receipt number AILCDC-4196490. (Allor, Katherine) Modified on 5/2/2023 to modify docket entry text (AH). (Entered: 05/01/2023) |
| 05/01/2023 | 87 | Short Record of Appeal Sent to US Court of Appeals regarding 86 Notice of Appeal (RES) (Entered: 05/01/2023) |
| 05/15/2023 | 88 | NOTICE of Docketing Record on Appeal from Federal Circuit Court of Appeals regarding 86 Notice of Appeal, filed by Jeremias, Inc., Van-Packer Co. Federal Circuit Court Case Number 23-1888. (RES) (Entered: 05/15/2023) |
| 05/25/2023 | 89 | STIPULATION AND MOTION *(Joint Stipulation to Bifurcate the Accounting, Dismissal of Affirmative Defenses, and Entry of Final Judgment of Infringement)* by Jeremias, Inc., Van-Packer Co... (Shimota, James) Modified on 6/1/2023 to indicate the filing is a Motion (JJK). (Entered: 05/25/2023) |
| 06/06/2023 | 90 | MANDATE of Federal Circuit Court of Appeals as to 86 Notice of Appeal, filed by Jeremias, Inc., Van-Packer Co. It is ordered that: (1) The proceeding is DISMISSED under Fed. R. App.P.42 (b). (2)Each side shall bear their own costs. (RES) (Entered: 06/06/2023) |
| 09/14/2023 | 91 | Joint MOTION for Hearing re 89 by Plaintiff Dura Systems Barriers, Inc.. Responses due by 9/28/2023 (Nydegger, Chad) (Entered: 09/14/2023) |
| 10/23/2023 | | TEXT ORDER entered by Chief Judge Sara Darrow on October 23, 2023. The Parties' 91 Joint Motion for Status Conference is DENIED and the Parties' 89 Joint Stipulation to |

| | | |
|---|---|---|
| | | Bifurcate the Accounting, Dismissal of Affirmative Defenses, and Entry of Final Judgment of Infringement ("Joint Stipulation") is DISMISSED without prejudice. On March 31, 2023, the Court entered an order on the Parties' various summary judgment motions. 85 Mar. 31, 2023 Order. After withdrawing an appeal to the Federal Circuit, the Parties filed the 89 Joint Stipulation on May 25, 2023. Defendant Van-Packer Inc. and Defendant Jeremias, Inc. agreed to waive affirmative defenses to Plaintiff DuraSystems Barriers Inc.'s claim of patent infringement. The Parties also requested the Court grant "any and all leave necessary for Defendants to immediately appeal the final judgment of liability in this proceeding, and to preserve its defenses to liability in further proceedings to the extent that Defendants are successful in such appeal." Joint Stip. para. 3. The Parties stated that such waiver and requested relief, along with bifurcating the issues of damages and willfulness and entering final judgment as to infringement, would give the Federal Circuit jurisdiction to hear an appeal in the instant matter. See 28 U.S.C. § 1292(c)(2) ("The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting."); Robert Bosch, LLC v. Pylon Mfg. Corp., 719 F.3d 1305, 1319 (Fed. Cir. 2013) (en banc). On September 14, 2023, the Parties 91 requested a status conference concerning their 89 Joint Stipulation. The Court does not have sufficient information before it to determine whether § 1292(c)(2) applies in this case and is concerned about the prospect of "piecemeal appeals." Robert Bosch, 719 F.3d at 1323. (Moore, J., concurring in part and dissenting in part). The Parties are DIRECTED to file a joint brief by November 6, 2023, addressing: (1) which causes of action and requests for relief included in the 17 First Amended Complaint remain pending in this matter following the Court's March 31, 2023 Order (e.g., inducement); (2) specifically which affirmative defenses Defendants are waiving; (3) what relief is necessary to preserve Defendants' defenses to liability in further proceedings; and (4) legal authority supporting the applicability of § 1292(c)(2) considering any remaining claims and remedies and Defendants' preservation of their defenses. (KJC) (Entered: 10/23/2023) |
| 10/24/2023 | | Set/Reset Deadlines: Other Deadline set for 11/6/2023 for Joint Brief. See Text Order entered on 10/23/2023. (RES) (Entered: 10/24/2023) |
| 11/06/2023 | 92 | Joint MOTION for Dismissal and Entry of Judgment Pursuant to 28 U.S.C. § 1292(c)(2) by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 11/20/2023 (Shimota, James) (Entered: 11/06/2023) |
| 11/29/2023 | | TEXT ORDER entered by Chief Judge Sara Darrow on November 29, 2023. Pursuant to the Court's October 23, 2023 Text Order, the parties filed an updated 92 Joint Motion for Dismissal and Entry of Judgment Pursuant to 28 U.S.C. § 1292(c)(2) ("Joint Motion"). The Court remains concerned about the applicability of 28 U.S.C. § 1292(c)(2) in this case. First, Plaintiff's request for an injunction remains unresolved, even if Defendants would not oppose equitable remedies upon remand. The Federal Circuit has suggested an unresolved request for an injunction precludes jurisdiction under § 1292(c)(2). See Randall May Int'l, Inc. v. DEG Music Prod., Inc., 378 F. App'x 989, 993 (Fed. Cir. 2010). Second, the status of Plaintiff's indirect infringement causes of action is also unresolved. See Inguran, LLC v. ABS Glob., Inc., 72 F.4th 1272, 127980 (Fed. Cir. 2023) (finding that "an induced infringement claim rests on evidence and elements beyond those required by direct infringement," and was therefore a distinct cause of action for res judicata purposes). Therefore, the 92 Joint Motion is DENIED without prejudice. (KJC) (Entered: 11/29/2023) |
| 01/08/2024 | | TEXT ORDER entered by Chief Judge Sara Darrow on January 8, 2024. No action has been taken in this case since the Court denied without prejudice the parties' 92 Joint Motion for Dismissal and Entry of Judgment Pursuant to 28 U.S.C. § 1292(c)(2). See Nov. |

| | | |
|---|---|---|
| | | 29, 2023 Text Order. This case is referred to Magistrate Judge Hawley for a status conference at a date and time to be set by a future order. (KJC) (Entered: 01/08/2024) |
| 01/09/2024 | | TEXT ORDER : Pursuant to the referral of this case to Judge Hawley, a telephone Status Conference is set for 1/18/2024 at 3:00 PM via telephone before Magistrate Judge Jonathan E. Hawley. Counsel are to phone into conference by calling (551) 285-1373 and enter the Meeting ID: 16009516536 when prompted to do so. Entered by Magistrate Judge Jonathan E. Hawley on 1/9/24. (WG) (Entered: 01/09/2024) |
| 01/17/2024 | 93 | Joint MOTION for Dismissal and Entry of Judgment Pursuant to 28 U.S.C. § 1292(c)(2) by Defendants Jeremias, Inc., Van-Packer Co.. Responses due by 1/31/2024 (Shimota, James) (Entered: 01/17/2024) |
| 01/18/2024 | | TEXT ORDER entered by Chief Judge Sara Darrow on January 18, 2024. The parties filed a 93 Joint Motion for Dismissal and Entry of Judgment Pursuant to 28 U.S.C. § 1292(c)(2) ("Joint Motion"). The Court had concerns about the applicability of 28 U.S.C. § 1292(c)(2) to this case. See Oct. 23, 2023 Text Order; Nov. 29, 2023 Text Order. The 93 Joint Motion addresses those concerns. The parties stipulated to Defendants' waiver of their remaining affirmative defenses: patent invalidity and failure to mark. Joint Mot. 2. The parties also agreed on a permanent injunction, to be entered by the Court with enforcement stayed pending appeal. Id. Plaintiff agreed to withdraw its claims of indirect infringement of U.S. Patent No. 10,024,569 and requests that the Court "enter an order dismissing these claims." Id. Courts within the Seventh Circuit may only use Federal Rule of Civil Procedure 41 to dismiss an entire action, not individual causes of action. See Taylor v. Brown, 787 F.3d 851, 857-58 (7th Cir. 2015). The Court therefore construes this request as seeking to amend the complaint under Federal Rule of Civil Procedure 15(a)(2). See Sennco Sols. Inc. v. Mobile Techs. Inc., No. 16 C 9668, 2018 WL 11318742, at *1 (N.D. Ill. Feb. 5, 2018) (construing a request to dismiss patent claims as a request to amend the complaint under Fed. R. Civ. P. 15(a)(2)). The Court grants this request, and the claims of indirect infringement in the First Amended Complaint are now removed. See 17 First Am. Compl. paras. 46-47. The parties' agreements sufficiently resolve any outstanding issues such that the Court's summary judgment order is "final except for an accounting." See 85 Mar. 31, 2023 Order (summary judgment order); 28 U.S.C. § 1292(c)(2) (giving the Federal Circuit exclusive jurisdiction over patent-related judgments which are "final except for an accounting"); Robert Bosch, LLC v. Pylon Mfg. Corp., 719 F.3d 1305, 1309, 1319 (Fed. Cir. 2013) (en banc) (holding that an accounting includes issues of damages and willfulness). The Court GRANTS the 93 Joint Motion. Discovery and motion practice related to issues of damages and willfulness is STAYED pending the resolution of Defendants' forthcoming appeal. The Court will enter the parties' proposed injunction in a forthcoming order, and that injunction is STAYED pending the resolution of Defendants' forthcoming appeal. The Clerk is DIRECTED to enter judgment. (KJC) (Entered: 01/18/2024) |
| 01/18/2024 | 94 | INJUNCTION entered by Chief Judge Sara Darrow on January 18, 2024, pursuant to the January 18, 2024 Text Order. (KJC) (Entered: 01/18/2024) |
| 01/18/2024 | | TEXT ORDER: Pursuant to Chief Judge Darrow's Text Order of 1/18/24 and the 94 Injunction, the Status conference set 1/18/24 at 3:00 PM via telephone is VACATED. Entered by Magistrate Judge Jonathan E. Hawley on 1/18/24. (WG) (Entered: 01/18/2024) |
| 01/19/2024 | 95 | JUDGMENT entered. (ED) (Entered: 01/19/2024) |
| 02/15/2024 | 96 | NOTICE OF APPEAL by Jeremias, Inc., Van-Packer Co.. Filing fee $ 605, receipt number AILCDC-4407617. (Shimota, James) (Entered: 02/15/2024) |
| 02/15/2024 | 97 | Short Record of Appeal Sent to Federal Circuit Court of Appeals re 96 Notice of Appeal. (ED) (Entered: 02/15/2024) |

| 02/20/2024 | | TEXT ORDER entered by Chief Judge Sara Darrow on February 20, 2024. Defendants have filed an appeal to the Federal Circuit. See 96 Not. Appeal. This case is STAYED pending the issuance of the Federal Circuit's mandate in that appeal. See Jan. 18, 2024 Text Order. (KJC) (Entered: 02/20/2024) |
| 03/05/2024 | 98 | NOTICE of Docketing Record on Appeal from USCA re 96 Notice of Appeal filed by Jeremias, Inc., Van-Packer Co. USCA Case Number 2024-1537. (DW) (Entered: 03/06/2024) |

**Appx110**

US010024569B2

(12) **United States Patent**

Duffy

(10) **Patent No.:** **US 10,024,569 B2**

(45) **Date of Patent:** **Jul. 17, 2018**

(54) **FIRE-RATED MODULAR DUCT ASSEMBLY AND IMPROVEMENTS THEREIN**

(71) Applicant: **William Christopher Duffy**, Thornhill (CA)

(72) Inventor: **William Christopher Duffy**, Thornhill (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 368 days.

(21) Appl. No.: **14/051,016**

(22) Filed: **Oct. 10, 2013**

(65) **Prior Publication Data**

US 2015/0101697 A1    Apr. 16, 2015

(51) **Int. Cl.**

| *F16L 9/14* | (2006.01) |
| *F16L 9/18* | (2006.01) |
| *F24F 13/02* | (2006.01) |
| *F16L 23/14* | (2006.01) |
| *F16L 57/04* | (2006.01) |
| *F16L 9/00* | (2006.01) |

(52) **U.S. Cl.**

CPC .......... *F24F 13/0209* (2013.01); *F16L 9/003* (2013.01); *F16L 23/14* (2013.01); *F16L 57/04* (2013.01); *F24F 13/0263* (2013.01); *F24F 13/0281* (2013.01); *F24F 2221/30* (2013.01)

(58) **Field of Classification Search**

CPC ..... F24F 13/0209; F24F 13/0263; F16L 23/16
USPC ................ 138/149, 106–108, 111, 112, 148
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 624,715 | A | 5/1899 | Wenz |
| 1,986,965 | A | 1/1935 | Harrison |
| 1,992,574 | A | 2/1935 | Jenkins |
| 2,183,174 | A | 12/1939 | Wiley |
| 2,226,523 | A | 12/1940 | Peck |
| 2,916,054 | A | * 12/1959 | Callan .................... F16L 9/003 |
| | | | 138/141 |
| 3,003,794 | A | 10/1961 | Burley |
| 3,123,880 | A | 3/1964 | Barry et al. |
| 3,198,561 | A | 8/1965 | Witt |
| 3,351,699 | A | 11/1967 | Merckle |
| 3,630,549 | A | 12/1971 | Grimm |
| 3,800,846 | A | 4/1974 | Kurz |
| 3,811,714 | A | 5/1974 | Pintard |
| 3,923,326 | A | 12/1975 | Mez |
| 4,133,566 | A | 1/1979 | Miller |
| 4,380,188 | A | 4/1983 | Nichols |
| 4,509,778 | A | 4/1985 | Arnoldt |
| 4,537,430 | A | 8/1985 | Sullivan |
| 4,557,297 | A | 12/1985 | Montana |
| 4,572,553 | A | 2/1986 | Geldner |
| 4,662,661 | A | 5/1987 | Arnoldt |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2357078 | 12/2002 |
| CA | 2450977 | 5/2005 |

(Continued)

*Primary Examiner* — Vishal Pancholi

(74) *Attorney, Agent, or Firm* — Cognitive IP Law

(57) **ABSTRACT**

A fire-rated exhaust duct system comprising a modular configuration or structure. The fire-rated exhaust duct system comprises a plurality of exhaust duct sections. Each of the exhaust duct sections is configured to be joined or connected with other exhaust duct sections in the field or at an installation site, e.g. in building housing a kitchen facility or a laboratory facility to form longer sections or runs for exhaust duct system.

**20 Claims, 9 Drawing Sheets**



**US 10,024,569 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,725,083 | A | 2/1988 | Schauer |
| 4,765,375 | A | 8/1988 | Nakajima |
| 4,804,207 | A | 2/1989 | Berchem et al. |
| 4,836,585 | A | 6/1989 | Schauer |
| 4,859,320 | A | 8/1989 | Beall, Jr. |
| 4,913,127 | A | 4/1990 | Dugger |
| 4,940,264 | A | 7/1990 | Mez |
| 4,951,716 | A | 8/1990 | Tsunoda |
| 5,024,251 | A | 6/1991 | Chapman |
| 5,067,278 | A | 11/1991 | Lyons |
| 5,069,484 | A | 12/1991 | McElroy |
| 5,103,549 | A | 4/1992 | Meinig et al. |
| 5,129,690 | A | 7/1992 | Meinig et al. |
| 5,133,580 | A | 7/1992 | Meinig |
| 5,135,270 | A | 8/1992 | Arnoldt et al. |
| 5,165,189 | A | 11/1992 | Besal |
| 5,171,184 | A | 12/1992 | Saucier et al. |
| 5,219,403 | A | 6/1993 | Murphy |
| 5,356,048 | A | 10/1994 | Geiser |
| 5,378,028 | A | 1/1995 | Issagholian-Havai et al. |
| 5,450,879 | A | 9/1995 | Toben |
| 5,538,377 | A | 7/1996 | Stewart et al. |
| 5,564,758 | A | 10/1996 | Tiberio |
| 5,575,131 | A | 11/1996 | Menchetti |
| 5,653,482 | A | 8/1997 | Ficchi, Jr. |
| 5,673,947 | A | 10/1997 | DeWaal |
| 5,753,855 | A | 5/1998 | Nicoli |
| 5,775,414 | A | 7/1998 | Graham |
| 5,865,478 | A | 2/1999 | Lin |
| 5,898,132 | A | 4/1999 | Lee |
| 5,901,502 | A | 5/1999 | Rafalski et al. |
| 5,944,060 | A * | 8/1999 | MacKay ................. F16L 23/14 |
| | | | 138/137 |
| 6,109,665 | A | 8/2000 | Meinig |

| | | | |
|---|---|---|---|
| 6,143,984 | A | 11/2000 | Auteri |
| 6,148,867 | A | 11/2000 | Matthews et al. |
| 6,156,977 | A | 12/2000 | Benito-Navazo |
| 6,188,024 | B1 | 2/2001 | Benito-Navazo |
| 6,213,522 | B1 | 4/2001 | Jacobson et al. |
| 6,231,704 | B1 | 5/2001 | Carpinetti |
| 6,412,519 | B1 | 7/2002 | Goodhue |
| 6,460,573 | B1 | 10/2002 | Fischer et al. |
| 6,471,256 | B1 | 10/2002 | Fischer |
| 6,502,716 | B1 | 1/2003 | Kolesar |
| 6,505,864 | B1 | 1/2003 | Shuey |
| 6,547,287 | B1 | 4/2003 | Shah et al. |
| 6,550,823 | B1 | 4/2003 | Siegwart |
| 6,561,553 | B1 | 5/2003 | Issagholian-Havai |
| 6,758,502 | B2 | 7/2004 | Mattsson et al. |
| 6,848,720 | B2 | 2/2005 | Carns et al. |
| 7,195,290 | B2 | 3/2007 | Duffy |
| 7,501,576 | B2 | 3/2009 | Gagliardi |
| 7,699,070 | B1 * | 4/2010 | Husmann, Jr. .......... F16L 59/04 |
| | | | 138/114 |
| 8,178,781 | B2 | 5/2012 | Duffy |
| 8,276,319 | B2 | 10/2012 | Duffy |
| 2002/0121778 | A1 | 9/2002 | Tigerfeldt |
| 2003/0006611 | A1 | 1/2003 | Shuey |
| 2003/0160452 | A1 | 8/2003 | Mattsson et al. |
| 2005/0116470 | A1 | 6/2005 | Duffy |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2691316 | 7/2010 |
| CA | 2800362 | 7/2013 |
| FR | 2719347 | 4/1994 |
| GB | 2045321 | 3/1979 |
| GB | 2284989 | 6/1995 |
| JP | 8-178404 | 7/1996 |

* cited by examiner



FIG. 1



FIG. 2



**FIG. 3**



FIG. 4



SECTION AT FLANGE

FIG. 5a



SECTION A-A

FIG. 5b

SECTION B-B

FIG. 5c



FIG. 6



FIG. 7



FIG. 8



FIG. 9

US 10,024,569 B2

**1**

# FIRE-RATED MODULAR DUCT ASSEMBLY AND IMPROVEMENTS THEREIN

### BACKGROUND OF THE INVENTION

The present application relates to a duct assembly, and more particularly, to a fire-rated modular duct assembly, and improvements therein, suitable for exhausting flammable or hazardous gases, vapour and the like.

### BACKGROUND OF THE INVENTION

Many processes in commercial and industrial facilities generate flammable or hazardous gases, vapors or particles. The hazardous material must be captured at the source and transported or moved through the facility (e.g. building) to a location where the material can be discharged, e.g. directly into the atmosphere, or into a collection or a treatment system within the building or exterior to the building.

In a typical facility, ventilation ducts are routed throughout the building. The ventilation ducts penetrate and cross fire separations, and typically comprise interior dampers installed within the fire separation section to prevent fire that penetrates the duct from travelling through the duct across the fire separators in the building. It will be appreciated that while such an implementation may be sufficient for the fire protection of ventilation ducts, ventilation or exhaust ducts for flammable or hazardous materials cannot be configured with fire dampers, so the duct itself must be fire-rated.

To be classified as a fire-rated duct, an exhaust duct must be capable of preventing the release of flammable materials from inside the duct and/or combustible materials adjacent the exterior of the exhaust duct from catching fire if a fire exists on the other side of the duct. In other words, a fire-rated duct must be capable of minimizing the transfer of heat through or across the duct walls. It is also desirable to maintain the wall thickness to a workable minimum.

Fire-rated ducts are typically found in installations such as commercial kitchens and laboratories.

In a commercial kitchen, the exhaust hoods are configured to capture grease laden air over deep fryers and grills, which is extremely flammable, and must be transported through the building to an exterior area where it can be safely discharged. Due to the flammable nature of the exhausted vapour, a minor fire, for example, in the kitchen could enter the exhaust duct and quickly spread throughout the duct system. As a result, any potential fire inside the duct system must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building. In addition, the exhaust duct system must be capable of preventing the ignition of the grease laden air from a fire source in another part of the building and then spreading to the kitchen or other parts of the building where the exhaust duct system is routed.

In a laboratory installation, the exhaust system is configured to collect and exhaust chemical vapours, including vapours from chemicals with low flash points, and contain any fire inside the duct system, or prevent an external fire from igniting the vapour inside the duct system.

Known fire-rated exhaust duct systems are typically fabricated in sections, and the sections are shipped to the installation location. At the installation location, the sections are welded together to form continuous conduits or conduit sections. Due to field conditions, the welding could be of poor work quality, for instance, due to limited space and/or setup. This meant expensive rework and re-welding to seal

**2**

leaks in the duct system during pressure testing. Conventional fire-rated duct systems typically require the installation of an additional gypsum fire-rated enclosure (approximately 10" thick) around the duct. In addition to requiring an additional step, the gypsum enclosure is typically constructed/installed by another trade.

In an attempt to overcome the known shortcomings in the art, chimney manufacturers introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems. While these pre-fabricated fire-rated exhaust ducts addressed shortcomings of existing systems, the characteristic round profile significantly limits the volume of air that can be vertically carried in conventional building footprints, and in a horizontal configuration, the round profile or cross section is often too large to fit into conventional ceiling space spaces or dimensions.

Accordingly, there remains a need for improvements in the art.

### BRIEF SUMMARY OF THE INVENTION

The present invention comprises embodiments of a modular fire-rated duct system and improvements therein and suitable for pre-fabrication and configured for assembly in the field.

According to an embodiment, the present invention comprises a modular fire-rated exhaust duct assembly comprising: two or more exhaust duct modules; each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void; a first exterior flange connector, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector; a second exterior flange connector, and another end of each of said exhaust duct modules being configured for receiving said second exterior flange connector; said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction.

According to another embodiment, the present invention comprises an exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising: an inner duct liner formed with a generally rectangular cross-section; an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said material occupies said void; a first exterior flange connector, and one end of said exhaust duct module being configured for receiving said first exterior flange connector; a second exterior flange connector, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

3

According to a further embodiment, the present invention comprises an exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising: an inner duct liner formed with a generally rectangular cross-section; an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving a compressible insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void; a first exterior flange connector, and one end of said exhaust duct module being configured for receiving said first exterior flange connector; a second exterior flange connector, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

Other aspects and features according to the present application will become apparent to those ordinarily skilled in the art upon review of the following description of embodiments of the invention in conjunction with the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

Reference will now be made to the accompanying drawings which show, by way of example, embodiments according to the present application, and in which:

FIG. 1 is a perspective view of an exhaust duct system according to an embodiment of the present invention and comprising a rectangular configuration and two sections or modules;

FIG. 2 is a perspective view of an inner exhaust duct liner according to an embodiment of the present invention;

FIG. 3 is an exploded view of one of the sections of FIG. 1;

FIG. 4 is a longitudinal sectional view of the first section in FIG. 1 taken along line A-A;

FIGS. 5(a) to 5(c) show a thermal spacer configuration according to an embodiment of the present invention;

FIG. 6 is a perspective view of an inner exhaust liner comprising first and second modular sections and the configuration for joining the two sections according to an embodiment of the present invention;

FIG. 7 is a perspective of the inner exhaust liner of FIG. 6 showing a configuration for thermally encasing the mechanical joint between the first and second modular sections according to an embodiment of the present invention;

FIG. 8 is a longitudinal sectional view of the inner exhaust liner of FIG. 7 taken through line B-B; and

FIG. 9 is a partial and enlarged view of the joint encasement, i.e. the encased mechanical joint, for the inner exhaust liner of FIG. 7.

Like reference numerals indicate like or corresponding elements in the drawings.

DETAILED DESCRIPTION OF THE EMBODIMENTS

Reference is first made to FIG. 1, which shows a fire-rated modular exhaust duct system or assembly according to an embodiment of the invention. The fire-rated modular

4

exhaust duct is indicated generally by reference 100 and according to an embodiment comprises a plurality of exhaust duct sections or modules 110, indicated individually by references 110a and 110b, as shown in FIG. 1. The individual exhaust sections 110 are connected or coupled together with a mechanical joint indicated generally by reference 120 and described in more detail below. Embodiments of the modular fire-rated exhaust duct system or apparatus according to the present invention are suitable for installations or applications requiring fire-rated duct systems, such as exhaust duct systems for commercial applications, for instances, kitchens and restaurants, laboratories and other chemical or hazardous material processing facilities, as will be apparent to those skilled in the art.

Reference is next made to FIG. 2, which shows an inner exhaust duct liner assembly according to an embodiment of the present invention and indicated generally by reference 200. The inner exhaust duct liner assembly 200 comprises an inner duct liner 210, and external flanged connectors 212, indicated individually by references 212a and 212b.

As shown in FIGS. 2 and 4, the inner metallic duct 210 is formed with an outer return or flange at each end, indicated generally by reference 214. The flange 214 is configured to overlap a portion of the external flange connector 212. According to an exemplary implementation, the inner metallic duct 210 is fabricated from stainless, carbon or coated steels, and is formed into a tube with a square or rectangular profile or cross-section. According to requirements under the UL 2221 and ASTM E2336 standards, the minimum wall thickness for the inner metallic duct 210 is typically 18 gauge (ga) for stainless steel and 16 ga for carbon steels.

The inner metallic duct 210 can be fabricated or formed in a number of ways including: (1) forming a piece of metal into a tube; (2) forming two pieces of metal into "L" shaped sections and joining the two sections together to form a rectangle (or a square profile); (3) forming a single piece of metal into a "U" shaped section and joining a flat piece of metal to the open end of the "U" shaped section; or (4) using four separate pieces or panels of steel and joining them to form a rectangular (or square) profile tube. The longitudinal joint or joints are continuously welded to provide a liquid and air tight seal between the edges of the panels. Other connection techniques, such as Pittsburgh type mechanical locks or pocket locks which are sealed with stitch welding, can be utilized as will be understood by one skilled in the art. Such techniques can provide mechanical strength to pass the fire exposure tests.

The flange 214 (FIGS. 2 and 4) is formed at each transverse end of the inner metallic duct 210 and serves to define the duct section length. The flange 214 is formed at a right angle and provides a smooth flat surface for coupling adjacent duct sections and assisting in providing a liquid and air-tight surface, as described in more detail below.

According to an embodiment, the external flange connector 212 is formed or fabricated from the same type of metal as the inner metallic duct 210 in order to avoid the potential for galvanic action which can occur with the joining of dissimilar metals. According to an embodiment, the external flanged 212 comprises four individual sections that are formed into right angle sections (as shown for external flange connectors 212a and 212b in FIG. 2), for instance, from flat metal strips or cut from hot rolled right angle formed structural steel and which are cut into the required lengths for the top and bottom pieces and the side pieces. The corners of the four individual sections for each of the external flange connectors 212 are suitably mitered, or in the alternative square cut, to achieve closed corners in the

US 10,024,569 B2

5

external flange connector **212**, and thereby allow the external flange connectors **212** to provide a better seal (liquid or air tight) at the joints formed from joining the external flange connectors **212** together for respective exhaust duct sections **110***a* and **110***b* (FIG. **1**). The external flange connectors **212** are fabricated with a thickness sufficient to support the duct assembly and prevent the duct assembly from collapsing due to fire exposure, and for typical installations, will have a thickness in the range of 0.125" to 0.250", depending on the width or depth of the duct and/or the size of the flanged connection section. As shown in FIG. **2** and according to an exemplary implementation, each of the external flange connectors **212** includes six holes **600** (punched or drilled) at nominal 4" to 8" centers for receiving bolts **610** and corresponding nuts **620** for joining the duct sections **110** and **112** together, for example, as shown in FIGS. **6** and **8**.

According to another aspect, the external flange connector **212** is formed by joining, for instance, welding, the four individual sections together. The external flange connectors **212** are then joined to the respective ends of the inner metallic duct **210**, for instance, using a continuous weld or a stitch weld, at the outer flange or return **214** at a contact point or surface indicated generally by reference **510** in FIG. **5**(*a*), and at the interface between the external flange connector **212** and the inner metallic duct **210** at a contact point or surface indicated generally by reference **520** in FIG. **5**(*b*).

Reference is next made to FIG. **3**, which shows an exploded view of one of the exhaust duct modules or sections **110** according to an embodiment of the invention. The exhaust duct section **110** comprises the inner metallic duct **210**, the first **212***a* and the second **212***b* external flange connectors (as described above), and an outer casing indicated generally by reference **300**. According to another aspect, there is a void or space **402** between the outer casing **300** (i.e. the outer casing panels **310**) and the inner duct assembly **200** (i.e. the inner metallic duct **210**) that is filled with an insulating material indicated generally by reference **410** in FIG. **4**. According to another aspect, the exhaust duct module or section **110** includes a thermal spacer indicated generally by reference **420** in FIG. **4**, as will be described in more detail below. According to an embodiment, the outer casing **300** comprises separate metallic sheets (or fire resistant board panels as described below) or sections indicated individually by references **310***a*, **310***b*, **310***c* and **310***d*. According to another aspect, the outer casing **300** comprises inner connection angle members **320**, indicated individually by references **320***a*, **320***b*, **320***c* and **320***d* in FIG. **3**.

According to an embodiment of the present invention, the outer casing **300** may be formed as follows: (a) forming two pieces of metal into "L" sections and joining the L-formed sections together, for example, at the corners; (b) forming one piece of metal into "U" shaped section and joining a flat piece to the top corners of the "U" shaped section; (c) using four separate metallic and joining them together at the edges; or (d) using four separate panels or boards fabricated from a fire resistant material. The outer casing **300** further includes edge reinforcement members **312**, indicated individually by references **312***a*, **312***b*, **312***c* and **312***d*. The edge reinforcement members **312** may comprise "J" shaped metallic edge reinforces which are configured to be fitted over the traverse edges of the respective outer casing panels **310**. The edge reinforcement members **312** provide additional stiffness to the outer casing panel **310**, for instance, when the outer casing panels **310** comprise fire resistant boards. The edge reinforcement members **312** also provide a metallic attachment point, for instance, for field installation of the joint encapsulation member **120** (as shown in

6

FIGS. **1**, **8** and **9**). For outer casing panels **310** fabricated from a metallic material, the edge reinforcement members **312** may be formed directly in the traverse edge of the respective metallic sections or panels **310** of the outer casing **300**.

Referring again to FIG. **3**, for outer casing panels **310** formed from a metal or metallic material, the longitudinal edges may be connected using Pittsburgh or Button type mechanical locks or mechanisms as will be understood by those skilled in the art. According to another implementation, other connection mechanisms or techniques may be utilized, such as, pocket locks that are stitch welded or screwed to provide positive connection, or welding techniques, such as continuous welding of the panels, provide the resulting mechanical structure meets the required mechanical strength and/or fire exposure tests. For outer casing panels **310** formed from a fire resistant board, the outer casing **300** comprises outer flashing members **330**, indicated individually by references **330***a*, **330***b*, **330***c* and **330***d* in FIG. **3**. The outer flashing members **330** are configured to protect the edges of the fire resistant board panels **310** and according to an exemplary implementation, the outer flashing members **330** are fastened through the outer casing panel **310** and into the respective inner connection angle members **320**, for example, using self-tapping screws or similar fasteners, indicated generally by reference **332** and shown in FIGS. **5**(*a*), **5**(*b*) and **5**(*c*).

According to another aspect, the options as to size, shape, width-to-depth ratio, and types of insulating materials for configuring the exhaust duct modules or sections **110**, the assembly and/or insulating of the outer casing assembly **300** may be performed in a number of ways, which can serve to simplify assembly. For a duct assembly with a smaller cross section, the inner metallic liner **210** may be wrapped with a blanket type insulating material **410** prior to assembly of the outer casing assembly **300** around the inner duct assembly **200**. For a duct assembly with a larger cross section, or where the insulating material **410** comprises a batt-type or blanket type insulation (or a board type insulation), the outer casing assembly **300**, i.e. the outer casing panels **310**, may be assembled into a "U" shaped section (e.g. formed from the outer casing panels **310***b*, **310***c* and **310***d* in FIG. **3**), followed by the insulating material **410** for the bottom horizontal section (i.e. the outer casing panel **310***c* (FIG. **4**). The inner duct assembly **200** would then be positioned inside the "U" shaped section for the outer casing **300** and supported at the bottom corners by the thermal spacers **420**, for example, as shown in FIG. **4**. The void between the two respective side outer panels **310***b* and **310***c*, and the top panel of the inner metallic liner **210** would then be insulated and two thermal spacers **420** would be positioned to support the top outer panel **310***a* and the top outer panel **310***a* would be installed and affixed as described above.

According to another aspect and as depicted in FIGS. **4** and **5**(*a*), the thermal spacers **420** are recessed into the insulation material **410** in order to maintain or provide a flat insulation face indicated by reference **422** in FIGS. **4** and **5**(*a*). According to another aspect, the flat insulation face **422** is inset from the transverse edge of the respective outer casing panel **310**, for example, the top **310***a* and the bottom **310***c* outer casing panels as shown in FIG. **4**. Once the thermal spacers **420** are correctly positioned, the spacers **420** are secured or connected to the outer casing panels **310** using staples or screws indicated generally by reference **424** in FIG. **5**(*c*), or a suitable adhesive, to ensure that the thermal spacers **420** stay in the desired position for supporting the outer casing panels **310** and maintaining the gap or void so

7

8

that the insulating material **410** is not unnecessarily compressed or crushed. For a duct assembly with a smaller cross section, the thermal spacers **420** may be positioned or located at the corners, for example, as shown in FIG. **5**(*b*). For a duct assembly with a larger cross section, additional thermal spacers may be positioned along the space between the outer casing panels **310** and the inner metallic liner **410** to provide additional support and maintain the space or separation for the insulating material **410**.

Reference is made back to FIG. **1** and as shown, the two exhaust duct sections **110***a* and **110***b* are joined or coupled together by the mechanical joint **120**. According to an embodiment, the mechanical joint **120** comprises a joint encasement having a configuration as shown in FIGS. **7**, **8** and **9**, and is indicated generally by reference **700**. The joint encasement **700** is configured to encase or surround the joint formed between two adjacent exhaust duct sections **110***a* and **110***b* when the exterior flange connectors **212** are connected together, for example, bolted.

As shown in FIG. **7**, joint encasement **710** comprises four sections **720**, indicated individually by references **720***a*, **720***b*, **720***c* and **720***d*. Each of the sections **720** comprises a formed outer metallic profile **730** and an insulating material (or layers of insulating material) **740**. The insulating material **740** is affixed to the inner face or side of the outer metallic layer **730** using suitable adhesives and/or mechanical fasteners, in order to provide for pre-fabrication at the factory and thereby minimize the number of components transported to and assembled on site. However, there may be applications where size and weight limitations and/or characteristics of the insulating material **740** may require the insulating material **740** and the outer metallic profile **730** be kept as separate components and then field installed over joint between the exhaust duct sections **110**. As shown in FIGS. **8** and **9**, the outer metallic layer **730** has a width sufficient to overlap the transverse edges of the outer casing panels **310**. According to another aspect, the sections **720** having longitudinal edges formed with a safety or hemmed edge in order to stiffen the edge so that it lies flat against the outer casing panel **310** when installed.

As shown in FIGS. **8** and **9**, the joint encasement sections **720** comprise a hat configuration having a channel-like configuration with flanges or returns **760** formed outward from the legs of the channel to create an attachment surface or points for connecting to the outer casing panels **310** using fasteners **722**, for example, screws, through holes (i.e. punched through holes) in the flanges **760**. According to another aspect, a thermal gasket indicated by reference **724** in FIG. **9** can be included to thermally isolate the joint encasement sections **720** from the outer casing panel **310**.

In accordance with an exemplary embodiment, the fire-rated exhaust duct sections **110** and encasement joint **120** is fabricated and assembled on a component level as described above in the factory and delivered to the installation site. According to an exemplary embodiment, a 0.250 to 0.500 inch diameter bead of high temperature sealant may be applied to the face of one of the exterior flange connectors **212** adjacent the edge of the flange or return **214** (FIG. **4**(*a*)) on the inner metallic duct **210**. The second duct section **110***b* is aligned with the first duct section **110***a* and brought together so that the faces of the flanges **212** on both of the inner metallic ducts **210** are in contact. The bolts **610** (FIG. **6**) are then installed through each hole **600** in the exterior flange connector **212** and the bolts **610** are secured by the nuts **620** (FIG. **6**). The fasteners are tightened in a circular and progressive manner to a torque setting defined by the exhaust duct manufacturer's specifications, for example,

according to fastener size being utilized. Once the adjacent exhaust duct sections **110***a* and **110***b* are connected together, the encapsulation sections **720** are installed. Each encapsulation section **720** is fitted into the space between the outer casing panels **310** of the adjacent duct sections **110***a* and **110***b* until the outer metallic layer **730** comes into contact with outer casing panel **310**. The outer metallic layer **730** is secured to the outer casing panel **310** using the screws **722**, which may be drilled and threaded into the outer casing panel **310** (metal) through pre-drilled or punched holes. This procedure is repeated for each exhaust duct section until the duct assembly extends from the source of vapours, gases or materials to the point of discharge or treatment.

In summary and according to another embodiment, the present invention comprises an exhaust duct system comprising a plurality of individual duct sections which are factory fabricated and then mechanically assembled on site. The void is configured with thermal spacers to prevent the insulation from being unduly compressed or crushed. This eliminates the need to do on site fabrication of the duct sections, e.g. welding and other hot work. The exhaust sections are connected together to form longer sections and runs to create a fire-rated exhaust duct system in a building or other type of facility for exhausting or moving flammable or hazardous gases, vapours and materials from an originating source, e.g. an exhaust hood or another duct inlet, to a location where the flammable or hazardous gases, vapours or materials can be safely discharged, for example into the atmosphere, or into a collection or treatment system. According to an embodiment, the exhaust duct system is configured to utilize batted insulation material which is carried in a void between the inner duct liner and the outer casing. According to another embodiment, the outer casing comprises non-metallic fire resistant panels.

The present invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. Certain adaptations and modifications of the invention will be obvious to those skilled in the art. Therefore, the presently discussed embodiments are considered to be illustrative and not restrictive, the scope of the invention being indicated by the appended claims rather than the foregoing description, and all changes which come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.

What is claimed is:

**1**. A modular fire-rated exhaust duct assembly comprising:

two or more exhaust duct modules;

each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of each of said

9

exhaust duct modules being configured for receiving said second exterior flange connector;

said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and

a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction.

**2.** The modular fire-rate exhaust duct assembly as claimed in claim **1**, said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

**3.** The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said exhaust duct modules have a generally rectangular cross-section.

**4.** The modular fire-rated exhaust duct assembly as claimed in claim **2**, wherein said inner duct liner comprises a return flange configured to be affixed to said first and said second exterior flange connectors.

**5.** The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said field assembly junction comprises a plurality of holes in each of said first and said exterior flanges, said plurality of holes being in alignment on said first and said exterior flanges, and being configured to receive a detachable fastener.

**6.** The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

**7.** The modular fire-rated exhaust duct assembly as claimed in claim **1**, wherein said joint encasement section comprises a plurality of joint encasement sections, each of said joint encasement sections comprising an outer layer and an inner layer, and said outer layer having a flange on each longitudinal edge for affixing said encasement section to respective ends of said adjacent exhaust duct modules.

**8.** The modular fire-rated exhaust duct assembly as claimed in claim **7**, wherein said outer casing is formed from a metallic material having a thickness sufficient to provide a specified fire rating and said outer layer of said joint encasement section comprises the same metallic material.

**9.** The modular fire-rated exhaust duct assembly as claimed in claim **8**, wherein said joint encasement sections are configured to be field attachable to said respective surfaces of the said exhaust duct modules.

**10.** An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

10

a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

**11.** The exhaust duct module as claimed in claim **10**, further including a thermal insulation material substantially filling said void space between said inner duct liner and said outer casing.

**12.** The exhaust duct module as claimed in claim **11**, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

**13.** The exhaust duct module as claimed in claim **12**, wherein said thermal insulation material comprises one of a batt insulation material and an insulation board.

**14.** The exhaust duct module as claimed in claim **11**, wherein said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

**15.** The exhaust duct module as claimed in claim **14**, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation and an insulation board.

**16.** An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving a compressible insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to another end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

**17.** The exhaust duct module as claimed in claim **16**, wherein said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

**18.** The exhaust duct module as claimed in claim **17**, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation material and an insulation board.

**19.** The exhaust duct module as claimed in claim **16**, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

US 10,024,569 B2

11                                                      12

**20**. The exhaust duct module as claimed in claim **19**, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation material and an insulation board.

\*   \*   \*   \*   \*

5

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/051,016 | 10/10/2013 | William Christopher Duffy | 56807-22 | 7635 |

64691          7590          11/09/2015
BENNETT JONES LLP
3400 ONE FIRST CANADIAN PLACE
PO BOX 130
TORONTO, ON M5X 1A4
CANADA

| EXAMINER |
|---|
| PANCHOLI, VISHAL J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3754 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/09/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

**Appx365**

| ***Office Action Summary*** | **Application No.**<br>14/051,016 | **Applicant(s)**<br>DUFFY, WILLIAM CHRISTOPHER |
|---|---|---|
| | **Examiner**<br>VISHAL PANCHOLI | **Art Unit**<br>3754 | **AIA (First Inventor to File)**<br>**Status**<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>10/10/2013</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**    2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1-20</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>1-20</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see
http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
   a) ☐ All   b) ☐ Some**  c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date <u>03/27/2014</u>.
3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____ .

**Appx366**

Application/Control Number: 14/051,016                                        Page 2
Art Unit: 3754

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

1.    The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

2.    In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

### *Claim Rejections - 35 USC § 103*

3.    The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102 of this title, if the differences
> between the claimed invention and the prior art are such that the claimed invention as a whole
> would have been obvious before the effective filing date of the claimed invention to a person
> having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not
> be negated by the manner in which the invention was made.

**4.    Claims 1-20 are rejected under 35 U.S.C. 103 as being unpatentable over**

**Callan (US PN 2,916,054) in view of Duffy (US PG PUB 2005/0116470).**

Regarding claim 1, Callan teaches a modular fire-rated exhaust duct assembly

comprising:

two or more exhaust duct modules (figure 1);

Application/Control Number: 14/051,016                                      Page 3
Art Unit: 3754

each of said exhaust duct modules having an outer casing (item 6, figure 1) and

an inner flange (item 24, figure 3), and a void (figure 3) being formed between at least a

portion of space between said inner flange and said outer casing, said void being

configured for receiving an insulation material (item 4, figure 1), and including one or

more thermal spacers (item 25, figure 3) configured to maintain said inner flange and

said outer casing in a spaced relationship so that said insulation material occupies said

void;

a first exterior flange connector (item 1, figure 4), and one end of each of said

exhaust duct modules being configured for receiving said first exterior flange connector;

a second exterior flange connector (item 1, figure 4), and another end of each of said

exhaust duct modules being configured for receiving said second exterior flange

connector;

said first and said second exterior flange connectors being configured to form a

field assembly junction (figure 1) for coupling respective ends of said exhaust duct

modules to form a single exhaust duct run; and

a joint encasement section (item 7, figure 1) configured to be field connectable to

each of said exhaust duct modules and encase said junction.

Callan does not explicitly teach an inner duct liner that creates a void between

the duct liner and the outer casing.

Duffy teaches a fire rated duct assembly (item 1, figure 2) comprising an inner

duct liner (item 12, figure 2) and an outer casing (items 14, 16, figure 2) in a duct

Application/Control Number: 14/051,016                                             Page 4
Art Unit: 3754

module to form the duct assembly wherein the outer casing is made of a fire-resistant

material and thus acts as fire insulation (paragraph [0025]).

It would have been obvious to one of ordinary skill in the art at the time before

the effective filling date of the claimed invention to have provided an inner duct liner

instead of just a small flange in the device of Callan such that the duct liner and the

outer casing can form a void where the fire-rated insulation is placed to build a fire-rated

duct assembly as taught by Duffy.

Regarding claim 2, Callan teaches that the outer casing comprises one or more

panels and is made of a metal and does not explicitly teach that is made from fire

resistant a non-metallic material.

Duffy teaches that the outer casing is made of one or more fire resistant non-

metallic panels (paragraph [0025]).

It would have been obvious to one of ordinary skill in the art at the time before

the effective filling date of the claimed invention to have formed the outer casing of the

duct assembly of Callan from fire-resistant non-metallic panels as taught by Duffy in

order to provide fire-resistive properties to the outer casing of the duct assembly.

Regarding claim 3, Callan teaches that the said exhaust duct assembly as

claimed in claim 1, wherein said exhaust duct modules have a generally rectangular

cross-section (figure 1).

Regarding claim 4, Callan as modified by Duffy teaches that said inner duct

comprises a return flange (item 2, figure 3) configured to be affixed to said first and said

second exterior flange connectors.

RECEIVED
CENTRAL FAX CENTER

**APR 1 1 2016**

Our file: 56807-0022/wbv

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**In the Matter of Patent Application:**

| | | |
|---|---|---|
| Serial No. | : | 14/051,016 |
| Applicant | : | DUFFY, William Christopher |
| Filing Date | : | October 10, 2013 |
| Title | : | FIRE-RATED MODULAR DUCT ASSEMBLY AND |
| | | IMPROVEMENTS THEREIN |
| Art Unit | : | 3754 |
| Examiner | : | Pancholi, Vishal J. |

*AMENDMENT*

To:   Commissioner of Patents
United States Patent and Trademarks Office
Washington, D.C. 20231

Dear Sirs:

This is in reply to the Official action dated November 9, 2015, a response to which was due February 9, 2016. A two-month extension of time is requested and the requisite fee is included in the attached Fee Payment sheet, pursuant to 37 CFR 1.17.

**Amendment to the claims** begin on Page 3 of this paper.

**Remarks** begin on Page 8 of this paper.

| | Claims remaining after Amendment | | Highest number previously paid for | | Present extra |
|---|---|---|---|---|---|
| **Total** | 20 | - | 20 | = | 0 |
| **Independent** | 3 | - | 3 | = | 0 |

- 9 -

RECEIVED
CENTRAL FAX CENTER

**APR 1 1 2016**

**REMARKS**

This is in response to the Office Action dated November 9, 2015. Claims 1 to 20 are pending. Claims 1 to 20 are rejected. Claims 1, 10 and 16 are amended.

Favourable reconsideration of the application is requested in view of the amendments and comments herein.

**I.    Interview Request**

The undersigned respectfully requests a telephone interview before the next Office Action on the merits.

**II.    Rejection of Claims 1 to 20 under 35 USC 103(a)**

The Examiner rejected claims 1 to 20 as allegedly being obvious in view of US Patent No. 2,916,054 to Callan (hereinafter "Callan") taken in combination with US Patent Publication No. 2005/0116470 to Duffy (hereinafter "Duffy").

The Examiner is thanked on behalf of the Applicant for the review and examination of the subject application.

As indicated above, independent claims 1, 10 and 16 have been amended to better define and distinguish the embodiments according to the present disclosure. In particular, independent claim 1 has been amended to recite the first exterior flange connector being joined directly to one end of the inner duct liner and the second exterior flange connector being joined directly to the other end of the inner duct liner. It is submitted that this amendment is fully supported by the application as originally filed, for example, in Paragraph [00033] and in Figs. 5(a) and 5(b).

The Examiner's comments concerning the obviousness rejection have been carefully considered. It is, however, respectfully submitted that the claims as amended and currently presented are distinguishable and not obvious in view of the cited prior art for at least the reasons as discussed in more detail below.

- 10 -

The present invention as defined by independent claim 1, as amended and currently presented, is directed to a "modular fire-rated exhaust duct assembly comprising: two or more exhaust duct modules; each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void; a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector; a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of each of said exhaust duct modules being configured for receiving said second exterior flange connector; said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction".

The Examiner relies on Callan as describing and teaching the feature of a "void" as recited in claim 1 of the subject application. It is respectfully submitted that based on a careful reading, Callan does not disclose or teach a void, but rather a channel as shown in Figs. 6 to 8, and furthermore the channel according to Callan is <u>not</u> configured for receiving an insulating material as recited in claim 1. According to Callan, the channel is configured for receiving the "tongue" 13 (Fig. 3) of another panel for connecting one longitudinal panel to another. It is therefore submitted that the channel as disclosed and described by Callan is not the same as the void recited in claim 1, as amended and currently presented.

The Examiner also relies on Callan as describing and teaching the feature of "thermal spacers" as recited in independent claim 1. It is respectfully submitted that the "sidewalls" 25 according to Callan do not comprise thermal spacers as being alleged and furthermore there is no description, teaching or suggestion by Callan that the sidewalls 25 are intended to maintain an inner duct in a spaced relationship from an outer casing, as recited in claim 1.

- 11 -

The Examiner also relies on Callan as describing and teaching the feature of a "joint encasement section" as recited in claim 1. It is respectfully submitted the "locking clip" 7 does not encase the junction as recited in claim 1. Instead the locking clip as described and taught by Callan merely comprises a channel strip that makes a physical connection between adjacent sections.

Moreover, independent claim 1 as amended and currently presented recites that each exterior flange is joined directly to each respective end of the inner duct liner. It is submitted that Callan fails to disclose and describe this configuration.

In view of these deficiencies and differences, it is submitted that one skilled in the art would not be led to modify the teachings of Callan as is being alleged. It is further submitted that Duffy fails to remedy the deficiencies of Callan.

Therefore, it is submitted that even if one skilled in the art were to combine the teachings of Callan with Duffy, which is not herein being conceded, the resulting combination would still be the same as modular fire-rated exhaust duct assembly defined by independent claim 1, and therefore claim 1 is not obvious in view of Callan and Duffy. Since claims 2 to 9 depend either directly from claim 1, it is submitted that claims 2 to 9 are also not obvious for similar reasons.

As indicated above, independent claims 10 and 16 have been amended to recite similar features to those in claim 1. It is submitted that independent claim 10, as amended and currently presented, and associated dependent claims 11 to 15 are also not obvious for similar reasons as discussed above in respect of independent claim 1. It is also submitted that independent claim 16, as amended and currently presented, and associated dependent claims 17 to 20 are also not obvious for similar reasons as discussed above in respect of claim 1.

Withdrawal of the obviousness rejection under 35 USC 103(a) is therefore respectfully requested.

In view of the foregoing, it is submitted that the subject application is in condition for allowance and favorable reconsideration is respectfully requested. If it is believed that a telephone interview would expedite successful prosecution of the present application, the

APR 11 2016  4:08 PM FR BENNETT JONES LLP16 863 1716 TO 915712738300    P.15/15

- 12 -

Examiner is invited to telephone, collect if necessary, the Applicant's representative William Vass at (416)777-7490.

Respectfully submitted,

**DUFFY, William Christopher**

William B. Vass
Registration No. 36,416

April 11, 2016
WBV/cl

WSLEGAL\056807\00022\13401541v1

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/051,016 | 10/10/2013 | William Christopher Duffy | 56807-22 | 7635 |

64691          7590          06/30/2016
BENNETT JONES LLP
3400 ONE FIRST CANADIAN PLACE
PO BOX 130
TORONTO, ON M5X 1A4
CANADA

| EXAMINER |
|---|
| PANCHOLI, VISHAL J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3754 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/30/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Appx410

Application/Control Number: 14/051,016                                    Page 11
Art Unit: 3754

It would have been obvious to one of ordinary skill in the art at the time before

the effective filling date of the claimed invention to have formed the outer casing of the

duct assembly of Callan from fire-resistant non-metallic panels as taught by Duffy in

order to provide fire-resistive properties to the outer casing of the duct assembly.

Regarding claim 18, Callan teaches that said thermal insulation material

comprises a slab of insulation material (column 3, lines 67-70).

Regarding claim 19, Callan as modified by Duffy teaches that said inner duct

liner (paragraph [0026], Duffy) and said outer casing are formed from a metallic material

(column 3, lines 7-12), and each having a thickness to provide a specified fire rating.

Regarding claim 20, Callan teaches that said thermal insulation material

comprises a slab of insulation material (column 3, lines 67-70).


### *Response to Arguments*

5.      Applicant's arguments filed 04/11/2016 regarding the rejection(s) of claim(s) 1-20

under Callan and Duffy have been fully considered but they are not persuasive.

6.      In response to applicant's arguments against the references individually, one

cannot show nonobviousness by attacking references individually where the rejections

are based on combinations of references.  See *In re Keller*, 642 F.2d 413, 208

USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800 F.2d 1091, 231 USPQ 375 (Fed. Cir.

1986).

7.      Applicant argued, in light of amended independent claims 1, 10, and 16, that

Callan does not teach a void between the inner duct liner and an outer casing since the

channel formed in the duct of Callan cannot be considered a void. Examiner disagrees and would like to point out that dictionary.com defines the term "void" as "empty space" or a "gap". Figure 3 of Callan clearly shows an empty space between the inner flange 24 and an outer duct casing 6 which satisfies the conditions of a "void" area between the inner duct and the outer casing. Therefore, Callan does indeed teach a void as recited in the independent claims.

7.      Applicant further argued that Callan does not teach thermal spacers since sidewalls 25 cannot be considered to be thermal spacers as recited in the independent claims. Examiner would like to remind the applicant that the claim recites "one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship". Thus the spacers are only there to keep duct components in a spaced relationship without requiring any specific thermal properties. Sidewalls 25 do indeed keep the inner flange 24 and the outer casing 6 in a spaced relationship as required by the claim and thus Callan does teach thermal spacers. When modified with the teachings of Duffy, the sidewalls 25 will keep the inner liner and the outer casing in a spaced relationship and thus teaching the claim limitation successfully.

8.      Lastly, applicant argued that Callan does not teach a joint encasement section as recited in the claim since the locking clip 7 of Callan cannot be considered a joint encasement junction. Examiner would like to once again point to the claim language where it recites "a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction". Thus, the joint encasement section only functions to connect the duct modules and encase the junction. As seen in

Application/Control Number: 14/051,016                                          Page 13
Art Unit: 3754

figures 1 and 10 of Callan, the locking clip 7 joins two duct sections together and also

covers the junction of the joint and thus satisfies the requirements of the claims.

Therefore, Callan does indeed teach a joint encasement section as recited in the

claims. As a result, independent claims 1, 10, and 16 remain rejected under the

combination of prior arts Callan and Duffy. Furthermore, dependent claims 2-8, 11-14,

and 17-20 are also taught and remain rejected under the prior arts Callan and Duffy.


### Conclusion

9.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure. The following documents disclose fire-rated duct assemblies: US

PN 5,944,060 and US PN 7,699,078.

10.     Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

        A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

Our file: 56807-0022/wbv

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**In the Matter of Patent Application:**

| | | |
|---|---|---|
| Serial No. | : | 14/051,016 |
| Applicant | : | DUFFY, William Christopher |
| Filing Date | : | October 10, 2013 |
| Title | : | FIRE-RATED MODULAR DUCT ASSEMBLY AND IMPROVEMENTS THEREIN |
| Art Unit | : | 3754 |
| Examiner | : | Pancholi, Vishal J. |

---

### *REQUEST FOR CONTINUED EXAMINATION AND AMENDMENT*

To:   Commissioner of Patents
      United States Patent and Trademarks Office
      Washington, D.C. 20231

Dear Sirs:

This is in reply to the Official action dated June 30, 2016, a response to which was due September 30, 2016. A three-month extension of time is requested and the requisite fee is included in the attached Fee Payment sheet, pursuant to 37 CFR 1.17. A Request for Continued Examination (RCE) is also being filed concurrently with the paper.

**Amendment to the claims** begin on Page 3 of this paper.

**Remarks** begin on Page 8 of this paper.

**Appx430**

- 3 -

**AMENDMENTS TO THE CLAIMS**

The following is a complete listing of the revised claims with a status indicator in parenthesis.

**LISTING OF CLAIMS**

1.    (Currently Amended) A modular fire-rated exhaust duct assembly comprising:

two or more exhaust duct modules;

each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of each of said exhaust duct modules being configured for receiving said second exterior flange connector;

said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and

a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction.

- 4 -

2.    (Original)    The modular fire-rate exhaust duct assembly as claimed in claim 1, said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

3.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said exhaust duct modules have a generally rectangular cross-section.

4.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 2, wherein said inner duct liner comprises a return flange configured to be affixed to said first and said second exterior flange connectors.

5.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said field assembly junction comprises a plurality of holes in each of said first and said exterior flanges, said plurality of holes being in alignment on said first and said exterior flanges, and being configured to receive a detachable fastener.

6.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

7.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said joint encasement section comprises a plurality of joint encasement sections, each of said joint encasement sections comprising an outer layer and an inner layer, and said outer layer having a flange on each longitudinal edge for affixing said encasement section to respective ends of said adjacent exhaust duct modules.

- 5 -

8.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 7, wherein said outer casing is formed from a metallic material having a thickness sufficient to provide a specified fire rating and said outer layer of said joint encasement section comprises the same metallic material.

9.    (Original)    The modular fire-rated exhaust duct assembly as claimed in claim 8, wherein said joint encasement sections are configured to be field attachable to said respective surfaces of the said exhaust duct modules.

10.    (Currently Amended) An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

- 6 -

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

11.    (Original)    The exhaust duct module as claimed in claim 10, further including a thermal insulation material substantially filling said void space between said inner duct liner and said outer casing.

12.    (Original)    The exhaust duct module as claimed in claim 11, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

13.    (Original)    The exhaust duct module as claimed in claim 12, wherein said thermal insulation material comprises one of a batt insulation material and an insulation board.

14.    (Original)    The exhaust duct module as claimed in claim 11, wherein said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

15.    (Original)    The exhaust duct module as claimed in claim 14, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation and an insulation board.

16.    (Currently Amended) An exhaust duct module configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising:

an inner duct liner formed with a generally rectangular cross-section;

- 7 -

an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving a compressible insulation material, and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing;

a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector;

a second exterior flange connector, said second exterior flange connector being joined directly to another end of said inner duct liner, and another end of said exhaust duct module being configured for receiving said second exterior flange connector; and

said first exterior flange connector and said second exterior flange connector being configured to be field attachable to couple another exhaust duct assembly.

17.    (Original)    The exhaust duct module as claimed in claim 16, wherein said outer casing comprises one or more panels formed from a fire resistant non-metallic material.

18.    (Original)    The exhaust duct module as claimed in claim 17, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation material and an insulation board.

19.    (Original)    The exhaust duct module as claimed in claim 16, wherein said inner duct liner and said outer casing are formed from a metallic material, and each having a thickness to provide a specified fire rating.

- 8 -

20.    (Original)    The exhaust duct module as claimed in claim 19, wherein said thermal insulation material comprises one of a batt insulation material, a blanket insulation material and an insulation board.

- 9 -

**REMARKS**

This is in response to the Office Action dated June 30, 2016. Claims 1 to 20 are pending. Claims 1 to 20 are rejected. The Office Action was made FINAL. Claims 1, 10 and 16 are amended as indicated above.

Favourable reconsideration of the application is requested in view of the amendments and comments herein.

**I.    Interview Request**

The undersigned respectfully requests a telephone interview before the next Office Action on the merits.

**II.    Rejection of Claims 1 to 20 under 35 USC 103(a)**

The Examiner rejected claims 1 to 20 as allegedly being obvious in view of US Patent No. 2,916,054 to Callan (hereinafter "Callan") taken in combination with US Patent Publication No. 2005/0116470 to Duffy (hereinafter "Duffy").

The Examiner is thanked on behalf of the Applicant for the review and examination of the subject application.

As indicated above, independent claims 1, 10 and 16 have been further amended to better define and distinguish the embodiments according to the present disclosure. In particular, independent claim 1 has been amended to recite the "*one or more thermal spacers thermally isolating said inner duct liner from said outer casing*".

It is submitted that this amendment is supported by the application as originally filed, for example, in Paragraph [00034] and in Fig. 4. The term "thermal" in the context of the subject application means and refers to 'specific thermal properties', namely, thermally isolating. For instance, the "thermal gasket" is described in Paragraph [00041] as follows, "According to another aspect, a thermal gasket indicated by reference 724 in Fig. 9 can be included to thermally isolate the joint encasement sections 720 from the outer casing panel 310." [Emphasis added.]

- 10 -

The thermal isolation function of the thermal spacers and the thermal gasket is entirely consistent with one of the problems addressed by the embodiments according to the present disclosure as described in Paragraph [0006]:

> "In a commercial kitchen, the exhaust hoods are configured to capture grease laden air over deep fryers and grills, which is extremely flammable, and must be transported through the building to an exterior area where it can be safely discharged. Due to the flammable nature of the exhausted vapour, a minor fire, for example, in the kitchen could enter the exhaust duct and quickly spread throughout the duct system. As a result, any potential fire inside the duct system must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building...." [Emphasis added.]

According to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat, e.g. due to a grease fire, from the inner duct to the outer casing.

The Examiner's comments concerning the obviousness rejection have been carefully considered. It is, however, respectfully submitted that the claims as amended and currently presented are distinguishable and not obvious in view of the cited prior art for at least the reasons as discussed in more detail below.

The present invention as defined by independent claim 1, as amended and currently presented, is directed to a "modular fire-rated exhaust duct assembly comprising: two or more exhaust duct modules; each of said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing; a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector; a second exterior flange connector, said second exterior flange connector being joined directly to one end of said inner duct liner, and another

- 11 -

end of each of said exhaust duct modules being configured for receiving said second exterior flange connector; said first and said second exterior flange connectors being configured to form a field assembly junction for coupling respective ends of said exhaust duct modules to form a single exhaust duct run; and a joint encasement section configured to be field connectable to each of said exhaust duct modules and encase said junction".

The Examiner relies on Callan as describing and teaching the feature of "thermal spacers" as recited in independent claim 1. It is respectfully submitted that the "sidewalls" 25 according to Callan do not comprise thermal spacers as being alleged and furthermore there is no description, teaching or suggestion by Callan that the sidewalls 25 are intended to maintain an inner duct in a spaced relationship from an outer casing, as recited in claim 1. It is further submitted that even if the "sidewalls" are construed as thermal spacers, which is not herein being conceded, Callan fails to describe and teach "one or more thermal spacers thermally isolating said inner duct liner from said outer casing" as also recited in independent claim 1 as amended and currently presented.

In view of these deficiencies and differences, it is submitted that one skilled in the art would not be led to modify the teachings of Callan as is being alleged. It is further submitted that Duffy fails to remedy the deficiencies of Callan.

Therefore, it is submitted that even if one skilled in the art were to combine the teachings of Callan with Duffy, which is not herein being conceded, the resulting combination would still be the same as modular fire-rated exhaust duct assembly defined by independent claim 1, and therefore claim 1 is not obvious in view of Callan and Duffy. Since claims 2 to 9 depend either directly from claim 1, it is submitted that claims 2 to 9 are also not obvious for similar reasons.

As indicated above, independent claims 10 and 16 have been amended to recite similar features to those in claim 1. It is submitted that independent claim 10, as amended and currently presented, and associated dependent claims 11 to 15 are also not obvious for similar reasons as discussed above in respect of independent claim 1. It is also submitted that independent claim 16, as amended and currently presented, and associated dependent claims 17 to 20 are also not obvious for similar reasons as discussed above in respect of claim 1.

- 12 -

Withdrawal of the obviousness rejection under 35 USC 103(a) is therefore respectfully requested.

In view of the foregoing, it is submitted that the subject application is in condition for allowance and favorable reconsideration is respectfully requested. If it is believed that a telephone interview would expedite successful prosecution of the present application, the Examiner is invited to telephone, collect if necessary, the Applicant's representative William Vass at (416)777-7490.

Respectfully submitted,

**DUFFY, William Christopher**

_____//William B. Vass//_____

William B. Vass
Registration No. 36,416

December 29, 2016
WBV/cl

| *Notice of Allowability* | Application No. 14/051,016 | Applicant(s) DUFFY, WILLIAM  CHRISTOPHER | |
|---|---|---|---|
| | Examiner VISHAL PANCHOLI | Art Unit 3754 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application.  If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.**  This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant.  See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *12/29/2016*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-20*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp  or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

      a) ☐ All   b) ☐ Some  *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below.  Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☒ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

| /VISHAL PANCHOLI/ Examiner, Art Unit 3754 | |
|---|---|

          **Notice of Allowability**          Part of Paper No./Mail Date

Application/Control Number: 14/051,016                                                Page 2
Art Unit: 3754

**REASONS FOR ALLOWANCE**

1.      The following is an examiner's statement of reasons for allowance: the primary
reason for allowance is the inclusion of limitations "said one or more thermal spacers
thermally isolating said inner duct liner from said outer casing" in claims 1, 10, and 16.
The closest prior arts are Callan (US PN 2,916,054), Duffy (US PG PUB
2005/0116470), and MacKay (US PN 5,944,060). Callan teaches an insulated section,
an inner duct liner, a first and second flange connector and a joint encasement section
and does not teach an outer casing and thermal spacers which thermally isolate the
inner duct liner from said outer casing. Duffy teaches an inner duct liner and an outer
casing but does not explicitly teach spacers which thermally isolate the inner duct liner
and the outer casing. MacKay teaches an inner duct liner, an insulated section, an outer
casing and flange connectors but does not teach any thermal spacers that thermally
isolate the inner duct liner and the outer casing. Moreover, no motivation is found to
modify the prior arts to arrive at the claimed invention. Therefore, the claims are
allowed.

        Any comments considered necessary by applicant must be submitted no later
than the payment of the issue fee and, to avoid processing delays, should preferably
accompany the issue fee.  Such submissions should be clearly labeled "Comments on
Statement of Reasons for Allowance."


        Any inquiry concerning this communication or earlier communications from the
examiner should be directed to VISHAL PANCHOLI whose telephone number is

E-FILED
Wednesday, 23 December, 2020  06:51:21 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, ) ) ) ) | |
| Plaintiff, ) ) | Consolidate Case No. 1:19-cv-01388 |
| vs. ) ) ) | Chief Judge Sara Darrow |
| ) | Magistrate Judge Jonathan E. Hawley |
| VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, ) ) ) ) | |
| Defendants. ) ) | |

**<u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>**

it impossible for a POSA to know, with reasonable certainty, whether they are dealing with a half-liquid within the meaning of the claim."); *Baldwin Graphics Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2008 WL 4083145, at *7-9 (N.D. Ill. Aug. 27, 2008) (holding the term "reduced air content cleaning fabric" indefinite because "the claims do not provide a reference baseline"). Because the specification does not provide the requisite objective standard, the element "compressible insulation material" is indefinite.

Not only is there no objective standard for "compressible," the claims as a whole require that "compressible" have a non-customary, ill-defined meaning that is contrary to ordinary usage. In particular, dependent claim 18, which depends from claim 16, provides that a "compressible insulation material" comprises "an insulation board." During his deposition, Mr. Duffy admitted that insulation board is not "compressible." *See* Ex. O at 111:1-3, 112:13-113:3. Mr. Cheek agrees with Mr. Duffy. *See* Cheek Decl. at ¶ 68. It is well established that internal inconsistencies in claims can result in elements being indefinite. *See Fundamental Innovation Sys. Int'l LLC v. Samsung Elecs. Co.*, No. 2:17-CV-145-JRG-RSP, 2018 WL 647734, at *40 (E.D. Tex. Jan. 31, 2018) (finding internally inconsistent claims indefinite). The Court should hold the element indefinite for this additional reason.

### B.    The "thermal" Terms

#### i.    "thermal spacers"[5]

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "thermal spacers" (claims 3, 6, 10- | "component(s) that maintain a space between the inner duct liner and outer casing and that are configured | "a spacer having a specific thermal isolation property" where a "spacer" is something that maintains two |

---

[5]    Plaintiff wants to construe the terms "thermal spacers" in conjunction with "thermally isolating," but the latter is the function the thermal spacers performs, not what the thermal spacers are. Defendants are properly seeking independent constructions for each phrase because such definitions are necessary to properly define the scope of the claims.

| 13, 16, 19-20) | to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | components in a spaced relationship |
|---|---|---|

Claims 1, 10 and 16 of the '569 Patent recite, in part, "including one or more _thermal spacers_ configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said [compressible insulation] material occupies said void." The Court should adopt Defendants' proposed construction because:

- The "thermal spacer" is explicitly tied to "thermal isolation" in the claim itself;
- During prosecution, applicant defined that "[t]he term 'thermal' in the context of the subject application _means_ and refers to 'specific thermal properties', namely, thermally isolating";
- During prosecution, applicant also argued that "the thermal spacers is configured to _prevent_ the thermal transfer of heat"; and
- The intrinsic record, expert testimony, and the inventor himself agree with Defendants' proposed construction.

Defendants' proposed construction is consistent with the claim itself and binds Plaintiff to a construction consistent with applicant's statements during prosecution. _See Poly-Am., L.P. v. API Indus., Inc._, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("Disavowal [may] be effectuated by language in the specification or the prosecution history," and requires "clear and unequivocal evidence that the claimed invention includes or does not include a particular feature."). Turning first to the claim language, the "thermal spacers" are used to "thermally isolate[e] said inner duct liner from said outer casing." JA0015-16 at cl. 1, 10, 16. This claim language makes clear that "thermal spacers" are spacers that have a _specific thermal isolation property_. _See Chef Am._, 358 F.3d at 1372. As explained by Mr. Cheek, a thermal isolation property of a spacer is an inherent property of the component, e.g., its thermal conductivity. _See_ Cheek Decl. at ¶¶ 73-74. As a simple example, calcium silicate insulation board, which can be used as the claimed thermal

spacer,[6] has a thermal conductivity rating of approximately 0.175 W/m.K, while spacers made from stainless steel or carbon steel would have thermal conductivity ratings of 15 W/m.K. and 45 W/m.K respectively. *See* Cheek Decl. at ¶¶ 83-84; *see also* Ex. M at 2. Additionally, the specification illustrates that the thermal spacers, shown as blocks placed next to blocks of insulation, actually thermally isolate, i.e., prevents heat from transferring from the inner duct liner to the outer casing and keep them in a spaced relationship. *See* Section II above (Fig. 5(b) annotated).

During prosecution, the Examiner found that U.S. Patent No. 2,916,054 ("Callan"), disclosed one or more thermal spacers. JA0257-58, JA0261, JA0263. Plaintiff tried, but failed, to convince the Examiner that Callan did not disclose "thermal spacers." JA0295. Rebuffing Plaintiff, the Examiner once again rejected the claims over Callan, specifically finding that "*the [claimed] spacers* are only there to keep duct components in a spaced relationship *without requiring any specific thermal properties*. Sidewalls 25 [of Callan] do indeed keep the inner flange 24 and the outer casing 6 in a spaced relationship as required by the claim and thus Callan does teach thermal spacers." JA0312, *see also* JA0302-03, JA0307, JA0309. In response, Plaintiff amended the claims to include the requirement that "said one or more *thermal spacers thermally isolating* said inner duct liner from said outer casing." JA0322. Specifically addressing the Examiner's comment that the "thermal spacer" element was not tethered to specific thermal properties, Plaintiff told the public:

> It is submitted that this amendment is supported by the application as originally filed, for example, in Paragraph [00034] and in Fig. 4. *The term "thermal" in the context of the subject application means and refers to "specific thermal properties", namely, thermally isolating*. For instance, the "thermal gasket" is

---

[6]   Plaintiff has confirmed that the thermal spacer it allegedly invented was made from calcium silicate insulation. *See* Ex. Y at 173:18–174:4; *see also* Ex. O at 131:6–14, 132:14–18; Ex. R at 219:5–220:8; Ex. X at 54:9–16.

described in Paragraph [00041] as follows, "According to another aspect, a thermal gasket indicated by reference 724 in Fig. 9 can be included to <u>thermally isolate</u> the joint encasement sections 720 from the outer casing panel 310." [Emphasis added.] . . . According to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and <u>*the thermal spacers is configured to prevent the thermal transfer of heat*</u>, e.g. due to a grease fire, from the inner duct to the outer casing.

JA0328-29. Not only is this statement a clear disclaimer of any spacer that does not have a specific thermal isolation property and that does not prevent the transfer of heat, usage of the word "means" is obviously synonymous with a definition. *See*, *e.g.*, *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002); *see also SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1194 (Fed. Cir. 2013) ("Whether viewed as a matter of disclaimer or of lexicography, the result is the same."). Here, the patentee defined "thermal spacer" to be a spacer with a specific property (i.e., an inherent characteristic of the spacer itself)

During his deposition, Mr. Duffy[7] repeatedly agreed with Defendants' construction:

Q.  I want to know if this -- that thermal spacer means a spacer with a specific thermal property; namely, thermal isolation?

A.  With a specific thermal properties. Yes.

&ast; &ast; &ast;

Q.  So the first full paragraph, or the second one after the block quote, it states, "According to one aspect, the arrangement of the inner duct lining, outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat." Do you see that?

A.  Yes.

Q.  Do you agree that the arrangement of the inner duct lining, the outer casing, the insulation material, and the thermal spacers are configured to prevent the thermal transfer of heat in the '569 patent?

A.  Yes.

Ex. O at 103:15-18, 104:2-14; *see also* Ex. R at 220:23-221:23. Mr. Cheek similarly agrees Defendants' construction is consistent with his understanding. *See* Cheek Decl. at ¶ 76.

---

[7]  Mr. Duffy is the owner of DuraSystems, Inc. He testified that he has a financial interest in this litigation. Ex. O at 141:15–22. His admissions confirming Defendants' constructions are statements against interest.

16

Plaintiff's vague position that any spacer can be "configured to limit the amount of heat conducted through the components" has no specification support and erases the clear and unmistakable statements it made in prosecution. As discussed above, the specification provides no anchor to a particular fire rating test. Moreover, the term "fail points" never once appears in the specification. If the Court were to adopt Plaintiff's proposed construction, it would be indefinite because there is no standard for how much heat the spacers need to "limit" in order to avoid "failure points." *See* Cheek Decl. at ¶¶ 77-78; *see also Teva*, 789 F.3d at 1344-45; *Datamize*, 417 F.3d at 1350-51.

More fundamentally, Plaintiff is plainly attempting to create a construction that results in <u>*all*</u> spacers, regardless of the spacer's thermal properties, being thermal spacers if they are used in exhaust duct modules (i.e., the spacer is "configured" to function in a duct that exhausts hot gases. Rather than embrace the language Plaintiff used during prosecution to secure its claims— that the term "thermal" in the context of the subject application means "specific thermal properties," Plaintiff runs from its claimed spacer having the "specific thermal propert[y]." The reason Plaintiff must flee from its prior statements is that what it accuses of being a "thermal spacer" in Defendants' accused products <u>*is made of metal*</u>. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-27 (Fed. Cir. 2006) (agreeing that "knowledge of [the accused product] provides meaningful context for the first step of the infringement analysis, claim construction"). Any child that has touched the proverbial hot pot knows that metal is a great conductor of heat, i.e., it does not have the "specific thermal properties" Plaintiff told the public a "thermal spacer" has. The Court should reject Plaintiff's effort to rewrite prosecution history, and adopt Defendants' proposed construction. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[P]rosecution disclaimer promotes the public notice

function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.").

**ii.     "thermally isolating"**

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "thermally isolating" (claims 3, 6, 10-13, 16, 19-20) | "component(s) that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | "preventing the thermal transfer of heat" |

Claims 1, 10 and 16 of the '569 Patent recite, in part, "one or more thermal spacers *thermally isolating* said inner duct liner from said outer casing." The Court should adopt Defendants' proposed construction for the same reasons given above with respect to the term "thermal spacers," and additionally because:

- Defendants construction is the plain and ordinary meaning of the term;
- There is extremely limited written description so the claims cannot be broader than the ordinary meaning;
- Defendants' proposed construction is verbatim what the applicant said during prosecution; and
- The inventor testimony and expert testimony support Defendants' proposed construction.

First, the plain and ordinary meaning of isolate, as given in the dictionary, is "to set apart or cut off from a group or whole" or "to place in quarantine." Ex. S at 453. It follows that the plain and ordinary meaning of "thermally isolate" would then be to keep heat in one component from getting to the other. [8] In that context, before even turning to the rest of the intrinsic record, the words themselves plainly convey that the thermal spacers cut off the thermal transfer of heat

---

[8]   During the pandemic, everyone now knows what it means to isolate. If someone with COVID-19 is asked to isolate, he or she does not just "limit" exposure to others.

from the inner duct liner to the outer casing. *See* Cheek Decl. at ¶¶ 81-84, 86.

Second, the specification provides that Plaintiff cannot swap the word "isolating" with "limiting." In particular, it is undisputed that <u>*nowhere*</u> does the '569 Patent explicitly describes the concept of "thermal isolation" with respect to "thermal spacers." *See* Ex. O at 83:9-21. Rather, the specification literally has one sentence discussing "thermal isolation" properties of another component: "a thermal gasket indicated by reference 724 in FIG. 9 can be included to *<u>thermally isolate</u>* the joint encasement sections 720 from the outer casing panel 310." JA0015 at 7:48-50. There is likewise no dispute that, at a minimum, the thermal gasket is not enumerated where it is supposed to be in the '569 Patent figures.[9] *See* Ex. O at 71:4-8. As the specification does not specifically disclose a thermal spacer thermally isolating, the Court is left with the meagre disclosure concerning the thermal gasket element. Given that the written description for "thermal isolation" is the slenderest of reads, it certainly cannot be used to broaden "isolation" to mean "limitation." *See Thorner*, 669 F.3d at 1365; *see also Teleflex*, 299 F.3d at 1325 (Fed. Cir. 2002); *Gentry*, 134 F.3d at 1479 (holding that "his original disclosure serves to limit the permissible breadth of his later-drafted claims."); *see also In re Power Integrations, Inc.*, 884 F.3d 1370, 1377 (Fed. Cir. 2018) (citations omitted) ("[A] proper claim construction analysis endeavors to assign a meaning to a disputed claim term 'that corresponds with . . . how the inventor describes his invention in the specification.'").

Third, statements made by the applicant during prosecution support Defendants' proposed construction: "the thermal spacer[] is configured *<u>to prevent the thermal transfer of heat</u>*, e.g. due to a grease fire, from the inner duct to the outer casing." JA0329. These exact words by the applicant form the basis for Defendants' construction.

---

[9]    Defendants do not believe that the thermal gasket is shown at all, but will address that issue at a later time if necessary.

Lastly and as discussed above, Plaintiff's construction improperly imports that the amount of heat conducted through the thermal spacers will result in "not creat[ing] fail points on the inner duct liner or outer casing during fire rating testing." The Court should construe "thermally isolating" consistent with the intrinsic record and the external evidence.

### C. "exhaust duct module"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "exhaust duct module[s]" (claims 3, 6 , 10-13, 16, 19-20) | "a section of pre-fabricated, factory-built duct" | "a section of an exhaust duct" |

Claim 1 of the '569 Patent recites, in part, "[a] modular fire-rated exhaust duct assembly comprising: two or more _exhaust duct modules_"; claims 10 and 16 recite, in part, "[a]n _exhaust duct module_ configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module comprising." The Court should adopt Defendants' proposed construction because:

- Plaintiff is attempting to read in a preferred embodiment; and
- Plaintiff is reading out that the duct is an _exhaust_ dust.

A "module" is defined as "a standardized unit or component of a system designed for easy assembly or flexible use." _See_ Ex. S at 545. The '569 Patent interchangeably uses the terms "section" and "module". _See_ JA0012-13 at 2:43-44, 3:34-37, 3:65-4:7. The parties appear agree that a "module" is a "section" of an overall exhaust duct

Where the parties depart is what that module (or section) actually is. Plaintiff improperly attempts to read into the claims a preferred embodiment—that the section of duct is "pre-fabricated, factory-built." For example, the '569 Patent states that "[i]n accordance with an _exemplary_ embodiment, the fire-rated exhaust duct sections 110 and encasement joint 120 is _fabricated_ and assembled on a component level as described above _in the factory_ and delivered

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, ) ) ) ) | Consolidate Case No. 1:19-cv-01388 |
| Plaintiff, ) ) | Chief Judge Sara Darrow |
| vs. ) ) ) | Magistrate Judge Jonathan E. Hawley |
| VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, ) ) ) ) | |
| Defendants. ) ) | |

## DECLARATION OF BARRY M. CHEEK

I, Barry M. Cheek, do hereby declare and say:

### I. INTRODUCTION

1.      I am over the age of twenty-one (21) and competent to make this declaration. I am also qualified to give testimony under oath. The facts and opinions listed below are within my personal knowledge.

2.      I am being compensated for my time in this proceeding at my standard consulting rate of $285/hr. My compensation in no way depends on the outcome of this proceeding or the content of my opinions. I am not employed by Defendants Van-Packer Co. and Jeremias (collectively, "Defendants"), Inc. in this matter. I am receiving compensation from Defendants solely for my involvement in this matter and based only on my standard hourly consulting fees for time actually spent on this matter, and I will not receive any added compensation based on the outcome of any proceeding related to the '569 Patent.

"configured." I'm therefore confused where DuraSystems is deriving its construction since my understanding is that claim constructions must be derived from the intrinsic record.

78.      Moreover, it is my opinion that DuraSystems' inclusion of the concept of "limiting" the transfer of heat is not reasonably clear. As discussed above, DuraSystems' proposed construction involves questions of degree. That is, any material -- even the most conductive of metals -- "limits" the transfer of heat for a small amount of time. The '569 Patent, however, does not provide any description of how long a spacer must "limit" the transfer of heat to be a thermal spacer. Thus, it is my opinion that, not only is DuraSystems' proposed construction inconsistent with the intrinsic record and the understanding of a POSA, it is also not reasonably clear.

**D.      "thermally isolating"**

| Claim Term | DuraSystems' Construction | Defendants' Construction |
|---|---|---|
| "thermally isolating" (claims 3, 6, 10–13, 16, 19–20) | "component(s) that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | "preventing the thermal transfer of heat" |

79.      I was provided the table above by counsel for Defendants. I understand that DuraSystems has proposed the phrase "thermal spacers thermally isolating" be construed as a single phrase and to mean "component(s) that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during

fire rating testing." I also understand that Defendants have proposed the term "thermally isolating" to mean "preventing the thermal transfer of heat."

80.     I understand that the term "thermally isolating" appears in claims 1, 3, 6, 10–13, 16, 19–20.

81.     It is my opinion that a POSA would understand the term "thermally isolating" to mean "preventing the thermal transfer of heat."

82.     As discussed above, I have reviewed the statement made by the applicant during prosecution that "the thermal spacers is configured _to prevent the thermal transfer of heat_, e.g. due to a grease fire, from the inner duct to the outer casing."  JA0328 (emphasis added). I agree with DuraSystems "preventing the thermal transfer of heat" is what thermal isolation means.

83.     While it is true that any material transfers some amount of heat, there are certain materials, such as calcium silicate insulation board, that have such a low enough thermal conductivity value that they _effectively_ prevent the flow of heat as a practical matter.  _See_ Ex. M (Promatect Datasheet showing a thermal conductivity rating of approximately 0.175 W/m.K). Materials that prevent heat transfer are typically described as insulators. When I read the statement by the applicant made during prosecution regarding how the thermal spacers "prevent the thermal transfer of heat," I understand this to mean that the spacers are to be made from something like insulation that essentially prevents heat transfer.

84.     Conversely, metals are typically described as conductors because they conduct or transfer heat well. For example, stainless steel, which has a thermal conductivity rating of approximately 15 W/m.K, or carbon steel, which has a thermal conductivity rating of approximately 45 W/m.K, would not prevent the flow of heat.  _See_ Ex. N, "Comparing the Thermal Conductivity of Stainless Steel to other Metals."  When I read the statement by the

applicant made during prosecution regarding how the thermal spacers "prevent the thermal transfer of heat," I understand this to mean that the spacers cannot be made from something like metal since they would not prevent the transfer of heat.

85.     As noted above, it is my opinion that DuraSystems' proposed construction that the "thermally isolating" means "limiting" heat transfer is inconsistent with how a POSA would use the term and is also not reasonably clear based on the specification of the '569 Patent and the statements made by the applicant during prosecution.

86.     It is also my opinion that a POSA would conclude that by the principles of heat transfer, two surfaces mechanically joined together, such as by welding, provide a thermal bridge through which heat will travel. If these surfaces are all made of the same metal, then it would not be possible to thermally isolate one surface from another.

87.     I declare that all statements herein made of my own knowledge are true, and that all statements herein made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code.


12/23/20
_____

Date

_____

Barry M. Cheek, PE

Dec. 8, 1959      W. D. CALLAN      2,916,054

KNOCKDOWN SECTIONAL AIR CONDUITS

Filed Nov. 3, 1953            3 Sheets—Sheet 1



_Fig-1_

_Fig-2_

INVENTOR.
WILLIAM D. CALLAN

BY

DesJardins Robinson, Tuttle & Schenk

HIS ATTORNEYS

Dec. 8, 1959      W. D. CALLAN      2,916,054

KNOCKDOWN SECTIONAL AIR CONDUITS

Filed Nov. 3, 1953          3 Sheets-Sheet 2



_Fig-3_

_Fig-4_

_Fig-5_

INVENTOR.
WILLIAM D. CALLAN

BY

*DesJardins, Robinson, Tritle & Schenk*

HIS ATTORNEYS

Dec. 8, 1959        W. D. CALLAN        2,916,054

KNOCKDOWN SECTIONAL AIR CONDUITS

Filed Nov. 3, 1953                   3 Sheets-Sheet 3



INVENTOR.
WILLIAM D. CALLAN

BY

*Des Jardins, Robinson, Tittle & Schenk*

HIS ATTORNEYS

# United States Patent Office

**2,916,054**
Patented Dec. 8, 1959

1

**2,916,054**

**KNOCKDOWN SECTIONAL AIR CONDUITS**

**William D. Callan, Cincinnati, Ohio**

**Application November 3, 1953, Serial No. 389,933**

**11 Claims. (Cl. 138—64)**

This invention relates to knockdown sectional air conduits, particularly conduits for conveying air in air-conditioning, ventilating and heating systems and the like, and it especially pertains to knockdown sectional conduits comprised of standard metal panels lined with insulating material, preferably inorganic, that is securely fixed thereto for sound and thermal insulation of the conduit sections and the ventilating, heating and air-conditioning systems in which the sections are installed.

The panels of the knockdown conduit sections are flat and can be stacked for packaging, handling and shipping to be readily assembled at the place of use into rectangular or square conduit sections that are in turn readily jointed in end to end relation for installation of conduit systems.

While these panels may, of course, be of any dimension they are preferably of one standard length made in certain selected standard widths and of a construction to be combined into larger panel assemblies of any desired greater widths by adapters or connecters of the same general construction and length as the standard panels, disposed between and interengaged with the longitudinal edges of two adjacent standard panels. Such panel assemblies permit the formation of conduit sections of any desired sizes and rectangular shapes.

Heretofore, insulated and acoustical conduit systems for ventilating, heating and air-conditioning have been made from conventional sectional metal conduits wrapped with insulating material or from sectional conduits made entirely from insulating materials. The latter type conduit sections are made from asbestos paper wound about a mandrel to be built up to desired form and size. Both types are cumbersome and bulky to handle, package and ship. The type made from insulating material has the further objection of shrinking, thereby opening the joints between said sections to cause an unsightly appearance, more especially when painted, and more often than not to cause leakage. Moreover, the insulating material used for making the conduits does not have a high degree of wet strength and hence the conduit sections cannot be exposed to the weather without being damaged. Therefore, installation of these asbestos conduit systems should not be installed until they are weather protected. This naturally delays progress of the job with consequent loss to the contractor. Furthermore, organic fibers are usually incorporated with asbestos fiber to improve the felting qualities of the fibrous stock, and the organic fibers are highly water absorbent.

Accordingly, one of the principal objects of my invention is insulated and acoustical metal sectional air conduits made from knockdown flat panels of standard sizes.

Another object of the invention is insulated and acoustical metal air conduits of varying sizes made from assemblies of the standard flat panels.

Another object of the invention is insulated and acoustical conduits having insulating and acoustical material

2

lining a protecting metal wall and with said lining securely fixed thereto.

Still another object of the invention is insulated and acoustical air conduits composed of sections readily detachably connected in end to end relation.

A still further object of the invention is knockdown insulated and acoustical metal air conduits which are simple in construction and efficient in operation.

A still further object of the invention is knockdown insulated and acoustical metal conduits composed of flat panels which are provided with longitudinal edges for interlocking them together without requiring accessory means.

Further objects, and objects relating to details of construction and economies of operation, will readily appear from the detailed description to follow. In one instance I have accomplished the objects of my invention by the device and means set forth in the following specification. My invention is clearly defined and pointed out in the appended claims. Structures constituting preferred embodiments of my invention are illustrated in the accompanying drawings, forming a part of this specification, in which:

Fig. 1 is a perspective view of two lengths of an insulated sectional air conduit disposed end to end.

Fig. 2 is a similar perspective view of a larger size conduit having two of its opposite walls formed by an assembly of a plurality of standard panels with an adapter or connecter piece between two adjacent standard panels.

Fig. 3 is a perspective view of one of the side panels with the insulating lining and the opposite removable end pieces removed.

Fig. 4 is a perspective view of one of the end pieces which is detachably fitted to each of the opposite ends of the panel.

Fig. 5 is a perspective view, similar to Fig. 3, with both opposite end pieces assembled and the insulation installed on the underside in the recess formed by the opposite flanged ends and sides of the panel.

Fig. 6 is a cross-sectional view taken along the plane of line 6—6 of Fig. 1 of two side panels of like size interlocked for forming two adjacent sides and one corner of a conduit section.

Fig. 7 is a cross-sectional view taken along the plane of line 7—7 of Fig. 2 of one of the assembly panels, without the insulation, formed with two standard panels of unlike size connected by an adapter panel interposed between adjacent longitudinal edges.

Fig. 8 is a perspective view of the adapter panel, with parts exploded.

Fig. 9 is a perspective view of a tear drop brace or strut which fits inside adjacent assembly panels to prevent sagging of the upper side of the conduit system.

Fig. 10 is a detail cross-sectional view taken along the plane of 10—10 of Fig. 1 through an end joint between sections of duct.

Fig. 11 is a perspective view of an end connector used in conjunction with the adapter panel.

Referring specifically to the drawings in which like numerals are used to designate like parts, the panels are preferably made in several standard sizes, all of equal length but with the panels of one standard size differing in width from the panels of the other standard sizes. Accordingly, the same or different standard sizes can be selected for being assembled into conduits having all sides equal to be perfectly square or have two opposite sides unequal in width with respect to the other opposite sides for one dimension of the conduit to be wider than the other. Two standard sizes of panels are illustrated, one being wider than the other. The narrower standard

2,916,054

3

size panel is designated A, and the wider standard size is designated B. However, these two panels are of the same construction, differing only as to width, and, therefore, conduits can be assembled from panels of either standard size, or both, or with assembly panels combining both sizes, for the construction of conduits of any desired size and rectangular shape.

The panel comprises a sheet metal sheet 6 having one opposite longitudinal margin bent at a right angle into a vertical flange 19 and terminating into a retroverted flange 20 to provide a double ply flange from which lugs 31 are cut to be bent to overhang the insulation receiving recess. An intermediate part of the vertical flange is bent outwardly and backwardly upon itself into a tongue 13 in which spaced apart bayonet slots 15 are provided with a hook portion 21 overhanging a part of the slot, adjacent the open side of said slot, and having their bottom edges 22 slightly tapered. The opposite longitudinal margin of sheet 6 is bent into a vertical flange 23, at a right angle to sheet 6, and terminating in another flange 24, parallel with sheet 6, having a channel groove 3 formed therein, between opposite sidewalls 25, opening outwardly from the top side. Rivets or screws 11 are fitted into the opposite sidewalls 25, transversely to and spanning the channel groove 3 and in longitudinally spaced apart relation to fit into the bayonet slots 15 and beneath the hook portions 21 of an adjacent panel to be detachably interfitted therewith. With the sheet constructed as above described, flanges 19 and 23 are formed on the two opposite longitudinal edges with one of the flanges 19 provided with a tongue 13 on the edge of the sheet and the other flange 23 provided with a mating groove 3 on a side face of the sheet for interfitting with adjacent panels of like construction and having the mating tongues 13 and grooves 3 detachably interlocked by the bayonet slots 15 in the tongues 13.

The opposite ends of the metal sheet 6 are provided with lugs or ears 2 which are adapted to project through slots 26 of the end pieces 1 which are to be fitted to the open or non-flanged ends of sheet 6 between the above described longitudinal flanges 19 and 23. These end pieces 1 are deformed from a sheet metal blank to provide a channel groove 27 between the single ply terminal sidewall 29 and the double ply wall 28, said wall 28 being at right angles to a vertical flange 30. The top edge of the vertical flange 30 is bent back inwardly upon itself to leave upwardly extending lugs or ears 31' that have been cut away therefrom along their side edges. The extended ears 31' of the end pieces are bent inwardly at right angles in the same direction as the wall portions 28 and 29 to overhang the recess in the face of sheet 6 and abut against the margin of the herewith described insulation material inserted to fill the recess. These end pieces are assembled to the open ends of the above described sheet 6 with the end of said sheet fitting within the groove 27 and the ears or lugs 2 on the sheet 6 projecting through the slots 26 of said end pieces, after which the ears or lugs 2 are bent downwardly against the outside face of the end pieces to hold them in assembled relation with the sheet 6. The bent extended ears or lugs 32 of the end pieces will lie against the inside faces of the longitudinal flanges 19 and 23 on sheet 6 to lap the corners. The opposite end pieces cooperate with said longitudinal flanges to form a flange surrounding a recess in one side of sheet 6 which is filled with suitable insulating material 4, preferably of such inorganic materials as mineral or glass fibers. A preformed slab of the insulating material is preferably used, and it is preferably adhered to the metal sheet with suitable water-insoluble adhesive. The marginal edges of the insulating material are engaged by the overhanging facing flanges having lugs 31 of the bent longitudinal edges of sheet 6 and the bent over lugs or ears 31' of the end pieces. Thus, the insulating material is not only securely bonded by the adhesive material but it is more positively secured by the overhanging parts of

4

the metal panel. There will be a slot formed in each of these end pieces 1 in registration with channel groove 3.

The insulated panels are fitted together in edge to edge relation into rectangular conduit sections, each of the panels comprising one of the sidewalls of the conduit section. The conduit sections can be made up from standard panels of equal width into square conduit or from standard panels of unequal width with rectangular conduits of unequal dimensions (Figs. 1 and 2). The insulating material is on the inside of the conduit lining the metal exterior and protected by it.

It will be noted that when the conduit section is formed from four of the panels, each panel forming one of the sides, the terminal side walls 29 of the groove portion on the removable end section will be oppositely disposed at the ends of the adjacent ends of the conduits on all four sides, and, accordingly, they may be advantageously locked in end to end relation by channel clips 7 having bent over side edges 33 which provide a channel into which the opposite terminal side walls are received (Fig. 10).

In order to effectively seal the end joints formed by the end to end connection of the conduit sections, a compressible gasket 14 of any suitable elastic material may be inserted, and the gasket and the adjacent ends of the conduit sections may be advantageously painted with water-insoluble cement for more effectively sealing the joint.

Larger conduits may be formed by connecting two or more of the standard size panels in assembly panels (Fig. 2) by a connector or adapter panel comprising parts 16 and 17 (Figs. 2, 7 and 8). The part 17 comprises a metal blank bent upwardly on one side into a vertical wall 35 with its top edge turned outwardly into a terminal flange 36, generally parallel with the bottom 37 of a channel 38, for receiving the groove 3 of a standard panel. The opposite side of channel 38 is formed by the flange 13' bent upwardly and reverted parallel to the vertical wall 35. Bayonet slots 15' are formed in the vertical wall 13' similar to the bayonet slots in the standard panels and for the same purpose. Ears or lugs 40 are cut from the bottom 37 to be bent over to retain insulation 4.

The part 16 of the adapter or connector is formed from a metal blank having a longitudinal vertical wall 41 with a channel or groove 3' formed therein and the spaced-apart rivets or screws 11' fixed to the opposite walls 42 of the channel 31 similar to and for performing the same functions as the rivets or screws 11 in the standard panel. Ears or lugs 43 are provided in spaced-apart relation on the bottom edge of wall 41 for being bent over, the marginal edge of an insulating slab 4' fitted between the said ears or lugs 43 and the top side of part 16. An intermediate portion of this top side of part 16 is doubled back upon itself at 44 and then, extended into a terminal end 45 to provide a channel 46 between it and the double ply back portion 44. This channel 46 receives the terminal flange 36 which is overlapped by the terminal end 45 that also extends to overlap the marginal edge of the standard panel that is fitted to the part 16. Screw holes 48 are formed in the terminal end 45 to register with the screw holes 49 formed in the outer face of the standard panel to receive the screws 12. Metal pieces 47 (Fig. 11) are fitted to the ends of the part 16 to cover the ends of the insulation and have ears or lugs 40 for being bent over the marginal edges of the insulation. Ears or lugs 48' may also be provided on these end pieces 47 and bent inwardly to be aligned with the marginal tongues on the detachable end pieces of the standard panels for also being engaged by the channel strips 7 for securing the assembled conduit sections in end to end relation.

When a conduit is formed of two or more panels for one side of a conduit, a tear drop support 18 (Fig. 9)

2,916,054

<table>
<tr><td>5</td><td>6</td></tr>
</table>

is inserted into the conduit spaced longitudinally about every four feet at a joint where the adapter panel is installed. This tear drop support **18** is constructed from a metal blank bent into a hollow body portion having a concavo-convex longitudinal side edge **50** opposite to the triangular edge **51**. A flat ear **9** is formed on one end and another flat ear **10** is formed on the opposite end, these ears being of the thickness of the sheet metal from which the support **18** is formed. The ears are adapted to fit in the joint between the ends of the conduit sections with the ends of the hollow body in contact with and abutting the inside of the assembly panels to prevent sagging of the upper side of the conduit system.

From the foregoing description, the construction of the panels and the adapters or connecters are readily apparent as well as their assembly to form the conduit sections which are assembled in end to end relation for any desired length systems. It will also be apparent that reducer conduit sections can be made of the same general construction, these being but tapered conduit sections for connecting conduit lines of smaller and larger cross sections.

I am aware that there may be various changes in details of construction without departing from the spirit of my invention, and, therefore, I claim my invention broadly as indicated by the appended claims.

Having thus described my invention, what I claim as new and useful and desire to secure by United States Letters Patent, is:

1. An insulated knockdown air conduit comprising conduit sections composed of separate flat thermo-insulating wall panels having readily detachable interfitting longitudinal edges, means carried by the panels for wedging them into interlocking relation, each of said panels being of metal having a surrounding marginal flange to provide a recessed side face, an insulating slab filling the recess, and lugs stamped from the surrounding flange for locking the insulating slab in the recess.

2. The insulated knockdown air conduit of claim 1 in which the insulating slab is adhesively bonded to the metal.

3. The insulated knockdown conduit of claim 2 having sealing means applied to the interengaging edges.

4. An insulated knockdown air conduit comprised of the conduit sections of claim 3 detachably connected in end to end relation.

5. The insulated knockdown air conduit of claim 4 in which the adjacent ends of the conduit are sealed.

6. A rectangular knockdown conduit composed of at least four wall panels interlocked together at their corners, each of said panels comprising a metal plate having a surrounding angular flange disposed about the opposite edges to provide a recess on one side face of the plate, an insulating slab in the recess, portions on the flanges for overhanging the marginal edges of the insulating slab for holding it in the recess, a tongue extending from one side of the panel with bayonet slots therein, a channeled wall along the margin of the face of the panel, opposite to the tongue side, and means on the channel wall for detachably engaging the bayonet slots of the tongue to a similar panel fitting within the channeled wall.

7. An insulated knockdown air conduit comprising conduit sections composed of separate flat metal panels, each having a surrounding flange to provide a recess on one face, insulating material filling the recess and secured therein, a mating tongue and groove formed on the opposite longitudinal edges of the panels, bayonet slots formed in the tongue, and means formed in the groove for engaging the bayonet slots of a similar constructed panel.

8. The insulated knockdown air conduit of claim 7 in which the engaging portion of the slot is inclined for causing the adjacent edges of the panels to be drawn in closely abutting relation.

9. The insulated knockdown conduit of claim 8 in which the abutting edges of the panels are coated with non-metallic material.

10. The insulated knockdown conduit of claim 9 in which the coating material is water-insoluble cement.

11. A knock-down conduit comprising rectangular metal wall panels having their opposite longitudinal edges bent into flanges to provide a recess on one side, a detachable end flange fitting between the longitudinal flanges and secured to each of the opposite ends of the panel for closing the ends of the recess, insulating material filling the recess, and channeled means carried by the end flanges for receiving a locking clip for fastening sections of said conduit end to end.

**References Cited** in the file of this patent

UNITED STATES PATENTS

| | | |
|---|---|---|
| 437,981 | Davidson | Oct. 7, 1890 |
| 1,268,707 | Gehnrich | June 4, 1918 |
| 2,183,174 | Smith | Dec. 12, 1939 |
| 2,215,318 | Bristol | Sept. 17, 1940 |
| 2,225,556 | Delaney | Dec. 17, 1940 |
| 2,330,763 | Townsend | Sept. 28, 1943 |
| 2,338,801 | Callan | Jan. 11, 1944 |
| 2,447,272 | Parkes | Aug. 17, 1948 |
| 2,489,048 | Rinehart | Nov. 22, 1949 |
| 2,670,763 | Hiss | Mar. 2, 1954 |
| 2,691,432 | Klein et al. | Oct. 12, 1954 |
| 2,741,341 | Anderson et al. | Apr. 10, 1956 |

E-FILED
Friday, 05 February, 2021  07:41:47 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation,<br><br>        Plaintiff,<br><br>  v.<br><br>VAN-PACKER CO., an Illinois corporation, JEREMIAS, INC., a Georgia corporation,<br><br>      Defendants. | Case No. 1:19-cv-01388-SLD-JEH<br><br><br>**PLAINTIFF DURASYSTEMS BARRIERS INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>**District Judge Sara Darrow**<br>**Magistrate Judge Jonathan E. Hawley** |

claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." This language is the foundation of the definiteness doctrine, which holds that claims, "viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2129 (2014). That a PHOSITA would understand with reasonable certainty the boundaries of the claim is all that is required for a claim to be upheld as definite. *See id.* ("[W]e read § 112, ¶2[3] to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable.").

Defendants argue that the terms "fire-rated" and "specified fire rating" are indefinite because there are multiple fire resistance tests and fire ratings, and "the specification provides insufficient objective guidance on what is required for an exhaust duct to be 'fire-rated.'" Dkt. No. 31, p. 7. This indefiniteness argument is founded on the faulty premise that an exhaust duct can only be "fire-rated" if it tests to a certain standard, and that certain standard is not disclosed in the '569 patent. To the contrary, there is no certain standard to which a duct must be tested to be "fire rated," and, consequently, no certain standard needs to be disclosed for "fire rated" to be definite. Different jurisdictions require different fire ratings. Crimi Decl., ¶¶24-29. Additionally, fire rating standards are dynamic and are updated from time to time. Cheek Depo., 79:3-80:20. Thus, there is no one set standard for obtaining a "fire rating" on an exhaust duct. Defendants' argument about different standards for exhaust duct fire ratings is a red herring.

All the evidence of record, including the testimony of Defendants' expert and fact

---

[3] The Leahy-Smith America Invents Act relabeled 35 U.S.C. §112, ¶2 as 35 U.S.C. §112(b).

witnesses, demonstrates that a PHOSITA would know and understand a "fire-rated" exhaust duct is simply one that has passed any standard fire resistance test. *See* Crimi Decl., ¶31; Cheek Depo., 16:15-19; Sims Depo., 136:14-137:20. Indeed, many companies, including Van-Packer, use the term "fire-rated" to market their fire-rated exhaust ducts. Crimi Decl., ¶36. And whether an exhaust duct has passed a standard fire test, and consequently is "fire-rated," is easily determined. Although Mr. Cheek is not familiar with the process for obtaining a fire rating on an exhaust duct (Cheek Depo., 18:8-20), he testified that whether an exhaust duct is fire rated is "an easy yes–no decision" and a company that makes an exhaust duct will "certainly know whether that exhaust duct has passed or has obtained a fire rating" (*id*., 82:3-23). Simply stated, every exhaust duct manufacturer knows whether its exhaust duct is fire rated, and, consequently, whether it meets the "fire-rated" element of the claims of the '569 patent. Similarly, the "specified fire rating" is simply the fire resistance rating for which the exhaust duct assembly has been tested. Crimi Decl., ¶¶32-35. Consequently, "fire-rated" and "specified fire rating" are not indefinite and Plaintiff's proposed constructions should be adopted.

Defendants cite *Pac. Coast Bldg. Prod., Inc. v. Certain Teed Gypsum, Inc.*, 816 F. App'x 454, 455, 459 (Fed. Cir. 2020), *Teva Pharms., USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015), and *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) in support of their indefiniteness argument. (Dkt. No. 31, p. 8).  But each of these cases is inapposite to this case because they merely hold that when more than one standard can be used to determine infringement, and when those different standards result in different outcomes, the claim is indefinite. In contrast, in this case only one standard is used to determine whether the accused instrumentality meets the "fire-rated" limitation: Does the exhaust duct have a fire rating? If yes, then the limitation is met. Thus, this is not a case where different standards result

in different conclusions concerning infringement as Defendants would lead this Court to believe. The claim terms "fire-rated" and "specified fire rating" are not indefinite and "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S.Ct. at 2129. Indeed, because whether a duct is "fire-rated" is an "easy yes-no decision," Cheek Depo., 82:3-23. the bounds of "fire rated" and "specified fire rating" could not be more clear.[4]

Defendants argue that "Plaintiff appears to have conceded the indefiniteness of the 'fire-rated' terms when the Examiner rejected claims from the '275 Application directed to 'modular fire-rated exhaust duct assembly'…." Dkt. No. 31, pp. 10-11. Plaintiffs did no such thing.  First, amending "fire rated exhaust duct" to an exhaust duct "having a fire rating" is a difference without a distinction. As explained above, a "fire-rated exhaust duct" is an exhaust duct that "has a fire rating." Second, the Examiner is not a PHOSITA, and apparently is not familiar with the fire-rated exhaust duct industry as shown by the Examiner's confusion concerning fire ratings. *See* Ex. P, 159-160. Third, the '275 Application is not part of the intrinsic record of the '579 patent and its prosecution does not alter the clear meaning of "fire rated" and "specified fire rating" understood by a PHOSITA based on the intrinsic record of the '569 patent. Fourth, the Examiner's rejection was based on a different standard for indefiniteness than the standard that

---

[4] Defendants' argument that Mr. Duffy, inventor of the '569 patent, "concede[d] that there is no relation to objective industry standards…" is likewise inapposite. Dkt. No. 31, p. 9 (quoting Duffy Depo., 14:8-15). Defendants take Mr. Duffy's testimony out of context to misconstrue it. Immediately prior to the testimony quoted in Defendants' brief, Mr. Duffy testified concerning how DuraSystems came into being, and of several different fire protection products made by DuraSystems, including "walls and doors and many, many, many other products." Ex. EE, 11:7-14:2. Thus, when asked, "And so your understanding of *something* being fire rated isn't tied to any particular standard, correct?" Mr. Duffy's answer was not specific to exhaust ducts or the '569 patent as Defendants portray. Further, as explained above, there is no dispute that there are many fire rating standards, not just one "particular standard." That is why Mr. Duffy went on to testify about various different standards, including "a 30-minute fire rating; one-hour fire rating; two-hour fire rating; four-hour rating, you know, goes on to many different kinds of – of fire ratings." *Id.,* 14:11-15.

applies to an issued patent and therefore is not dispositive. The standard that applies to an issued patent is whether the accused infringer has proven by clear and convincing evidence that "its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. In contrast, the standard applied by the Examiner was whether the claim language was "unclear." *In re Packard*, 751 F.3d 1307, 1310 (Fed. Cir. 2014); *Ex Parte McAward*, 2017 WL 3669566, *4 (P.T.A.B. Aug. 25, 2017) ("The Office's application of the broadest reasonable interpretation for pending claims and its employment of an interactive process for resolving ambiguities during prosecution naturally results in an approach to resolving questions of compliance with §112 that fundamentally differs from a court's approach to indefiniteness."). Therefore, the amendment at issue does not dispositively show that the claim language at issue is invalid for indefiniteness.

In view of the foregoing, a PHOSITA would understand the bounds of the claim terms "fire-rated" and "specified fire rating" with reasonable certainty and Defendants have not presented clear and convincing evidence that these terms are indefinite.

### B.    "compressible insulation material"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "compressible insulation material" | "insulation material whose thickness changes under the weight of the inner duct" | Indefinite |

Defendants argue that the term "compressible insulation material" is indefinite because (1) "The specification of the '569 Patent does not provide a standard for measuring the scope of 'compressible,'" and (2) a dependent claim "provides that a 'compressible insulation material' comprises 'an insulation board'" and insulation boards are not "compressible." Dkt. No. 31, pp. 12-13. Defendants are wrong on both accounts.

10

Plaintiff does not dispute that "compressible" is a term of degree, and as such, the '569 patent must provide an objective standard to inform a PHOSITA how to distinguish which insulation materials are sufficiently "compressible" to fall within the scope of the claims and which are not. *See* Dkt. No. 31, p. 12. But reading the '569 patent as a whole, as the law requires, a PHOSITA would understand that the '569 patent teaches just such a standard.

The degree of "compressibility" required by the claims is understood from the purpose of the thermal spacers. As Defendants' expert testified, "if you took the spacers out, then the ductwork would crush the insulation on the bottom from gravity and thus negating some of the insulation properties of the insulation." Cheek Depo., 106:22-107:1. Indeed, the need to prevent the insulation from being crushed is expressly taught in the '569 patent:

> Once the thermal spacers 420 are correctly positioned, the spacers 420 are secured or connected to the outer casing panels 310 using staples or screws … to ensure that the thermal spacers 420 stay in the desired position for supporting the outer casing panels 310 and maintaining the gap or void [between the inner duct liner and outer casing] *so the insulating material 410 is not unnecessarily compressed or crushed*.

'569 patent, 6:61-7:2. Mr. Cheek admitted that a PHOSITA would understand from this passage "that a compressible insulation is an insulation that would be compressed if the spacers were removed[.]" Cheek Depo., 107:2-108:8. Mr. Crimi agrees. Crimi Decl., ¶¶39-39. Thus, both experts agree that a PHOSITA would understand that the objective standard taught by the '569 concerning the "compressibility" of the insulation material is whether the weight of the inner duct would compress the insulation material. In other words, a "compressible insulating material" is one where the "thickness changes under the weight of the inner duct."

Defendants also argue that "compressible insulation material" is indefinite because it includes an "insulation board" that is allegedly not "compressible." Dkt. No. 31, p. 13. Defendants assert that "Mr. Duffy admitted that insulation board is not 'compressible.'" *Id.*

(citing Ex. O, ("Duffy Depo."), 111:1-3, 112:13-113:3). But Defendants mischaracterize Mr. Duffy's testimony. When asked, "And is insulation board compressible?" Mr. Duffy replied, "Generally speaking, no." Duffy Depo., 111, 1-3. This is a correct statement. Some insulation boards are not "compressible." *See* Duffy Depo., 112:13-113:3; Crimi Decl., ¶41. However, some insulation boards are compressible. Both Mr. Cheek and Mr. Crimi agree that fiberglass insulation boards that have "air gaps" that "provide a significant portion of the insulated properties of the board" and can be compressed using your fingers. *See* Cheek Depo.,[5] 108:9-109:14; Crimi Decl., ¶41. When compressed, the fiberglass board "loses those air gaps and it can compromise the insulated [sic, insulative] properties of the board[.]" Cheek Depo., 109:2-5. More importantly, Mr. Cheek admitted that the weight of the inner duct liner could compress fiberglass insulation board. *Id.* at 109:15-110:15. Mr. Crimi agrees. Crimi Decl., ¶41. Thus, Defendants' argument that an "insulation board" is not "compressible" is incorrect and debunked by their own expert.

In summary, a PHOSITA reading the '569 patent as a whole would understand that the objective standard by which "compressibility" of the insulation material is to be determined is whether its thickness changes under the weight of the inner duct such that its insulation properties are compromised. Consequently, the term "compressible insulation material" is not indefinite and would be understood by a PHOSITA to mean an "insulation material whose thickness changes under the weight of the inner duct."

### C.   "thermal spacers thermally isolating"[6]

---

[5] Mr. Cheek's deposition testimony that fiberglass insulation boards are "compressible" contradicts his declaration in which he opined that "insulation boards" are not compressible. *Compare* Cheek Depo., 108:9-109:14 *with* Cheek Decl. ¶68.

[6] Defendants argue that "thermal spacer" and "thermally isolating" should be construed separately because "'thermally isolating' … is the function the thermal spacer performs, not what

### 1.    Genesis of the dispute

The dispute concerning the interpretation of "thermal spacers thermally isolating" arises from Defendants' non-infringement contentions. Defendants' accused products use a metal thermal spacer. The spacer (green) is shown in Figure 1 of Van-Packer's patent application on its GRZ product, and the colorized picture of a GRZ product below:

 

Van-Packer describes this spacer in its patent application on the accused products as follows:

> [0047] As shown in FIG. 4, the perforations 130 create vertical metal strips 132 between the perforations 130. … The metal strips 130 act as a heat sink by reducing the amount of heat transferred between the inner liner 102 and out [sic, outer] shell 104. … Therefore, in order to prevent failure (e.g., a fire), the present device reduces the amount of heat transfer between the inner liner 102 and outer shell 104.

Ex. FF, ¶[0047]; *see also id.*, ¶[0013]. Thus, the spacer of the accused products is specifically configured to reduce the amount of heat transferred between the inner liner and the outer casing to prevent failure of the exhaust duct during a fire.

---

the thermal spacers are." Dkt. No. 31, p. 13 n. 5. Ironically, Defendants then use the function of a "spacer" to define that term by arguing "a 'spacer' is something that maintains two components in a spaced relationship." *Id.* pp. 13-14. Defendants also argue that its proposed construction should be adopted because "The 'thermal spacer' is explicitly tied to 'thermal isolation' in the claim itself[.]" *Id.* p. 14. Whether the terms "thermal spacer" and "thermally isolating" are defined together or separately, the end result is the same. However, because the words appear in the claims as "thermal spacers thermally isolating," it makes more sense to construe the phrase as a whole rather than parsing into two terms.

To avoid infringement Defendants propose constructions of "thermal spacer" and "thermally isolating" that potentially remove *metal* thermal spacers such as those used by Defendants from the scope of the claims. Defendants do this by construing "thermal spacer" to require the spacer to have "a specific thermal isolation property," which Defendants interpret to be "an inherent property of the component, e.g., its thermal conductivity." Dkt. No. 31, pp. 13-14. Defendants then argue no infringement because metal is a "thermal conductor" with a high heat conductivity value and, therefore, does not have a "specific thermal isolation property." Defendants also construe "thermally isolating" to mean "preventing the thermal transfer of heat." Dkt. No. 31, p. 18. Defendants again argue that metal thermal spacers do not "prevent the thermal transfer of heat" because they are thermal conductors.

> **2.** **Plaintiff's proposed construction of "thermal spacer thermally isolating" should be adopted**

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "thermal spacers thermally isolating" | "components that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | "a spacer having a specific thermal isolation property where a 'spacer' is something that maintains two components in a spaced relationship" and "preventing the thermal transfer of heat" |

As Defendants note, the plain language of the claim requires the "thermal spacer" to "thermally isolate." Dkt. No. 31, p. 14. This is not in dispute. Rather the dispute centers on (1) how the "thermal spacer" accomplishes "thermal isolation," and (2) the degree to which the "thermal spacer" must "thermally isolate."

Defendants argue that the claim language "thermal spacer thermally isolating said inner duct liner from said outer casing" "makes clear that 'thermal spacers' are spacers that have a *specific thermal isolation property*" that "is an inherent property of the component, e.g., its

thermal conductivity." Dkt. No. 31, p. 14 (emphasis in original, citations omitted). In other words, Defendants' argue that the "thermal spacer" should be construed to require the spacer to accomplish "thermally isolation" by virtue of a low heat conductivity value of the material from which the spacer is made. Dkt. No. 31, pp. 14-15.

During prosecution of the '569 patent the applicant stated, "The term 'thermal' in the context of the subject application means and refers to 'specific thermal proper*ties*', namely, thermally isolating." JA0328 (emphasis added). Defendants misconstrue this statement that clearly includes multiple thermal "proper*ties*" to be a definition and/or disavowal limiting "thermal spacers" to one thermal property, namely the "thermal conductivity rating." Dkt. No. 31, pp. 14-16. Defendants' only evidence that the "thermal isolation property" of a spacer refers to thermal conductivity rating of the material is Mr. Cheek's declaration. Dkt. No. 31, p. 14 (citing Cheek Decl., ¶¶ 73-74). But during deposition Mr. Cheek conceded that the "thermal property" of a spacer is simply "the speed with which heat travels from one side of the spacer to another side of the spacer…." Cheek Depo., 110:16-22. Mr. Cheek testified that one could affect this "thermal property" and slow the transfer of heat through the spacer by (1) "mak[ing] the spacer out of a material with a low overall conductivity of heat value," (2) "reduc[ing] the surface area" of the spacer, and (3) lengthening the path of the spacer through which the heat must travel, for example by making the spacer with a "path less than a direct path [such as] in some kind of coil configuration." Cheek Depo., 111:9-112:19. Thus, the "thermal property" of a spacer is more than just the thermal conductivity rating of the material and can be affected in several different ways. Defendants' construction artificially limiting the "thermal property" to only the thermal conductivity rating of the material is incorrect.

Defendants argue that the Court should deviate from the "clear and unquestionable"

meaning of words in a claim only "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Dkt. No. 31, pp. 4-5 (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). But here the patentee did not define "thermal spacers thermally isolating" to require "**a** thermal isolation property," or a particular "inherent property of the component, e.g., its thermal conductivity." There is no discussion of the "thermal conductivity value" of the thermal spacer anywhere in the intrinsic record. Nor could Mr. Cheek identify any disclaimer limiting the thermal spacer's thermal isolation property to its thermal conductivity value. Cheek Depo., 112:20-113:14. Thus, Defendants' proposed construction should be rejected because it mischaracterizes the prosecution history, contradicts the very case law Defendants cite, and is refuted by the testimony of their own expert.

That a PHOSITA would understand a "thermal spacer" to include spacers made of metal configured to reduce or limit heat transfer is further exemplified by Defendants' own patent application. As noted above, Van-Packer's patent application explains that the thermal spacers are designed with "metal strips [that] reduce the amount of heat transfer between the inner liner and the outer shell…" and that the "metal strips 130 [of the spacer] act as a heat sink by reducing the amount of heat transferred between the inner liner 102 and out [sic, outer] shell 104." Ex. FF, ¶[0013], ¶[0047]. Thus, by Van-Packer's own admission a PHOSITA would understand that a thermal spacer may accomplish "thermal isolation" via the shape of the spacer regardless of the heat conductivity value of the spacer.

Turning to the dispute about the degree to which the "thermal spacer" must "thermally isolate," Defendants argue that "thermally isolating" requires the spacer to "prevent[] the thermal transfer of heat," i.e., it must "cut off" the transfer of heat. Dkt. No. 31, pp. 18-19. This

proposed construction is wrong and should be rejected for four reasons.

First, Defendants have truncated and altered the applicant's statement during prosecution to transform it into something it is not. That Defendants' mischaracterize that the applicant argued that "the thermal spacer[] is configured *to prevent the thermal transfer of heat,* e.g., due to a grease fire, from the inner duct to the outer casing." Dkt. No. 31, p. 19 (quoting JA0329 (emphasis and alterations by Defendants). What the applicant in fact argued and what a PHOSITA would understand is that "*the arrangement* of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers *is configured to prevent the thermal transfer of heat*…." JA0329 (emphasis added); *see also* Crimi Decl., ¶48. Defendants' proposed construction is based on an altered statement in the prosecution history.

Second, "preventing" the thermal transfer of heat is a physical impossibility. There is no material that can "prevent" or "cut off" the transfer of heat between two objects. Crimi Decl., ¶49; Cheek Depo., 124:2-4. Even Mr. Cheek conceded that this is a basic principle of thermodynamics that a PHOSITA would certainly understand. Cheek Depo. 125:18-23; *see also* Crimi Decl., ¶49. Thus, a PHOSITA would understand the applicant's statement "prevent the thermal transfer of heat" to be a colloquial, rather than a literal, use of "prevent." Crimi Decl., ¶50. Thus, literally "preventing" the thermal transfer of heat cannot be the correct interpretation of "thermally isolating" because it would exclude every embodiment taught in the patent. *Vitronics*, 90 F.3d at 1583 (an interpretation that causes the claim to fail to cover *any* of the embodiments disclosed in the specification is "rarely, if ever, correct").

Third, Mr. Cheek's opinion that "thermally isolating" means to "prevent the thermal transfer of heat" Cheek Decl., ¶¶81-82 is based on a misunderstanding of the '569 patent and its prosecution history. Mr. Cheek mistakenly thought that "the patent say[s] that it prevents heat

transfer." Cheek Depo., 120:2-4. The '569 patent says no such thing. Mr. Cheek also mistakenly thought that the claim language includes the phrase "prevent the transfer of heat." *Id.*, 121:14-17. Mr. Cheek's misunderstandings render opinions on this issue uncredible.

Fourth, and perhaps most importantly, Defendants' proposed construction does not align with the teachings of the '569 patent. The '569 patent teaches the following concerning thermal isolation between the inner duct liner and the outer casing:

- In other words, a fire-rated duct must be capable of *minimizing the transfer of heat* through or across the duct walls. '569 patent, 1:30-36.
- As a result, any potential fire inside the duct system must be contained and *thermal transfer through the duct walls limited* to prevent ignition of adjacent combustible material in the kitchen or other areas of the building. '569 patent, 1:44-50.

In view of these teachings and a PHOSITA's understanding of thermodynamics concerning the transfer of heat between objects, a PHOSITA would understand that "thermally isolating" in the context of the '569 patent means that the transfer of heat is "minimized" or "limited" such that a fire on one side of the duct will not start a fire on the other side of the duct. Crimi Decl., ¶¶49-51. Defendants' proposed construction that the "thermal spacer" must "prevent" or "cut off" the thermal transfer of heat altogether is contrary to the teachings of the patent, and, consequently, is not the correct interpretation.

Plaintiff's proposed construction, on the other hand, stays true to these teachings of the '569 patent. Defendants' fault Plaintiff's proposed construction as "improperly import[ing] the amount of heat conducted through the spacer…" Dkt. No. 31, p. 20. But just as a PHOSITA must understand how "compressible" insulation must be to fall within the claim term "compressible insulation," as Defendants argue, a PHOSITA must also know to what degree the thermal spacer must "limit" or "minimize" the thermal transfer of heat to be a "thermal spacer thermally isolating." A PHOSITA would understand that the degree to which the "thermal spacers

thermally isolating" must limit, minimize, or "prevent" the transfer of heat would be determined by the specific standard against which the exhaust duct assembly was being tested to obtain a fire rating. Crimi Decl., ¶51. In other words, if the "thermal spacers thermally isolating" allow too much heat transfer through the spacers during testing as compared to the heat passing through the insultation then the attachment points of the thermal spacers will become "hot spots" and the duct will fail the test. *Id*. Mr. Cheek agrees: "Q. So the person of ordinary skill in the art would understand that the thermal spacer has to thermal [sic, thermally] isolate to the degree that it does not transfer heat faster than the heat goes through the insulation, correct? A. Correct. Q. Because otherwise the spacer becomes a hotspot and a fail point during the test, correct? A. Correct." Cheek Depo. 125:18-130:13.

Thus, the testimony of both experts supports interpreting "thermally isolating" to mean "to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." In summary, this construction is correct because it "stays true to the claim language and most naturally aligns with the patent's description of the invention." *See Renishaw*, 158 F.3d at 1250.

### D. "exhaust duct module"

#### 1. Genesis of the dispute

The dispute concerning "exhaust duct module" arises from Defendants' invalidity contentions. Defendants assert that prior art references disclosing a "section" of an exhaust duct are "modular" and teach "exhaust duct modules." Plaintiff asserts that a "section" of an exhaust duct assembly is not necessarily an "exhaust duct module" as that term would be understood by a PHOSITA. As explained above, ducts installed in field-applied fire-rated exhaust ducts are constructed in "sections" then welded together and wrapped, while factory-built or pre-fabricated fire-rated exhaust ducts are constructed as "modules" that are connected together at the

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | **Case No. 1:19-cv-01388-SLD-JEH** |
| Plaintiff, | **DECLARATION OF TONY CRIMI** |
| v. | **District Judge Sara Darrow** |
| VAN-PACKER CO., an Illinois corporation, JEREMIAS, INC., a Georgia corporation, | **Magistrate Judge Jonathan E. Hawley** |
| Defendants. | |

## I.    INTRODUCTION

1.    I am over the age of twenty-one and I am competent to make this declaration.

2.    I have been retained as an expert witness by Workman Nydegger, counsel for DuraSystems Barriers Inc. ("DuraSystems"), to provide my opinions regarding the interpretation of certain claim terms in U.S. Patent No. 10,024,569 ("the '569 patent").

## II.    CREDENTIALS AND COMPENSATION

3.    I earned a Bachelor's Degree in Chemical Engineering from the University of Toronto in 1984, and a Master of Applied Sciences Degree also from the University of Toronto in 1986. I am a Professional Engineer, registered in the Province of Ontario, Canada since 1988. I also hold a Certificate of Authorization, which is to allow individuals and business

1

**Appx1815**

### C.  "thermal spacers thermally isolating"

42.     I understand that the following table sets forth the positions for Plaintiff and Defendants concerning the meaning of "thermal spacers thermally isolating":

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "thermal spacers thermally isolating" | "components that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | "a spacer having a specific thermal isolation property where a 'spacer' is something that maintains two components in a spaced relationship" and "preventing the thermal transfer of heat" |

43.     The '569 patent pertains to fire-rated exhaust duct systems. ('569 patent, Abstract). A PHOSITA would understand that to be a fire-rated exhaust duct system the system must have demonstrated its ability to withstand a fire such that the fire will not spread from one side of the duct (e.g., from inside the duct) to the other side of the duct (e.g., to outside the duct) by passing the pertinent fire resistance tests, as explained above. Consequently, a PHOSITA reading the '569 patent would understand that the patent's references to thermal properties of the duct and its parts to relate to the duct's ability to prevent flame penetration and excessive heat transfer through the duct walls in relation to the pertinent fire test.

44.     With the foregoing context in mind, it is my opinion that a PHOSITA would understand a "thermal spacer thermally isolating" to need to perform two functions. The first function is to maintain the space between the inner duct liner and the outer casing. This function

is expressly stated in the claims. For example, claim 1 states, "said exhaust duct modules having an inner duct liner and an outer casing, and a void being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation material, and including *one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship* so that said insulation material occupies said void." The specification also states this function: "Once the thermal spacers 420 are correctly positioned, the spacers 420 are secured or connected to the outer casing panels 310 using staples or screws … to ensure that the thermal spacers 420 stay in the desired position for supporting the outer casing panels 310 and *maintaining the gap or void [between the inner duct liner and outer casing]* so the insulating material 410 is not unnecessarily compressed or crushed." ('569 patent, 6:61-7:2). This function would be understood by a PHOSITA by virtue of the part being a "spacer," meaning that it must maintain a "space" between two objects. I understand that the parties do not dispute this aspect of the meaning of "thermal spacers thermally isolating."

45.     The second function a PHOSITA would understand a "thermal spacer thermally isolating" to perform would concern the transfer of heat through the spacer. A PHOSITA would understand this to be a function of the spacer because it is a "thermal" spacer that "thermally isolates." I agree with Mr. Cheek's opinion that the "thermal conductivity" of a material is an intrinsic property of the material. (Cheek Decl., ¶74). Because the '569 patent pertains to fire-rated exhaust ducts as explained above, a PHOSITA would understand that a "thermal spacer thermally isolating," which the patent teaches is located between the inner duct liner and the

outer casing, must limit the transfer of heat between those two components to the extent required by the pertinent fire test.

46.     I disagree with Mr. Cheek's opinion that the sole way in which a PHOSITA would affect the thermal conductivity of "thermal spacers thermally isolating" is via the thermal conductivity value of the material from which the spacer is made. (Cheek Decl., ¶¶72-76). A PHOSITA would understand that there are a number of different methods for slowing the transfer of heat through a spacer. For example, a PHOSITA would understand that s/he could affect the transfer of heat through the spacer by selecting different materials having different thermal conductivity values as Mr. Cheek opines. The lower the thermal conductivity value of a material the slower heat moves through or is conducted through the material. A PHOSITA would also understand that s/he could affect the transfer of heat through the spacer by altering the shape of the spacer. For example, heat would transfer through a spacer that has perforations more slowly than it would through a spacer made of the same material and with the same geometry but without the perforations. A PHOSITA would also understand that s/he could affect the transfer of heat through the spacer by increasing the length of the path which the heat must travel along the spacer to reach the other side. For example, it would take heat longer to travel through a spacer in the shape of a coil than it would through a spacer made of the same material in the shape of a straight line. Yet another way a PHOSITA would understand that s/he could affect the transfer of heat through the spacer would be to construct a spacer that has a thermal break in it. For example, the spacer could be made of more than one material, such as a spacer that is metal at the connection points to the inner duct liner and the outer casing, but having a rubber thermal break between the metal ends. Each of these different methods of

20

**Appx1834**

slowing the transfer of heat through a thermal spacer is based on basic principles of thermodynamics that a PHOSITA would understand.

47.    Because a PHOSITA would understand that s/he could affect the rate at which heat is conducted through a "thermal spacer thermally isolating" using a variety of different approaches, a PHOSITA would not understand a "thermal spacer thermally isolation" to require using any particular method of limiting the transfer of heat, such as the thermal conductivity value, absent some specific teaching in the '569 patent requiring that approach. Neither the specification of the '569 patent nor the prosecution history of the '569 patent contains any such teaching that would cause a PHOSITA to limit the plain and ordinary meaning of a "thermal spacer thermally isolating" to require a specific approach to limiting the heat conductivity of the spacer material. A PHOSITA would understand that all methods of limiting the transfer of heat through the spacer would be at the PHOSITA's disposal.

48.    Mr. Cheek opines that a PHOSITA would understand the following argument made by the applicant during the prosecution of the '569 patent to limit the meaning of "thermal spacers thermally isolating":

> It is submitted that this amendment is supported by the application as originally filed, for example, in Paragraph [00034] and in Fig. 4. The term "thermal" in the context of the subject application means and refers to "specific thermal properties", namely, thermally isolating. For instance, the "thermal gasket" is described in Paragraph [00041] as follows, "According to another aspect, a thermal gasket indicated by reference 724 in Fig. 9 can be included to thermally isolate the joint encasement sections 720 from the outer casing panel 310." [Emphasis added.] . . . According to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and ***the thermal spacers is configured to***

> ***prevent the thermal transfer of heat***, e.g. due to a grease fire, from the
> inner duct to the outer casing.

(Cheek Decl., ¶75 (quoting JA0328-29)) (emphasis added by Mr. Cheek)). I disagree. A PHOSITA would understand from the above argument that "thermal" in the claim term "thermal spacers thermally isolating" to mean that the spacer must have "'specific thermal properties', namely, thermally isolating." This is in contrast to a spacer that does not take into account any specific thermal properties that would contribute to the exhaust duct assembly's ability to pass the fire test. Nothing in this argument by the applicant would cause a PHOSITA to limit the meaning of "thermal spacers thermally isolating" to require that the thermal spacers be made of a material with a low thermal conductivity value.

49.     Mr. Cheek opines that "a POSA would understand the term 'thermally isolating' to mean 'preventing the thermal transfer of heat'" or "absolute thermal isolation." (Cheek Decl., ¶81; Cheek Depo., 119:18-120:3). I disagree. As Mr. Cheek subsequently conceded in his declaration (Cheek Decl., ¶83), it is not possible for any material to "prevent" the transfer of heat which is a basic principle of thermal dynamics that a PHOSITA would know and understand. Consequently, Mr. Cheek alters his original opinion to instead focus on "effectively" preventing the transfer of heat. (Cheek Decl., ¶83). In support of this opinion Mr. Cheek again relies on the arguments made by the applicant in the prosecution history quoted above. (*Id*.) Specifically, Mr. Cheek opines, "When I read the statement by the applicant made during prosecution regarding how thermal spacers 'prevent the thermal transfer of heat,' I understand this to mean that the spacers are to be made from something like insulation that essentially prevents heat transfer."

(*Id.*) Mr. Cheek's opinion is both based on an incorrect reading of the applicant's argument and his own understanding, and, consequently, does not represent the understanding of a PHOSITA.

50.     A PHOSITA would understand that the applicant's statement, "According to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat, e.g. due to a grease fire, from the inner duct to the outer casing" to meant that the "arrangement" of the exhaust duct assembly as a whole "is configured to prevent the thermal transfer of heat," and not that the "thermal spacers" prevent the thermal transfer of heat as Mr. Cheek opines. That Mr. Cheek's reading of this passage is incorrect is clear given that the verb "is" in the statement is singular to "arrangement" and not plural to "thermal spacer_s_." Additionally, given that a PHOSITA would know and understand that it is not possible to literally "prevent" the thermal transfer of heat, a PHOSITA would understand the applicant's use of the phrase "prevent the thermal transfer of heat" to be a colloquial use, and not a technical or literal use of the word "prevent."

51.     A PHOSITA would understand that the degree to which the "thermal spacers thermally isolating" must limit, slow, or colloquially "prevent" the transfer of heat would be determined by the specific standard against which the exhaust duct assembly was being tested to obtain a fire rating. Thus, the more stringent the fire rating test to which the duct is to be tested the more effectively the "thermal spacers thermally isolating" must slow the transfer of heat through the spacer and between the inner duct liner and the outer casing. In other words, if the "thermal spacers thermally isolating" allow too much heat to transfer through the spacers during

testing as compared to the heat passing through the insultation then the attachment points of the thermal spacers will become "hot spots," exceed the allowed temperature, and the duct will fail the test.

52.     In view of the foregoing, a PHOSITA's understanding of the degree to which the thermal spacers must "thermally isolate" will be tied to the standard of the relevant fire test. The thermal spacers must limit the transfer of heat through the spacers such that they do not create fail points on the inner duct liner or outer casing during fire rating testing. Consequently, I disagree with Mr. Cheek's opinion that interpreting "thermally isolating" is "inconsistent with how a POSA would use the term and is also not reasonably clear based on the specification of the '569 Patent and the statements by the applicant during prosecution." (Cheek Decl., ¶85).

53.     I also disagree with Mr. Cheek's opinion that "by the principles of heat transfer, two surfaces mechanically joined together, such as by welding, provide a thermal bridge through which the heat will travel. If these surfaces are all made of the same metal, then it would not be possible to thermally isolate one surface from another." (Cheek Decl., ¶86). As discussed above, a PHOSITA would understand that the thermal transfer of heat through a spacer can be affected through a variety of different approaches, several of which can be used on spacers that are of the same material (even metal) as the components that are being spaced apart. Further, because a PHOSITA reading the '569 patent as a whole would understand "thermally isolating" to require limiting the transfer of heat to the degree necessary to pass the pertinent fire test as discussed above, it would be possible to "thermally isolate" surfaces made of the same material as the

spacer using one or more of the various methods of affecting the thermal performance of the spacer discussed above.

54.    In summary, it is my opinion that a PHOSITA would understand "thermal spacers thermally isolating" to mean "components that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." This interpretation comports with the plain and ordinary meaning of the words, and  captures the teachings of the '569 patent as whole as understood by a PHOSITA.

**D.    "exhaust duct module"**

55.    I understand that the following table sets forth the positions for Plaintiff and Defendants concerning the meaning of "exhaust duct module":

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "exhaust duct module" | "a section of pre-fabricated, factory-built duct" | "a section of an exhaust duct" |

56.    Virtually all fire-rated exhaust ducts are assembled from sections. However, fire-rated exhaust ducts are generally categorized as either "field-applied" or "factory-built," also known as "pre-fabricated." A "field-applied" exhaust duct is an exhaust duct assembly in which the insulative material used to provide the fire-rating, typically one or more layers of insulation material, is installed onto the conduit at the job site or "in the field." For field-applied exhaust

Dated: February 05, 2021 _____

Signature of Declarant

Tony Crimi

Page 1

1            UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

ROCK ISLAND DIVISION
4    DURASYSTEMS BARRIERS INC.,
     a Canadian corporation,
5

          Plaintiff,
6                                    Case No.
     v.                              1:19-cv-01388-SLD-JEH
7

     VAN-PACKER CO., an Illinois
8    Corporation, JEREMIAS, INC.,
     a Georgia corporation,
9

          Defendants.
10   _____/

11

12         The videoconference deposition of
13   BARRY CHEEK, P.E., taken before MARIA MAZZA, CSR,
14   Notary Public, pursuant to the provisions of the
15   Code of Civil Procedure of the State of Illinois and
16   the Rules of the Supreme Court thereof pertaining to
17   the taking of depositions for the purpose of
18   discovery, commencing at 1:00 o'clock p.m., on
19   January 14, 2021.

20

21

22

23

24

Page 2

1   REMOTE APPEARANCES:
2
    WORKMAN NYDEGGER
3   60 East South Temple
    Suite 1000
4   Salt Lake City, UT  84111
    (801) 533-9800
5   cnydegger@wnlaw.com
    BY:  MR. CHAD E. NYDEGGER
6      appearing on behalf of the Plaintiff;
7
    K&L GATES LLP
8   70 W. Madison Street
    Suite 3300
9   Chicago, IL  60602
    (312) 807-4325
10  katy.allor@klgates.com
    BY:  MS. KATHERINE L. ALLOR
11     appearing on behalf of the Defendant.
12
    ALSO PRESENT:
13
    Tony Crimi
14
15            *************
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2
3   WITNESS:                    PAGES:
4   BARRY CHEEK, P.E.
5
    Direct Examination by Mr. Nydegger      5
6
    Cross-Examination by Ms. Allor       130
7
    Redirect Examination by Mr. Nydegger   140
8
9
10
11          E X H I B I T S
12
    Exhibit No. 78 marked          52
13  (Mr. Cheek's Declaration)
14
    EXHIBITS REFERRED TO
15
    Exhibit No. 25             85
16  (569 Patent)
17  Exhibit No. 39             12
    (GRZ Product Overview)
18
19
20
21
22
23
24

Page 4

1       THE REPORTER:  Do the attorneys agree
2   that the court reporter can swear the witness in
3   remotely?
4       MR. NYDEGGER:  Yes.
5       MS. ALLOR:  Yes, I do.
6          (Witness sworn.)
7       MR. NYDEGGER:  Good morning, Mr. Cheek.
8   Could you please state your name for the record?
9       THE WITNESS:  Yes.  Hang on a second.
10  I'm having trouble with the volume now for some
11  reason.
12       MS. ALLOR:  Chad, are we not going to
13  identify everyone?  Are you going to identify the
14  third party who is on the line?  I assume it's your
15  expert.
16       MR. NYDEGGER:  Certainly.  I would
17  be happy to do that and maybe we should make
18  appearances just for the record.
19       I am Chad Nydegger.
20       We are going to start over, Barry.
21       I'm Chad Nydegger from Workman
22  Nydegger, representing the Plaintiff DuraSystems
23  Barriers, Inc.  With me I have Tony Crimi who's a
24  technical expert for the plaintiff.

Page 5

1       MS. ALLOR:  My name is Katy Allor.  I'm
2   from K&L Gates and I'm representing the Defendants
3   in this matter Van-Packer Co and Jeremias, Inc., and
4   also the witness Barry Cheek.
5       THE WITNESS:  I'm Barry Cheek and I'm an
6   expert witness for K&L Gates.
7       B A R R Y  C H E E K, P. E,
8   called as a witness herein, having been first
9   duly sworn, was examined and testified as follows:
10         D I R E C T  E X A M I N A T I O N
11  BY MR. NYDEGGER:
12       Q.  Mr. Cheek, could you, please, state your
13  full name for the record.
14       A.  Barry Martin Cheek.
15       Q.  And could you provide your address as
16  well, please?
17       A.  Sure.  It's 300 Pintail Lake Drive in
18  Gilbert, South Carolina.
19       Q.  Thank you.
20       Mr. Cheek, has your counsel gone over
21  sort of the ground rules for this deposition today?
22       A.  Yes.
23       Q.  Okay.  Thank you.
24       Is anyone in the room with you today?

2 (Pages 2 - 5)

Page 102

1  in the field maybe.
2  BY MR. NYDEGGER:
3     Q.  Well, prefabricated ducts don't require
4  field welding; isn't that correct?
5        MS. ALLOR:  Object to the form.
6        THE WITNESS:  Field welding obviously
7  that one means something done in the field.
8  BY MR. NYDEGGER:
9     Q.  And prefabricated ducts don't require
10 wrapping the enclosure in the field with gypsum
11 fire-rated enclosure, correct?
12       MS. ALLOR:  Object to the form.
13       THE WITNESS:  I guess it depends on how
14 they are getting their fire rating.  They can always
15 wrap it in some type of fire-retardant installation
16 I'm assuming.
17 BY MR. NYDEGGER:
18    Q.  But this paragraph that we just read
19 talks about wrapping it in gypsum fire-rated
20 enclosure approximately 10-inches thick; do you see
21 that?
22    A.  Yes, I see it.
23    Q.  And is it your understanding that that is
24 referring to a field-applied exhaust duct?

Page 103

1        MS. ALLOR:  Object to the form.
2        THE WITNESS:  Well, to me it sounds like
3  it's a field applied -- to me that sounds like it's
4  a field-applied gypsum board to a prefabricated
5  duct, so it's kind of a grey area in-between because
6  it sounds like they are fabricating it and shipping
7  to the site and then they are wrapping it in gypsum
8  once it gets there.  So, you know, part A of that is
9  prefab and Part B of that is field installation.
10 BY MR. NYDEGGER:
11    Q.  The duct can't obtain a fire rating
12 before it's shipped because it's just a single wall
13 and it has not had the gypsum board wrapped,
14 correct?
15       MS. ALLOR:  Object to the form.
16       THE WITNESS:  I'm not sure about that
17 one.
18 BY MR. NYDEGGER:
19    Q.  Well, let's move on here.  So the next
20 paragraph in Paragraph 2 talks about overcoming the
21 shortcomings of the type of duct in the previous
22 paragraph to the introduction of prefabricated
23 fire-exhaust ducts; do you see that?
24       MS. ALLOR:  Object to the form.

Page 104

1        THE WITNESS:  Yes.
2  BY MR. NYDEGGER:
3     Q.  And then we get to the section called
4  Brief Summary of the Invention; do you see that?
5     A.  Yes.
6     Q.  And do you understand that this is the
7  section where the patent begins to explain the
8  invention of the patent?
9     A.  Yes.
10    Q.  And do you see the first paragraph under
11 that section heading in Column 2, Lines 22 through
12 24?
13    A.  Yes.
14    Q.  It states, The present invention
15 comprises embodiments of a modular fire-rated duct
16 system and improvements therein and suitable for
17 prefabrication and configured for assembly in the
18 field; do you see that?
19    A.  I do.
20    Q.  So a person of ordinary skill in the
21 569 Patent reading that would understand that the
22 invention pertains to prefabricated fire-rated duct
23 systems, correct?
24       MS. ALLOR:  Object to the form.

Page 105

1        THE WITNESS:  I guess that would probably
2  be a safe assumption.  Like I said, there's always
3  those cases where you have to do some field
4  modifications but the original product in that
5  scenario would definitely be prefab.
6  BY MR. NYDEGGER:
7     Q.  What does the 569 Patent teach about the
8  purpose of the thermal spacer?
9        MS. ALLOR:  Object to the form.
10       THE WITNESS:  Could you be a little more
11 specific, as it relates to my report?
12 BY MR. NYDEGGER:
13    Q.  Well, right now I'm not talking about
14 your report.  I'm just talking about the 569 patent
15 which you reviewed, correct?
16    A.  Correct.
17    Q.  Do you recall that the 569 Patent talks
18 about a thermal spacer?
19    A.  I do.
20    Q.  In fact, you offer opinions about what
21 thermal spacer means in your report, correct?
22    A.  I do.  I do.
23    Q.  And so my question is what is the purpose
24 of the thermal spacer according to what is found in

27 (Pages 102 - 105)

Page 106

1  the 569 Patent?
2      A.  It's basically to prevent heat transfer
3  so that you don't have the excessive heat to cause
4  the duct to buckle prematurely.
5      Q.  Is that the only function of the spacer
6  that you recall?
7      A.  Well, I mean, the second part of it
8  spacer obviously it provides that -- maintains that
9  inner section of space between the two ducts.
10     Q.  So one of the functions of the spacer is
11  to keep the inner duct liner and the outer casing
12  spaced apart, correct?
13     A.  Correct.
14     Q.  And why is a spacer needed to keep those
15  two components separated from each other?
16        MS. ALLOR:  Object to form.
17        THE WITNESS:  So that you can get
18  insulation in there.
19  BY MR. NYDEGGER:
20     Q.  And what would happen if you took the
21  spacers out?
22     A.  If you took the spacers out, then the
23  ductwork would crush the insulation on the bottom
24  from gravity thus negating some of the insulation

Page 107

1  properties of the insulation.
2      Q.  If we go to Column 6 of the 569 Patent,
3  if you go down to Line 61, do you see the sentence
4  that begins once the thermal spacers 420?
5      A.  I'm looking at 61.  Column 2 you said?
6      Q.  No, Column 6.
7      A.  Column 6, Row 61, Once the thermal
8  spacers are correctly positioned, the spacers are
9  secured or connected to the outer casing panels
10  using staples or screws.  Yeah, I've got a problem
11  with that too but I won't get into that.  Yeah, I
12  see that section, though.
13     Q.  That section reads, Once the thermal
14  spacers 420 are correctly positioned, the spacers
15  420 are secured or connected to the outer casing
16  panels 310 using staples or screws indicated
17  generally by reference 424 in Figure 5C or a
18  suitable adhesive, to ensure that the thermal
19  spacers 420 stay in the desired position for
20  supporting the outer casing panels 310 and
21  maintaining the gap or void so that the insulating
22  material 410 is not unnecessarily compressed or
23  crushed.  So the 569 Patent teaches a person having
24  ordinary skill in the art that one function of the

Page 108

1  spacers is to prevent insulation from being crushed
2  as you mentioned earlier, correct?
3      A.  That is one function, correct.
4      Q.  And so reading that would a person having
5  ordinary skill in the art understand that a
6  compressible installation is an installation that
7  would be compressed if the spacers were removed?
8      A.  Yes.
9      Q.  Are you familiar with what insulation
10  boards are?
11     A.  Yes, my experience with insulation boards
12  is mainly in, like, general ductwork applications
13  where it's basically a semirigid fiberglass type
14  board, but, yeah, you don't want to compress it.  It
15  generally comes in various thicknesses ranging from
16  a half-an-inch on up two-inch thickness.  You know,
17  like I said, you don't want them to compress because
18  you're negating some of that insulating capability
19  because the air gaps are what is your friend when it
20  comes to insulating.
21     Q.  So the air gaps inside those fiberglass
22  insulation boards are what provide a significant
23  portion of the insulated properties of the board,
24  correct?

Page 109

1      A.  That's correct.
2      Q.  And so if the board gets crushed, it
3  loses those air gaps and it can compromise the
4  insulated properties of the board, correct?
5      A.  That's correct.
6      Q.  Is it possible to compress a fiberglass
7  insulation board with your fingers?
8      A.  If you push hard enough.
9      Q.  I mean, it's not like pressing on a pine
10  board that you can't really compress with your
11  fingers, correct?
12     A.  No, it will definitely give.  There's
13  definitely degrees of compressibility that will
14  give.
15     Q.  And would the weight of an inner duct
16  liner compress a fiberglass air duct board if there
17  were no spacers between the inner liner -- the inner
18  ducts and the outer casing?
19     A.  Would it compress it how much?  It really
20  would depend on the size of the ducts.  If you have
21  a really small duct, it probably would not be that
22  noticeable of a compression.  If it was a large
23  duct, obviously due to the weight of the sheet metal
24  you're going to compress more.

28 (Pages 106 - 109)

Page 110

1   Q.  Let's take a 4-foot by 4-foot duct is
2   that a size that would be normal to see in a
3   commercial kitchen application?
4   A.  4-feet by 4-feet that's pretty large.  I
5   mean, yeah, I guess that would be standard in a
6   commercial but, yeah, something like that would
7   definitely compress the insulation board than you
8   would want it to.
9   Q.  And so even if you are using a fiberglass
10  insulation board, it's important to have the spacers
11  to maintain that void because in a duct at least of
12  that size there's a risk that the fiber insulation
13  board would become compressed, correct?
14  A.  Yeah, you would definitely want to have
15  some type of spacer in there for sure.
16  Q.  So turning to the thermal spacer and its
17  function to prevent heat from being transferred
18  between the inner duct and the outer casing, if the
19  speed with which heat travels from one side of the
20  spacer to another side of the spacer, a thermal
21  property of the spacer?
22  A.  Yes.
23  Q.  And so assume you have a spacer
24  connecting an inner duct liner and an outer casing

Page 111

1   in an exhaust duct and you want to slow the transfer
2   of heat between the two, what are the different ways
3   in which you could accomplish that?
4   MS. ALLOR:  Object to the form.
5   THE WITNESS:  You would want to use
6   something with a very low conductivity value as
7   material properties go.
8   BY MR. NYDEGGER:
9   Q.  So one method of slowing the transfer of
10  heat through the spacer would be to make the spacer
11  out of a material with a low overall conductivity of
12  heat value, correct?
13  A.  That's correct.
14  Q.  Is there any other way that you could
15  slow the transfer of heat between the inner duct and
16  the outer casing?
17  A.  The only other thing would be to somehow
18  interrupt the path by if you had less surface area,
19  maybe.  I guess the more surface area would give you
20  more path for the heat to transmit through.  So if
21  you can minimize the surface area of your spacer,
22  then that would also help.
23  Q.  Okay.  So a second way would be to reduce
24  the surface area.  Can you think of any other ways

Page 112

1   you can slow the transfer of heat between the inner
2   duct and the outer casing?
3   A.  That's the only two that come to mind.
4   Q.  What about making the path longer?  Would
5   it slow the transfer of heat if the spacer was in
6   the shape of a coil connecting the inner duct liner
7   and the outer casing as opposed to a straight line?
8   A.  If the heat -- yeah, if you figure the
9   space -- well, let me think about that for a second.
10  Obviously the more material that the heat has to go
11  through the slower it will travel.  So if you made
12  that path less than a direct path in some kind of
13  coil configuration, yeah, that would definitely slow
14  it down.  So, yeah, I'd envision like a coil or
15  something like that slowing it down.
16  Q.  So we've talked about at least three
17  different ways you can affect the thermal property
18  of a spacer, correct?
19  A.  Correct.  Yes.
20  Q.  Does the 569 Patent contain a disclaimer
21  that a person of ordinary skill in the art of the
22  569 Patent would understand excludes any of those
23  three different ways to affect heat transfer through
24  a spacer?

Page 113

1   A.  It doesn't mention any type of materials
2   being used or any configuration whatsoever.  It's
3   totally ambiguous.  So it just says to prevent the
4   heat transfer, so I guess they leave it up to the
5   POSA to figure out what it has to be.
6   Q.  And so you don't recall reading any
7   disclaimer in the 569 Patent that would tell a
8   person of ordinary skill in the art that he has to
9   use the heat conductivity value of the material or
10  he has to use the shape of the spacer or he has to
11  use the length of the pathway; is that correct?
12  A.  No, it just says that it needs to be a
13  thermal spacer in order to prevent heat transfer, so
14  you know.
15  Q.  So a person of ordinary skill in the art
16  could employ any one of the three principles we've
17  talked about or others to accomplish that, correct?
18  A.  Some more effectively than others, but
19  yeah.  In order to prevent the heat transfer I would
20  think, you know, in engineering terms to effectively
21  prevent it, it would have to be a material of low
22  conductivity because regardless of the path, surface
23  area, whatever, you know, if it's made out of
24  something with a high conductivity value, heat is

29 (Pages 110 - 113)

Page 114

1 still going to travel through it fairly quickly.
2 You are going to slow it down a little bit by making
3 it, you know, different shapes and that sort of
4 thing but it's not going to effect it that much, not
5 as much as the material itself.
6     Q.  If you could wait until I ask my question
7 first, that's kind of the format we are in.  Let me
8 ask some questions about that.
9     A.  Okay.  Sorry.
10     Q.  Would the concept of thermal isolation be
11 known and understood by a person of ordinary skill
12 in the art of the 569 Patent?
13     A.  I believe that the term -- yeah, the term
14 of thermal isolation or preventing thermal flow or
15 however it's put, I believe that that would be
16 something that a POSA would understand.
17     Q.  Can you provide me with an example of how
18 a person of ordinary skill in the art of the 569
19 Patent might employ the concept of thermal isolation
20 in making a fire-rated exhaust duct?
21     MS. ALLOR:  Object to the form.
22     THE WITNESS:  Sure.  If we could refer
23 back to where I've given an example.
24     (Brief pause.)

Page 115

1 BY MR. NYDEGGER:
2     Q.  Are you going back to Exhibit 78, your
3 declaration?
4     A.  Yes, this is Exhibit 78.  I'm trying to
5 find my example of something good to use in that
6 situation.  I think it was listed as Exhibit M of
7 what was submitted to you and I'm trying to find it
8 in here.  It's basically a silicate-based board that
9 has very, very low conductivity which would be a
10 very good example of something to use in that
11 situation.  I can't seem to find it here, but that's
12 basically what it is.  I'm still not seeing it,
13 though.
14     Q.  You mentioned that using a -- was it a
15 calcium silicate board?
16     A.  Yeah, the example that I was using in my
17 report was a calcium silicate board.  I'm trying to
18 find the actual caption here.  Here it is.  So it's
19 in Section 83.  It's near the end of the report.
20 But, yeah, if you look at the conductivity value of
21 that, you know, with respect to something like sheet
22 metal, it basically reduces the amount of
23 conductivity by a magnitude of 50, roughly.  So that
24 to me would be a good example of a thermal spacer

Page 116

1 that prevents that heat transfer that you are going
2 for there.
3     Q.  So now heat still transfers through a
4 calcium silicate insulation board, correct?
5     MS. ALLOR:  Object to the form.
6     THE WITNESS:  Very small amount.  I mean,
7 probably almost undetectable depending on the -- I
8 guess, it would depend on the temperature
9 differences between the two surfaces and the, you
10 know, dimensions of the spacer and the length of the
11 path it has to travel, but it would be very small,
12 put it that way.
13 BY MR. NYDEGGER:
14     Q.  It would, as you say, depend on all those
15 different variables, the length of the path, the
16 temperature difference between the inner duct and
17 the outer casing and so forth, correct?
18     A.  Correct.
19     Q.  So, for example, if you had a calcium
20 silicate insulation board that was next to the inner
21 duct liner and the inner duct liner was at
22 2000 degrees and the boards -- the calcium silicate
23 spacer was two millimeters thick and then you had on
24 the other side the outer casing, the heat transfer

Page 117

1 would probably be pretty detectable, correct?
2     MS. ALLOR:  Object to the form.
3     THE WITNESS:  No, that's not a good
4 example.  If it was two millimeters thick, it
5 wouldn't be a spacer.  It would collapse upon
6 itself.  If you wanted to use something a little
7 more realistic, if it were to say -- I mean, you're
8 basically trying to keep the ducts apart.  I would
9 think in reality it would have to be at least
10 three-inches thick and something that thick would
11 have negligible heat transfer through it.
12 BY MR. NYDEGGER:
13     Q.  I'm posing a hypothetical.  And in the
14 hypothetical, I mean, even if it's two or three
15 millimeters thick, it could be long so there's a
16 long surface area so that it does not collapse on
17 itself and it would maintain some space between the
18 two but it would not effectively prevent the
19 transfer of heat, correct, just because it's not
20 properly configured, correct?
21     MS. ALLOR:  Object to the form.
22     THE WITNESS:  Well, that's a strange
23 hypothetical and I guess in that case some heat
24 would definitely get through.

30 (Pages 114 - 117)

Page 118

BY MR. NYDEGGER:

Q. And at the same time I could create a metal spacer that would be, you know, let's say 18 inches so the metal -- or so the inner duct liner and the outer casing are 18 inches apart and the temperature casing is 10 degrees between the two and would effectively prevent the transfer of heat in that situation, correct?

MS. ALLOR: Object to the form.

THE WITNESS: Yeah, I guess so.

BY MR. NYDEGGER:

Q. So the point is that you would agree with me, wouldn't you, that the ability to effectively prevent the transfer of heat depends on a number of factors not just the low conductivity of heat value, correct?

MS. ALLOR: Object to the form.

THE WITNESS: I would agree that the heat conductivity value is the determining factor and that the hypothetical that you're giving are not realistic in nature. That's all I can agree to.

The spacer has to actually keep the ducts apart. So, you know, in your first hypothetical, you know, just doesn't hold water.

Page 119

And in the second hypothetical you're not going to have 18 inches of space between the two ducts because then it does not become a commercially viable product. You know, it's too expensive to make, it's too bulky and nobody is going to buy it and again it's not a good hypothetical. But, you know, to answer your question from a technical sense, sure, why not.

BY MR. NYDEGGER:

Q. So would you agree that a person of ordinary skill in the art of the 569 Patent would not read thermal isolation as used in the claims to require absolute thermal isolation?

A. I think it would read it to mean that it needs to effectively prevent any heat transfer which means that it's almost nonmeasurable. It's at a level so slow that it's not measurable.

Q. My question is different. My question is whether a person having ordinary skill in the art of the 569 Patent, would understand thermal isolation as used in the 569 Patent to mean absolute thermal isolation?

A. Well, the fact that it says that it prevents heat transfer I would say yes because he's

Page 120

going by what's in the patent.

Q. Does the patent say that it prevents heat transfer?

A. It does, yes.

Q. Could you point me to that in the patent?

A. It's actually in the amendment to the patent.

Q. So it's in the patent or no?

A. It's in the amendment to the patent. It was added later.

Q. I think we're having a semantic problem. So the patent -- I understand that the patent is just the document that's published as the 569 Patent?

A. Yes.

Q. Do you understand that?

A. Yes, I understand that.

Q. And then do you understand that there's a prosecution history to the patent; do you understand that?

A. Yes, I went through that.

Q. And what do you understand the prosecution history to be?

A. Prosecution history basically gives the

Page 121

patent office either the right to deny or issue a patent based on problems that it sees in the way that the language is worded in the patent. One of the problems that they have with the language, from what I can tell anyway, was the part about limiting transfer of heat so they had to change that to preventing transfer of heat and this is going by memory, all of this is going by memory. So they changed it to the thermal spacer to prevent the transfer of heat in order to get it over that hurdle so that it was not in such ambiguous terms. So that's what I'm referring to when I say that it has to prevent the thermal transfer of heat.

Q. Was it your understanding that the actual claim language was modified to state preventing the thermal transfer of heat?

A. Yeah, I said that in my Section 82.

Q. In Paragraph 82 you're quoting a section from the prosecution history but that is not a quotation from the patent itself; do you understand that?

A. Yes.

Q. And so do you understand that the claim language in the 569 Patent does not state the phrase

31 (Pages 118 - 121)

Page 122

1  prevent the thermal transfer of heat?
2      A.  I guess I'm a little bit fuzzy because I
3  was under the impression that those documents were
4  part of the patent history and, therefore, became
5  part of the patent itself, is that not correct?
6      Q.  That is not correct.  They are part of
7  the -- the prosecution history is part of the file,
8  the intrinsic evidence, but the patent itself is
9  only the documents that are published as the actual
10  patent.  Now that you know that does that change
11  your opinion about what the thermally isolating
12  means as used in the plain language of the 569
13  Patent?
14      A.  It doesn't really change my whole like,
15  you know, report or whatever because that was based
16  on looking at it from -- through the eyes of an
17  engineer where, you know, if you're saying that, you
18  know, we are just trying to limit something, what
19  are their parameters, you know.  But if you say
20  you're going to try to prevent something, then
21  you're effectively preventing it.  Those are terms
22  that I can wrap my mind around as an engineer and
23  that's much more clear and conscience as far as
24  actually being able to design an actual product

Page 123

1  around.  If you just say something has to limit
2  something and don't give any context or range, that
3  doesn't give enough information.  I think in the
4  original verbiage it had said something about just
5  limiting rather than preventing heat transfer I
6  believe and that's also going by memory.
7      Q.  Well, I will inform you that the claim
8  language did not contain the phrase limiting the
9  transfer of heat and the claim language does not
10  contain the words prevent the thermal transfer of
11  heat.  The only words in the claim are thermally
12  isolating; do you understand that?
13      A.  Well, I understand thermally isolating
14  means that you are basically trying to keep heat
15  from getting through, therefore, you are preventing
16  heat transfer.
17      Q.  Is limiting heat transfer also thermal
18  isolating?
19      A.  I mean, if you are limiting it, how much
20  are you limiting it?  That's not a term that's a
21  quantitative value, I guess; whereas if you say
22  prevent, that gives something to hang your hat on as
23  far as we don't want heat transfer period, rather
24  than, all right, oh, a little bit, swag it.  That's

Page 124

1  not how engineering works.
2      Q.  But preventing the thermal transfer of
3  heat period is a physical impossibility, correct?
4      A.  Correct.
5      Q.  So a person having ordinary skill in the
6  art wouldn't understand thermally isolating to
7  require preventing the thermal transfer of heat,
8  correct?
9      A.  Normally isolating to mean -- well, I
10  think a person would just take that to mean that you
11  didn't want any heat transfer.  I mean, just kind of
12  looking at it from the mind of someone, you know,
13  pretty much putting myself in a POSA's shoes, if you
14  said thermally isolating, I would think that you
15  would want -- whatever you want to thermally isolate
16  I would think that you're trying to keep as much
17  heat away from it as possible, therefore, preventing
18  heat transfer.  I mean, that's just the way I'm
19  looking at it.
20      Q.  Well, if you are trying to keep the heat
21  transfer as low as possible, aren't you then
22  limiting the heat transfer?
23      MS. ALLOR:  Object to the form.
24      THE WITNESS:  By definition you are.

Page 125

1  BY MR. NYDEGGER:
2      Q.  And you agree with me that preventing
3  thermal heat transfer literally is a physical
4  impossibility, correct?
5      A.  Except in a vacuum, that's correct.
6      Q.  So as far as the application of the 569
7  Patent goes, we're not dealing with vacuums,
8  correct?
9      A.  Correct.
10      Q.  So as far as the 569 Patent is concerned,
11  preventing the thermal transfer of heat is a
12  physical impossibility, correct?
13      MS. ALLOR:  Object to the form.
14      THE WITNESS:  Preventing it 100 percent
15  but you could effectively prevent it provided the
16  correct materials are used.
17  BY MR. NYDEGGER:
18      Q.  You agree with me that a person of skill
19  in the art would not read that to require preventing
20  the thermal transfer of heat 100 percent, correct?
21      A.  I think that's a fair assumption because,
22  yeah, you can't stop it all together, that's
23  correct, but you can effectively prevent it.
24      Q.  So now that we've agreed that a person

32 (Pages 122 - 125)

E-FILED
Wednesday, 03 March, 2021  07:35:36 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, )<br><br>Plaintiff, )<br><br>vs. )<br><br>VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, )<br><br>Defendants. ) | Consolidate Case No. 1:19-cv-01388<br><br>Chief Judge Sara Darrow<br>Magistrate Judge Jonathan E. Hawley |

**<u>DEFENDANTS' REPLY CLAIM CONSTRUCTION BRIEF</u>**

claims "insulation board" as a type of "compressible insulation," in direct contradiction to what the inventor Duffy said—insulation board is not "a compressible insulation material." *See* D.I. 31-16, Ex. O at 110:21-111:3. Duffy did not testify about fiberglass boards, nor does the '569 Patent describe fiberglass boards. While Defendants' expert acknowledged fiberglass insulation boards may have "air gaps" that would allow one to compress them to some degree, as discussed above, all insulation can be compressed to some degree. Thus, the conflict between claims 16 and 18 remains an additional basis for holding the term indefinite.

### B.     The "thermal" Terms

Plaintiff tries to mislead the Court that "the dispute centers on . . . *how* the 'thermal spacer' accomplishes 'thermal isolation.'" Plaintiff's Br. at 14 (emphasis added). In other words, Plaintiff is desperate to have the Court not say *what* a "thermal spacer" is—revealing why Plaintiff spends so much time impermissibly discussing *how* Defendants' accused product operates.

#### i.     "thermal spacers"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "thermal spacers" (claims 3, 6, 10-13, 16, 19-20) | "component(s) that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | "a spacer having a specific thermal isolation property" where a "spacer" is something that maintains two components in a spaced relationship |

Plaintiff spends much of its brief on a strawman argument that Defendants' construction limits the thermal spacer to a particular thermal property—thermal conductivity. To the contrary, using the abbreviation "e.g.," Defendants explicitly noted that thermal conductivity is one well-known *example* of a thermal property. *See* Defendants' Br. at 14; *see also* D.I. 31-3, Ex. B, Cheek Decl. at ¶¶73-74; Crimi Tr. at 181:22-182:23. As Material Science textbooks show, "[a] property is a *material trait* in terms of the kind and magnitude of response to a specific imposed stimulus

[e.g., heat]. Generally, definitions of properties are made _independent of material shape and size_."[5] Ex. 3 at 3 (emphasis added). While there are other thermal properties of materials (i.e., heat capacity) (_id._), the crucial point is that the "thermal spacer" has thermal propert_ies_ allowing it to "isolate" heat or, in the words of the inventor, be insulation. _See_ D.I. 31-19, Ex. R at 221:24-222:2. And, mischaracterizing Mr. Cheek's testimony, Plaintiff argues that the "transfer of heat" is a property that can be "affected" in "several different ways." Plaintiff's Br. at 15. While Mr. Cheek agreed there are ways (aside from material selection) to slow heat transfer, which included changing the shape of a particular material, such changes to the shape of the material would _not_ impact it's "specific thermal properties," as a property of material does not change depending on its size or shape. Crimi Tr. at 149:1-8; _see also_ Ex. 3 at 3. Despite Plaintiff's mischaracterization, "heat transfer" is not a thermal property of a material. Crimi Tr. at 181:7-187:13; 245:8-14. In short, a property is a material trait. The material traits—propert_ies_—of a "thermal spacer" are ones such as thermal conductivity, thermal capacity, etc. that result in "thermal isolation."

Plaintiff also attempts to shift the focus from _what_ the "thermal spacer" is to _how_ the whole duct should be configured to escape its clear statements during prosecution. But Plaintiff cannot now walk away from the definition provided during prosecution: "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties', namely, thermally isolating." JA0328. Even Mr. Crimi agrees that the statement from prosecution is a definition, tying _what_ the claimed spacer is to materials that have "specific thermal isolation properties." Crimi Tr. at 166:5-167:3. As such, the Court must hold Plaintiff to its definition. _See, e.g._, _SkinMedica, Inc. v. Histogen Inc._, 727 F.3d 1187, 1194 (Fed. Cir. 2013).

---

[5] The '569 Patent nowhere describes changing the size or shape of thermal spacers to, using Plaintiff's words, "affect" the transfer of heat through them. Crimi Tr. at 158:13-16.

In a last ditch effort, Plaintiff points to Defendants' product and a corresponding patent application to support its construction. As noted, the "claims may not be construed by reference to the accused device." *NeoMagic*, 287 F.3d at 1074. While undisputed that the patent application discusses reducing heat transfer by perforations in "metal strips," it does not describe these "metal strips" as "spacers" or "thermal spacers," nor does it state that the "metal strips" "thermally isolate[e]" the inner duct liner from the outer shell.[6] And, while Van-Packer's patent application might be relevant to the construction of the term "metal strips," it does not contradict the compelling intrinsic and extrinsic evidence supporting Defendants' proposed construction.[7]

### ii. "thermally isolating"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "thermally isolating" (claims 3, 6, 10-13, 16, 19-20) | "component(s) that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" | "preventing the thermal transfer of heat" |

Plaintiff's construction relies on the Court finding that patentee did not mean "preventing" when he said "preventing" to the USPTO. It also relies on the exhaust duct successfully completing a fire rating test such that "fail points" are not created. As a matter of law, Plaintiff cannot whitewash its arguments to the USPTO. And, linking the meaning of the term "thermally isolating" to a fire rating test makes the definition indefinite, for reasons discussed above. *See* Section II.A.i.

---

[6] The Van-Packer patent application describes how the perforations "allow[s] the insulation to absorb heat away from the inner liner." D.I. 36-6, Ex. FF at [0013]. In other words, the perforations are a way to *fight* against the unchangeable thermal properties of metal by using the insulation to suck away the heat. Crimi Tr. at 158:17-23.

[7] Compare Plaintiff's reliance on Van-Packer's patent application using the term "metal strips" (not in the patent) with Plaintiff's argument that the Court cannot consider Plaintiff's '275 Application using the term "fire-rated" (a claim element).

## 1.2   MATERIALS SCIENCE AND ENGINEERING

Sometimes it is useful to subdivide the discipline of materials science and engineering into *materials science* and *materials engineering* subdisciplines. Strictly speaking, materials science involves investigating the relationships that exist between the structures and properties of materials. In contrast, materials engineering is, on the basis of these structure–property correlations, designing or engineering the structure of a material to produce a predetermined set of properties.[2] From a functional perspective, the role of a materials scientist is to develop or synthesize new materials, whereas a materials engineer is called upon to create new products or systems using existing materials, and/or to develop techniques for processing materials. Most graduates in materials programs are trained to be both materials scientists and materials engineers.

*Structure* is at this point a nebulous term that deserves some explanation. In brief, the structure of a material usually relates to the arrangement of its internal components. Subatomic structure involves electrons within the individual atoms and interactions with their nuclei. On an atomic level, structure encompasses the organization of atoms or molecules relative to one another. The next larger structural realm, which contains large groups of atoms that are normally agglomerated together, is termed *microscopic,* meaning that which is subject to direct observation using some type of microscope. Finally, structural elements that may be viewed with the naked eye are termed *macroscopic*.

The notion of *property* deserves elaboration. While in service use, all materials are exposed to external stimuli that evoke some type of response. For example, a specimen subjected to forces will experience deformation, or a polished metal surface will reflect light. A property is a material trait in terms of the kind and magnitude of response to a specific imposed stimulus. Generally, definitions of properties are made independent of material shape and size.

Virtually all important properties of solid materials may be grouped into six different categories: mechanical, electrical, thermal, magnetic, optical, and deteriorative. For each there is a characteristic type of stimulus capable of provoking different responses. Mechanical properties relate deformation to an applied load or force; examples include elastic modulus (stiffness), strength, and toughness. For electrical properties, such as electrical conductivity and dielectric constant, the stimulus is an electric field. The thermal behavior of solids can be represented in terms of heat capacity and thermal conductivity. Magnetic properties demonstrate the response of a material to the application of a magnetic field. For optical properties, the stimulus is electromagnetic or light radiation; index of refraction and reflectivity are representative optical properties. Finally, deteriorative characteristics relate to the chemical reactivity of materials. The chapters that follow discuss properties that fall within each of these six classifications.

In addition to structure and properties, two other important components are involved in the science and engineering of materials—namely, *processing* and *performance*. With regard to the relationships of these four components, the structure of a material will depend on how it is processed. Furthermore, a material's performance will be a function of its properties. Thus, the interrelationship between processing, structure, properties, and performance is as depicted in the schematic

---

[2] Throughout this text we draw attention to the relationships between material properties and structural elements.

**precipitation hardening.** Hardening and strengthening of a metal alloy by extremely small and uniformly dispersed particles that precipitate from a supersaturated solid solution; sometimes also called *age hardening*.

**precipitation heat treatment.** A heat treatment used to precipitate a new phase from a supersaturated solid solution. For precipitation hardening, it is termed *artificial aging*.

**prepreg.** Continuous fiber reinforcement preimpregnated with a polymer resin that is then partially cured.

**prestressed concrete.** Concrete into which compressive stresses have been introduced using steel wires or rods.

**primary bonds.** Interatomic bonds that are relatively strong and for which bonding energies are relatively large. Primary bonding types are ionic, covalent, and metallic.

**primary phase.** A phase that exists in addition to the eutectic structure.

**principle of combined action.** The supposition, often valid, that new properties, better properties, better property combinations, and/or a higher level of properties can be fashioned by the judicious combination of two or more distinct materials.

**process annealing.** Annealing of previously cold-worked products (commonly steel alloys in sheet or wire form) below the lower critical (eutectoid) temperature.

**proeutectoid cementite.** Primary cementite that exists in addition to pearlite for hypereutectoid steels.

**proeutectoid ferrite.** Primary ferrite that exists in addition to pearlite for hypoeutectoid steels.

**property.** A material trait expressed in terms of the measured response to a specific imposed stimulus.

**proportional limit.** The point on a stress–strain curve at which the straight line proportionality between stress and strain ceases.

**p-type semiconductor.** A semiconductor for which the predominant charge carriers responsible for electrical conduction are holes. Normally, acceptor impurity atoms give rise to the excess holes.

**Q**

**quantum mechanics.** A branch of physics that deals with atomic and subatomic systems; it allows only discrete values of energy that are separated from one another. By contrast, for classical mechanics, continuous energy values are permissible.

**quantum numbers.** A set of four numbers, the values of which are used to label possible electron states. Three of the quantum numbers are integers, which also specify the size, shape, and spatial orientation of an electron's probability density; the fourth number designates spin orientation.

**R**

**random copolymer.** A polymer in which two different repeat units are randomly distributed along the molecular chain.

**recovery.** The relief of some of the internal strain energy of a previously cold-worked metal, usually by heat treatment.

**recrystallization.** The formation of a new set of strain-free grains within a previously cold-worked material; normally an annealing heat treatment is necessary.

**recrystallization temperature.** For a particular alloy, the minimum temperature at which complete recrystallization will occur within approximately one hour.

**rectifying junction.** A semiconductor $p$–$n$ junction that is conductive for a current flow in one direction and highly resistive for the opposite direction.

**reduction.** The addition of one or more electrons to an atom, ion, or molecule.

**reflection.** Deflection of a light beam at the interface between two media.

**refraction.** Bending of a light beam upon passing from one medium into another; the velocity of light differs in the two media.

**refractory.** A metal or ceramic that may be exposed to extremely high temperatures without deteriorating rapidly or without melting.

**reinforced concrete.** Concrete that is reinforced (or strengthened in tension) by the incorporation of steel rods, wires, or mesh.

**relative magnetic permeability ($\mu_r$).** The ratio of the magnetic permeability of some medium to that of a vacuum.

**relaxation frequency.** The reciprocal of the minimum reorientation time for an electric dipole within an alternating electric field.

**relaxation modulus [$E_r(t)$].** For viscoelastic polymers, the time-dependent modulus of elasticity. It is determined from stress relaxation measurements as the ratio of stress (taken at some time after the load application—normally 10 s) to strain.

**remanence (remanent induction, $B_r$).** For a ferromagnetic or ferrimagnetic material, the magnitude of residual flux density that remains when a magnetic field is removed.

**repeat unit.** The most fundamental structural unit found in a polymer chain. A polymer molecule is composed of a large number of repeat units that are linked together and successively repeated.

**residual stress.** A stress that persists in a material that is free of external forces or temperature gradients.

**resilience.** The capacity of a material to absorb energy when it is elastically deformed.

**resistivity ($\rho$).** The reciprocal of electrical conductivity, and a measure of a material's resistance to the passage of electric current.

**resolved shear stress.** An applied tensile or compressive stress resolved into a shear component along a specific plane and direction within that plane.

**reverse bias.** The insulating bias for a $p$–$n$ junction rectifier; electrons flow into the $p$ side of the junction.

**rolling.** A metal-forming operation that reduces the thickness of sheet

E-FILED
Wednesday, 03 March, 2021  07:35:37 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4

E-FILED
Thursday, 09 June, 2022  10:19:30 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | Case No. 1:19-cv-01388-SLD-JEH |
| Plaintiff, | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF PATENT INFRINGEMENT** |
| v. | |
| VAN-PACKER CO., an Illinois corporation, JEREMIAS, INC., a Georgia corporation, | **District Judge Sara Darrow Magistrate Judge Jonathan E. Hawley** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................1

II. STATEMENT OF MATERIAL FACTS ..................................................2

III. ARGUMENT .............................................................................................6

    A.  Legal Standards................................................................................6

        1.  Summary Judgment ................................................................6

        2.  Patent Infringement................................................................7

    B.  Defendants' Accused Products Literally Infringe the Asserted Claims of the '569 Patent as a Matter of Law ..........................................7

        1.  The Court's Construction of "Thermal Spacers Thermally Isolating" Sets Forth the Required Standard to which the Thermal Spacers Must Thermally Isolate. ...............................7

        2.  Defendants' Non-infringement Positions Fail Because There Is No Dispute that Defendants' Thermal Spacers Thermally Isolate to the Degree Required by the Court's Construction............................................8

            a)  Defendants' non-infringement position based on a standard for thermal isolation different than the standard set forth in the Court's claim construction fails as a matter of law...................9

            b)  Defendants' non-infringement position that the insulation performs the thermal isolation fails because the thermal spacers of the Accused Products are specifically designed to thermally isolate the inner duct liner and the outer casing. ...........11

IV. CONCLUSION.........................................................................................13

V.  REQUEST FOR ORAL ARGUMENT ...................................................13

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ....................................................................................6

*Copelands' Enters. v. CNV, Inc.*,
   945 F.2d 1563 (Fed. Cir. 1991) ...................................................................6

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
   289 F.3d 1367 (Fed. Cir. 2002) ...................................................................6

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) ................................................................6, 7

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
   355 F.3d 1361 (Fed. Cir. 2004) .........................................................9, 10, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ....................................................................................6

*Paragon Podiatry Lab'y, Inc. v. KLM Lab'ys, Inc.*,
   984 F.2d 1182 (Fed. Cir. 1993) ...................................................................6

*PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*,
   525 F.3d 1159 (Fed. Cir. 2008) ...................................................................6

## Other Authorities

Federal Rule of Civil Procedure 56(c) .....................................................1, 6

**Appx2162**

Pursuant to Federal Rule of Civil Procedure 56(c), Plaintiff DuraSystems Barriers Inc. ("DuraSystems") respectfully moves the Court to enter summary judgment that Defendants Van-Packer Co. ("Van-Packer") and Jeremias, Inc. ("Jeremias" and together with Van-Packer, "Defendants") literally infringe claims 3, 6, 10-13, 16, 19, and 20 (the "Asserted Claims") of U.S. Patent No. 10,024,569 (the "'569 Patent").

## I.    INTRODUCTION

The '569 Patent claims a fire-rated modular exhaust duct system. DuraSystems accuses Van-Packer's GRZ Grease Duct System and Jeremias' DWGD-RZ Grease Duct System (the GRZ and DWGD-RZ Grease Duct Systems collectively the "Accused Products") of infringing the Asserted Claims of the '569 Patent. Each of the Asserted Claims requires one or more "thermal spacers thermally isolating said inner duct liner from said outer duct casing." This claim limitation is the **only** claim limitation that Defendants contend is not present in the Accused Products. Thus, the sole disputed issue regarding patent infringement is whether the Accused Products satisfy the "thermal spacers thermally isolating" claim limitation.

The Court construed "thermal spacers thermally isolating" to mean "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." Defendants contend that the thermal spacers of the Accused Products do not satisfy this claim limitation because more heat is conducted between the inner duct liner and outer casing when the thermal spacers are present than the amount of heat conducted between the inner liner and outer casing in the absence of the thermal spacers. Additionally, Defendants argue that this claim limitation is not met because it is the insulation within voids of the thermal spacers that limits the amount of heat transferred through the thermal spacers, and not the thermal spacers themselves. Thus, Defendants reason, the thermal spacers do not "limit the

amount of heat transferred through the [thermal spacers]" and, consequently, do not meet the "thermal spacers thermally isolating" limitation.

Defendants' positions fail as a matter of law because they are based on an incomplete and improper application of the Court's construction of "thermal spacers thermally isolating." To satisfy the Court's construction, the thermal spacers need only limit the transfer of heat through the spacers "so that they do not create fail points on the inner duct liner or outer casing during fire rating testing." There is no dispute that the Accused Products are fire rated, and there is no dispute that the thermal spacers "do not create fail points on the inner duct liner or outer casing during fire rating testing." Moreover, the Defendants' own patent application filed on its Accused Products explains that the thermal spacers are specially configured, themselves, to reduce (i.e., limit) the transfer of heat between the inner liner and the outer casing. Consequently, the thermal spacers of the Accused Products sufficiently limit the transfer of heat "so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" and satisfy the "thermal spacers thermally isolating" limitation as a matter of law. Whereas this is the only claim limitation Defendants argue is not present in the Accused Products, the Court should grant summary judgment that the Accused Products infringe the Asserted Claims.

## II.     STATEMENT OF MATERIAL FACTS

1.      DuraSystems owns the '569 Patent and asserts that the Accused Products infringe the Asserted Claims. (Dkt. 17, First Amended Complaint, ¶¶ 33-34.)

2.    The parties have stipulated that there is no difference between the Accused

Products for purposes of determining infringement of the Asserted Claims. (*See* Ex. A, Corrected

Expert Report of Tony Crimi ("Crimi Infringement Report"), p. 7, ¶17.) [1]

3.    The only element of the Asserted Claims that Defendants dispute as missing from

the Accused Products is the element "including one or more thermal spacers configured to

maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation

material occupies said void, said one or more thermal spacers thermally isolating said inner duct

liner from said outer casing." (Ex. B, Deposition Transcript for Dr. Morse ("Morse Depo. Tr."),

189:6-13 ("Q. So is it correct that other than the thermal spacer and thermal spacer thermally

isolating claim elements, you do not provide an opinion that any other claim element is not found

in the accused product; is that correct? A.  Right. I haven't done an analysis. I don't have an

opinion either way on the other elements."); *see generally,* Ex. C, Expert Report of Timothy L.

Morse, Ph.D., Regarding Non-infringement of U.S. Patent No. 10,024,659 ("Morse Rebuttal

Report").) [2]

4.    The Court has construed the "thermal spacers thermally isolating" claim

limitation to mean "components that maintain a space between the inner duct liner and outer

casing that limit the amount of heat conducted through the components so that they do not create

---

[1] For the convenience of the Court and to avoid unnecessarily filing duplicative copies of
documents with the Court, all Exhibits cited to herein are contained in a separately-filed
Appendix that contains all Exhibits cited in each of the three summary judgment motions
concurrently filed by DuraSystems.

[2] Dr. Morse notes in his expert report that it is his opinion that the term "compressible insulation
material" is indefinite and that "[t]his dispute concerns a threshold question that needs to be
addressed before analyzing whether the insulation utilized in the GRZ Duct is compressible."
(Morse Rebuttal Report, p. 27, ¶76.) However, Dr. Morse does not dispute that the Accused
Products meet the "compressible insulation material" limitation under DuraSystems' proposed
construction of that term. (*See* Ex. B, Morse Depo. Tr., 187:10-188:3.)

fail points on the inner duct liner or outer casing during fire rating testing." (Dkt. No. 45 ("Markman Order"), p. 17.)

5.     The Accused Products have thermal spacers (colorized green below) that maintain a space between the inner duct liner and outer casing shown in the following annotated picture of a sample GRZ Grease Duct System:



outer casing

spacer maintaining a space between the inner duct liner and outer casing

inner liner

(Ex. A, Crimi Infringement Report, pp. 14, 16-17.)

6.     The Accused Products are fire rated to the standard UL 2221 because the Accused Products passed, *inter alia*, the fire-rating test required by that standard. (*Id.* at p. 17; Ex. B, Morse Depo. Tr., 191:19-192:14.)

7.     Van-Packer has filed a patent application with the U.S. Patent and Trademark Office on its GRZ system and, specifically, the spacers between the inner liner and outer casing, which application has been published as U.S. Patent Publication No. 2019/0293301. (*See generally,* Ex. D, U.S. Patent Publication No. 2019/0293301 ("Van-Packer Application").)

8.      The Van-Packer Application discloses a double walled grease duct with an "inner liner 102, an outer shell 104, [and] a spacer 106" that has been colorized green in annotated Figure 1 from the Van-Packer Application reproduced below:



FIG. 1

(*Id.* at Fig. 1.)

9.      The Van-Packer Application describes the spacer between the inner duct liner and the outer casing as follows:

…The spacer 106 also includes one or more perforations 130. The perforations are voids and/or openings within the planar body of the spacer. The perforations may be one of many shapes, including, but not limited to ovals, circles[,] squares, rectangles, pentagons, and/or hexagons.

As shown in FIG. 4, the perforations 130 create vertical metal strips 132 between the perforations 130. The metal strips 132 traverse between the two edges of the spacer. In an example, one perforation is between two metal strips. The metal

5

strips 130 act as a heat sink by *reducing the amount of heat transferred between the inner liner 102 and the out [sic, outer] shell 104*."

(*Id.* at ¶¶ [0046]-[0047] (emphasis added).)

## III. ARGUMENT

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment is proper in a patent infringement case, as in any other case, when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986); *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1168 (Fed. Cir. 2008). A fact is material only when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Thus, a court should grant a party's motion for summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The initial burden is on the movant to show there is no dispute as to any genuine issue of material fact. *Copelands' Enters. v. CNV, Inc.*, 945 F.2d 1563, 1565 (Fed. Cir. 1991). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). Ultimately, "the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. 242 at 243; *see also Paragon Podiatry Lab'y, Inc. v. KLM Lab'ys, Inc.*, 984 F.2d 1182, 1185 (Fed. Cir. 1993).

### 2.    Patent Infringement

A patent infringement analysis is typically a two-step process. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). First, the Court must "interpret the claims to determine their scope and meaning." *Id.* Second, the claims, as construed by the Court, must be compared to the Accused Products to determine whether all the claim limitations are present in the Accused Products. *Id.*

On September 3, 2021, the Court issued its Markman Order construing the disputed terms of the '569 Patent thereby completing the first step in the patent infringement analysis. (*See generally* Dkt. No. 45.) The Court now moves to the second step to compare the Accused Products with the patent claims as construed by the Court to determine whether all the claim limitations are present in the Accused Products.

### B.    Defendants' Accused Products Literally Infringe the Asserted Claims of the '569 Patent as a Matter of Law

The issue of infringement in the present case has been reduced to whether the Accused Products satisfy the "thermal spacers thermally isolating" claim limitation because Defendants do not dispute that every other limitation of the Asserted Claims is present in the Accused Products. However, when the Court's construction of "thermal spacers thermally isolating" is properly applied, there is also no dispute that the Accused Products satisfy the "thermal spacers thermally isolating" limitation and, consequently, infringe the Asserted Claims.

### 1.    The Court's Construction of "Thermal Spacers Thermally Isolating" Sets Forth the Required Standard to which the Thermal Spacers Must Thermally Isolate.

During claim construction Defendants proposed that "thermally isolating" be construed to mean "preventing the thermal transfer of heat." (*See* Markman Order, p. 17.) The Court rejected that argument, correctly finding that "it is not possible to truly prevent the transfer of heat." (*Id.* at

p. 29 (citations omitted).) Thus, the Court acknowledged that the question was not *whether* "thermal spacers thermally isolating" allow the transfer of heat through the components, but was rather a question of *how much* heat can be transferred through the components and still be "thermally isolating" as stated in the claims. The Court answered the question of *how much* heat can be transferred through the thermal spacers and still satisfy the "thermal spacers thermally isolating" limitation by providing a clear standard for the degree of thermal isolation in its construction of that claim limitation. That standard set forth in the Court's claim construction is to "limit the transfer of heat" sufficiently to "not create fail points on the inner duct liner or outer casing during fire rating testing." (Markman Order, p. 17.) In other words, if the thermal spacers reduce the transfer of heat sufficiently to "not create fail points on the inner duct liner or outer casing during fire rating testing," then the thermal spacers "thermally isolate" sufficiently to satisfy that claim limitation as correctly construed by the Court. As explained below, there is no dispute that the thermal spacers of the Accused Products thermally isolate to that standard.

> ### 2. Defendants' Non-infringement Positions Fail Because There Is No Dispute that Defendants' Thermal Spacers Thermally Isolate to the Degree Required by the Court's Construction.

DuraSystems' expert, Tony Crimi, provided an expert report demonstrating how the Accused Products meet each and every limitation of each of the Accused Products. (*See generally,* Ex. A, Crimi Infringement Report.) Mr. Crimi opined that the thermal spacers of the Accused Products thermally isolate the inner duct liner and the outer casing such that the thermal spacers do "not create fail points on the inner duct liner or outer casing during fire rating testing" as set forth in the Court's claim construction. (*See, e.g., id.* at pp. 16-17.)

Defendants responded to Mr. Crimi's opinions on infringement with the rebuttal expert report of Dr. Timothy Morse. (*See generally,* Ex. C, Morse Rebuttal Report.) However, nowhere does Dr. Morse opine that the thermal spacers of the Accused Products do not "thermally isolate"

because they "create fail points on the inner duct liner or outer casing during fire rating testing." Indeed, there is no dispute that the thermal spacers of the Accused Products do **not** create fail points during fire rating testing because the Accused Products are fire rated to UL 2221. (*See* Ex. C, Morse Rebuttal Report, pp. 15-21, ¶¶44-56; *see also* Ex. B, Morse Depo. Tr., 191:19-192:14; Ex. A, Crimi Infringement Report, p. 17.)

Instead, Defendants assert that the Accused Products do not meet the "thermal spacers thermally isolating" limitation because (1) the thermal spacers of the Accused "do not limit the amount of heat conducted through the components" when "compared to the amount of heat transferred in the absence of the [thermal spacers]," and (2) the "insulation is what thermally isolates the inner duct liner from said outer casing as opposed to the [thermal spacers], which is what would be necessary to find infringement based on the Court's construction." (Ex. C, Morse Rebuttal Report, pp. 15-21, ¶¶44-56.) Both of Defendants' non-infringement arguments fail.

> a) **Defendants' non-infringement position based on a standard for thermal isolation different than the standard set forth in the Court's claim construction fails as a matter of law.**

To determine infringement the Accused Products are compared to the Asserted Claims *as construed by the Court.* See *Liquid Dynamics Corp. v. Vaughan Co., Inc*., 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("The court must . . . then compare the properly construed claims to the allegedly infringing device.") As explained above, the Court's claim construction requires that the thermal spacers thermally isolate sufficiently to "not create fail points on the inner duct liner or outer casing during fire rating testing." Because it is indisputable that the thermal spacers in the Accused Products meet that standard, Defendants instead apply a *different* standard to concoct its non-infringement argument. Defendants argue that the thermal spacers of the Accused Products do not satisfy the "thermal spacers thermally isolating" limitation because its thermal spacers "increase the amount of heat transferred" between the inner liner and the outer casing. (Ex. C, Morse

Rebuttal Report, p. 17, ¶ 48.) Defendants arrive at this conclusion by comparing the "amount of heat transferred in the absence of the [thermal spacers]" to the amount of heat transferred in the presence of the thermal spacers. (*See id.*) Thus, the standard of thermal isolation that Defendants apply to argue non-infringement is that thermal spacers must not allow more heat to be transferred between the inner duct liner and the outer casing than is transferred between those components absent the thermal spacers.[3]

      This is legal error because Defendants do not compare the thermal spacers of the Accused Products to the "thermal spacers thermally isolating" limitation *as construed by the Court. See Liquid Dynamics*, 355 F.3d at 1367 ("The court must . . . then **compare the properly construed claims** to the allegedly infringing device.") (emphasis added). Consequently, Defendants' argument that its thermal spacers conduct more heat than no spacers at all is irrelevant to whether the thermal spacers thermally isolate to the degree required by the claims, i.e., whether they do "not create fail points on the inner duct liner or outer casing during fire rating testing." There is no dispute that the thermal spacers of the Accused Products thermally isolate sufficiently to "not create fail points on the inner duct liner or outer casing during fire rating testing," regardless of whether the thermal spacers conduct more heat between the inner duct liner and the outer casing than no spacers at all. Indeed, Dr. Morse expressly concedes that the thermal spacers of the

---

[3] Dr. Morse fails to provide any explanation for why the Court should consider the amount of heat transferred through a thermal spacer compared to the amount of heat transferred in the absence of a thermal spacer in evaluating whether the spacer meets the Court's construction of a "thermal spacer thermally isolating." In fact, this comparison makes no sense because removing a thermal spacer from the device eliminates the "spacing" function performed by a "thermal spacer" thermally isolating, which could alter the insulative properties of the insulation that could be "unnecessarily compressed or crushed," thereby increasing the amount of heat transferred through other areas of the exhaust duct. (*See* '569 Patent, col. 6, ln. 61 – col. 7, ln. 2; *see also*, Dkt. No. 36-1, p. 17 of 36 (Mr. Crimi explaining that insulative properties of insulation can be compromised if the insulation is compressed or crushed).)

Accused Products conduct only "a **tolerated** amount of heat" between the inner duct liner and the outer casing. (Ex. C, Morse Rebuttal Report, p. 17, ¶48 (emphasis added).) Dr. Morse also concedes that the Accused Products are fire rated, which means that the thermal spacers did not create fail points during fire rating testing. (*See id.* at pp. 15-21, ¶¶43-56 (disputing only the "thermal spacers thermally isolating" claim limitation and not the "fire rated exhaust duct" limitation of claim 1); *see also* Ex. A, Crimi Infringement Report, p. 13, ¶24.) Defendants' argument fails as a matter of law because it ignores the Court's claim construction, and there is no dispute that the Accused Products satisfy the "thermal spacers thermally isolating" limitation as construed by the Court.

> **b)   Defendants' non-infringement position that the insulation performs the thermal isolation fails because the thermal spacers of the Accused Products are specifically designed to thermally isolate the inner duct liner and the outer casing.**

Defendants' second argument is that although the thermal spacers do not create fail points during fire rating testing, they do not meet the "thermal spacers thermally isolating" limitation because "the thermal spacers themselves are not thermally isolating" but "[r]ather, the insulation that occupies the space in the gaps in the [thermal spacers], is what limits the transfer of heat." (*See* Ex. C, Morse Rebuttal Report, p. 17, ¶49.) This argument is debunked by Van-Packer's own explanation of how the thermal spacers of its Accused Products function to thermally isolate.

As established above, Van-Packer filed the Van-Packer Application directed to the GRZ product, and more specifically on the thermal spacers in the GRZ product. (*See, e.g.,* Ex. D, Van-Packer Application, ¶¶[0046]-[0052], Figs. 1, 2, 4-7.) In describing the thermal spacers, Van-Packer explains that the thermal spacers include "perforations 130 [that] create vertical metal strips 132 between the perforations 130." (*Id.* at ¶ [0047].) Van-Packer goes on to explain that the "metal strips 130" of its thermal spacers thermally isolate the inner liner and outer casing because they

"act as a heat sink by **reducing the amount of heat transferred between the inner liner 102 and the out [sic, outer] shell 104**." (*Id.* (emphasis added).) Van-Packer cannot now run from this pre-litigation admission to the U.S. Patent Office that its thermal spacers *themselves* meet the "thermal spacers thermally isolating" limitation "by **reducing the amount of heat transferred between the inner liner 102 and the out [sic, outer] shell 104**."

Although Dr. Morse reviewed the Van-Packer Application, when questioned about this teaching of the Van-Packer Application during his deposition Dr. Morse refused to comment on that statement, instead testifying that he "ha[sn't] done a detailed an [sic] analysis and do[esn't] have an opinion regarding this document [i.e., the Van-Packer Application]." (Ex. B, Morse Depo. Tr., 216:9-219:17.) More importantly, even if the insulation *assists* with thermally isolating the inner duct liner and the outer casing of the Accused Products as Defendants argue (a position that DuraSystems disputes), Defendants have no evidence to rebut its own admission to the U.S. Patent and Trademark Office that the thermal spacer, itself, also thermally isolates "by reducing the amount of heat transferred between the inner liner 102 and the out [sic, outer] shell" as stated in the Van-Packer Application.

\* \* \*

In view of the foregoing, when the Court's construction of "thermal spacers thermally isolating" is properly applied, there is also no dispute that the Accused Products satisfy the "thermal spacers thermally isolating" limitation and, consequently, infringe the Asserted Claims because that is the only claim limitation Defendants contest to be absent in the Accused Products. Because there is no genuine dispute that the Accused Products satisfy each claim limitation of the Asserted Claims as construed by the Court, summary judgment of infringement is warranted.

## IV.    CONCLUSION

The Court should grant summary judgment of infringement because there is no dispute that the thermal spacers of the Accused Products thermally isolate sufficiently to "not create fail points on the inner duct liner or outer casing during fire rating testing" as set forth in the Court's claim construction. Accordingly, DuraSystems respectfully requests the Court to enter summary judgment that the Defendants' Accused Products infringe Claims 3, 6, 10-13, 16, 19, and 20 of the '569 Patent.

## V.    REQUEST FOR ORAL ARGUMENT

DuraSystems requests the Court to hear oral argument on the present Motion. The reasons for oral argument are to explain the technology of the '569 Patent and Accused Products, to address any questions or concerns that the Court may have concerning that technology and the opinions set forth in the expert reports on that technology, and to address any questions or concerns that the Court may have concerning any other issue raised in this Motion.

DATED this 9th day of June, 2022.

WORKMAN NYDEGGER

/s/ *Chad E. Nydegger*
Brian N. Platt
Chad E. Nydegger
60 East South Temple, Suite 1000
Salt Lake City, UT 84111
(801) 533-9800
bplatt@wnlaw.com
cnydegger@wnlaw.com

Matthew V. Topic
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
foia@loevy.com

*Attorneys for Plaintiff DuraSystems Barriers Inc.*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | Case No. 1:19-cv-01388-SLD-JEH |
| Plaintiff, | **CORRECTED EXPERT REPORT OF TONY CRIMI** |
| v. | **District Judge Sara Darrow**<br>**Magistrate Judge Jonathan E. Hawley** |
| VAN-PACKER CO., an Illinois corporation, JEREMIAS, INC., a Georgia corporation, | |
| Defendants. | |

## CORRECTED EXPERT REPORT OF TONY CRIMI

_____
Tony Crimi

MARCH 24, 2022
Date

1

24.     The following chart demonstrates how, in my opinion, the Accused Products meet the limitations of claims 1 and 3, and therefore infringe claim 3.

| Claim 1 | Van-Packer Model GRZ Grease Duct |
|---|---|
| 1. A modular fire-rated exhaust duct assembly comprising: | The Model GRZ grease duct system is a modular fire-rated exhaust duct assembly. The GRZ grease duct system is fire rated and listed by Intertek Testing. The listings are identified as VPC/FMF120-03 in the United States, VPC/FMF60-01 in the United States, and VPC/FMF120-04 in Canada, as a "pre-fabricated grease duct." The GRZ grease duct system is modular in that it is pre-fabricated in modular sections supplied by the manufacturer and assembled in the field. |
| two or more exhaust duct modules; | Defendants concede that this element is literally present in the Accused Products.<br><br>Exhaust duct runs for the GRZ grease duct system are comprised of two or more exhaust duct modules that are pre-fabricated and supplied by the manufacturer, as shown in the following picture of the sample provided by Van-Packer:<br><br><br><br>First exhaust duct module          Second exhaust duct module<br><br>The Intertek Listing Report SPEC ID 39882 for the GRZ grease duct systems confirms that this is modular grease duct system and states, "Van-Packer's Model GRZ Series (with Stainless Steel Inner Liner) Pre-fabricated Grease Duct System consists of rectangular factory-built, prefabricated, duct sections and system components that are mechanically coupled together and designed |

| | for zero clearance to combustibles except as noted in the corresponding Intertek Listing." |
|---|---|
| each of said exhaust duct modules having an inner duct liner and an outer casing, | Defendants concede that this element is literally present in the Accused Products.<br><br>Each of the exhaust duct models has an inner duct liner and an outer casing as shown in the following picture of the sample provided by Van-Packer:<br><br><br><br>Outer casing<br><br>Inner duct liner |
| and a void being formed between at least a portion of space between said inner duct liner and said outer casing, | Defendants concede that this element is literally present in the Accused Products.<br><br>Each duct module has a void formed between the inner duct liner and the outer casing as shown in the following picture of the sample provided by Van-Packer: |



Void between inner duct liner and outer casing

| | |
|---|---|
| said void being configured for receiving an insulation material, | Defendants concede that this element is literally present in the Accused Products.<br><br>The void in each exhaust duct module is configured to receive an insulation material, as shown in the following picture of the sample provided by Van-Packer: |



The void is substantially filled with a ceramic fiber insulation.

| | |
|---|---|
| and including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing; | Each exhaust duct module includes one or more thermal spacers that maintain an annular space between the inner duct liner and the outer casing so that the ceramic fiber insulation occupies the void. The thermal spacers have been colorized green in the following picture of the sample provided by Van-Packer: |

| an outer casing formed with a generally rectangular cross-section and being sized to substantially surround said inner duct liner | Defendants concede that this element is literally present in the Accused Products.<br><br>The exhaust duct modules of the GRZ grease duct system have an outer casing with a generally rectangular cross-section that substantially surrounds the inner duct liner as shown in the following picture of the end view of the sample provided by Van-Packer:<br><br><br>Outer casing with a generally rectangular cross section that surrounds the inner duct liner |
|---|---|
| and a void being formed between at least a portion of space between said inner duct liner and said outer casing, | Defendants concede that this element is literally present in the Accused Products.<br><br>Each duct module has a void formed between the inner duct liner and the outer casing as shown in the following picture of the sample provided by Van-Packer: |

| | |
|---|---|
| | <br>Void between inner duct liner and outer casing |
| said void being configured for receiving a compressible insulation material, | The void in each exhaust duct module is configured to receive an insulation material, as shown in the following picture of the sample provided by Van-Packer:<br><br><br>The void is filled with a compressible ceramic fiber insulation. |

| | The insulation material used is a compressible insulation. I have examined the sample insulation material provided by Van-Packer and found it to be compressible. I have also reviewed the Expert Report of Mark Colton, PhD, in which Dr. Colton confirms that the insulation material is compressible under the weight of the inner liner. |
|---|---|
| and further including one or more thermal spacers configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said compressible insulation material occupies said void, said one or more thermal spacers thermally isolating said inner duct liner from said outer casing; | Each exhaust duct module includes one or more thermal spacers that maintain an annular space between the inner duct liner and the outer casing so that the ceramic fiber insulation occupies the void. The thermal spacers have been colorized green in the following picture of the sample provided by Van-Packer:<br><br><br><br>The colorized spacers are thermal spacers because they are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing. Specifically, the cutout portions of the spacers are designed to limit the transfer of heat through the spacer between the inner duct liner and the outer casing. This is explained in Van-Packer's U.S. Patent Application Publication No. 2019/0293301 which states as follows: "The spacer may include perforations that create metal strips between each of the perforation, wherein the metal strips connect a top edge of the spacer |

| | to a bottom edge of the spacer, wherein the top edge of the spacer contacts the outer shell and the bottom edge contacts the inner liner. The metal strips reduce the amount of heat transfer between the inner liner and outer shell, while also allowing the insulation to absorb heat away from the inner liner." The thermal spacers limit the transfer of heat sufficiently to avoid creating fail points during fire rating testing as demonstrated by virtue of the fact that the GRZ grease duct system has been tested and listed for a two-hour fire rating as described in VPC/FMF120-03 in the United States, and VPC/FMF120-04 in Canada. |
|---|---|
| a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of said exhaust duct module being configured for receiving said first exterior flange connector; | Each exhaust duct module has a first exterior flange connector that is joined directly to the inner duct liner as shown in the below picture of the sample provided by Van-Packer. The end of the exhaust duct module is configured to receive the first exterior flange connector.   First exterior flange connector of first exhaust duct module    First exterior flange connector of second exhaust duct module |
| a second exterior flange connector, said second exterior flange connector being joined directly to another end of said inner duct liner, and another end of said | Each exhaust duct module has a second exterior flange connector that is joined directly to the inner duct liner as shown in the below picture of the sample provided by Van-Packer. The end of the exhaust duct module is configured to receive the second exterior flange connector. |

**CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, <br><br> Plaintiff, <br><br> v. <br><br> VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, <br><br> Defendants. | Case No. 1:19-cv-01388-SLD-JEH <br><br> Chief Judge Sara Darrow <br> Magistrate Judge Jonathan E. Hawley |

**EXPERT REPORT OF TIMOTHY L. MORSE, PH.D.,
<u>REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 10,024,569</u>**

**CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER**



Figure 9. Model Boundary Conditions. Insulation and draw band not shown for clarity of view.

52.     The model was run twice, first for the Van-Packer GRZ product in its original configuration having metal spacers and a second time for a modified GRZ product without the metal spacers. The results of the model are shown below in Figure 10.

**CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER**



Figure 10. Temperature contours of the Van-Packer GRZ Duct with metal spacers(left) and without the metal spacers(right) undergoing an internal hot air flow of 1500°F.

53.     Results show that when the metal spacers are present in the GRZ duct (Figure 10, left) they conduct heat from the inner duct to the outer duct surface. The inner duct and metal spacers are at elevated temperatures compared to the outer enclosure. There are visible hot spots on the outer duct surface with temperatures as high as ~260°F that correspond to where the metal spacer bridges between the inner duct and the outer duct surface. A scenario under the same conditions but without metal spacers (Figure 10, right) does not produce the same visible hot spots on the outer duct surface and the temperature is more uniform across the surface with a maximum temperature only reaching 185°F. The analysis shown above was performed with an internal temperature of 1500 °F. Qualitatively similar results are obtained for higher or lower temperatures.

54.     Therefore, the metal spacer of the GRZ Duct cannot be considered a "thermal spacer thermally isolating." It is my opinion that Van-Packer's GRZ Duct product does not literally infringe claim 1 of the '569 Patent.

**CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER**

March 11, 2022
Date

Timothy L. Morse, Ph.D.

US 20190293301A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2019/0293301 A1

Rediger et al. (43) **Pub. Date:** **Sep. 26, 2019**

(54) **PRE-FABRICATED GREASE DUCT SYSTEM**

(71) Applicant: **Van-Packer Company**, Buda, IL (US)

(72) Inventors: **Robin Rediger**, Buda, IL (US); **Billy J. Sims**, Tiskilwa, IL (US); **Jason M. Kerner**, Sheffield, IL (US)

(73) Assignee: **Van-Packer Company**

(21) Appl. No.: **16/362,991**

(22) Filed: **Mar. 25, 2019**

**Related U.S. Application Data**

(60) Provisional application No. 62/647,983, filed on Mar. 26, 2018.

**Publication Classification**

(51) **Int. Cl.**
  *F24C 15/20* (2006.01)
  *A47J 37/06* (2006.01)

(52) **U.S. Cl.**
  CPC ........... *F24C 15/20* (2013.01); *A47J 37/0664* (2013.01)

(57) **ABSTRACT**

The present double walled grease duct includes a tubular outer shell surrounding a tubular inner liner, wherein a spacer is positioned perpendicular to the walls of the outer shell and the inner liner. The spacer can include a plurality of vertical metal strips extend from a top edge of the spacer to the bottom edge of the spacer, wherein the top edge of the spacer contacts the walls of the outer shell and wherein the bottom edge of the spacer contacts the walls of the inner liner. The metal strips resist the different rates of thermal expansion between the outer shell and inner liner ultimately preventing the collapse of the inner liner under pressure from thermal expansion.





FIG. 1



FIG. 2

Case: 24-1597cv-0Document: JH Page:250 Filed:07/31/2024



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9

Case: 24-1537 Document: 18 Page: 257 Filed: 07/31/2024



FIG. 10

Case: 24-1537v-0Document: Document: 18/Page: 258Page: of 07/31/2024



FIG. 11



FIG. 12



FIG. 13



FIG. 14a



FIG. 14b



FIG. 15

## PRE-FABRICATED GREASE DUCT SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]   This application incorporates by reference and claims the benefit of priority to U.S. Provisional Application 62/647,983 filed on Mar. 26, 2018.

### BACKGROUND OF THE INVENTION

[0002]   The present subject matter relates generally to air ventilation systems. More specifically, the present invention relates to a pre-fabricated grease duct system capable of removing grease laden air present in residential, industrial, and commercial kitchens.

[0003]   Grease duct systems are used in industrial and commercial kitchens including food production plants, restaurants, and food courts. Grease duct systems generally include a cooking hood that is coupled to one or more air ducts. The cooking hood is generally installed over a cooking stove, deep fryer, etc. to ventilate smoke, heat, and gases created during the cooking and preparation of food away from the cooking area. As the hot air moves through the venting system, it begins to cool and layers of grease often build-up in the duct system. Without proper cleaning, these layers of accumulated grease can combust causing fires, smoke damage, etc. Accordingly, a properly installed and maintained grease duct system for commercial and industrial kitchens is often required by local laws and ordinances.

[0004]   Current grease duct systems are either circular or rectangular and can be either single or double-walled. In a single walled system, the ventilation duct includes only one (layer or wall) duct to remove the grease laden air. In a double walled system, the ventilation duct includes an inner liner and an outer shell. The grease laden ventilated air travels through the inner liner, which is surrounded by an outer shell. An advantage of double walled systems is they can be zero-clearance systems, meaning that the outer shell can have zero clearance between itself and another combustible or even partially combustible surface, such as a wall or ceiling.

[0005]   During operational failure (e.g., grease duct fire) of a double-walled system, the inner liner can often reach temperatures of 2000 degree Fahrenheit, while the outer shell can reach temperatures of 400 degrees Fahrenheit. The extreme temperature in the system creates a thermal expansion difference between the inner liner and outer shell, meaning that the metal comprising the inner liner and outer shell expand and contract at difference rates. This thermal expansion difference can lead to a build-up of stress in the inner liner, causing it to fail, potentially catastrophically (i.e., large scale fire, vent duct rupture, etc.).

[0006]   Rectangular-grease duct systems are commonly fabricated on-site by well-meaning but untrained or uninformed contractors, as a custom installation because each installation site has different dimensions, parameters, and requirements. On-site fabrication increases both the cost and time of installation. Additionally, on-site, one-off fabricated venting systems may not be manufactured as well as factory-built systems due to a lack of quality control oversight, human error, etc.

[0007]   Accordingly, there is a need for a factory-built modular double-walled grease duct system that can with-

stand the thermal expansion difference between the inner liner and outer shell and also be installed on-site with no fabrication.

### BRIEF SUMMARY OF THE INVENTION

[0008]   To meet the needs described above and others, the present disclosure provides for a factory-built, pre-fabricated, double-walled grease duct system.

[0009]   The present double walled grease duct includes a tubular outer shell surrounding a tubular inner liner, wherein a spacer is positioned perpendicular to the walls of the outer shell and the inner liner. The spacer can include a plurality of vertical metal strips extend from a top edge of the spacer to the bottom edge of the spacer, wherein the top edge of the spacer contacts the walls of the outer shell and wherein the bottom edge of the spacer contacts the walls of the inner liner. The metal strips resist the different rates of thermal expansion between the outer shell and inner liner ultimately preventing the collapse of the inner liner under pressure from thermal expansion.

[0010]   The pre-fabricated grease duct system can be a double walled grease duct system that includes one or more pre-fabricated sectional double walled grease duct fittings. The sectional grease duct fittings may be one of various types including, but not limited to: straight section, 45-degree tee, reduced 45-degree tee, 90-degree tee, reduced 90-degree tee, 90-degree elbow, 90-degree wye, end cap, and fan hood transition. These various types of grease duct fittings (and others) may be needed during the installation of the grease duct system due to the construction variations present in each installation location. For example, 90-degree elbows may be needed to go around walls and/or columns while a 90-degree wye may be used to connect two separate grease ducts to a singular grease duct exhaust port.

[0011]   The pre-fabricated double layer grease duct section can include an inner liner, an outer shell, a spacer, a flange, and high temperature insulation. The inner liner, outer shell, spacer, and flange may be manufactured from any metal or other material that can withstand the high temperatures generated by the ignition or combustion of grease in an improperly maintained grease duct system. Particularly preferred metals include stainless steel, aluminized steel, and galvanized steel.

[0012]   The spacer can be located in the annular space between the inner liner and the outer shell. The spacer can include perforations that allow for the independent expansion and contraction of the inner liner and outer shell, while also maintaining the dimensions of the annular space. Before being placed into the outer shell, the inner liner can be wrapped in thick layers of ceramic fiber insulation. The insulation limits the amount of heat transferred between the inner liner and outer shell. The insulation combined with the spacers may also allow the grease duct system to have a zero-clearance rating.

[0013]   The spacer may include perforations that create metal strips between each of the perforations, wherein the metal strips connect a top edge of the spacer to a bottom edge of the spacer, wherein the top edge of the spacer contacts the outer shell and the bottom edge contacts the inner liner. The metal strips reduce the amount of heat transfer between the inner liner and outer shell, while also allowing the insulation to absorb heat away from the inner liner. Additionally, the metal strips have limited resistive strength, and therefore, can resist the different rates of

thermal expansion between the inner liner and outer shell. Without the narrow metal strips, the thermal expansion difference can cause a significant build-up of stress in the duct, which can lead to a failure of the grease duct system, including fatigue, fracture, and/or rupture of the weld joints which hold the duct system together, or even structural failure due to the liner nearing the melting point of the steel.

[0014] An object of the present invention is to provide a pre-fabricated factory-built double walled grease duct system. Such a system simplifies the installation process, therefore lowering the time and cost of installation.

[0015] An advantage of the invention is that it can be factory built, thus reducing the risks associated with on-site fabrication, including mistakes in welding which can lead to leakage from the system, etc. Most modern factories are capable of tight quality control standards and even automated inspections of welds, etc. which are difficult if not impossible when a vent duct system is installed on site. Further, fabrication of the duct system in a factory prevents or greatly reduces the need for skill laborers to install a grease duct venting system onsite.

[0016] Another advantage of the invention is that it provides for independent expansion and contraction of the inner liner and outer shell, while also maintaining the dimensions of the annular space. The independent expansion and contraction reduces the risk of failure of the system.

[0017] Additional objects, advantages and novel features of the examples will be set forth in part in the description which follows, and in part will become apparent to those skilled in the art upon examination of the following description and the accompanying drawings or may be learned by production or operation of the examples. The objects and advantages of the concepts may be realized and attained by means of the methodologies, instrumentalities and combinations particularly pointed out in the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0018] The drawing figures depict one or more implementations in accord with the present concepts, by way of example only, not by way of limitations. In the figures, like reference numerals refer to the same or similar elements.

[0019] FIG. 1 is a perspective view of an example of the double walled straight rectangular grease duct section.

[0020] FIG. 2 is a front elevational view of an example of the double walled rectangular Reduced 90 degree Tee grease duct section.

[0021] FIG. 3 is a side view of an example of the double walled rectangular grease duct section.

[0022] FIG. 4 is a front elevation view of an example spacer disclosed herein.

[0023] FIG. 5 is an enlarged view of an example of a corner of the spacer disclosed herein.

[0024] FIG. 6 is the backside view of an example of a corner of the spacer disclosed herein.

[0025] FIG. 7 is a flat pattern view of an example of the spacer disclosed herein.

[0026] FIG. 8 is a front elevational view of an example flange disclosed herein.

[0027] FIG. 9 is a flat pattern view of an example of the flange disclosed herein.

[0028] FIG. 10 is a perspective view of an example of a 45-degree tee grease duct.

[0029] FIG. 11 is a perspective view of an example of a 90-degree tee grease duct.

[0030] FIG. 12 is a perspective view of an example of a 90-degree wye grease duct.

[0031] FIG. 13 is a perspective view of an example of a 90-degree wye grease duct.

[0032] FIGS. 14a-14b are perspective views of examples of an end-cap for a double walled grease duct.

[0033] FIG. 15 is a perspective view of a fan adaptor.

## DETAILED DESCRIPTION OF THE INVENTION

[0034] FIG. 1 illustrates an example of a manufactured double walled straight rectangular grease duct 100. As shown in FIG. 1, the straight grease duct 100 includes an inner liner 102, an outer shell 104, a spacer 106, and a flange 108. The inner liner 102 extends out past the outer shell 104, which allows room for the installer's hands to work during field assembly. For example, the inner liner 102 can be composed of an internal portion 102a that can be completely encompassed by the outer shell 104, and an external portion of an external inner liner 102b that can protrude out from the outer shell 104.

[0035] The straight grease duct 100 can have a section length 110, wherein the section length 110 can be between and including 10-80 inches, e.g., 18 inches, 30 inches, 42 inches, or 60 inches, or any suitable length.

[0036] The inner liner 102 can have an inside width 112 and an inside height 114. In an example, the inside width 112 and inside height 114 can have a minimum length of 4 inches, a maximum length of 48 inches, and a maximum interior cross-section area of 1300 square inches (e.g., 1296 square inches). Further, in an example, the inner liner 102 can have a maximum inside width 112 to inside height 114 ratio of 6:1.

[0037] The liner extender 102b extends beyond the outer shell and can have a length between, and including, 0.5 inches to 10 inches, for example, 1 inch, 3 inches, 5 inches, 6 inches, among others.

[0038] The outer shell 104 can have an outside width 116 and an outside height 118. The outside width 116 and outside height 118 can be greater than the inside width 112 and inside height 114, respectively. In an example, the length of the outer shell 104 can be 6 to 8 inches longer than the length of the inner liner 102. The size difference between the dimensions of the inner liner 102 and outer shell 104 results in an annular space between the inner liner 102 and outer shell 104.

[0039] The spacer 106 lies perpendicular between the inner liner 102 and outer shell 104 and sits flush with the edge of the outer shell 104 and the inner liner 102 can extend past the spacer 106.

[0040] The inner liner 102, outer shell 104, spacer 106, and flange 108 can individually be made of any suitable material. In an example, the inner liner 102, outer shell 104, spacer 106, and flange 108 include metals that have a metal gauge value that can withstand the high temperatures generated by the possible ignition and combustion of built up layers of grease within the inner liner 102 of an improperly maintained grease duct.

[0041] The inner liner 102 can be constructed of stainless steel with a minimum gauge value of 20 and/or mild carbon steel with a minimum gauge value of 16 In an example, the outer shell 104 can include an outside width 116 and outside height 118 of less than or equal to 36 inches, wherein the outer shell 104 can be constructed 24-gauge aluminized

3

steel, galvanized steel, or stainless steel. The outer shell **104** with an outside width **116** or outside height **118** greater than 36 inches can be constructed of at least 20-gauge aluminized steel, galvanized steel, or stainless steel.

[0042] The spacer **106** can be constructed from 20-gauge to 18-gauge stainless steel. The flange **108** can be constructed from at least 11 gauge mild steel, aluminized steel, galvanized steel, or stainless steel.

[0043] FIG. **3** illustrates an example wherein the external inner liner **102***b* protrudes out of the outer shell **104**. As seen in the figure, the flange **108** is MIG welded to the end of the external inner liner **102***b*. However, MIG welding is only one of any number of welding methods by which the flange **108** can be attached to external inner liner **102***b*.

[0044] As shown in FIG. **2**, the annular space between the inner liner and outer shell is filled with thick layers of ceramic fiber insulation **111** (e.g., high-temperature ceramic fiber insulation). The ceramic fiber insulation **111** can be alkaline earth silicate fiber insulation and can have a density of 10 pounds per cubic foot. However, the density of the insulation can vary depending on the use requirements for a given venting system installation. For example, a range of densities between 8-12 pounds is contemplated, with different insulation densities potentially being used within different portions of a given venting system installation to save on costs, aid in weight balancing, etc.

[0045] In an example, the annular space is filled with insulation **111** to wrap the inner liner **102**, for example, in multiple (e.g., 3) layers, of nominal 1-inch thick insulation within the entire annular space before placing the outer shell **104** over the inner liner **102**. For example, the annular space between the inner liner **102** and outer shell **104** is 3 or 4-inches, the inner liner **102** should be wrapped with three 1-inch layers of insulation **111**. The annular space can be either 3 inches or 4 inches wide. In an example, **3** wraps of 1″ nominal thickness ceramic fiber insulation is used.

[0046] FIG. **4** illustrates an example of the spacer **106**. As seen in FIG. **4**, the spacer **106** includes sides **120**, **122**, **124**, and **126**. The spacer **106** also includes one or more perforations **130**. The perforations are voids and/or openings within the planar body of the spacer. The perforations may be one of many shapes, including, but not limited to ovals, circles squares, rectangles, pentagons, and/or hexagons.

[0047] As shown in FIG. **4**, the perforations **130** create vertical metal strips **132** between the perforations **130**. The metal strips **132** traverse between the two edges of the spacer. In an example, one perforation is between two metal strips. The metal strips **130** act as a heat sink by reducing the amount of heat transferred between the inner liner **102** and out shell **104**. During operation of the grease duct system, the metal of the inner liner **102** can reach extreme temperatures (approximately 2000 degrees Fahrenheit). The metal of the outer shell **104**, while not as hot as the inner liner **102**, can also reach high temperatures (approximately 400 degrees Fahrenheit). Therefore, in order to prevent failure (e.g., a fire), the present device reduces the amount of heat transfer between the inner liner **102** and outer shell **104**. The metal strips **132** can be narrow in width to allow the insulation **111** to absorb the heat away from the metal. For example, the perforations can be filled at least partially with insulation. The width of the metal strips **132** can be between, and including, 0.1 inches to 3 inches, 0.5 inch to 2 inches, 0.5 inch to 1 inch, among others.

[0048] Additionally, the narrow metal strips **132** can have limited resistive strength to resist the different rates of thermal expansion between the inner liner **102** and outer shell **104**. As previously discussed, both the inner liner **102** and outer shell **104** can reach high temperatures during operation. However, the inner liner **102** has a higher rate of thermal expansion than the outer shell **104** because the inner liner **102** reaches temperatures higher than the outer shell **104**. The metal strips **132** resist the difference rates of thermal expansion between the inner liner **102** and outer shell **104** by functioning as expansion joints.

[0049] If the inner liner **102** was rigidly attached to the outer shell **104** with a spacer **106** that did not include perforations **130**, the inner liner **102** may collapse during operation due to the thermal expansion difference between the inner liner **102** and outer shell **104**. For example, the thermal expansion difference may be so great that it applies too much pressure on the inner liner **102**, weakening the inner liner **102**, and causing the inner liner **102** to collapse on itself, possibly leading to a fire. However, with inclusion of perforations **130**, the metal strips **132** can resist the different rates of thermal expansion and prevent the inner liner **102** from collapsing.

[0050] Spacer **106** also includes overlap areas **128***a*, **128***b*, **128***c*, and **128***d* are areas where one side of the spacer overlaps another perpendicular side of the spacer **106**. For example, as seen in FIG. **4**, in overlap area **128***d*, side **126** overlaps side **120**. The overlap areas may also include one or more spot-weld locations **134**, which is where the spacer **106** is welded to the inner liner **102**, as shown in FIG. **5**. The spacer **106** may be resistance welded into place between the inner liner **102** and outer shell **104**. Although other welding methods can be used.

[0051] FIG. **6** illustrates the backside of the spacer **106** shown in FIGS. **2** and **4**. The backside of the spacer **106** includes roll formed flange **136***a* and overhang **136***b*. The roll formed flanges **136***a* and overhang **136***b* allow the spacer **106** to have a tighter fit when installed and attached to the inner liner **102**. The roll formed flange also provides a flat area to weld.

[0052] FIG. **7** illustrates the spacer **106** as it would look if it were laid out at **180** degrees on a flat surface. The spacer **106** can include notches **150***a*, **150***b*, and **150***c*, and **150***d*, bend lines **152**, and overlap areas **154**. Each side of the spacer can be folded along the notch to create the rectangular spacer **104** illustrated in FIG. **4**.For example, side **122** can be folded along notch **150***a* such that it is perpendicular to side **120**. The notches may be cut at between, and including, 30 degrees to 55 degrees, for example, 45 degrees.

[0053] As seen in FIG. **7**, the spacer **106** may also include bend lines **152**. The bend lines **152** allow the sides of the spacer **106** to be bent so as to create the overhangs **136***a* and **136***b* seen in FIG. **6**.

[0054] FIG. **8** is an example of the mating side of the flange **108** shown in FIGS. **1** and **2**. The mating side of the flange **108** is capable of being attached to the mating face of a second grease duct. As seen in FIG. **8**, the flange **108** includes sides **160**, **162**, **164**, and **166** and slotted bolt holes **168**. The flange **108** has a width **170**. The width **170** can be between, and including, 0.5 inch to 4 inches, 0.5 inch to 2 inches, 0.5 to 1.5 inches, for example, 1 inch.

[0055] During installation of the flange **108**, fasteners are inserted into the bolt holes **168** to attach the flange **108** to the flange of another grease duct fitting or component. It is

US 2019/0293301 A1

Sep. 26, 2019

4

preferred that the bolts holes be spaced no more than 6-inches apart. The mating face of the flange **108** is flush with the front-end of the inner liner.

[0056]   Upon installation, a rectangular flange can be capable of being rotated 180 degrees and match the mating flange of an adjoining rectangular grease duct and that a square flange be capable being rotated 90 degrees and match the mating flange of an adjoining square grease duct.

[0057]   FIG. **9** illustrates the flange **108** as it would look if it were laid out at 180 degrees on a flat surface. The flange can be folded into four sides **160**, **162**, **164**, and **168**. Similar to spacer **106**, flange **108** includes notches **172**a, **172**b, **172**c, and **172**d. Each side of the flange **108** can fold along its corresponding notch to create a rectangle. For example, side **160** can fold along notch **172**a so that side **160** is perpendicular to side **162**.

[0058]   The present device can be any suitable shape and configuration. For example, various types of ducts are generally used for construction purposes, including maneuvering around walls and going through ceilings, as shown in FIGS. **10-13**. For example, in order to connect a horizontal portion of the grease duct system to a vertical portion of the grease duct system, a one or more 90-degree tee, as shown in FIG. **11** may be used. As shown in FIG. **12-13**, the device can include more than one elbows.

[0059]   FIGS. **14**a to **14**b illustrate a grease duct end cap **700** that can be installed on any of the grease duct sections previously presented. The end cap includes a drain pipe **200** that is used to discharge grease out of the ducts into a reservoir. FIG. **15** illustrates a fan hood transition section of a grease duct system. The fan hood transition section **800** is connected, via the flange, to a fan hood used to exhaust the grease laden air present in the kitchen cooking area, out to the atmosphere.

[0060]   The various duct sections can be joined together via the flange **108**. In one example, two duct sections can be bonded together by bolting together each flange **108** via the bolts holes **168**. Prior to bolting together each flange, a sealant may be placed on each flange. After joining the sections, the space between the two separate sections (e.g., field joint) may be filled with insulation and then surrounded by one or more draw bands that completely enclose the field joint between the two grease duct sections.

[0061]   It should be noted that various changes and modifications to the presently preferred embodiments described herein will be apparent to those skilled in the art. Such changes and modifications may be made without departing from the spirit and scope of the present invention and without diminishing its attendant advantages.

We claim:

**1**. A double walled grease duct comprising:

an outer shell including an outer tubular body having an outer first end and an outer second end;

an inner liner including an inner tubular body having an inner first end and an inner second end, wherein the inner liner has a cross-sectional area less than the cross-sectional area of the outer liner, wherein at least a portion of the inner liner is positioned within the outer liner; and

a spacer including a rectangular planar body including an outer edge and an inner edge, wherein the outer edge contacts an inside surface of the outer liner, wherein the inner edge contacts an outer surface of the inner liner, wherein the spacer includes a plurality of metal strips extending from the inner edge to the outer edge.

**2**. The double walled grease duct of claim **1**, wherein the spacer includes a plurality of perforations between the metal strips, wherein each perforation is an opening in the rectangular planar body of the spacer.

**3**. The double walled grease duct of claim **1**, wherein the spacer includes a plurality of perforations between the metal strips, wherein the perforations are filled with insulation.

**4**. The double walled grease duct of claim **1**, wherein the rectangular planar body of the spacer includes notches in the inner edge, wherein the notches are voids in the inner edge, wherein when the spacer is bent around the outer surface of the inner tubular body, at least a portion of the sections of the rectangular planar body overlap.

**5**. The double walled grease duct of claim **1**, wherein the inner liner has a higher rate of thermal expansion than the outer shell.

**6**. The double walled grease duct of claim **1**, wherein the metal strips have a width between, and including, 0.5 inch to 1 inch.

**7**. The double walled grease duct of claim **1**, wherein the space between the outer tubular body and the inner tubular body is at least partially filled with ceramic fiber insulation.

**8**. The double walled grease duct of claim **1**, wherein the inner first end of the inner liner extends outside of the outer first end, wherein the inner second end of the inner liner extends outside of the outer second end.

**9**. The double walled grease duct of claim **1**, further comprising a flange outwardly extending from a perimeter of the inner first end, the inner second end, or combinations thereof.

**10**. The double walled grease duct of claim **9**, wherein the width of the flange is between, and including, 0.5 inch to 1.5 inches.

**11**. The double walled grease duct of claim **9**, wherein the flange is connected to a second grease duct.

\*    \*    \*    \*    \*

E-FILED
Friday, 10 June, 2022  12:09:26 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | Case No. 1:19-cv-01388-SLD-JEH |
| Plaintiff, | |
| v. | Chief Judge Sara Darrow |
| | Magistrate Judge Jonathan E. Hawley |
| VAN-PACKER CO., an Illinois corporation, JEREMIAS, INC., a Georgia corporation, | |
| Defendants. | |

## DEFENDANTS VAN-PACKER CO. AND JEREMIAS, INC.'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 7

II.   UNDISPUTED FACTS ...................................................................................... 8

III.  LEGAL STANDARDS ..................................................................................... 11

      A.    Legal Standards Governing Summary Judgment ................................. 11

      B.    Legal Standards Governing Noninfringement ..................................... 12

      C.    Invalidity ............................................................................................ 12

            1.    Legal Standards Governing Lack of Written Description ...................... 12

            2.    Legal Standards Governing Lack of Enablement ................................. 13

            3.    Legal Standards Governing Indefiniteness .............................................. 14

IV.   ARGUMENT ..................................................................................................... 14

      A.    AS A MATTER OF LAW, PLAINTIFF CANNOT DEMONSTRATE
            VAN-PACKER INFRINGES ANY OF THE ASSERTED CLAIMS ............... 14

            1.    There is no factual dispute that the spacers in the Accused Product
                  do not "limit the amount of heat conducted between components" ........ 14

            2.    A void cannot "maintain a space between the inner duct liner and
                  outer casing" and cannot be the claimed one or more thermal
                  spacers ................................................................................................. 17

      B.    ALL ASSERTED CLAIMS LACK OF WRITTEN DESCRIPTION ............... 18

            1.    The '569 Patent Does Not Adequately A "Fire-Rated" Laboratory
                  Duct ..................................................................................................... 18

            2.    The '569 Patent Lacks Evidence That The Inventor Possessed A
                  "Fire-Rated" Grease Duct with One or More Thermal Spacers
                  Thermally Isolating ................................................................................ 20

      C.    THE ASSERTED CLAIMS OF THE '569 PATENT ARE INVALID
            FOR LACK OF ENABLEMENT ............................................................. 21

            1.    Undue Experimentation is Required to Implement the Asserted
                  Claims ................................................................................................... 21

      D.    THE ASSERTED CLAIMS ARE INVALID AS INDEFINITE ..................... 23

            1.    The terms "fire-rated" and "thermal spacer" are indefinite .................... 23

            2.    The Term "Compressible Insulation Material" Is Indefinite. ................. 23

E. The Evidence Is Insufficient to Support an Award of Lost Profits or Convoyed Sales................................................................................ 24

    1. Plaintiff Cannot Prove the Absence of Non-Infringing Alternatives....... 24

    2. There Is No Evidence of Convoyed Sales ................................................ 26

V. CONCLUSION............................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Alton*,
    76 F.3d 1168 (Fed. Cir. 1996)...............................................................................13

*Am. Seating Co. v. USSC Grp., Inc.*,
    514 F.3d 1262 (Fed. Cir. 2008).................................................................................6

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc).....................................................*passim*

*Atmel Corp. v. Info. Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)...............................................................................14

*Auto. Tech. Int'l, Inc. v. BMW of N. Am., Inc.*,
    501 F.3d 1274 (Fed. Cir. 2007).........................................................................14, 22

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. July 29, 2010).................................................................18

*CAO Lighting, Inc. v. Light Efficient Design*,
    No. 17 C 7359, 2019 WL 1468139 (N.D. Ill. Apr. 3, 2019)....................................13

*Carnegie Mellon Univ. v. Hoffmann-La Roche*,
    541 F.3d 1115 (Fed. Cir. 2008).........................................................................18, 20

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)...............................................................................14

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009)...............................................................................27

*Fargo Elecs. Inc. v. Iris Ltd., Inc.*,
    No. 04-1017, 2006 WL 3839931 (D. Minn. Dec. 29, 2006) ...................................24

*Genentech, Inc. v. Novo Nordisk, A/S*,
    108 F.3d 1361 (Fed. Cir. 1997).........................................................................13, 22

*Gentry Gallery, Inc. v. Berkline Corp.*,
    134 F.3d 1473 (Fed. Cir. 1998).........................................................................13, 20

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999).........................................................................24, 26

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)..................................................................14, 23

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
    324 F.3d 1308 (Fed. Cir. 2003).......................................................................12

*Meyer Intell. Props. Ltd. v. Bodum, Inc.*,
    597 F. Supp. 2d 790 (N.D. Ill. 2009) ..............................................................12

*Milos Misha Subotincic v. 1274274 Ontario, Inc.*,
    Case. No. 10-cv-01946-AG, 2013 WL 3964994 (C.D. Cal. Apr. 9, 2013) ...............24, 25, 26

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..................................................................................14, 23

*Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.*,
    861 F. Supp. 653 (N.D. Ill. 1994) ...................................................................19

*Novartis Corp. v. Ben Venue Labs., Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001).......................................................................12

*Panduit Corp. v. Stahlin Bros. Fibre Works Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ........................................................................24

*Pitney Bowes, Inc. v. Hewlett–Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999).......................................................................12

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)..................................................................12, 13

*Protegrity Corp. v. Voltage Sec., Inc.*,
    No. 3:10-CV-755-RNC, 2013 WL 6880597 (D. Conn. Dec. 31, 2013)...................4

*Regents of Univ. of Cal. v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997).......................................................................13

*Rivera v. Int'l Trade Comm'n*,
    857 F.3d 1315 (Fed. Cir. 2017)..................................................................20, 21

*Sloan Valve Co. v. Zurn Indus., Inc.*,
    No. 10–cv–00204, 2013 WL 6132598 (N.D. Ill. Nov. 20, 2013)...........................18

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991).......................................................................24

*TechSearch, L.L.C. v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002).......................................................................12

5

**Appx2781**

*ULF Bamberg v. Dalvey,*
 815 F.3d 793 (Fed. Cir. 2016)...................................................................13

*Vasudevan Software, Inc. v. MicroStrategy, Inc.,*
 782 F.3d 671 (Fed. Cir. 2015)...................................................................13

*Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.,*
 No. 16-CV-13456, 2019 WL 3334563 (E.D. Mich. July 25, 2019) ......................................25

*Wleklinski v. Targus, Inc.,*
 258 Fed. App'x 325 (Fed. Cir. 2007).........................................................7

**Statutes**

35 U.S.C. § 112..........................................................................................12

35 U.S.C. § 112(b).....................................................................................14

**Other Auths.**

Fed. R. Civ. P. 56(a) .................................................................................11

U.S. Pat. No. 10,024,569 ................................................................. *passim*

Defendants, Van-Packer Co. and Jeremias, Inc. (collectively "Van-Packer"), move for summary judgment that: (1) the accused Van-Packer product does not infringe any asserted claim of U.S. Pat. No. 10,024,569 ("the '569 Patent") ("Asserted Claims"); (2) the '569 Patent is invalid for lack of written description and enablement; (3) the '569 Patent is invalid for being indefinite; and (4) the evidence is insufficient to support an award of lost profits or convoyed sales.

## I. INTRODUCTION

DuraSystems' case depends entirely on whether the accused Van-Packer products ("Accused Products") includes a thermal spacer. Every claim of the '569 Patent requires "one or more thermal spacers." This Court held that "thermal spacer" means:

> Components that maintain a space between the inner duct liner and outer casing that **limit** the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing.

Claim Construction Order of September 23, 2021, Dkt. No. 45 ("Claim Construction Order") (emphasis added). The Van-Packer product simply does not have "one or more thermal spacers."

The Accused Products use spacers to maintain a space between the inner duct liner and the outer casing. However, the Van-Packer spacers are **made of steel** and, thus, do not limit the amount of heat conducted through the components. Even DuraSystems' expert, Mr. Crimi, agrees that the Van-Packer spacers **increase** the flow of heat from the inner duct liner to the outer casing. *See* Crimi Tr., 214:14-215:10, 90:7-91:14. This is not surprising, as it is a well-known and indisputable fact that metal is thermally conductive.

As is demonstrated below: (1) Mr. Crimi agrees that Van-Packer's steel spacers do not limit the heat transfer between the inner and outer elements and, in fact, increase the transfer of heat between the components; and (2) rules of claim interpretation and this Court's claim construction itself bar DuraSystems from claiming that the void or air in the void around the steel

**Appx2783**

spacers makes the steel spacers "thermal spacers." No reasonable juror (or Mr. Crimi) could disagree with these facts.

Additionally, summary judgment must be granted because the '569 Patent fails the written description requirement, the claim terms "fire rated" and "thermal spacer" are indefinite, and the evidence is insufficient to support an award of lost profits or convoyed sales.

## II.    UNDISPUTED FACTS

1. The Van-Packer spacers are made of steel. Ex. A., Morse Rebuttal Report.

2. The spacers in the Accused Products increase the amount of heat conducted from the inner liner duct to the outer casing. Ex. A.

3. Mr. Crimi agrees that the Van-Packer spacers increase the amount of heat conducted from the inner duct liner to the outer casing. *See* Ex. B, Crimi Depo. 214:14-215:10, 90:7-91:14.

4. Mr. Crimi testifies it's the combination of the air in the void and the metal spacers of the Accused Products that limits the transfer of heat from the inner duct liner to the outer casing. Ex. B, Crimi. Depo.

5. Dr. Morse's modeling of the Accused Product shows the outer casing of the Accused Product is hotter when metal spacers are used compared to not having metal spacers. Ex. A.

6. Mr. Crimi agrees that Dr. Morse's model is physically accurate. Ex. B.

7. According to Mr. Crimi, the "thermal spacer" in the Accused Products is the combination of the metal spacer and the air in the "void." Ex. B, 218:9-18.

8. Every claim of the '569 Patent separately recites a) thermal spacers and b) a void. Ex. C., "U.S. Patent No. 10,024,569.

9. Plaintiff's infringement contentions did not argue that the void, including the air in the void, is the claimed "thermal spacer" or "thermally isolates." Ex. D, Plaintiff's Infringement Contentions.

10. The term "exhaust duct" recited in all asserted claims covers laboratory exhaust ducts. Ex. B, 112:18-113:1.

11. When the '569 Patent was filed, there was no standard fire-rating test for laboratory exhaust ducts. *See* Ex. C, at Abstract, 4:7-14, Ex. B, 72:8-16, 112:18-113:1; *see also* Ex. E, 51:10-52:5, 225:6-19.

12. Today, there is no standard fire-rating test for laboratory exhaust ducts. *See* Ex. C, at Abstract, 4:7-14, Ex. B, 72:8-16, 112:18-113:1; *see also* Ex. E, 51:10-52:5, 225:6-19.

13. Mr. Crimi testified he had never seen a grease exhaust duct used in a laboratory. Ex. B.

14. Mr. Crimi testified that unidentified individuals allegedly told Mr. Crimi that unidentified customers had told unidentified individuals they wanted grease ducts for use in laboratories. Id.

15. Mr. Crimi allegedly talked with the unidentified individuals from Statement of Fact ("SOF"), para. 14 sometime between 2012 and 2017. Ex. B.

16. DuraSystems sells grease exhaust ducts and laboratory exhaust ducts as distinct products. Ex. F, Printout of Plaintiff's website.

17. The '569 Patent does not suggest using fire-rated grease ducts as substitutes for laboratory exhaust ducts. Ex. C.

18. Mr. Crimi testified that the '569 Patent does not describe the physical characteristics of thermal spacers, just the function that thermal spacers perform. Ex. B.

19. The '569 Patent does not use the term "fail points." Ex. C.

**Appx2785**

20. Mr. Crimi testified that, no matter what spacer is selected for a design, an ordinary artisan would need to run a fire test to know if a thermal spacer thermally isolates. Ex. B.

21. The '569 Patent describes a "thermal gasket" in one sentence. Ex. C.

22. The '569 Patent does not describe what the "thermal gasket" is made of or its properties. Id.

23. The '569 Patent does not describe the test an ordinary artisan would use to identify whether a particular structure is a thermal spacer. Ex. C.

24. The '569 Patent does not expressly disclose thermal conductivity or describe thermal conductivity in the sense of a quantifiable test. Ex. C.

25. The '569 Patent does not describe what "thermal isolation" means with respect to the "thermal spacers." Ex. C.

26. The omission of the thermal gasket from Fig. 9 in the '569 Patent is an error. Ex. C.

27. Mr. Crimi testified that starting from the '569 Patent written description, it could take two or three years to construct a fire-rated duct. Ex. B.

28. Performing a fire-rating test for an exhaust duct is inherently uncertain and complex. Id.

29. Dr. Morse opined on the existence of five acceptable non-infringing alternatives. Ex. A.

30. Mr. Clemons opined on the economic acceptability of existing market solutions, including a) Van-Packer's round ducts and b) Dr. Morse's non-infringing alternatives. Ex. G, Rebuttal Report of Clemons.

31. Plaintiff's support for the absence of an acceptable non-infringing alternative is Mr. Curtis' opinion that 1) the existing alternatives are "unlikely to be acceptable" and 2) the fact that Van-Packer did not implement Dr. Morse's proposed design-arounds. Ex. H, Curtis Report.

32. Mr. Curtis never spoke to Mr. Crimi about non-infringing alternatives. Ex. H.

10

33. Mr. Crimi did not consider non-infringing alternatives. Ex. B.

34. Mr. Crimi testified that "it is highly unlikely that an accountant could assess non-infringing alternatives." Ex. B.

35. Paul Wells is an employee of DuraSystems and not an expert in this case. Exs. I, Curtis Depo, and H.

36. Mr. Wells had no opinion on the non-infringing alternatives offered by Dr. Morse. Id.

37. Mr. Curtis testified that he did not consider any evidence relevant to whether the non-infringing alternatives proposed by Dr. Morse were "either feasible or infeasible." Ex. I.

38. Mr. Curtis offered no opinion on the consumer acceptability of Dr. Morse's proposed non-infringing alternatives. Ex. I.

39. Plaintiff's convoyed sales claim is based solely on Mr. Curtis' reliance on DuraSystems' employee Gerry Saieva's statement that "convoyed sales total 20% of Patented DuraDuct sales." Exs. H, I.

40. Mr. Curtis' expert report does not identify a single Van-Packer component or product subject to convoyed sales. Exs. H, I.

41. At his deposition, Mr. Curtis was unable to identify any components or products sold by Van-Packer or DuraSystems that would constitute a convoyed sale. Exs. H, I.

## III.    LEGAL STANDARDS

### A.  Legal Standards Governing Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "At summary judgment the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient

evidence favoring the non-moving party for a jury to return a verdict in its favor." *Bd. of Trustees of the Univ. of Illinois v. Micron Tech., Inc.*, No. 2:11-CV-2288-SLD-JEH, 2017 WL 11679600, at *2 (C.D. Ill. Sept. 28, 2017). A promise to produce admissible evidence at trial is not sufficient to defeat a motion for summary judgment. *See*, *e.g., Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 597 F. Supp. 2d 790 (N.D. Ill. 2009) (stating that only evidence admissible at trial may be relied on for summary judgment purposes).

### B. Legal Standards Governing Noninfringement

Infringement is a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett–Packard Co*., 182 F.3d 1298, 1304 (Fed. Cir. 1999). "The determination of infringement …is a question of fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc*., 324 F.3d 1308, 1318 (Fed. Cir. 2003).

Because the burden of proving infringement is the patentee's, an accused infringer may show summary judgment of noninfringement is proper by producing evidence that precludes a finding of infringement, or showing the evidence on file fails to create a material factual. *See Novartis Corp. v. Ben Venue Labs., Inc*., 271 F.3d 1043, 1046 (Fed. Cir. 2001); *see also TechSearch, L.L.C. v. Intel Corp*., 286 F.3d 1360 (Fed. Cir. 2002). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id*.

### C. Invalidity
#### 1. Legal Standards Governing Lack of Written Description

There are three requirements under 35 U.S.C. § 112(a): written description, enablement, and best mode. The written description requirement is separate and distinct from the enablement requirement. *Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1341 (Fed. Cir. 2010) (en banc). "Compliance with the written description requirement is a question of fact but is amenable to

12

summary judgment in cases where no reasonable fact finder could return a verdict for the nonmoving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

The written description requirement is satisfied if "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms.*, 598 F.3d at 1351. The description of the invention in the patent "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *In re Alton*, 76 F.3d 1168, 1172 (Fed. Cir. 1996). The specification must show that the inventor "was in possession of the invention," i.e., "actually invented" what is claimed. *ULF Bamberg v. Dalvey*, 815 F.3d 793, 797–98 (Fed. Cir. 2016).

Assessing "possession as shown in the disclosure" requires "an objective inquiry into the four corners of the specification." *Ariad*, 598 F.3d at 1351. A "mere wish or plan" for obtaining the claimed invention does not satisfy the written description requirement. *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997); *see also PowerOasis*, 522 F.3d at 1306 (the "'descriptive matter must necessarily be present in the'" specification) (citation omitted). "[I]f the claimed invention does not appear in the specification . . . the claim . . . fails regardless whether one of skill in the art could make or use the claimed invention." *Ariad*, 598 F.3d at 1348.

"[C]laims may be no broader than the supporting disclosure, and therefore [...] a narrow disclosure will limit claim breadth." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998). Plaintiff cannot make claims broader than the written description allows. *Id.*; *see also CAO Lighting, Inc. v. Light Efficient Design,* No. 17 C 7359, 2019 WL 1468139, at *9 (N.D. Ill. Apr. 3, 2019).

### 2. Legal Standards Governing Lack of Enablement

"To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'"

13

*Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). "Enablement is a legal question based on underlying factual determinations." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 684 (Fed. Cir. 2015). Where a "specification provides only a starting point, a direction for further research," it is not enabling. *Auto. Tech. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1284 (Fed. Cir. 2007).

### 3. Legal Standards Governing Indefiniteness

A patent claim must "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). [I]ndefiniteness is a question of law" appropriate for summary judgment. *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1378 (Fed. Cir. 1999).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). A claim that recites both a system and the method for using that system does not apprise a person of ordinary skill in the art of its scope, and is invalid as indefinite. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).

## IV. ARGUMENT

### A. AS A MATTER OF LAW, PLAINTIFF CANNOT DEMONSTRATE VAN-PACKER INFRINGES ANY OF THE ASSERTED CLAIMS

1. There is no factual dispute that the spacers in the Accused Product do not "limit the amount of heat conducted between components"

All of the Asserted Claims require "thermal spacers thermally isolating" the inner duct liner from the outer casing. Based on this Court's Claim Construction Order, a thermal spacer must: (1) **maintain a space** between the inner duct liner and outer casing; and (2) **limit the amount of heat conducted** through the components so they do not create fail points on the inner duct liner or outer casing during fire rating testing. Defendants address the second point first.

While the Accused Products do not fail along the inner duct liner or the outer casing during fire rating testing, the '569 Patent specifically requires that the lack of failure is **because** one or more thermal spacers **limit** the heat conducted between the components. Here, expert witnesses for both parties agree that the metal spacers in the Accused Products **increase** the amount of heat conducted through the components, which is exactly the opposite of what is required to infringe.

In his expert report, Mr. Crimi includes the following (color-added) picture that identifies what DuraSystems claims is a "thermal spacer" in the Accused Product (shown in green below):



**Crimi Opening Report, p. 15.**

Van-Packer's expert witness, Dr. Timothy Morse, performed modeling and opined that the steel spacer shown above increases, rather than limits, the transfer of heat between the inner duct

15

liner and the outer casing. Expert Report of Timothy L. Morse, Ph.D., Regarding Non-Infringement of U.S. Patent No. 10,024,569 ("Morse Rebuttal Report"), p. 17. Dr. Morse's model, shows that the outer casing of a duct is hotter—the red hot spots—when metal spacers are used.



**Morse Rebuttal Report, p. 20**

Mr. Crimi agrees with Dr. Morse's opinion that the Van-Packer spacers increase the heat transferred between the inner duct liner and the outer casing.

> 6    Q    You disagree with Mr. Morse as to the
> 7    implication of what his model shows, but you don't
> 8    disagree that his model is inaccurate, right?
> 9    A    Correct.
> 10    Q    And so there really isn't a -- there isn't
> 11    a factual dispute between you two.  You guys both
> 12    agree as to what's happening?
> 13    A    Well, again, I agree with what has been --
> 14    what the model has shown and his expectation and mine
> 15    too that where it connects, those are -- and yours
> 16    and everybody else's, that where it connects, those
> 17    are going to be hotter spots than the rest of the
> 18    surface, I don't disagree, but hotter doesn't
> 19    necessarily mean a failure and that's I guess where
> 20    we differ.

**Crimi Tr., 216:6-20**

In his deposition, Mr. Crimi stated "this is exactly what I would expect as well […] I don't disagree with that" and Dr. Morse is "physically correct." *See* Crimi Dep., 215:11-216:20. Mr. Crimi repeatedly confirmed that Van-Packer's metal spacers increase the heat conducted between the inner and outer elements. *Id.* at 214:22-215:10.

16

**Appx2792**

Because both expert witnesses agree that the Van-Packer spacers increase the transfer of heat between the inner and outer walls, rather than limit it, the Accused Products do not include one or more thermal spacers and cannot infringe. *See Wleklinski v. Targus, Inc.,* 258 Fed. App'x 325 (Fed. Cir. 2007) (summary judgment of noninfringement granted where accused product was the opposite of claimed invention).

> 2. A void cannot "maintain a space between the inner duct liner and outer casing" and cannot be the claimed one or more thermal spacers

As seen above, Van-Packer's metal spacers are designed with holes (shown where the insulation creeps through the green metal spacers). Knowing that metal increases the flow of heat, Plaintiff tries to argue that the air occupying the holes is what limits heat transfer. According to Mr. Crimi, the "thermal spacer" in the Accused Products is the combination of the metal and the voids, and it is the air that limits the flow of heat. Crimi Tr. 218:9-18.

```
17    Q   I guess, would you agree with me that it's
18    the air in the void that limits the transfer of heat
19    from the inner to the outer?
20    A   Yeah, it's the absence of anything that --
21    other than air that allows it then to dissipate into
22    the air.
```
**Crimi Tr., 221:17-22**

This argument violates this Court's claim construction and is inconsistent with the claim. First, this Court unequivocally holds that the **spacer itself** must thermally isolate the inner duct liner from the outer casing. *See* Claim Construction Order, p. 22. The void does not maintain the space between the inner duct liner and the outer casing. A physical structure maintains space, not air, and the accused structure identified by Plaintiff is thermally conductive steel.

Second, referring to the void as part of the thermal spacer violates the claim language of the '569 Patent itself. Claim 1, for example, recites:

> each of said exhaust duct modules having an inner duct liner and an outer casing, and **a void** being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving an insulation

17

material, and including **one or more thermal spacers** configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void,

*See* '569 Patent, Claim 1 (emphasis added).

Thus, the '569 Patent distinctly claims the void separately from the one or more thermal spacers. "Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. July 29, 2010).

Finally, Plaintiff's infringement contentions never identified any argument that the "void" (or the air in the void) is the claimed "thermal spacer" that "thermally isolates." *See* Ex. D. As a result, not only is Plaintiff's argument wrong as a matter of law, it is untimely. *See Sloan Valve Co. v. Zurn Indus., Inc.*, No. 10–cv–00204, 2013 WL 6132598 (N.D. Ill. Nov. 20, 2013).

In short, it is undisputed that the metal spacers increase the transfer of heat and the voids do not maintain the space between the components— thus neither can be a thermal spacer.

### B.    ALL ASSERTED CLAIMS LACK OF WRITTEN DESCRIPTION

1.    The '569 Patent Does Not Describe A "Fire-Rated" Laboratory Duct

"It has long been the case that a patentee 'can lawfully claim only what he has invented *and described*, and if he claims more his patent is void.'" *Carnegie Mellon Univ. v. Hoffmann-La Roche*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (citation omitted) (emphasis added). The written description requirement is only satisfied when "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351. In the *Ariad* case, the Federal Circuit invalidated a claim directed to "any vertebrate and mammalian cDNA" as being unsupported by a specification that only discussed one species, namely rat cDNA. *Id.*

18

Here, Mr. Crimi agrees the claims cover laboratory exhaust ducts. Crimi Tr.112:18-113:1. However, the '569 Patent does not reasonably convey to those skilled in the art that the inventor knew how to make and use a fire-rated laboratory exhaust duct as of the filing date.

There was no standard fire rating test for laboratory exhaust ducts at the time the '569 Patent was filed, nor do any exist today. *See* '569 Patent at Abstract, 4:7-14, Crimi Tr. 72:8-16, 112:18-113:1; *see also* Crimi **CC** Tr., 51:10-52:5, 225:6-19. The '569 Patent claims "fire-rated" laboratory exhaust ducts, but that is more than what was invented and described in the patent.

DuraSystems tries to excuse this fatal flaw by offering evidence that is: (i) inadmissible; (ii) irrelevant; and (iii) contradicted by admissible evidence.

Mr. Crimi opines that it is immaterial that specific fire ratings did not exist at the time of the invention and do not exist today, because fire-rated **grease** ducts have been, and continue to be, installed for use in laboratories. Crimi Rebuttal Report, p. 11., Ex. L. However, when asked the basis for this opinion, Mr. Crimi testified that he had never seen a grease duct used in a laboratory and cited inadmissible and irrelevant evidence for this opinion. Specifically, unidentified individuals supposedly told Mr. Crimi that unidentified customers had told the unidentified individuals they wanted grease ducts for use in laboratories. That is double hearsay, and, as the declarants are unknown, there is no basis for admissibility. *See* Crimi Tr. 71:18-80:11; *see also Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.*, 861 F. Supp. 653 (N.D. Ill. 1994).

Not only is Mr. Crimi relying on inadmissible double hearsay, he also concedes he likely heard the hearsay **after** the '569 Patent was filed in October 2013. *See* Crimi Tr., 78:16-79:2; 80:2-11. Because written description is analyzed as of a patent's filing date, evidence concerning what unidentified consumers supposedly requested after October 2013 is irrelevant. *Ariad*, 598 F.3d

19

1336, 1351. Additionally, DuraSystems' own **admissible** evidence contradicts Mr. Crimi's position as DuraSystems offers distinct products for use as grease ducts and laboratory ducts.[1]

More importantly, even if DuraSystems' evidence was admissible and relevant, the undisputed fact is the '569 Patent simply does not provide any description of a fire-rated laboratory duct. Written description must be found within the four corners of the document. *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1322 (Fed. Cir. 2017) (quoting *Ariad*, 598 F.3d at 1351). The '569 patent does not suggest using fire-rated grease ducts as substitutes for "fire-rated" laboratory ducts. DuraSystems could have simply claimed a "fire-rated grease exhaust duct," but it elected to claim more broadly. As in *Gentry Gallery*, DuraSystems' choice to claim more broadly than its description allowed is fatal. 134 F.3d 1473.

> 2.   The '569 Patent Lacks Evidence That The Inventor Possessed A "Fire-Rated" Grease Duct with One or More Thermal Spacers Thermally Isolating

As noted, "[i]t has long been the case that a patentee 'can lawfully claim only what he has invented *and described*, and if he claims more his patent is void.'" *Carnegie Mellon Univ.*, 541 F.3d at 1122. Based on Mr. Crimi's testimony, the '569 Patent fails to describe "one or more thermal spacers thermally isolating said inner duct liner from said outer casing." Crimi Tr.

With respect to one or more thermal spacers thermally isolating, Mr. Crimi testified that **the '569 Patent does not describe what thermal spacers are**, just what they do. Crimi Tr., 143:2-17 (the '569 patent describes the thermal spacer in terms of the **function** it performs, rather than providing specific examples of materials you might use or properties for a thermal spacer or how you might build it). Likewise, it is undisputed that the '569 patent does not describe the "fail points" that are included in this Court's construction of "thermal spacers." Crimi Tr. 141:4-25.

---

[1] *See* Exs. F and N (DuraSystems' Laboratory Duct Product Line)

Mr. Crimi testified no matter what spacer material is selected for a design (even copper or balsa wood), an ordinary artisan "would still need to run the fire test to know" whether a thermal spacer thermally isolates. Crimi Tr., 53:4-25, 142:4-143:7, 143:18-144:1, 148:12-22 ('569 Patent mentions "thermal gasket" once but does not state where it should be implemented, the material it is made of, or its physical properties), 150:14-18 ("The '569 patent itself, as I recall, does not specific (sic) identify the types of materials"). Mr. Crimi further agrees that the '569 Patent does not describe the test one would use to identify whether a particular element is a thermal spacer. *See* Crimi Tr. 128:8-16 ("the patent doesn't talk about thermal conductivity in the sense of… [a] quantifiable test."), 125:8-20 (no express disclosures concerning thermal conductivity), 133:1-10 ('569 Patent does not describe reducing the conductivity of the thermal energy through the components of the system).

The '569 Patent does not describe what "thermal isolation" means with respect to the "thermal spacers." Ex. C. The specification only says, in a single sentence, that a "thermal gasket" "thermally isolates." Crimi Tr., 142:4-143:7. And it is undisputed that there is an error in the '569 Patent, resulting in the omission of the "thermal gasket" from the figures. Crimi Tr., 143:18-146:2. This Court even noted that "[t]he four corners of the '569 Patent provide little guidance;" the claims do not explain what "isolating" means and the specification does not either. *See* Claim Construction Order, p. 27. Under these circumstances, there is no written description support for a "thermal spacer" that "thermally isolates." *Rivera*, 857 F.3d at 1322 ("The knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification…"). The Court should therefore grant summary judgment.

### C.   THE ASSERTED CLAIMS OF THE '569 PATENT ARE INVALID FOR LACK OF ENABLEMENT

1.   Undue Experimentation is Required to Implement the Asserted Claims

"To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech,* 108 F.3d at 1365. Where a "specification provides only a starting point, a direction for further research," it is not enabling. *Auto. Tech.*, 501 F.3d at 1284. Here, the '569 Patent provides no more than a starting point, a direction for further research, to determine whether an element qualifies as a thermal spacer. Crimi Tr., 52:7-55:7.

Every claim of the patent requires an infringing product to include "thermal spacers thermally isolating" the inner duct liner from the outer casing. In accordance with the Court's Claim Construction Order, to know whether an accused structure in a product is a "thermal spacer," one must understand whether the element limits the amount of heat conducted through the components so they do not create fail points on the inner duct liner or outer casing during fire rating testing. The '569 Patent does not teach how to make this determination. Undue experimentation is required to reach this conclusion, which renders the '569 Patent invalid.

When considering hypothetical spacers made from the most thermally conductive material imaginable, Mr. Crimi testified, no matter what spacer is selected for a design, an ordinary artisan, "would still need to run the fire test to know" if a thermal spacer thermally isolates. Crimi Tr., 52:7-55:7. Mr. Crimi further testified that starting from the description provided in the '569 Patent, it could take two or three years to construct a fire-rated duct. Crimi Tr., 159:14-23. It is undisputed that performing a fire-rating test is inherently uncertain and complex. *See* Crimi **CC** Tr. at 75:22-76:17; 74:5-25; *see also* Crimi Tr. at 153:7-14. The fact that one would not know what a thermal spacer is without first testing, using an uncertain and complex process that may take several years, is exactly the "starting point, the direction for further research," that is not enabling. *Auto. Tech.*, 501 F.3d at 1284.  Summary judgment should therefore be granted.

### D. THE ASSERTED CLAIMS ARE INVALID AS INDEFINITE

1. The terms "fire-rated" and "thermal spacer" are indefinite

The claim terms "fire-rated" and "thermal spacer" are indefinite because, when read in light of the intrinsic record, the claim terms fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. *See Nautilus*, 572 U.S. at 901. The patent specification provides no assistance in determining the scope of these claims and Mr. Crimi's attempt to remedy the inadequacy with his knowledge is inappropriate as a matter of law. *See Ariad*, 598 F.3d at 1348. The facts now require this Court to decide this purely legal issue in Defendants' favor.

The term "fire-rated is indefinite because no fire rating standards exist for the laboratory ducts that fall within the scope of the claims of the '569 Patent. *See* '569 Patent at Abstract, 4:7-14; *see also* Crimi Tr. at 112:18-113:1. Said differently, the phrase "fire-rated" duct does not provide reasonable certainty to the scope of the claims because a laboratory duct cannot be fire-rated. *See* Crimi **CC** Tr. 51:10-52:5; 225:6-19. As a result, when read in light of the intrinsic record (which are silent as to how to fire rate the claimed ducts), the claim term "fire-rated" fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

The term "thermal spacer" is indefinite because an ordinary artisan would "need to run the fire test to know" if a thermal spacer thermally isolates. Crimi Tr., 52:7-55:7. A claim that recites both a system (the duct) and a method (testing that must be done to know if a spacer is a thermal spacer), does not apprise one of ordinary skill in the art of its scope and is invalid as being indefinite. *See IPXL Holdings*, 430 F.3d at 1384. As such, the Asserted Claims are indefinite.

2. The Term "Compressible Insulation Material" Is Indefinite.

Defendants fully briefed this issue at claim construction and nothing has changed factually since. *See* Defendants' Opening Claim Construction Brief, Dkt. No. 31, p. 11-13; *see also*

23

Defendants' Reply Claim Construction Brief, Dkt. No. 41, p. 5-7. As a matter of law, Defendant

is entitled to summary judgment that the term "compressible insulation material" is indefinite.

Construction Brief, pp. 11-13; *see also* Defendants' Reply Claim Construction Brief, pp. 5-7.

**E.    The Evidence Is Insufficient to Support an Award of Lost Profits or Convoyed Sales**

> **1.    Plaintiff Cannot Prove the Absence of Non-Infringing Alternatives**

Lost profits damages turn on whether "lost profits claimed were in fact caused by the

infringing sales, thus establishing a patentee's *prima facie* case with respect to 'but for' causation."

*Rite-Hite v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). Proof of causation requires the

absence of acceptable non-infringing substitutes. *Panduit Corp. v. Stahlin Bros. Fibre Works Inc.*,

575 F.2d 1152, 1156 (6th Cir. 1978). Plaintiff cannot recover lost profits because no reasonable

jury could find the absence of non-infringing alternatives.

An acceptable non-infringing alternative prevents a plaintiff from recovering lost profits.

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991).

Therefore, a patentee claiming lost profits has the burden to prove that any proposed alternatives

were either (1) unavailable at the time of infringement or (2) not an acceptable substitute to

consumers. *Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1355 (Fed. Cir.

1999). Where a patentee fails to offer that proof, courts routinely grant summary judgment. *Fargo

Elecs. Inc. v. Iris Ltd., Inc.*, No. 04-1017 (JRT/FLN), 2006 WL 3839931 (D. Minn. Dec. 29, 2006);

*Protegrity Corp. v. Voltage Sec., Inc.*, No. 3:10-CV-755-RNC, 2013 WL 6880597 (D. Conn. Dec.

31, 2013); *see also Milos Misha Subotincic v. 1274274 Ontario, Inc.*, Case. No. 10-cv-01946-AG

(PJWx), 2013 WL 3964994, at *14-15 (C.D. Cal. April 9, 2013).

Dr. Morse, provided no less than five acceptable noninfringing alternatives. *See* Morse

Opening Report, pp. 76-79. Van-Packer's economic expert, Mr. Clemons, similarly opined on the

24

**Appx2800**

economic acceptability of (a) *existing* market solutions, including Van-Packer's own round ducts, and (b) Dr. Morse's non-infringing alternative designs. *See* Clemons Report, pp. 17-23. In contrast, Plaintiff's sole support for the *absence* of an acceptable non-infringing alternative is Mr. Curtis' opinion that: (i) certain existing alternatives are "unlikely" to be acceptable based on discussions with Paul Wells, a DuraSystems lay witness; and (ii) the fact that Van-Packer didn't actually implement Dr. Morse's proposed non-infringing redesigns.

At the outset, Mr. Curtis admits that he had never spoken to Mr. Crimi about non-infringing alternatives. *See* Curtis Tr., 29:22-24. In fact, Mr. Crimi testified that he has not considered non-infringing alternatives. *See* Crimi Tr., 21:21-22:10. Likewise, Mr. Curtis testified that he does not offer "any opinions on [] technical aspects," and Mr. Crimi testified that "[i]t is highly unlikely an accountant [such as Mr. Curtis] could assess non-infringing alternatives." Curtis Tr., 24:7-12; Crimi Tr., 24:20-23. Viewed against that background, Mr. Curtis's reliance on the *ipse dixit* of lay employee Mr. Wells to conclude that existing market alternatives are "*unlikely*" to be acceptable fails as a matter of law. *See Milos Misha Subotincic*, 2013 WL 3964994, at *14-15. Indeed, issues such as consumer acceptability are "manifestly beyond the scope of [a lay witness's] percipient factual knowledge and personal experience." *See Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at *16 (E.D. Mich. July 25, 2019) (precluding economic expert's opinions on non-infringing alternatives where discussions with non-expert employee "form[ed] the sole foundation" for said opinions).[2]

Not only is it legally impermissible for Mr. Wells to opine on existing market alternatives, Mr. Wells had no opinion on the design-arounds proposed by Dr. Morse. *See* Clemons Report, pp. 17-23. Mr. Curtis' erroneous reasoning is that Van-Packer could not have made the noninfringing

---

[2] While *Webasto* involved the opinions of an accused infringer's expert, Mr. Curtis's reliance on a lay witness's opinion for the unacceptability is doubly problematic, since it is Plaintiff's burden of proof..

alternatives because it chose the particular accused design. The Federal Circuit has rejected this reasoning. *See Grain Processing Corp.*, 185 F.3d at 1349 ("[A]vailable alternatives—including *but not limited to* products on the market—[may] preclude lost profits damages." (emphasis added)). The question for lost profits is whether the accused infringer **could** have redesigned its product to the extent necessary, not whether the accused infringer actually did. *Id*. at 1350. As a result, Mr. Morse's unrebutted opinion is that multiple noninfringing designs could have easily been implemented by Van-Packer. That is all the law requires.

When examined on Dr. Morse's proposed design-arounds, Mr. Curtis testified that he did not consider **any** evidence that such alternatives are "either feasible or infeasible." Curtis Tr., 26:14-29:21. Similarly, Mr. Curtis offers **no opinion** on the commercial acceptability of the proposed design-arounds. *See* Curtis Report, pp. 19-20. There is no evidence the designs proposed by Dr. Morse were unavailable. Such an "unsupported conclusory statement . . . is insufficient [to prove lost profits]." *Milos Misha Subotincic*, 2013 WL 3964994, at *15.

### 2.    There Is No Evidence of Convoyed Sales

"A 'convoyed sale' refers to the relationship between the sale of a patented product and a functionally associated non-patented product. A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products 'together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit.'" *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268-69 (Fed. Cir. 2008) (citing *Rite–Hite Corp.*, 56 F.3d at 1550).

Plaintiff does not attempt the rigorous functional relationship test. Rather, the only support for its claim to convoyed sales is Mr. Curtis' reliance on DuraSystems employee Gerry Saieva's statement that "convoyed sales total 20% of Patented DuraDuct sales." Curtis Report, p. 22. Mr.

Saieva has **no factual knowledge about Defendant's business or sales**. Thus, based entirely on Mr. Saieva's irrelevant *ipse dixit*, Mr. Curtis enhances his lost profits calculations by 20%, resulting in an increase of $163,883 in lost sales and approximately $62,439.42 in lost profits. Mr. Curtis' report fails to identify a single Van-Packer component or product subject to convoyed sales, and, at deposition, Mr. Curtis was unable to identify any such component or product sold by Van-Packer *or* Durasystems. *See id.*; Curtis Tr. 46:19-47:2. Likewise, Mr. Curtis could not identify any documentary evidence identifying such components or products. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1333 (Fed. Cir. 2009) (rejecting lost profits for convoyed sales where "damages expert could not identify specifically what products he included in his lost-profits analysis"). Plaintiff should be precluded from recovering any lost profits from convoyed sales.

## V. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment.

Dated: June 9, 2022            Respectfully submitted,

By: /s/ James A. Shimota

James A. Shimota (IL Bar No. 6270603)
Katherine L. Allor (IL Bar No. 6317964)
Jacob T. Michalakes (IL Bar No. 6336389)
K&L GATES LLP
70 W. Madison St., Suite 3300
Chicago, IL 60602
james.shimota@klgates.com
katy.allor@klgates.com
jacob.michalakes@klgates.com

*Attorneys for Defendants Van-Packer Co.
and Jeremias, Inc.*

27

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

/s/ James A. Shimota

James A. Shimota

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | |
| Plaintiff, | Case No. 1:19-cv-01388-SLD-JEH |
| v. | Chief Judge Sara Darrow |
| | Magistrate Judge Jonathan E. Hawley |
| VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, | |
| Defendants. | |

**EXPERT REPORT OF TIMOTHY L. MORSE, PH.D.,
<u>REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 10,024,569</u>**



Figure 9. Model Boundary Conditions. Insulation and draw band not shown for clarity of view.

52.    The model was run twice, first for the Van-Packer GRZ product in its original configuration having metal spacers and a second time for a modified GRZ product without the metal spacers. The results of the model are shown below in Figure 10.



Figure 10. Temperature contours of the Van-Packer GRZ Duct with metal spacers(left) and without the metal spacers(right) undergoing an internal hot air flow of 1500°F.

53.     Results show that when the metal spacers are present in the GRZ duct (Figure 10, left) they conduct heat from the inner duct to the outer duct surface. The inner duct and metal spacers are at elevated temperatures compared to the outer enclosure. There are visible hot spots on the outer duct surface with temperatures as high as ~260°F that correspond to where the metal spacer bridges between the inner duct and the outer duct surface. A scenario under the same conditions but without metal spacers (Figure 10, right) does not produce the same visible hot spots on the outer duct surface and the temperature is more uniform across the surface with a maximum temperature only reaching 185°F. The analysis shown above was performed with an internal temperature of 1500 °F. Qualitatively similar results are obtained for higher or lower temperatures.

54.     Therefore, the metal spacer of the GRZ Duct cannot be considered a "thermal spacer thermally isolating." It is my opinion that Van-Packer's GRZ Duct product does not literally infringe claim 1 of the '569 Patent.

**CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER**

March 11, 2022
Date

Timothy L. Morse, Ph.D.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                    ROCK ISLAND DIVISION
 4    _____
 5    DURASYSTEMS BARRIERS INC.,     )
      a Canadian corporation,        )
 6                                   )
           Plaintiff,                ) Civil No.
 7                                   ) 1:19-cv-01388
        v.                           )
 8                                   )
      VAN-PACKER CO., an Illinois    )
 9    corporation, and JEREMIAS,     )
      INC., a Georgia corporation,   )
10                                   )
           Defendants.               )
11    _____
12
13            VIDEOTAPED DEPOSITION OF TONY CRIMI
14               May 11, 2022  9:04 a.m.
15              Location: Workman Nydegger
                60 South Temple, Suite 1000
16                  Salt Lake City, UT
17
18
19
20
21
22
23
24    Reported by:
      HEIDI HUNTER, RPR, CSR
25    Job No.: 5179104
```

Page 2

1                 A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3             Chad Nydegger
              WORKMAN NYDEGGER
4             Attorneys at Law
              60 East South Temple, Suite 1000
5             Salt Lake City, UT 84111
              Tel: 801.533.9800
6             Email: cnydegger@wnlaw.com
7    FOR THE DEFENDANT:
8             James A. Shimota
              K&L GATES, LLP
9             Attorneys at Law
              70 West Madison Street, Suite 3100
10            Chicago, IL 60602
              Tel: 214.939.5500
11            Email: jim.shimota@klgates.com
12   ALSO PRESENT:
13            Erik Largin, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

Page 89

1    right?  The punching of holes and the fact that it's

2    strip as opposed to a flat sheet doesn't change its

3    thermal conductivity, correct?

4              MR. NYDEGGER:  Objection; form.

5         A    It doesn't change the thermal conductivity

6    of the material, the metal.  It changes the thermal

7    conductivity, as we discussed at length in the first

8    deposition, of the thermal spacer, or the overall

9    heat transfer can be provided by the thermal spacer.

10        Q    (By Mr. Shimota) Well, the thermal spacer

11   is the -- is what you colorized, right?

12        A    Yes.

13        Q    So how does it change the thermal

14   conductivity of what is colorized?

15        A    It changes the voids, how does the void --

16        Q    No, no, no.  Let's take it step-wise,

17   right.  The green -- the green colorized area is all

18   the same metal, right?

19        A    I assume so.

20        Q    You don't know if it's all the same metal,

21   right?

22        A    I don't.

23        Q    Let's assume it is all the same metal,

24   right?  And if it's all the same metal, it has the

25   same thermal conductivity throughout.  Let me -- if

1   the -- if the colorized structure is all the same

2   metal, then the colorized structure has the same

3   thermal conductivity throughout, correct?

4           MR. NYDEGGER:  Objection; form.

5       A    The material used to create the colorized

6   section has the same thermal conductivity throughout.

7       Q    (By Mr. Shimota) Right.  The void has a

8   different thermal conductivity, correct?

9       A    Correct.

10      Q    Okay.  And it's the presence of the void

11  that limits the transfer of heat, correct?

12      A    The presence of the void that limits the

13  transfer of heat through that part.

14      Q    When you say that part, what do you mean?

15      A    I mean, the piece in its entirety, the

16  component, the thermal spacer.

17      Q    And how does the presence of the void limit

18  the transfer of the heat through that part?

19      A    By reducing the contact surface area with

20  the outer duct and inner duct liner.

21      Q    So if there's more -- put it kind like a

22  dumb guy terms like me, if there's more surface area,

23  more heat will flow through the metal, right?

24      A    If there's more surface area and direct

25  contact connecting the inner duct liner and the outer

1   duct liner, you would expect, yes.

2        Q    And if there's less surface area, less heat

3   will flow through, right?

4        A    Yes.

5        Q    Okay.  So cutting the holes out reduces the

6   surface area through which heat can flow, correct?

7        A    Correct.

8        Q    And instead, you've got surface area which

9   is occupied by insulation, correct?

10       A    Yes.  But the other thing with the holes is

11   that it also provides an outlet for radiation of heat

12   into the -- into the cavity, which can be absorbed by

13   the insulation, as opposed to transmitting through

14   the cavity.

15       Q    Right.  That's what I meant by the

16   insulation provides a heatsink at the metal strips.

17            MR. NYDEGGER:  Object.  I don't think

18   there's a question.

19       Q    (By Mr. Shimota) Okay.  So is it correct

20   that the insulation provides a heatsink at the

21   locations of the metal strips?

22            MR. NYDEGGER:  Objection; form.

23       A    To me, when you say "heatsink," the

24   implication is that it pulls heat away from the metal

25   strips.  Insulations normally are trying not to pull

Page 92

1   heat away but to prevent the movement of heat, that's
2   why they're insulators, right.
3         So if I do a -- if I do a fire resistance
4   test on a wall assembly and I insulate the cavity,
5   what tends to happen is the membrane on the fire side
6   actually falls off prematurely because the heat can't
7   escape.  So using the word "heatsink" is a little bit
8   of a challenge for me.
9         Q   Okay.  Let me try to make it clearer then.
10  At the area that constitutes the metal strips, does
11  the insulation pull heat away from the metal?
12        A   Again, that's -- you're essentially asking
13  me a different way if it's a heatsink.  And for the
14  reason I explained, I don't know that I would call it
15  a heatsink.
16        Q   Can you describe for me in your own words
17  then what you think is happening at the -- in the
18  area which constitutes the metal strips and the
19  adjacent insulation with respect to the heat?
20        A   Yeah.  So the area where the metal strip is
21  in contact with the insulation may actually be
22  slightly hotter than if it were able to radiate.
23        But the fact that you've got enough of the
24  voids there to mitigate that compensates for a little
25  bit of the difference it makes.

1    Q    But so let's -- there's the question of

2  whether he's using a particular standard and there's

3  also:  Do you disagree with anything his model is

4  showing as to what's happening as just a matter of

5  like physical reality?

6            MR. NYDEGGER:  Objection; form.

7    A    I don't disagree that there's going to be

8  hot spots where the points of contact are.  They're

9  going to be less hot spots where there's a void and

10 demonstrates that the void is effective in limiting

11 the transfer of heat in those areas between the inner

12 duct and the outer encasement or the other shell in

13 those areas.  The model shows that and that makes

14 perfect sense to me.

15           And I'm not disputing the one without the

16 metal spacers, I just find it odd as to why that has

17 a uniformly higher temperature than the one that has

18 the thermal spacer, but I don't know the answer to

19 that.

20   Q    All right.  So we talked about this

21 earlier, right, so tests aside, right, Dr. Morse's

22 simulation seems to show that it's the void that

23 limits the transfer of heat not the spacers, right?

24           MR. NYDEGGER:  Objection; form.

25   A    So that I guess is another question.  I

1  assume that he did the simulation with the void

2  insulated.  The void between the inner duct liner and

3  the outer duct.

4       Q    Yes.

5       A    Does it include the insulation?  I'm not

6  sure that it's clear.

7       Q    He's attempting -- he's purporting to

8  simulate that the GRZ in actual operation, so yes, it

9  includes insulation.

10      A    Right, because it does show it in the

11 picture on page 19.

12      Q    Okay.  So any ways my --

13      A    I wouldn't say it's the void then, it's

14 that configuration, insulated void with thermal

15 spacers that manage to thermally isolate to the level

16 that would meet the requirements.

17      Q    Well, do you disagree with him that, you

18 know, with his model, which shows first that where

19 the thermal spacers are, they'll be hot spots,

20 correct?

21      A    Hotter spots, yes.

22      Q    Okay, right.  And there's hotter spots

23 there because the metal in the thermal spacers is

24 conducting heat?

25      A    Correct.

Page 215

1    Q    Metal does, right?

2    A    Uh-huh.

3    Q    I mean, people get it, right?  As a kid

4    when you touch a hot pot, heat transfers fast through

5    metal.  It's not tricky.

6    A    No question, yeah.

7    Q    All right.  And so the places the holes

8    where there isn't metal, right, the so-called void,

9    heat doesn't transfer as much there, right?

10   A    Correct.

11   Q    So my point though then is that I mean,

12   quibbles aside, regarding whether the temperatures

13   he's used are correct, right, you don't disagree with

14   Dr. Morse that what he's purporting -- what he's

15   saying happens is physically correct, right?  There's

16   no factual dispute about that, right?

17   A    Correct.

18   Q    So the only real dispute here is how --

19   whether how the claims as construed by the Court

20   should or should not read.  There's no dispute as a

21   factual matter as to how these products work, right?

22   You and Dr. Morse --

23   A    Correct.

24   Q    -- don't agree.  I talked over you, let me

25   stop.  You and Morse don't disagree on how these

1 products work as a factual matter, right?

2     A    Correct.  In the sense that this is exactly

3 what I would expect as well, yes.  I don't disagree

4 with that.  But a hot spot isn't a failure point

5 necessarily.

6     Q    You disagree with Mr. Morse as to the

7 implication of what his model shows, but you don't

8 disagree that his model is inaccurate, right?

9     A    Correct.

10     Q    And so there really isn't a -- there isn't

11 a factual dispute between you two.  You guys both

12 agree as to what's happening?

13     A    Well, again, I agree with what has been --

14 what the model has shown and his expectation and mine

15 too that where it connects, those are -- and yours

16 and everybody else's, that where it connects, those

17 are going to be hotter spots than the rest of the

18 surface, I don't disagree, but hotter doesn't

19 necessarily mean a failure and that's I guess where

20 we differ.

21     Q    Okay.  And that's -- I mean not to, it's

22 just -- the question is whether or not under the

23 Court's construction that's required or not, right?

24             MR. NYDEGGER:  Objection; form.

25     Q    Skip that.  I guess -- I'm not going to

E-FILED
Thursday, 14 July, 2022  11:44:33 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | Case No. 1:19-cv-01388-SLD-JEH |
| Plaintiff, | |
| v. | Chief Judge Sara Darrow |
| | Magistrate Judge Jonathan E. Hawley |
| VAN-PACKER CO., an Illinois corporation, JEREMIAS, INC., a Georgia corporation, | |
| Defendants. | |

## DEFENDANTS VAN-PACKER CO. AND JEREMIAS, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF PATENT INFRINGEMENT

(N.D. Ill. 2009). In State Court practice, when cross-motions for summary judgment have been filed, courts have found that there are no genuine issues of fact.[2] *See e.g. Millennium Park Joint Venture, LLC v. Houlihan,* 241 Ill. 2d 281, 308-9 (2010) ("It is well settled that when the parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record.").

Determining infringement requires two steps: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Applied Med. Res. Corp.*, 448 F.3d at 1332 (internal quotations omitted).

## IV. ARGUMENT

### A. The Accused Product do not contain "thermal spacers thermally isolating" as required by the claims so cannot infringe as a matter of law

#### 1. The spacers in the Accused Product do not themselves "thermally isolate" as required by the Court's construction

This Court held that "thermal spacers thermally isolating" means "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."[3] Claim Construction Order at 17. In making this decision, the Court held that it is the thermal spacers *themselves* that must perform the step of thermal isolation—not "the arrangement of the inner duct liner, the outer casing, the insulation material in the void" as proposed by DuraSystems. *Id.* at 22 ("The intrinsic evidence shows thermal spacers

---

[2] While these opinions are not binding on this Court, the Court may find them instructive and be reluctant to find an issue of fact where, such as here, there are cross-motions for summary judgment.

[3] Defendants address the issue of including "fire rating" in the construction and how that term is indefinite in their motion for summary judgment (Dkt. 67 at 23) and below in Section C.

themselves thermally isolate. . . While the word 'configured' is used six times in each of the Independent Claims, *e.g.*, *id.* col. 10 ll. 27–56, J.A. 0016, it is never used to indicate the 'thermal spacers' do not, on their own, thermally isolate the inner duct liner from the outer casing.").  In its Motion, DuraSystems asks the Court to ignore its clear holding that the thermal spacers ***themselves*** must limit the amount of heat conducted, and find that simply because the Accused Product ***as a whole*** passed the UL 2221 fire test, then the metal spacers included in the Accused Products must be thermal spacers.  *See* Motion at 9.  Since DuraSystems has no evidence showing that the spacers in the Accused Products limit the amount of heat conducted through the components, summary judgment of infringement cannot be granted, and instead, Defendants' motion for summary judgment of non-infringement must be granted.

It is undisputed that Defendants' Accused Products contain a spacer made from stainless steel, which is the same material that the inner duct liner and outer casing is made from.  Ex. C to Motion (Dkt. 66-3), Morse Rebuttal Report at ¶ 46.  As such, heat is transferred at the same rate through the spacer as through the inner duct liner and outer casing: 5.3 W/m^2-K.  *Id.* at ¶ 51.  Through computational modeling, Defendants' expert, Dr. Timothy Morse, demonstrated that not only is heat transfer ***not limited*** by the metal spacers in the Accused Products, the transfer of heat between the inner duct liner and the outer casing actually ***increases*** when spacers are used compared to when they are not:



Figure 10. Temperature contours of the Van-Packer GRZ Duct with metal spacers(left) and without the metal spacers(right) undergoing an internal hot air flow of 1500°F.

*Id*. at ¶ 52.  Mr. Crimi agrees that Dr. Morse's modeling "makes perfect sense" and that the metal spacers do indeed increase the heat conducted between the inner duct liner and outer casing.  Ex. 1, Crimi Tr. at 213:1–14, 214:22–215:10, 215:11–216:20.  DuraSystems offers no evidence to the contrary[4], instead relying on "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers" to demonstrate that no fail points are created during fire rating testing.  Motion at 9.  The Court has already rejected this argument during claim construction, finding that by amending the independent claims to overcome the prior art, patentee "restricted the meaning of 'thermal spacers' to spacers that thermally isolate the inner duct liner from the outer casing."  Claim Construction Order at 22.  Even Mr. Crimi admits that he relies on the configuration of the duct ***as a whole*** when giving his opinion that the Accused Product

---

[4]     DuraSystems includes a straw man argument that Dr. Morse's modeling "makes no sense because removing a thermal spacer from the device eliminates the 'spacing' function performed by a 'thermal spacer' thermally isolating, which could alter the insulative properties of the insulation that could be 'unnecessarily compressed or crushed,' thereby increasing the amount of heat transferred through other areas of the exhaust duct."  Motion at Fn. 3.  This ignores that the modeling software can simulate the inner duct liner being held in a spaced relationship from the outer casing without the need for an actual spacer.  But, more importantly, it is an attempt to obscure the fact that the spacers ***increase*** the amount of heat transfer—the exact opposite of what the Court's construction requires.

infringe, and has not independently evaluated the impact of the spacers themselves on the heat transfer that would occur during fire testing. *See* Ex. 1, Crimi Tr. at 54:18–55:7. Given that DuraSystems fails to show any evidence that the metal spacers in the Accused Products are the "components that [] limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing," the Court must rely on the evidence of record that definitively shows that the heat transfer is ***increased*** when the metal spacers are used, and find that the Accused Products do not infringe. *See Wleklinski v. Targus, Inc.,* 258 Fed. App'x 325 (Fed. Cir. 2007) (summary judgment of non-infringement granted where accused product was the opposite of claimed invention).

### 2. The void and insulation together limit the heat transfer but cannot be included in the "components" that make up the claimed "thermal spacers"

The claims separately require (1) a void, (2) insulation material, and (3) thermal spacers:

> each of said exhaust duct modules having an inner duct liner and an outer casing, and ***a void*** being formed between at least a portion of space between said inner duct liner and said outer casing, said void being configured for receiving ***an insulation material***, and including ***one or more thermal spacers*** configured to maintain said inner duct liner and said outer casing in a spaced relationship so that said insulation material occupies said void,

*See* '569 Patent, cl. 1 (emphasis added); *see also* cls. 10, 16. "Where a claim lists elements separately, 'the clear implicate on of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,* 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004). Here, it is undisputed that Defendants' Accused Products use a metal spacer to "maintain a space between the inner duct liner and outer casing," as shown in Mr. Crimi's colorized photo: